## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NIHON TSUSHIN KABUSHIKI KAISHA d/b/a ) 
JAPAN COMMUNICATIONS, INC., )
)
    Plaintiffs, )
)
    v. )      C.A. No.: 07-619-JJF
)
DONALD DAVIDSON, et al., )
)
    Defendants. )

## DEFENDANT DAVID IZATT'S OPENING
## BRIEF IN SUPPORT OF MOTION TO DISMISS

**GREENBERG TRAURIG, LLP**
Donald J. Detweiler (No. 3087)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000

**MAYNARD, COOPER & GALE P.C.**
W. Percy Badham, III
Will A. Smith
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 254-1000

**MAYNARD, COOPER & GALE, P.C.**
G. Bartley Loftin, III
Douglas B. Hargett
655 Gallatin Street, S.W.
Huntsville, Alabama 35801
Telephone: (256) 512-0171

Dated: November 30, 2007

*DEL 86,202,372v2 11/30/2007*

# TABLE OF CONTENTS

I.    STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ....................................1

II.   PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ...........................1

III.  STATEMENT OF UNDISPUTED FACTS .......................................................................1

IV.   ARGUMENT.......................................................................................................................3

V.    REQUEST FOR RELIEF ....................................................................................................5

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

<u>Burger King Corp. v. Rudzewicz,</u>
    471 U.S. 462 (1985)........................................................................................................4

<u>Int'l Shoe Co. v. Washington,</u>
    326 U.S. 310 (1945)........................................................................................................4

<u>Marten v. Godwin,</u>
    499 F.3d 290 (3d Cir. 2007) .......................................................................................1, 4

### <u>RULES</u>

Fed. R. Civ. P. 4(k)...............................................................................................................4

## I.    <u>STATEMENT OF NATURE AND STAGE OF PROCEEDINGS</u>

This action (the "<u>Delaware Action</u>") was filed on October 9, 2007 by Plaintiff Nihon Tsushin Kabushiki Kaisha d/b/a Japan Communications, Inc. ("<u>JCI</u>"), a Japanese corporation, against numerous individuals and entities, including David Izatt ("<u>Izatt</u>"). Izatt filed this Motion seeking the dismissal of all claims asserted against him in his individual capacity. In addition, Izatt and the other parties named as defendants in this action filed a Motion to Dismiss or, in the Alternative, Motion to Stay or Transfer contemporaneously with this Motion seeking the dismissal, stay, or transfer of this entire action based on the first-filed doctrine, rules governing abstention, and applicable law governing transfer.

## II.    <u>PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT</u>

This Motion is filed pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, seeking the dismissal of all claims asserted against Izatt in his individual capacity based on the fact that Izatt is not subject to the personal jurisdiction of this Court. <u>See</u> <u>Marten v. Godwin</u>, 499 F.3d 290 (3d Cir. 2007).

## III.    <u>STATEMENT OF UNDISPUTED FACTS</u>

1.    In the Complaint filed by JCI in this Delaware Action, JCI names a number of individuals and entities as defendants that were parties to a Purchase of Securities Agreement (the "<u>POS</u>"), pursuant to which JCI acquired a 58% majority ownership interest in Arxceo Corporation ("<u>Arxceo</u>"). (<u>Affidavit of David Izatt</u> ("<u>Izatt Affidavit</u>") at ¶ 5; <u>see also</u> Complaint).[1]

---

[1] A true and correct copy of the Izatt Affidavit is attached hereto as **Exhibit "A"** and incorporated herein by reference. A true and correct copy of the POS is attached hereto as **Exhibit "B"** and incorporated herein by reference.

1

2.      The remaining 42% ownership interest in Arxceo was to be purchased from the remaining minority Arxceo shareholders in accordance with the terms of the POS.  (Izatt Affidavit at ¶ 5).

3.      Arxceo is a Delaware corporation; however, its principal place of business, assets, books and records, and property are all located in Madison County, Alabama.  (Id. at ¶ 2).

4.      At all times relevant to the allegations asserted in JCI's Complaint, Izatt has been an employee of Arxceo and has acted as its technology architect.  (Id. at ¶ 1).

5.      Izatt is not individually an investor or shareholder of Arxceo.  (Id. at ¶ 3).  Rather, Izatt is the President of Angus Adair Wolfgang, Inc. ("AAW"), which is an investor and shareholder of Arxceo.  (Id.).  AAW is an Alabama corporation with it principal place of business located in Madison County, Alabama.  (Id.).

6.      Izatt signed the POS as the President and representative of AAW.  (Id. at ¶ 4). Izatt did not sign the POS in his individual capacity, and he does not have and has never had any connection or contact with the State of Delaware.  (Id. at ¶¶ 5-6).  Additionally, Izatt does not currently and has never conducted any business in the State of Delaware.  (Id. at ¶ 6).

7.      On August 29, 2007, certain of Arxceo's remaining minority shareholders filed a lawsuit against JCI, two of its wholly owned subsidiaries, and two of its Board of Directors to enforce their individual rights, as well as the rights of the other remaining minority shareholders of Arxceo, under the POS.

8.      Over one month later, on October 9, 2007, JCI filed its Complaint to commence this Delaware Action, naming Izatt as a defendant in his individual capacity and asserting individual causes of action against Izatt for breach of contract, fraudulent inducement, and fraud.

(See Complaint).  The allegations and claims asserted against Izatt arise out of and related to the

POS and facts and circumstances occurring prior to and after the execution of the POS.  (Id.).

## IV.    ARGUMENT

9.      The only possible basis JCI has for naming Izatt as a party to this Delaware

Action is based on Section 18 of the POS, which states as follows:

> **Section 18. Governing Law; Consent to Jurisdiction and Venue; Waiver of
> Jury Trial.**  This Agreement shall be governed by and construed in accordance
> with the laws of the State of Delaware, without giving effect to any law or rule
> that would cause the laws of any jurisdiction other than the State of Delaware to
> be applied. ANY PROCEEDING AGAINST THE PARTIES RELATING IN
> ANY WAY TO THIS AGREEMENT *MAY BE BROUGHT AND ENFORCED*
> IN THE COURTS OF THE STATE OF DELAWARE OR THE UNITED
> STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, TO THE
> EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR, AND
> THE PARTIES IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH
> SUCH COURTS IN RESPECT OF ANY SUCH PROCEEDING.  EACH OF
> THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT
> PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR
> HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH
> PROCEEDING IN THE COURTS OF THE STATE OF DELAWARE
> LOCATED IN NEW CASTLE COUNTY OR THE DISTRICT OF DELAWARE
> AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY
> SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM.
> ANY JUDGMENT MAY BE ENTERED IN ANY COURT HAVING
> JURISDICTION HEREOF. . . .

(POS at § 18) (emphasis added).

10.     JCI's reliance on the above-referenced provision of the POS to assert an action

against Izatt in his individual capacity in the State of Delaware is misplaced.  Section 18 of the

POS clearly states that it only applies to the "PARTIES" who entered into and executed the POS.

(Id.).  Izatt was not individually a party to the POS or a shareholder of Arxceo; therefore, he did

not consent to or voluntarily submit himself to the jurisdiction of this Court under the POS other

otherwise.  (Izatt Affidavit at ¶¶ 3, 6).

11.    Moreover, apart from Section 18 of the POS, Izatt does not and has never individually had any contact or connection with the State of Delaware. (Id. at ¶ 6).  In Marten v. Godwin, the Third Circuit Court of Appeals articulated the general rules applicable to challenges of personal jurisdiction as follows:

> If an issue is raised as to whether a court lacks personal jurisdiction over a defendant, *the plaintiff bears the burden of showing that personal jurisdiction exists*. Pursuant to Rule 4(k) of the Federal Rules of Civil Procedure, "a federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state."
>
> \* \* \* \* \* \* \*
>
> *The Due Process Clause of the Fourteenth Amendment requires that nonresident defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."* Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  Having minimum contacts with another state provides *"'fair warning'" to a defendant that he or she may be subject to suit in that state*. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).
>
> \* \* \* \* \* \* \*
>
> These basic due process principles are reflected in the two recognized types of personal jurisdiction. *General jurisdiction* exists when a defendant has maintained systematic and continuous contacts with the forum state. *Specific jurisdiction* exists when the claim arises from or relates to conduct purposely directed at the forum state.

499 F.3d 290, 295-96 (3d Cir. 2007) (certain internal citations and quotations omitted) (emphasis added).

12.    These long-standing principles of personal jurisdiction are firmly affixed into the rules governing civil procedure.  JCI's attempt to circumvent these rules should not be permitted, as Izatt has not subjected himself to the jurisdiction of this Court, and JCI cannot meet its burden of showing otherwise.

13.    Izatt — a nonresident of Delaware – has never had "minimum contacts" with the State of Delaware.  For that matter, he has never had *any* contacts or connections with Delaware

and has never conducted business in Delaware. (<u>Izatt Affidavit</u> at ¶ 6). Based on these circumstances, Izatt had no reason to believe he would be sued in Delaware and was not given any "warning" that he would be required to defend himself before this Court prior to JCI's attempt to lump him in as a defendant in this action. There is no dispute that AAW was a party to the POS; however, Izatt was not. (<u>Id.</u> at ¶ 5). Izatt unquestionably signed the POS in his representative capacity as President of AAW, not individually. (<u>Id.</u>).

14.    Moreover, Izatt has certainly not subjected himself to the general jurisdiction of this Court, as he has never "maintained systematic and continuous contacts with the forum state." (<u>Id.</u> at ¶ 6). In fact, his contacts with the State of Delaware are nonexistent. Finally, Izatt has never engaged in "conduct purposely directed" at Delaware or otherwise come within the specific jurisdiction of this Court. While AAW may have subjected itself to the jurisdiction of the State of Delaware by being a party to the POS, Izatt did not enter into the POS and has never individually had any contact with Delaware. Consequently, this Court should refuse to exercise personal jurisdiction over Izatt in his individual capacity.

## V.    <u>REQUEST FOR RELIEF</u>

For the foregoing reasons, Izatt requests this Court to dismiss this action or, in the alternative, grant a summary judgment in his favor as it relates to him in his individual capacity on the grounds that Izatt is not subject to the personal jurisdiction of this Court. In addition, Izatt requests this Court to enter an additional relief that it deems just and appropriate.

Dated: November 30, 2007

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

Donald J. Detweiler (No. 3087)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000

**-and-**

**MAYNARD, COOPER & GALE, P.C.**
G. Bartley Loftin, III
Douglas B. Hargett
655 Gallatin Street, S.W.
Huntsville, Alabama 35801
Telephone: (256) 512-0171

**-and-**

**MAYNARD, COOPER & GALE P.C.**
W. Percy Badham, III
Will A. Smith
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 254-1000

**Attorneys for the Defendants**

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that service of this document has been made upon

the following by electronic delivery and by U.S. mail, properly addressed and postage prepaid:

Thomas C. Grimm
1201 N. Market Street
Wilmington, Delaware 19899-1347
E-mail: tgrimm@mnat.com

Jay D. Bennett
Paul J. Kaplan
Jonathan B. Davis
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
E-mail: Jay.Bennett@alston.com
      Jonathan.Davis@alston.com
      Paul.Kaplan@alston.com

_____
Dennis A. Meloro (No. 4435)

DEL 86,202,372v2 11/30/2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NIHON TSUSHIN KABUSHIKI KAISHA d/b/a    )
JAPAN COMMUNICATIONS, INC.,             )
                                        )
       Plaintiffs,                      )
                                        )     C.A. No.: 07-619-JJF
       v.                               )
                                        )
DONALD DAVIDSON, et al.,                )
                                        )
       Defendants.                      )


**STATE OF ALABAMA**    )
                    :

**COUNTY OF MADISON**  )


### AFFIDAVIT OF DAVID IZATT

      Before me, the undersigned Notary Public, personally appeared David Izatt, who, after being duly sworn, states as follows:

      1.     My name is David Izatt. I am over the age of twenty-one years, and I am a resident of Madison County, Alabama. I am currently and have been an employee of Arxceo Corporation ("Arxceo"), acting as its technology architect.

      2.     Arxceo is a Delaware corporation; however, its principal place of business, assets, books and records, and property are all located in Madison County, Alabama.

      3.     I am not individually an investor or shareholder of Arxceo. I am the President of Angus Adair Wolfgang, Inc. ("AAW"), an investor and shareholder of Arxceo. AAW is an Alabama corporation with it principal place of business located in Madison County, Alabama.

      4.     I signed the Purchase of Securities Agreement (the "POS") as the President and as a representative of AAW. Under the POS, Japan Communications, Inc. ("JCI") acquired a 58% majority ownership interest in Arxceo Corporation. The remaining 42% ownership interest in

Arxceo was to be purchased from the remaining minority Arxceo shareholders in accordance with the terms of the POS.

5. I did not sign the POS in my individual capacity.

6. I do not have any connection or contact with the State of Delaware, and I do not currently and have never conducted any business in the State of Delaware.

Further affiant saith not.

**[SIGNATURE PAGE TO FOLLOW.]**

_____
David Izatt

**SWORN TO and SUBSCRIBED** before me this ⎯29⎯ day of November, 2007.

_____
Notary Public
My Commission Expires: _My Commission Expires 8/14/2010_

**[SEAL]**

**ARXCEO CORPORATION**

**STOCKHOLDERS AGREEMENT**

**FEBRUARY 28, 2006**

9130792.3

This **STOCKHOLDERS AGREEMENT** (this "Agreement") is dated as of February 28, 2006, by and among Arxceo Corporation (the "Corporation"), Japan Communications, Inc. (the "Purchaser"), and each existing and future stockholder of the Corporation.

### PREAMBLE

Each current stockholder of the Corporation owns, as of the date hereof, that number of Shares set forth opposite such stockholder's name on Annex I hereto. The stockholders believe it to be in the best interests of the Corporation and the stockholders to provide for the continued stability of the business and policies of the Corporation and its subsidiaries, as the same may exist from time to time, and, to that end, the parties hereto set forth this Agreement.

**ACCORDINGLY,** in consideration of the mutual covenants and agreements contained in this Agreement, the sufficiency of which is hereby acknowledged, the parties agree as follows:

### ARTICLE I

### DEFINITIONS; RULES OF CONSTRUCTION

The following terms have the following meanings:

"Affiliate" means, with respect to any Person, any (a) director, officer, limited or general partner, member or stockholder holding 5% or more of the outstanding capital stock or other equity interests of such Person, (b) spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of a Person specified in clause (a) above relating to such Person) and (c) other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Approved Sale" shall have the meaning set forth in Section 3.6 hereof.

"Board" means the Board of Directors of the Corporation.

"Charter" means the Second Amended and Restated Certificate of Incorporation of the Corporation in effect as of the date hereof, as the same may be amended, modified or supplemented after the date hereof.

"Common Stockholder Director" shall have the meaning set forth in Section 2.1(b)(ii).

"Co-Sale Offeree" shall have the meaning set forth in Section 3.4.

"Co-Sale Offeror" shall have the meaning set forth in Section 3.4

"Equity Securities" means all shares of capital stock of the Corporation, all securities convertible into or exchangeable for shares of capital stock of the Corporation, and all options, warrants, and other rights to purchase or otherwise acquire from the Corporation shares of such capital stock, including any stock appreciation or similar rights, contractual or otherwise.

"Excluded Stock" shall have the meaning set forth in the Charter.

"Future Stockholder" shall have the meaning set forth in Section 3.1.

"Group" means:

(a)         in the case of any Stockholder who is an individual, (i) such Stockholder, (ii) the spouse, parent, sibling or descendants of such Stockholder, (iii) all trusts for the benefit of such Stockholder, (iv) all Persons principally owned by and/or organized or operating for the benefit of any of the foregoing and (v) all Affiliates of such Stockholder;

(b)         in the case of any Stockholder that is a partnership, (i) such Stockholder, (ii) its limited, special and general partners, (iii) any Person to which such Stockholder shall Transfer all or substantially all of its assets, and (iv) all Affiliates and employees of and consultants to, such Stockholder or any of its Affiliates; and

(c)         in the case of any Stockholder which is a corporation or a limited liability company, (i) such Stockholder, (ii) its stockholders or members as the case may be, (iii) any Person to which such Stockholder shall Transfer all or substantially all of its assets, and (iv) all Affiliates of such Stockholder;

"Liquidation" shall have the meaning set forth in the Charter.

"New Securities" means all Equity Securities other than Excluded Stock.

"Person" shall be construed in the broadest sense and means and includes a natural person, a partnership, a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization and any other entity and any federal, state, municipal, foreign or other government, governmental department, commission, board, bureau, agency or instrumentality, or any private or public court or tribunal.

"Pro Rata Amount" means the quotient obtained by dividing (i) the number of shares of Common Stock held by such Co-Sale Offeree by (ii) the number of shares of Common Stock held by the Purchaser, assuming in each case the conversion or exchange of all securities by their terms convertible into or exchangeable for Common Stock and the exercise of all vested and "in the money" options to purchase or rights to

subscribe for Common Stock (including warrants) or such convertible or exchangeable securities.

"Purchase Agreement" means that certain Securities Purchase Agreement, dated as of February 28, 2006, among the Corporation, the Purchaser and certain stockholders of the Corporation.

"Purchaser Directors" shall have the meaning set forth in Section 2.1(b)(i).

"Purchaser Nominee" shall have the meaning set forth in Section 3.6 hereof.

"Purchaser Shares" means all Equity Securities of the Corporation held at any time during the term of this Agreement by the Purchaser.

"QIPO" shall have the meaning set forth in the Charter.

"Sale of the Corporation" shall have the meaning set forth in the Charter.

"Shares" means all outstanding shares of capital stock of the Corporation. Any reference to a number of "Shares" shall treat each share of Preferred Stock as the number of shares of Common Stock into which it is then convertible pursuant to the Charter and any warrants or convertible securities as the number of shares of Preferred Stock or Common Stock for which it is then exercisable or convertible.

"Stockholders" means: (i) the Purchaser; (ii) the signatories to this Agreement (other than the Corporation) for so long as such Persons own capital stock of the Corporation; and (iii) Future Stockholders.

"Subsidiary" means, with respect to any Person, any other Person the majority of whose Equity Securities or voting securities are directly or indirectly owned or controlled by such Person.

"Terminating Liquidation Event" shall have the meaning set forth in the Charter.

"Termination Date" means the earlier to occur of: (i) the closing of a QIPO; and (ii) the closing of a Liquidation; (iii) the expiration of this Agreement on the Third Closing Date.

"Third Closing Date" shall have the meaning set forth in the Purchase Agreement.

"Third Party" means, with respect to any Stockholder, any Person that is not (i) the Corporation or (ii) a member of the Group of such Stockholder.

"Transfer" means to sell, transfer, assign, pledge, hypothecate or otherwise dispose of Shares, either voluntarily or involuntarily and with or without

consideration excluding by employees to the Corporation upon a termination of employment or by Purchaser to the Corporation.

"Transferee" means any Person to whom a Stockholder shall Transfer Shares.

## ARTICLE II

### BOARD REPRESENTATION

**2.1    Board Representation.**

(a)    The Corporation and the Stockholders shall take such corporate actions as may be required to ensure that (i) the number of directors constituting the Board is at all times three (3), and (ii) the presence of two (2) directors (including at least one (1) director nominated under Section 2.1(b)(i) hereof) is required to constitute a quorum of the Board.

(b)    Subject to Section 2.1 (c) below:

(i)    the holder(s) of a majority of all Purchaser Shares shall be entitled: (A) to nominate two (2) individuals to the Board to serve as directors (the "Purchaser Directors") until their respective successors are elected and qualified, (B) to nominate each successor to the Purchaser Directors and (C) to direct the removal from the Board of any director nominated under the foregoing clauses (A) or (B); the Purchaser Directors shall initially be Marc Winn and Frank Sanda; and

(ii)    the holder(s) of a majority of the Shares (other than the Purchaser) shall be entitled: (A) to nominate one (1) individual to the Board to serve as a director (the "Common Stockholder Director") until his respective successor is elected and qualified, (B) to nominate each successor to the Common Stockholder Director, and (C) to direct the removal from the Board of any director nominated under the foregoing clauses (A) or (B); the Common Stockholder Director shall initially be Donald J. Davidson.

(c)    Each nomination or any proposal to remove from the Board any director shall be made by delivering to the Corporation a notice signed by the party or parties entitled to such nomination or proposal. As promptly as practicable, but in any event within ten (10) days, after delivery of such notice, the Corporation shall take or cause to be taken such corporate actions as may be reasonably required to cause the election or removal proposed in such notice. Such corporate actions may include calling a meeting or soliciting a written consent of the Board, or calling a meeting or soliciting a written consent of the Stockholders.

**2.2**   **Voting Agreement.**

(a)   Each Stockholder shall vote all Shares held by such Stockholder for the election to the Board of all individuals nominated in accordance with Section 2.1 and for the removal from the Board of all directors proposed to be removed in accordance with Section 2.1 and shall take all actions required on its behalf to give effect to the agreements set forth in this Section 2. Each Stockholder shall use all reasonable efforts to cause each director originally nominated by such Stockholder to vote for the election to the Board of all individuals nominated in accordance with Section 2.1.

(b)   Until the Termination Date, the Purchaser agrees not to vote any or all of the Purchaser shares in favor of an amendment to the Second Amended and Restated Charter (in effect as of the date hereof) which alters the number or rights with respect to the authorized securities of the Corporation, without the approval of the holders of a majority of the Shares (other than the Purchaser).

**2.3**   **Interim Director.**

The Corporation shall notify each Stockholder of the occurrence of any vacancy in any seat of the Board. If the Stockholders entitled to nominate a successor to fill such vacancy fail to do so within thirty (30) days after delivery of such notice, such vacancy may be filled in accordance with the By-laws of the Corporation until a successor has been nominated and elected to the Board in accordance with Sections 2.1 and 2.2.

**2.4**   **Committees; Subsidiaries.**

(a)   Each Stockholder shall use all reasonable efforts to cause each director of the Corporation originally nominated by such Stockholder to take such corporate actions as may be reasonably required to ensure that (i) the Board has at all times a compensation committee, and an audit committee and (ii) at least one (1) director nominated under Section 2.1(b)(i) shall be appointed to each such committee. The Compensation Committee shall approve all increases in executive compensation, executive bonuses and all option grants (including the vesting schedules with respect to such option grants) (other than those option grants contemplated by the Purchase Agreement). The Audit Committee shall approve the engagement of the Corporation's auditors and approve the audit prior to its issuance each year.

(b)   The Corporation and each Stockholder shall take, and each Stockholder shall use all reasonable efforts to cause each director of the Corporation originally nominated by such Stockholder to take, such corporate actions as may be reasonably required to ensure that the composition of the board of directors of all direct and indirect Subsidiaries of the Corporation is identical to the composition of the Board.

**2.5**   **Meetings; Expenses; Compensation.**

(a)   The Corporation shall convene meetings of the Board at least once every three (3) months. Upon any failure by the Corporation to convene any meeting

9130792.3

required by this paragraph, a director nominated under <u>Section 2.1(b)(i)</u> shall be empowered to convene such meeting.

(b)    The Corporation shall reimburse each director who is not an employee of the Corporation (and any advisors) for his or her reasonable out-of-pocket expenses (including travel) incurred in connection with the attendance of meetings of the Board or any committee thereof or the performance of his or her duties.

**ARTICLE III**

**SHARES**

**3.1    <u>Future Stockholders.</u>**

The Corporation shall require each Person that acquires Equity Securities after the date hereof (a "<u>Future Stockholder</u>"), as a condition to the effectiveness of such acquisition, to execute a counterpart to this Agreement, agreeing to be treated in the same manner as the transferring Stockholder. The Stockholders agree to take all actions to permit the Corporation to comply with all of its obligations under all agreements with the Purchaser (including authorization of sufficient Equity Securities to permit conversion of the Purchaser Shares in accordance with the Charter or the exercise of any warrants or other convertible securities (including convertible notes)).

**3.2    <u>Limitations on Transfers.</u>**

(a)    No Transfer of any Shares by any Stockholder shall become effective unless and until the transferee (unless already subject to this Agreement) executes and delivers to the Corporation a counterpart to this Agreement, agreeing to be treated in the same manner as the transferring Stockholder. Upon such Transfer and such execution and delivery, the transferee shall be bound by, and entitled to the benefits of, this Agreement with respect to the transferred Shares in the same manner as the transferring Stockholder. Any Transfer of Shares by any Stockholder not in accordance with this paragraph shall be void.

(b)    No Stockholder shall be permitted to Transfer any Shares or participate in any transaction constituting a Liquidation unless: (i) such Transfer complies in all respects with this Agreement and the Charter and the holders of a majority of shares of the Corporation's Series C Preferred Stock consent in writing in advance of such Transfer; *provided*, that no consent shall be required from a majority of the shares of Series C Preferred Stock for any Transfers by a Stockholder to a member of such Stockholder's Group, or (ii) all of the holders of Preferred Stock receive the full amounts that they are entitled to receive pursuant to the Charter in connection with a Liquidation. In the event of a Liquidation, each Stockholder shall use his, her or its best efforts to ensure that the holders of the Purchaser Shares receive (out of the proceeds of such Liquidation distributable to the Corporation's stockholders) the full amount that they are entitled to receive pursuant to the Charter in connection with a Liquidation.

9130792.3

(c)     Each Stockholder that is an entity that was formed for the sole purpose of directly or indirectly acquiring Shares or that has no substantial assets other than Shares or direct or indirect interests in Shares agrees that: (i) certificates for shares of its common stock or other instruments reflecting equity interests in such entity (and the certificates for shares of common stock or other equity interests in any similar entities controlling such entity) will note the restrictions contained in this Agreement on the restrictions on transfer of shares as if such common stock or other equity interests were Shares, (ii) no shares of such common stock or other equity interests may be transferred to any person other than in accordance with the terms and provisions of this Agreement as if such common stock or other equity interests were Shares and (iii) any transfer of such common stock or other equity interests shall be deemed to be a transfer of a pro rata number of Shares hereunder.

## 3.3     Right of First Refusal.

If any Stockholder (other than the Purchaser) (the "First Offeror") proposes to Transfer any Shares to any Person other than to a member of the Group of such Stockholder, the First Offeror shall, before such Transfer:

(a)     Simultaneously deliver to the Corporation and the Purchaser an offer (the "First Offer") to Transfer such Shares upon the terms set forth in this Section 3.3, including: (i) the number of Shares to which the First Offer relates (the "Offered Shares") and the name of the First Offeror, (ii) the name and address of the proposed offeree (the "First Offeree"), (iii) the proposed amount and type of consideration (including, if the consideration consists in whole or in part of non-cash consideration, such information available to the First Offeror as may be reasonably necessary for the Corporation and the Purchaser to properly analyze the economic value and investment risk of such non-cash consideration) and the terms and conditions of payment offered by the First Offeror. The First Offer shall remain open to the Corporation and irrevocable for a period of thirty (30) days from the date of the Corporation's receipt (the "Corporation Acceptance Period") and open to the Purchaser and irrevocable for a period of forty-five (45) days from the date of the Purchaser's receipt (the "Purchaser Acceptance Period").

(b)     The Corporation may accept the First Offer and purchase the Offered Shares by delivering to the First Offeror (with a copy to the Purchaser) a notice (the "Acceptance Notice") in writing within the Corporation Acceptance Period.

(c)     To the extent such Offered Shares are not purchased by the Corporation pursuant to Section 3.3(b), the Purchaser may accept the First Offer and purchase any such remaining Offered Shares by delivering to the First Offeror an Acceptance Notice in writing (with a copy to the Corporation) within the Purchaser Acceptance Period.

(d)     The First Offeror may Transfer any or all of the Offered Shares not purchased by the Corporation or the Purchaser, on terms and conditions no more favorable to the First Offeree than are described in the First Offer, within thirty (30) days after expiration of the Purchaser Acceptance Period. If such Transfer is not made within

such thirty (30) day period, the restrictions provided for in this <u>Section 3.3</u> shall again become effective.

**3.4    Co-Sale Rights.**

       (a)    If the rights granted to the Corporation and the Purchaser pursuant to <u>Section 3.3</u> are not exercised in full, then, the Purchaser shall have a right of co-sale with respect to any Shares to which such rights are not exercised (the "<u>Co-Sale Shares</u>"). In the event of a proposed Transfer by a Stockholder (the "<u>Co-Sale Offeree</u>") of Co-Sale Shares, the Co-Sale Offeree shall deliver a notice (the "<u>Co-Sale Notice</u>") to the Corporation and the Purchaser that sets forth substantially the same information as the First Offer in <u>Section 3.3(a)</u> hereof; <u>provided</u>, <u>however</u>, that such Co-Sale Notice shall indicate that the Third Party to which such Co-Sale Shares are to be Transferred (the "<u>Co-Sale Offeror</u>") has been informed of the co-sale rights provided for in this <u>Section 3.4</u> and has agreed to purchase Shares in accordance with the terms hereof.

       (b)    The Co-Sale Offeree shall not Transfer any Co-Sale Shares to the Co-Sale Offeror unless the Purchaser is permitted to Transfer its Pro Rata Amount of the aggregate number of Co-Sale Shares to which the Co-Sale Offer relates.

       (c)    The Co-Sale Offeree shall, in addition to complying with the provisions of this <u>Section 3.4</u>, comply with the other provisions of this Article III (it being understood that the notice contemplated by <u>Section 3.3(a)</u> and the Co-Sale Notice contemplated by this <u>Section 3.4</u> may be included in a single notice).

       (d)    Within thirty (30) days after delivery of the Co-Sale Notice, the Purchaser may elect to participate in the proposed Transfer by delivering to such Co-Sale Offeree a notice (the "<u>Tag-Along Notice</u>") specifying the number of Shares (up to its Pro Rata Amount) with respect to which the Purchaser shall exercise its rights under this <u>Section 3.4</u>.

       (e)    Any Shares requested to be included in any Co-Sale Notice shall be Transferred on at least the same terms and conditions as are set forth in the Co-Sale Notice, <u>provided</u>, <u>however</u>, that the price for each Purchaser Share shall be the product of (x) the price per share of common stock Transferred or to be Transferred by the Co-Sale Offeror and (y) the number of shares of common stock into which such Purchaser Share is then convertible into in accordance with the Charter.

**3.5    First Offer Rights.**

       (a)    If the Corporation proposes to offer New Securities to any Person, the Corporation shall, before such offer, deliver to the Purchaser an offer (the "<u>Offer</u>") to issue to the Purchaser such New Securities upon the terms set forth in this <u>Section 3.5</u>. The Offer shall state that the Corporation proposes to issue New Securities and specify their number and terms (including purchase price). The Offer shall remain open and irrevocable for a period of thirty (30) days (the "<u>First Offer Period</u>") from the date of its delivery.

9130792.3

(b)    The Purchaser may accept the Offer by delivering to the Corporation a notice (the "Purchase Notice") within the First Offer Period. The Purchase Notice shall state the number (the "First Offer Number") of New Securities such Purchaser desires to purchase.

(c)    The issuance of New Securities to the Purchaser shall be made on a business day, as designated by the Corporation, not less than ten (10) and not more than thirty (30) days after expiration of the First Offer Period on those terms and conditions of the Offer not inconsistent with this Section 3.5.

(d)    If the number of New Securities exceeds the First Offer Number, the Corporation may issue such excess or any portion thereof on the terms and conditions of the Offer to any Person within thirty (30) days after expiration of the First Offer Period. If such issuance is not made within such thirty (30) day period, the restrictions provided for in this Section 3.5 shall again become effective.

**3.6    Approved Sale; Sale of the Corporation.**

(a)    So long as the Purchaser owns Preferred Stock representing at least twenty-five percent (25%) of the Equity Securities of the Corporation, the Purchaser may propose a Sale of the Corporation that results in proceeds to the holders of Common Stock of the Corporation (other than the Purchaser) of not less than the Common Special Preference Amount (as defined in the Charter), and shall be entitled to deliver notice to the Corporation that the Purchaser desires the Corporation and/or the Stockholders to enter into one or more agreements with one or more Persons that would result in a Sale of the Corporation (an "Approved Sale"), whereupon all Stockholders and the Corporation shall consent to and raise no objections against the Approved Sale, and if the Approved Sale is structured as (A) a merger or consolidation of the Corporation, each Stockholder shall, and hereby agrees to, waive any dissenter's rights, appraisal rights or similar rights in connection with such merger or consolidation and instruct the Board to vote in favor of such Approved Sale, or (B) a sale of shares of capital stock, each Stockholder shall, and hereby agrees to, agree to sell their Shares on the terms and conditions approved by the Purchaser. All Stockholders and the Corporation shall take all necessary and desirable actions in connection with the consummation of the Approved Sale, including the execution of such agreements and such instruments and other actions reasonably necessary to: (i) provide the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements relating to such Approved Sale; and (ii) allocate the expenses in accordance with Section 3.6(b).

(b)    The Corporation shall provide the Stockholders with written notice of any Approved Sale at least ten (10) days prior to the consummation thereof.  Each Stockholder shall pay his pro rata amount of reasonable expenses incurred (based on the proportion of the aggregate transaction consideration received (in accordance with the terms of the Charter)) in connection with a consummated Approved Sale to the extent such expenses are incurred for the benefit of all Stockholders and are not otherwise paid by the Corporation or the acquiring party (expenses incurred by or on behalf of a

Stockholder for its or his sole benefit not being considered expenses incurred for the benefit of all Stockholders).

(c)    Each Stockholder and the Corporation hereby grants an irrevocable proxy and power of attorney to any nominee of the Purchaser (the "Purchaser Nominee") to take all necessary actions and execute and deliver all documents deemed necessary and appropriate by such Person to effectuate the consummation of any Approved Sale. The Stockholders hereby indemnify, defend and hold the Purchaser Nominee harmless (severally in accordance with their pro rata share of the consideration received in any such Approved Sale (and not jointly and severally)) against all liability, loss or damage, together with all reasonable costs and expenses (including reasonable legal fees and expenses), relating to or arising from its exercise of the proxy and power of attorney granted hereby.

**3.7    No Terminating Liquidation Event.**

The Purchaser shall not, on or prior to April 30, 2008, cause a Terminating Liquidation Event; *provided*, that this Section 3.7 shall not restrict the Purchaser from causing a Terminating Liquidation Event on or prior to the Third Closing so long as the Corporation becomes insolvent or otherwise becomes unable to pay its debts as they become due.

**ARTICLE IV**

**MISCELLANEOUS**

**4.1    Termination.**

This Agreement shall automatically terminate and be of no further force or effect as of the Termination Date.

**4.2    Legend on Stock Certificates.**

Each certificate representing shares of capital stock that are subject to this Agreement shall bear a legend substantially in the following form:

> "THE SALE, TRANSFER, ASSIGNMENT, PLEDGE, OR ENCUMBRANCE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE AND THE RIGHTS OF THE HOLDER OF SUCH SECURITIES IN RESPECT OF THE ELECTION OF DIRECTORS ARE SUBJECT TO A STOCKHOLDERS AGREEMENT DATED FEBRUARY 28, 2006, AMONG ARXCEO CORPORATION AND THE HOLDERS OF ITS OUTSTANDING CAPITAL STOCK. COPIES OF SUCH AGREEMENT MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE

9130792.3

HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF ARXCEO CORPORATION."

**4.3     Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

Other than with respect to matters relating to the internal governance of the Corporation, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied. All matters which are the subject of this Agreement relating to matters of internal governance of the Corporation shall be governed and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied.

**ANY ACTION OR PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF DELAWARE OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR, AND THE PARTIES IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH SUCH COURTS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING. EACH OF THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING IN THE COURTS OF THE STATE OF DELAWARE LOCATED IN NEW CASTLE COUNTY OR THE DISTRICT OF DELAWARE AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM. ANY JUDGMENT MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.**

**EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

**4.4     Severability.**

It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the law and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, in the event that any provision of this Agreement would be held in any jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

11

**4.5**    **Assignments; Successors and Assigns.**

Except in connection with any Transfer of Shares in accordance with this Agreement, the rights of each party under this Agreement may not be assigned. This Agreement shall bind and inure to the benefit of the parties and their respective successors, permitted assigns, legal representatives and heirs.

**4.6**    **Amendments; Waivers.**

This Agreement may only be modified or amended by an instrument in writing signed by (i) the Corporation, (ii) the holders of at least a majority of the outstanding Purchaser Shares and (iii) the holders of at least a majority of the Shares (other than the Purchaser Shares). Any waiver of any provision of this Agreement requested by any party hereto must be granted in advance, in writing by the party granting such waiver. Notwithstanding the foregoing, the holders of a majority of all then outstanding Purchaser Shares may grant a waiver or effect any modification or amendment on behalf of Purchaser and the holders of a majority of all then outstanding Shares (other than the Purchaser Shares) may grant a waiver or effect any modification or amendment on behalf of all Stockholders (other than the Purchaser).

**4.7**    **Notices.**

All notices, claims, certificates, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or if sent by nationally-recognized overnight courier, by telecopy, or by registered or certified mail, return receipt requested and postage prepaid, addressed as follows:

> if to the Corporation:
>
> > Arxceo Corporation
> > 1525 Perimeter Parkway, Suite 225
> > Huntsville, Alabama 35806
> > Telephone: (256) 837-8388 x110
> > Fax: (256) 837-2888
> > Attention: Donald J. Davidson
>
> with a copy (which shall not constitute notice) to:
>
> > Bradley Arant Rose & White LLP
> > 200 Clinton Avenue West, Suite 900
> > Huntsville, Alabama 35801-4900
> > Telephone: (256) 517-5146
> > Fax: (256) 517-5246
> > Attention: S. Revelle Gwyn, Esq.
>
> if to the Purchaser:

9130792.3

Japan Communications, Inc.
6-25-3 Minami Oi
Shinagawa-ku
Tokyo 140-0013 JAPAN
Telephone: 011-81-3-5767-9101
Fax: 011-81-3-5767-9123
Attention: Frank Seiji Sanda

with a copy (which shall not constitute notice) to:

Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Fax: 404-815-6555
Telephone: 404-815-6500
Attention: Steven L. Berson

if to the Stockholders:

to their respective addresses
set forth on Schedule I hereto.

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith. Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery if a business day or, if not a business day, the next succeeding business day, (ii) in the case of internationally-recognized overnight courier, on the second business day after the date when sent, (iii) in the case of fax transmission, when received if a business day or, if not a business day, the next succeeding business day, and (iii) in the case of mailing, on the seventh business day following that on which the piece of mail containing such communication is posted.

**4.8    Headings.**

The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

**4.9    Nouns and Pronouns.**

Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

**4.10    Entire Agreement.**

This Agreement contains the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to such subject matter. The parties hereto represent and warrant that there are no

13

other agreements or understandings regarding any of the subject matter hereof other than as set forth herein and covenant not to enter into any such agreements or understandings after the date hereof except pursuant to an amendment, modification or waiver of the provisions of this Agreement.

**4.11**    **Counterparts.**

This Agreement may be executed in any number of original or facsimile counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

9130792.3

**IN WITNESS WHEREOF,** the parties hereto have executed this Stockholders Agreement on the date first written above.

**ARXCEO CORPORATION:**

By:_____
Name:  Donald J. Davidson
Title:  President and Chief Executive Officer

**PURCHASER:**

JAPAN COMMUNICATIONS, INC.

By:_____
Name:  Frank Seiji Sanda
Title:  President and Chief Executive Officer

[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

9130792.3

**IN WITNESS WHEREOF,** the parties hereto have executed this Stockholders Agreement on the date first written above.

### SERIES A STOCKHOLDERS:

HRC, L.L.C.

By:_____
Name:
Title:

LIOCE INVESTMENTS, L.L.C.

By:_____
Name:
Title:

SHATAS FAMILY PARTNERS

By:_____
Name:
Title:

SLYMAN INVESTMENTS

By:_____
Name:
Title:

_____
BRYAN BUTLER

_____
DAVID BUTLER

_____
JOHN JURENKO

[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

16

9130792.3

_____

BILL MCCARY


_____

SCOTT MCCARY


_____

JEAN MOORE


_____

GARY SHELTON


_____

TODD SLYMAN

**SERIES B STOCKHOLDERS:**

FRANKLIN STREET INVESTMENTS,
LLC


By:_____
Name:
Title:

LIOCE INVESTMENTS, L.L.C.


By:_____
Name:
Title:

BRINDLEE CAPITAL, L.L.C.


By:_____
Name:
Title:

[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

9130792.3

CITY LIGHT CAPITAL, L.L.C.


By:_____
Name:
Title:


_____
JV BALCH


_____
WAYNE BONNER


_____
GREG CLAYTON


_____
DONNA COLEMAN


_____
TONY GANN


_____
TOM GRIGGS


_____
GREG GUM


_____
RANDY HAIRSTON


_____
TOM HOUSER


[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

9130792.3

_____
JEFF IRONS


_____
RAO KAKANI


_____
BAVANH KAKANI


_____
STEVE MARZ


_____
SAM MCMANUS


_____
DAVE NICOLAS


_____
ALAN NORDLINGER


_____
REMIGIUS SHATAS


_____
LOUIS SISCO


_____
DAVID SLYMAN


_____
TODD SLYMAN


[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

9130792.3

_____
MIKE SOLLEY


_____
BOB THURBER


_____
HEIDE WILLIAMS


_____
DIXIE WOLF

**COMMON STOCKHOLDERS:**

RNR VENTURES, LLC

By:_____
Name:
Title:

AAW, LLC

By:_____
Name:
Title:

_____
DONALD DAVIDSON


_____
CHANDLER HALL


[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

9130792.3