# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NIHON TSUSHIN KABUSHIKI KAISHA d/b/a )
JAPAN COMMUNICATIONS, INC.,          )
                                      )
       Plaintiffs,                )
                                      )    C.A. No.: 07-619-JJF
       v.                         )
                                      )
DONALD DAVIDSON, et al.,              )
                                      )
       Defendants.                )

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO STAY OR TRANSFER

**GREENBERG TRAURIG, LLP**
Donald J. Detweiler (No. 3087)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000

**MAYNARD, COOPER & GALE, P.C.**
G. Bartley Loftin, III
Douglas B. Hargett
655 Gallatin Street, S.W.
Huntsville, Alabama 35801
Telephone: (256) 512-0171

**MAYNARD, COOPER & GALE P.C.**
W. Percy Badham, III
Will A. Smith
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 254-1000

Dated: November 30, 2007

# TABLE OF CONTENTS

**PAGE(S)**

I.  STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ....................................1

II.  PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ...........................2

III.  STATEMENT OF FACTS ............................................................................................4

IV.  ARGUMENT ...............................................................................................................6

    A.  IN THE INTERESTS OF COMITY AND JUDICIAL EFFICIENCY AND TO AVOID DUPLICATIVE LITIGATION, THIS COURT SHOULD DISMISS, STAY, OR TRANSFER THE DELAWARE ACTION BASED ON THE "FIRST-FILED" DOCTRINE...........................................................................................................6

        1.  The Alabama Action was the first-filed action. ...........................................8

        2.  The Alabama and Delaware Actions involve the same key parties and issues. ...................................................................................................10

        3.  The Alabama court is capable of rendering prompt and complete justice between the parties. ......................................................................12

    B.  IN THE ALTERNATIVE, THE COURT SHOULD STAY THE DELAWARE ACTION PENDING THE RESOLUTION OF THE ALABAMA ACTION BASED ON RULES GOVERNING ABSTENTION. ......................................................................15

        1.  Inconvenience of the Federal Forum ..........................................................16

        2.  Avoidance of Piecemeal Litigation.............................................................17

        3.  Order in Which Jurisdiction was Obtained .................................................18

        4.  Presence of Res or Property........................................................................18

        5.  Rule of Decision on the Merits ...................................................................18

        6.  Adequacy of the State Court.......................................................................19

        7.  Identity of Issues ........................................................................................19

        8.  Federal Policy Militating in Favor or Against the Stay .............................19

        9.  Important Countervailing Federal Interest..................................................20

    C.  ALTERNATIVELY, 28 U.S.C. § 1404(A) AND CONSIDERATIONS OF *FORUM NON CONVENIENS* DICTATE THAT THE DELAWARE ACTION BE DISMISSED OR TRANSFERRED. ..................................................................................................20

V.  CONCLUSION..........................................................................................................24

## TABLE OF AUTHORITIES

**CASES**                                                        **PAGE(S)**

Bank of America v. S.I.P. Assets, LLC,
    2007 U.S. Dist. LEXIS 67107 (D. Del.) ................................... 21, 22, 23

Carvel v. Andreas Holdings Corp.,
    698 A.2d 375 (Del. Ch. 1995) ............................................... 12

Colorado River Water Cons. Dist. v. U.S.,
    424 U.S. 800 (1976).......................................................... 16

Cont'l Grain Co. v. Barge F.B.L.-585,
    364 U.S. 19 (1960)........................................................... 21

Crosley Corp. v. Hazeltine Corp.,
    122 F.2d 925 (3d Cir. 1941) ............................................ passim

Dura Pharmaceuticals, Inc. v. Scandipharm, Inc.,
    713 A.2d 925 (Del. Ch. 1998) .......................................... passim

EEOC v. Univ. of Pennsylvania,
    850 F.2d 969 (3d Cir. 1998) ................................................. 7

Eisenbud v. Omnitech,
    1996 WL 162245 (Del. Ch.) .................................................. 9

Gilbane Bldg. Co. v. Nemours Foundation,
    568 F.Supp 1085 (D. Del. 1983)............................................ 16

Gulf Oil Corp. v. Gilbert,
    330 U.S. 501 (1947)......................................................... 21

Harbor Fin. Partners. v. Sunshine Mining and Refining Co.,
    1996 WL 74728 (Del. Ch.) ............................................... 11, 12

Harvey & Harvey v. Delaware Solid Waste Auth.,
    600 F.Supp. 1369 (D. Del. 1985)........................................... 16

Horack v. Minott,
    1995 U.S. Dist. LEXIS 7583 (D. Del. 1995) ....................... 16, 18, 19, 20

In re Chambers Dev. Co., Inc. S'holders Litig.,
    1993 WL 179335 (Del. Ch.) ................................................ 12

Johnston v. Caremark RX, Inc.,
    2000 WL 354381 (Del. Ch.) ................................................ 12

Jumara v. State Farm Ins. Co.,
    55 F.3d 873 (3d Cir. 1995) .......................................... 21, 22, 23

Lafferty v. Riel,
    495 F.3d 72 (3d Cir. 2007) ............................................... 6, 20

Lanova Corp. v. Atlas Imperial Diesel Engine Co.,
 64 A.2d 419 (Del. 1949) ................................................................... 11

McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,
 263 A.2d 281 (Del. 1970) ........................................................... passim

Moses H. Cone Hosp. v. Mercury Constr. Corp.,
 460 U.S. 1 (1983).............................................................................. 16

Robinson v. Ruiz,
 772 F.Supp. 212 (D. Del. 1991)........................................... 16, 17, 18

Sea Colony, Inc. v. Alcan Aluminum Corp.,
 653 F.Supp. 1323 (D. Del. 1987)............................................. passim

Stewart Org., Inc. v. Ricoh Corp.,
 487 U.S. 22 (1988)............................................................................ 21

Time Warner Cable, Inc. v. GPNE Corp.,
 497 F.Supp 584 (D. Del. 2007)............................................................ 6

Time Warner Cable, Inc. v. USA Video Tech. Corp.,
 2007 U.S. Dist. LEXIS 80582 (D. Del) ............................................ 6, 7

Transamerica Corp. v. Reliance Ins. Co. of Illinois,
 1995 WL 1312656 (Del. Super.) ........................................................ 11

Van Dusen v. Barrack,
 376 U.S. 612 (1964)........................................................................... 21

Welbilt Corp., et al. v. The Trane Co.,
 2000 WL 1742053 (Del. Ch.) ...................................................... 12, 13

Will v. Calvert Fire Ins. Co.,
 437 U.S. 655 (1978)........................................................................... 16

**STATUTES**

28 U.S.C. § 1404............................................................................ 3, 20, 24

**RULES**

Alabama Rule of Civil Procedure 13 .......................................................... 10

# I.    STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This action was filed by Plaintiff Nihon Tsushin Kabushiki Kaisha d/b/a Japan Communications, Inc. ("JCI"), a Japanese corporation, against the Delaware Defendants[1] on October 9, 2007 (the "Delaware Action"). Over a month prior to JCI's filing of the Delaware Action, on August 29, 2007, certain of the Delaware Defendants, Davidson, Hall, RNR, and AAW (the "Alabama Plaintiffs"), filed a Complaint in the Circuit Court of Madison County, Alabama (the "Alabama Action")[2] against JCI; Communications Security and Compliance Technologies, Inc. ("CSCT"); Computer and Communication Technologies, Inc. ("CCT"); Frank Seiji Sanda ("Sanda"); J. Marc Winn ("Winn");[3] and Arxceo Corporation ("Arxceo," together with JCI, CSCT, CCT, Sanda, and Winn, the "Alabama Defendants"). In response to the Complaint filed by the Alabama Plaintiffs in the Alabama Action, JCI and Arxceo filed a

---

[1]    JCI named each of the following individuals and/or entities as defendants in the Delaware Action: Donald Davidson ("Davidson"), J. Chandler Hall ("Hall"), RNR Ventures, LLC ("RNR"), Angus Adair Wolfgang, Inc. ("AAW"), David Izatt ("Izatt"), HRC, LLC, Lioce Investments, LLC, Shatas Partners, Ltd., Bryan W. Butler, Jacalyn A. Butler, William McCary, Billie Joe McCary, Jean T. Moore, Margaret T. Moore, David S. Butler, John Jurenko, William Scott McCary, Todd J. Slyman, Franklin Street Investments, LLC, Brindlee Capital, LLC, Heide Williams, David Nichols, Mark Nicolas, James V. Balch, Alan L. Nordlinger, Forrest R. Hairston, Sr., Dixie D. Wolf, Michael W. Solley, Samuel P. McManus, Steven D. Marz, Anthony A. Gann, Gregory J. Clayton, J. Jeffrey Irons, Vicki C. Irons, City Light Capital, LLC, Louis K. Sisco, Jr., Gregory K. Gum, E. Wayne Bonner, Thomas M. Griggs, Dale B. Griggs, Webber Investments, John R. Coleman, Donna C. Coleman, Charles T. Houser, Prasada Kakani, Bhavani K.D. Kakani, Robert E. Thurber, Eleanor B. Thurber, and David J. Slyman, Jr. (collectively, the "Delaware Defendants"). This Brief and corresponding Motion are filed on behalf of all the Delaware Defendants. Contemporaneously with this Motion, undersigned counsel filed a separate Motion to Dismiss the Delaware Action on behalf of Izatt based on the fact that he is not subject to the personal jurisdiction of this Court.

[2]    A true and correct copy of the Complaint filed by the Alabama Plaintiffs in the Alabama Action is attached hereto as **Exhibit "A"** and incorporated herein by reference. The claims asserted by the Alabama Plaintiffs in the Alabama Action are both individual and derivative in nature. The derivative claims are asserted on behalf of all the remaining minority shareholders of Arxceo, and the individual claims are asserted on behalf of the Alabama Plaintiffs.

[3]    CSCT and CCT are wholly owned subsidiaries of JCI. (Affidavit of Donald J. Davidson ("Davidson Affidavit") at ¶ 12). Sanda is the President and Chief Executive Officer of JCI and is a member of Arxceo's Board of Directors. (Id. at ¶ 13). Winn is the President and Chief Executive Officer of both CSCT and Arxceo, a member of Arxceo's Board of Directors, Vice President of JCI's Group Executive Security, and a member of JCI's Management Board of U.S. Operations and Security. (Id. at ¶ 14). A true and correct copy of the Davidson Affidavit is attached hereto as **Exhibit "B"** and incorporated herein by reference.

Counterclaim against Davidson and Hall.[4] Discovery is underway in the Alabama Action, as the Alabama Plaintiffs have served each of the Alabama Defendants with discovery requests— requests for production and interrogatories—and the parties have agreed to and are scheduled take the depositions of Sanda, Winn, and Davidson.

Both the Delaware and Alabama Actions involve the same set of facts, issues, and claims, which relate directly to JCI's acquisition of a majority interest in Arxceo and JCI's purchase of the Delaware Defendants' stock in Arxceo pursuant to a Purchase of Securities Agreement (the "<u>POS</u>")[5] entered into by JCI and the Delaware Defendants, with the exception of Izatt, on or about March 2, 2006.[6] Each of the Delaware Defendants named in the Delaware Action either was formerly and/or is currently a shareholder of Arxceo. Arxceo is a Delaware corporation; however, it has no other connections with the State of Delaware. Arxceo's principal place of business is located in Madison County, Alabama, as well as all of its assets, books and records, and property.

## II.    <u>PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT</u>

The filing of the Delaware Action is a deliberate attempt by JCI to deprive the Alabama Plaintiffs of their legitimate choice of an Alabama state court forum. By this Motion, filed pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, the Delaware Defendants respectfully request this Court to dismiss, stay, or transfer the Delaware Action based on three separate and distinct legal theories.

---

[4] A true and correct copy of the Counterclaim filed by JCI and Arxceo in the Alabama Action is attached hereto as **Exhibit "C"** and incorporated herein by reference.

[5] A true and correct copy of the POS is attached to the Complaint in the Alabama Action as **Exhibit "1"** and incorporated herein by reference.

[6] A chart depicting the virtually identical allegations and claims made in the Counterclaim in the Alabama Action and JCI's Complaint in the Delaware Action is attached hereto as **Exhibit "D"** and incorporated herein by reference.

The Delaware Action is due to be dismissed, stayed, or transferred based on the fact that both it and the Alabama Action involve the same facts, issues, and claims and many of the same parties. Accordingly, the Court should apply the "first-filed" doctrine articulated by the Third Circuit Court of Appeals in Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 929-30 (3d Cir. 1941) and the Delaware Supreme Court in McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co., 263 A.2d 281 (Del. 1970). Simply put, the first-filed doctrine gives this Court the authority to dismiss, stay, or transfer the second-filed Delaware Action and allow the Alabama Action to proceed because the Alabama Action was filed before the Delaware Action.

In the alternative, the Delaware Defendants request this Court to stay the Delaware Action in accordance with rules governing federal abstention articulated in Sea Colony, Inc. v. Alcan Aluminum Corp., 653 F.Supp. 1323 (D. Del. 1987). The applicable rules of abstention allow this federal district court to stay this action and allow the Alabama Action to proceed to, among other things, avoid piecemeal litigation and conserve valuable judicial resources.

As a second alternative, even if the first-filed doctrine or the rules governing abstention were not applicable to the Delaware and Alabama Actions, 28 U.S.C. § 1404 and the doctrine of *forum non conveniens* apply and should operate to transfer the Delaware Action to the District Court for the Northern District of Alabama. Transferring this action to the District Court for the Northern District of Alabama would protect the Delaware Defendants from the substantial inconvenience of litigating this dispute in Delaware, a geographically inconvenient and costly forum with which none of them have any real connection.

# III.    STATEMENT OF FACTS

Both the Delaware and Alabama Actions arise from and are directly related to the POS entered into by JCI and the Delaware Defendants on or about March 2, 2006, pursuant to which the Delaware Defendants sold and JCI acquired a 58% majority ownership interest in Arxceo. (Davidson Affidavit at ¶ 3). Certain of the Delaware Defendants retained a 42% minority ownership interest in Arxceo, which JCI agreed to purchase in accordance with the Earn-Out Schedule described in the POS, which took into account Arxceo's Gross Revenues and Net Operating Income over a two-year period. (Id. at ¶ 4). In short, the amount the remaining minority Arxceo shareholders were to be paid by JCI for their remaining shares of Arxceo stock was tied directly to the target Gross Revenues and Net Operating Income levels of Arxceo over a short duration as described in the POS and Earn-Out Schedule. (Id. at ¶ 5).

As detailed in the Alabama Plaintiffs' Complaint in the Alabama Action, the Alabama Defendants made numerous misrepresentations leading up to and after the parties executed the POS and completely changed the business direction of Arxceo. (Id. at ¶ 6). These actions and/or inactions resulted in Arxceo's minority shareholders receiving no benefit for their remaining 42% interest in Arxceo. (Id. at ¶ 7). Consequently, the Alabama Plaintiffs filed the Alabama Action on August 29, 2007, to enforce their individual rights, as well as the rights of the other remaining minority shareholders of Arxceo under the POS. (Id. at ¶ 8). With knowledge of and in reaction to the Alabama Action, JCI filed the Delaware Action on October 9, 2007, constituting a blatant and glaring attempt to forum shop and waste the valuable judicial resources of both this Court and the Alabama state court presiding over the Alabama Action by having virtually identical lawsuits proceeding in two separate forums at the same time. (Id. at ¶ 9).

In the Delaware Action, JCI asserts claims against all of the Delaware Defendants for fraudulent inducement and breach of contract and asserts individual causes of action against Davidson and Izatt for fraud.  In its prayer for relief in the Delaware Action, JCI seeks: compensatory damages, pre- and post-judgment interest, costs and expenses, including attorneys' fees and costs.  However, in its Complaint in the Delaware Action, JCI conveniently fails to disclose the pendency of the Alabama Action.  In response to the Complaint filed by the Alabama Plaintiffs in the Alabama Action, JCI and Arxceo filed a Counterclaim against Davidson and Hall for breach of contact, fraudulent inducement, fraud, and breach of fiduciary duty, all of which relate to the POS.  Also in its Counterclaim in the Alabama Action, JCI and Arxceo seek the exact same relief as JCI seeks in the Delaware Action.  Aside from the additional Arxceo shareholders JCI named as defendants in the Delaware Action, JCI's Complaint in the Delaware Action and JCI and Arxceo's Counterclaim in the Alabama Action are virtually mirror images, as shown in the chart attached as **Exhibit "D"** to this Motion.

It is important to emphasize that almost all of the Delaware Defendants named in the Delaware Action are citizens of the State of Alabama and reside in Madison County, Alabama. None of the individual Delaware Defendants are citizens of the State of Delaware.[7]  Only one of the entity Delaware Defendants, City Light Capital, LLC, has any type of connection to Delaware, as it is a Delaware limited liability company; however, even its principal place of business is not located in Delaware, and it does not conduct business in Delaware.  Moreover, Arxceo is a Delaware corporation; however, its principal place of business, assets, books and records, and property are all located in Madison County, Alabama.  (Davidson Affidavit at ¶ 10). JCI intentionally failed to name Arxceo, the corporation at the center of the parties' dispute, as a

---

[7]  A detailed list of the citizenship and/or corporate information relied upon by JCI prior to filing its Complaint for each of the Delaware Defendants is set forth in the Complaint filed by JCI in the Delaware Action. (See Complaint in Delaware Action at ¶¶ 6-55).

plaintiff in the Delaware Action because this would have destroyed diversity jurisdiction and, consequently, JCI's ability to file the Delaware Action in federal court in this forum. Finally, JCI is a Japanese corporation with its principal place of business located in Tokyo, Japan. (Id. at ¶ 11). JCI does not have any connection with the State of Delaware, and JCI has no basis for filing this action in Delaware other than to deprive the Alabama Plaintiffs of their choice of forum in Alabama state court. (Id.).

## IV.    ARGUMENT

### A.    IN THE INTERESTS OF COMITY AND JUDICIAL EFFICIENCY AND TO AVOID DUPLICATIVE LITIGATION, THIS COURT SHOULD DISMISS, STAY, OR TRANSFER THE DELAWARE ACTION BASED ON THE "FIRST-FILED" DOCTRINE.

In Crosley, the Third Circuit Court of Appeals articulated the "first-filed" doctrine, which follows the general rule that a court of concurrent jurisdiction having first possession of the subject matter of a case should decide the merits of the case. 122 F.2d at 929-30; see also Time Warner Cable, Inc. v. USA Video Tech. Corp., 2007 U.S. Dist. LEXIS 80582, at *16 (Oct. 31, 2007 D. Del) (the court first having possession over the subject matter of the actions should decide the dispute); Time Warner Cable, Inc. v. GPNE Corp., 497 F.Supp 584, 588-89 (D. Del. 2007) (first-filed rule applies where two actions pending in separate courts involve the "same set of facts" and issues).[8] The court in Crosley further held that:

---

[8] The Delaware Action was filed in this Court by JCI based on diversity jurisdiction. Consequently, the substantive law of the State of Delaware applies to this Motion rather than the substantive law or federal common law of the Third Circuit Court of Appeals. See Lafferty v. Riel, 495 F.3d 72, 76 (3d Cir. 2007) ("a federal court must apply the substantive laws of its forum state in diversity actions"). In addition, pursuant to the express terms of the POS, JCI and the Delaware Defendants agreed that the "laws of the State of Delaware" apply. (See POS at § 18). Regardless of the law applied by this Court related to the first-filed doctrine, the result is the same—the Delaware Action should be dismissed, stayed, or transferred in favor of allowing the first-filed Alabama Action to proceed.

> It is of obvious importance to all the litigants to have a single determination of their controversy, rather than several decisions which if they conflict may require separate appeals to different [appellate courts]. . . . The party who first brings a controversy into a court of competent jurisdiction for adjudication should, so far as our dual system permits, be free from the vexation of subsequent litigation over the same subject matter. The economic waste involved in duplicating litigation is obvious. Equally important is its adverse effect upon the prompt and efficient administration of justice. In view of the constant increase in judicial business in the federal courts and the continual necessity of adding to the number of judges, at the expense of the taxpayers, public policy requires us to seek actively to avoid the waste of judicial time and energy. Courts already heavily burdened with litigation with which they must of necessity deal should therefore not be called upon to duplicate each other's work in cases involving the same issues and the same parties.

Id. at 930.  The first-filed doctrine ensures that the resolution of the subject matter of a dispute is achieved in a single lawsuit, thereby preserving valuable judicial assets and preventing courts from unnecessarily duplicating each other's work.  USA Video, 2007 U.S. Dist. LEXIS 80582 at *16, 21.  The rule's primary purpose is to avoid burdening the federal judiciary, to prevent the judicial embarrassment of conflicting judgments, and to promote comity among courts of concurrent jurisdiction.  EEOC v. Univ. of Pennsylvania, 850 F.2d 969, 971, 977 (3d Cir. 1998) (citations omitted).

Similarly, in McWane, a Delaware Supreme Court decision, a party commenced an action in the State of Delaware despite a then-pending action in Alabama arising from the same contract and involving the same issues and bases of liability.  In McWane, the Delaware Supreme Court noted that a court's discretion to dismiss or stay based on the first-filed doctrine

> should be exercised freely in favor of the stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues; that, as a general rule, litigation should be confined to the forum in which it is first commenced, and a defendant should not be permitted to defeat the plaintiff's choice of forum in a pending suit by commencing litigation involving the same cause of action in another jurisdiction of its own choosing; that these concepts are impelled by considerations of comity and the necessities of an orderly and efficient administration of justice.

263 A.2d at 283.  Among the chief benefits to be gained by the exercise of such discretion, the McWane court further noted, were the following:

> [T]here is avoided the wasteful duplication of time, effort, and expense that occurs when judges, lawyers, parties, and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts.  Also to be avoided is the possibility of inconsistent and conflicting rulings and judgments and an unseemly race by each party to trial and judgment in the forum of its choice. Public regard for busy courts is not increased by the unbusinesslike and inefficient administration of justice such situation produces.

Id.  Accordingly, because (a) the Alabama Action was first-filed; (b) both the Alabama and Delaware Actions involve the same key parties and issues; and (c) the Alabama court is capable of rendering a just and efficient resolution of the parties' claims, this Court should dismiss, stay, or transfer the Delaware Action in the interests of comity and the efficient administration of justice.

### 1.    The Alabama Action was the first-filed action.

The Alabama Action was filed on August 29, 2007, over a month before the Delaware Action was filed on October 9, 2007.  Consequently, the Alabama Action must be considered the "first-filed."  The date of JCI's filing of additional and duplicative litigation necessarily suggests that it filed the Delaware Action in reaction to — rather than independently of — the Alabama Action, and that JCI did so for the express purpose of seeking to deprive the Alabama Plaintiffs of their choice of forum in Alabama.  Neither Delaware nor any other state, however, will sanction such efforts.  Indeed, to permit "such a rule would undermine the very considerations of comity and efficiency upon which the general rule of McWane [and Crosley are] based by encouraging a 'race' to file responsive or reactive complaints" and encourage and sanction forum shopping by defendants who are unhappy with the venue of the first-filed action.  Dura Pharmaceuticals, Inc. v. Scandipharm, Inc., 713 A.2d 925, 929 (Del. Ch. 1998).

The POS contains a clause whereby the parties agreed that they "may" submit to the jurisdiction of the courts of Delaware. (POS at § 18). However, this clause not deprive the Alabama Action of its first-filed status. In fact, Delaware courts routinely reject such arguments. In Dura Pharmaceuticals, for example, the court noted with regard to a similar provision that a forum selection clause "merely identifies the courts of this State as ones in which the parties agree disputes may be brought and is not exclusive." Dura Pharmaceuticals, 713 A.2d at 929-30 (citing Eisenbud v. Omnitech, 1996 WL 162245 (Del. Ch.) (deeming non-exclusive a forum selection clause similar the clause at issue in the present case). Indeed, the POS itself clarifies that the parties' consent to jurisdiction is non-exclusive and "may" be brought in another jurisdiction:

> **Section 18. Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied. ANY PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT ***MAY BE BROUGHT AND ENFORCED*** IN THE COURTS OF THE STATE OF DELAWARE OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR, AND THE PARTIES IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH SUCH COURTS IN RESPECT OF ANY SUCH PROCEEDING. EACH OF THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDING IN THE COURTS OF THE STATE OF DELAWARE LOCATED IN NEW CASTLE COUNTY OR THE DISTRICT OF DELAWARE AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM. ANY JUDGMENT MAY BE ENTERED IN ANY COURT HAVING JURISDICTION HEREOF. . . .

(POS at § 18) (emphasis added). The parties' consent to jurisdiction clause, therefore, in no way deprives the Alabama Action of its first-filed status, as the resolution of any disputes between the

parties related to the POS in Delaware was expressly made optional by use of the word "may" rather than "shall" or "must" in Section 18 of the POS.

    2.    **The Alabama and Delaware Actions involve the same key parties and subject matter.**

The claims and issues asserted in the Alabama and Delaware Actions all arise out of the same nucleus of operative facts — specifically, the POS and Earn-Out Schedule. In the Alabama Action, the Alabama Plaintiffs asserted claims against the Alabama Defendants for breach of contract, fraud, and breach of fiduciary duty related to the POS and events transpiring prior to and after the execution of the POS. In response, JCI and Arxceo filed a Counterclaim in the Alabama Action which contains allegations mirroring those JCI has asserted against the Delaware Defendants in the Delaware Action and requesting the exact same types of relief in both actions. The gravamen of both lawsuits is the determination of which party or parties breached the POS and/or acted fraudulently prior to and/or after the execution of the POS.

Moreover, all of the claims asserted by JCI in this Delaware Action constitute compulsory counterclaims in the Alabama Action. <u>See</u> Alabama Rule of Civil Procedure 13(a) ("[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ."); <u>see also</u> <u>Dura Pharmaceuticals</u>, 713 A.2d at 930. This close identity of issues between the Delaware and Alabama Actions clearly implicates the <u>Crosley</u> and <u>McWane</u> comity analysis. <u>See</u> <u>Dura Pharmaceuticals</u>, 713 A.2d at 930 ("Delaware courts . . . have recognized that all claims arising from a common nucleus of operative facts should be brought in the same court at the same time whenever possible.").

Furthermore, the key parties in the Delaware and Alabama Actions are the same. JCI is the parent corporation of its wholly owned subsidiaries—CSCT and CCT; JCI is the majority shareholder of Arxceo; and Sanda and Winn unquestionably have integral roles with JCI. Therefore, JCI is obviously able to represent the interests of these parties in the first-filed Alabama Action and in this Delaware Action. That JCI has chosen to name all of Arxceo's former and current shareholders in the Delaware Action is a smokescreen that should not be permitted to obscure the essentially identical character of the two actions. Naming additional parties does not bar this Court from dismissing this action, issuing a stay, or transferring this action since both actions need not have completely identical parties to justify the same. See Harbor Fin. Partners. v. Sunshine Mining and Refining Co., 1996 WL 74728, at *2 (Del. Ch. 1996) (stating that Delaware law does not require both actions to have identical parties and issues in order to grant a stay); Transamerica Corp. v. Reliance Ins. Co. of Illinois, 1995 WL 1312656, at *5 (Del. Super. 1995) ("Although there may not be an absolute identity of parties and issues in both actions, lack of absolute identity of parties and issues is not a prerequisite [sic] to granting a motion to stay.").

In McWane, the Delaware Supreme Court expressly stated that the parties do have need to be identical when the identity of issues is such that resolution of the first-filed action will have a substantial impact on the viability of the later-filed action. McWane, 262 A.2d at 283 n.1 (citing Lanova Corp. v. Atlas Imperial Diesel Engine Co., 64 A.2d 419 (Del. 1949) for the proposition that a stay may be proper even when cases do not involve the same parties, but where first-filed action is expected to render moot the controlling issues in the later-filed case). The same reasoning applies here.

3.    **The Alabama court is capable of rendering prompt and complete justice between the parties.**

The POS provides that Delaware law is to be applied to any dispute between and among JCI and the Delaware Defendants. However, this does not suggest any reason to conclude that the Alabama state court presiding over the Alabama Action is incapable of rendering a swift and judicious resolution of the parties' claims. Delaware courts have routinely recognized the ability of courts in sister states to apply the law of Delaware to disputes pending before them. See Johnston v. Caremark RX, Inc., 2000 WL 354381, at *4 (Del. Ch.) (issuing stay of Delaware action in favor of first-filed Alabama action despite Delaware's admittedly "compelling interest" in the application of its own law because "other states are capable of applying Delaware law"); In re Chambers Dev. Co., Inc. S'holders Litig., 1993 WL 179335, at *3 (Del. Ch.) (except perhaps in cases involving application of novel and substantial issues of Delaware corporate law, other "courts are more than capable of interpreting Delaware corporate law"); Harbor Fin. Partners, 1996 WL 74728, at *3 (granting stay in favor of first-filed action in federal court in part because "[t]here is no basis for concern [that] the District Court will not apply Delaware corporate law consistently with the views of our courts"). Unlike those few cases in which a Delaware court has refused to dismiss or stay a later-filed Delaware action, this is *not* a case raising novel or important issues of Delaware law, or arising under a special statutory grant of jurisdiction. See Johnston, 2000 WL 354381, *4 (staying later-filed, Delaware action in part because neither case raised novel issues of state law); Carvel v. Andreas Holdings Corp., 698 A.2d 375 (Del. Ch. 1995) (staying suit in favor of proceedings in New York even in face of strong public policy favoring retention of jurisdiction on matters involving construction of Delaware corporate law); Welbilt Corp., et al. v. The Trane Co., 2000 WL 1742053, *4 (Del. Ch.) (same). Rather, this is an ordinary dispute related to a contract — the POS — and

circumstances arising and related to the contract. Neither the public policy of Delaware, nor novel legal issues of special interest to it, are here implicated.[9]

That JCI conceivably may choose to raise questions about the need to join other of the Delaware Defendants as necessary parties in the Alabama Action, or about any of those parties' amenability to suit there, does not warrant any consideration from this Court. Questions not yet raised respecting "necessary parties" or the exercise of personal jurisdiction by a court in a first-filed action simply are not sufficient to establish that the first-filed court is incapable of rendering prompt and complete justice between the parties. See Welbilt Corp., 2000 WL 1742053 at *4. In Welbilt, the Delaware court stayed a later-filed action in favor of a first-filed case commenced in Texas state court despite the then-pending objections by certain parties over the Texas court's potential exercise of personal jurisdiction over them. Id. Here, JCI and Sanda have reserved the right to raise such an objection in the Alabama Action even though they have both already filed an Answer to the Alabama Plaintiffs' Complaint and even though it is undisputed that JCI and Sanda actively negotiated and entered into the POS to purchase Arxceo, a corporation having its principal place of business in Madison County, Alabama, and continue to conduct business in Madison County, Alabama. Even with these pending objections, such a "fact is not enough to establish that the [first-filed] court is incapable of rendering prompt and complete justice between the parties." Id.

---

[9] Even were the first-filed case to raise novel or important issues, however, on any interlocutory appeal to the Alabama Supreme Court, that court has the option of certifying such questions of law to the Delaware Supreme Court. See Del. Supreme Court Rule 41(a)(ii) ("[T]he Highest Appellate Court of any other State may, on motion or sua sponte, certify to this Court for decision a question or questions of law arising in any case before it prior to the entry of final judgment if there is an important and urgent reason for an immediate determination of such question or questions by this Court and the certifying court has not decided the question or questions in the case").

Similarly, the court in <u>Dura Pharmaceuticals</u> rejected an argument that a first-filed court would be incapable of providing complete and prompt justice between and among the parties because that court may lack personal jurisdiction over a subsidiary corporation alleged to be an indispensable party. 713 A.2d at 930. Noting that even were the subsidiary corporation "found to be a necessary party to the [first-filed] Alabama action, its interests in the subject matter of that litigation are identical to those of its parent . . . and will be fully protected by [the parent's] participation in the action," the court held that "[i]n any case, it is an argument better presented to the [first-filed] Alabama Court." <u>Id.</u> at 931.

Moreover, JCI has not suggested — nor could it plausibly do so — that the Alabama Plaintiffs commenced their first-filed action in "an unusual or unexpected forum, in order to gain an improper advantage" over JCI or the other Alabama Defendants. <u>See</u> <u>Dura Pharmaceuticals</u>, 713 A.2d at 931. As previously stated, JCI and the other Alabama Defendants were involved in negotiations related to the acquisition of Arxceo and have had direct contacts with and regularly conduct business related to Arxceo in the State of Alabama. Thus, the Alabama venue chosen by the Alabama Plaintiffs in its first-filed action is both "usual" and "ordinary", and certainly would be a venue contemplated by JCI as being available in the event of litigation arising out of the POS. Consequently, this Court should apply the first-filed doctrine to dismiss, stay, or transfer this action in order to allow the Alabama Action to resolve the dispute between the parties.

As a final concern, JCI elected to file claims against Izatt, in his individual capacity, in this Delaware Action rather than asserting any claims it may have against Izatt in the Alabama Action. However, Izatt has never subjected himself to the personal jurisdiction of this Court, as he was not a party to the POS, has never had any contacts or connections with the State of Delaware, and does not conduct business in the State of Delaware. (<u>See</u> <u>Izatt's Motion to</u>

Dismiss).    Thus, while Izatt would be subject to the jurisdiction of the Alabama state court presiding over the Alabama Action, JCI failed to join him as a party to the Alabama Action. This further evidences that the Alabama state court is well suited to reach a resolution of the disputes at issue between all of the parties involved.

**B.    IN THE ALTERNATIVE, THE COURT SHOULD STAY THE DELAWARE ACTION PENDING THE RESOLUTION OF THE ALABAMA ACTION BASED ON RULES GOVERNING ABSTENTION.**

If this action is not dismissed, stayed, or transferred pursuant to the first-filed doctrine, it should be stayed pending resolution of the Alabama Action in accordance with long-standing rules governing abstention.  In Sea Colony, Inc. v. Alcan Aluminum Corp., a case involving two separate lawsuits very similar to the Delaware and Alabama Actions, Sea Colony, Inc. and Sea Colony Development Corporation, Inc. filed a complaint in the District Court for the District of Delaware against Alcan Aluminum based on diversity jurisdiction.  653 F.Supp. 1323, 1324-25 (D. Del. 1987).  Subsequently, actions were filed against these parties and other defendants, in a separate state court action.  Id. at 1325.  The Sea Colony defendants moved the federal district court to stay the federal court action pending the outcome of the state court litigation, which the federal district court granted.  Id.

In reaching its decision, the court in Sea Colony stated that the power to stay or dismiss federal proceedings pending resolution of a state court action rests within the sound discretion of the trial court (this discretion stemming from the court's inherent power to control its docket). Id. at 1326.  In order for a federal district court to stay an action before it and allow a state court action to proceed: the two pending actions must be parallel — meaning that the pending actions must be "substantially similar" but not identical; and there must be adequate grounds to justify the stay.  Id.

In making such a determination, the Court must apply a multi-factor balancing test consisting of the following nine factors: (1) the inconvenience of the federal forum; (2) the desirability of avoiding piecemeal litigation; (3) the order in which the proceedings were initiated; (4) the presence of a res or property over which jurisdiction has been asserted; (5) whether federal law provides the rule of decision on the merits; (6) the adequacy of state court proceedings to protect plaintiff's rights; (7) the identity of issues in the two forums or the lack thereof; (8) the existence of a federal policy militating either in favor of or against the stay; and (9) the existence of an important countervailing federal interest which federal courts might be more likely than state courts to respect or enforce. Id. at 1326-27 (citing Colorado River Water Cons. Dist. v. U.S., 424 U.S. 800 (1976), Moses H. Cone Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983), Will v. Calvert Fire Ins. Co., 437 U.S. 655 (1978), Harvey & Harvey v. Delaware Solid Waste Auth., 600 F.Supp. 1369 (D. Del. 1985), and Gilbane Bldg. Co. v. Nemours Foundation, 568 F.Supp 1085 (D. Del. 1983)); see also Robinson v. Ruiz, 772 F.Supp. 212, 213-16 (D. Del. 1991); Horack v. Minott, 1995 U.S. Dist. LEXIS 7583, at *16-21 (D. Del. 1995).

As discussed below, the application of these factors to the instant case demonstrates that the Delaware Action should be stayed.

### 1.     Inconvenience of the Federal Forum

The inconvenience of the federal forum is based on the "ease of access to sources of proof, availability of compulsory process and enforceability of judgments." Sea Colony, 653 F.Supp. at 1327; Robinson, 772 F.Supp. at 215; Horack, 1995 U.S. Dist. LEXIS 7583 at *21-22. In the present case, Arxceo's principal place of business along with its assets, books and records, and property are located in Madison County, Alabama. In addition, almost all of the Delaware Defendants and other witnesses who will testify at trial reside in or around Madison County, Alabama. In fact, only one of the numerous parties named as the Delaware Defendants has any

connection with Delaware — City Light Capital, LLC — and it does not conduct business in Delaware. These facts alone demonstrate that this forum is inconvenient for the Delaware Defendants or at least "less convenient" than the Alabama forum based on the location of the sources of proof that will be available to the parties. See Robinson, 772 F.Supp. at 215. It should also be noted that JCI, the plaintiff in the Delaware Action, is a Japanese corporation and has no connection with the State of Delaware. Therefore, JCI cannot argue that this forum is any more convenient for it than Alabama state court. Moreover, compulsory process is available in the Alabama Action with respect to the Delaware Defendants and other parties involved, and a judgment entered by either this Court or the Alabama state court will be equally enforceable.

### 2. Avoidance of Piecemeal Litigation

Of all the factors to be considered in determining whether abstention is appropriate, *the most important, by far, is the strong federal policy in favor of avoiding piecemeal litigation*. Sea Colony, 653 F.Supp. at 1327. This factor revolves around whether "'the claims of all parties in interest can satisfactorily be adjudicated in that proceeding, whether necessary parties have been joined, [and] whether such parties are amendable to process in that proceeding.'" Robinson, 772 F.Supp. at 215. As was the case in Sea Colony, a denial of the stay in the Delaware Action "would result in two separate lawsuits over virtually the same issues . . . ." 653 F.Supp. at 1327. This is easily seen by the fact that JCI has asserted virtually identical allegations in the Delaware and Alabama Actions. (See **Exhibit "D"**). Accordingly, denying the Delaware Defendants' request for a stay would necessarily result in two lawsuits and two different courts considering the same facts and deciding the same issues. Further, the Delaware Defendants that are not named in the Alabama Action are subject to process and could be joined as parties by JCI in its Counterclaim, as each of them, with the exception of Izatt, were investors in Arxceo. In addition, JCI improperly named Izatt, in his individual capacity, as one of the

Delaware Defendants in this action; however, JCI failed to name him as party in the Alabama Action even though he would be subject to the personal jurisdiction of the Alabama state court. Because Izatt is not subject to the personal jurisdiction of this Court, this further evidences the fact that piecemeal litigation will result if a stay of the Delaware Action is not issued. (See Izatt's Motion to Dismiss). Thus, staying the Delaware Action will allow the Alabama state court to decide the disputed issues in a single forum and avoid unnecessary, costly, and potentially inconsistent results that may result from piecemeal litigation.

### 3.    Order in Which Jurisdiction was Obtained

As stated in subsection III of this Motion, it is not disputed that the Alabama Action was the first-filed action. The Alabama Action was filed a month prior to the Delaware Action, and discovery is underway in the Alabama Action. Accordingly, this factor must weigh heavily in favor of staying the Delaware Action.

### 4.    Presence of Res or Property

Arxceo is the corporation at the center of both the Delaware and Alabama Actions, and all of its assets, books and records, and property are located in Madison County, Alabama. Hence, the property at issue in this litigation in located within the jurisdiction of the Alabama state court presiding over the Alabama Action, which weighs in favor of staying this action.

### 5.    Rule of Decision on the Merits

This action does not involve a claim based on federal subject matter jurisdiction. Rather, JCI filed the Delaware Action based on diversity jurisdiction. Accordingly, even if this action proceeds in this forum, the issues and claims involved must be decided in accordance with state, not federal, law. Horack, 1995 U.S. Dist. LEXIS 7583 at *27-28; Robinson, 772 F.Supp. at 216. The fact that state law rather than federal law applies at most implies that this factor is a wash

either in favor of or against issuing a stay, as either this Court or the Alabama state court can equally apply the requisite state law.

### 6.    Adequacy of the State Court

There is absolutely no reason to believe or contend that the Alabama state court presiding over the Alabama Action and applying applicable state law will not adequately and correctly determine the parties' rights. The issues and claims involved — breach of contract and fraud — are germane and routinely tried before virtually all courts, federal or state, located throughout the United States. As such, this factor must weigh in favor of staying the Delaware Action.

### 7.    Identity of Issues

The facts, issues, and claims asserted by the parties in the Delaware and Alabama Actions are "substantially similar" and, therefore, should be considered parallel. Sea Colony, 653 F.Supp. at 1329. Even a cursory review of the Complaint filed by JCI in this action and the Counterclaim filed in the Alabama Action show that the two actions are virtually mirror images. (See Exhibit "D"). As such, this factor should weigh in favor of issuing a stay of this action.

### 8.    Federal Policy Militating in Favor or Against the Stay

Two federal policies must be considered when analyzing this factor: (1) judicial economy; and (2) comity between state and federal courts. Sea Colony, 653 F.Supp. at 1329; Horack, 1995 U.S. Dist. LEXIS 7583 at *28-29. Because the Delaware and Alabama Actions involve the same issues and same key parties, failing to stay the Delaware Action would result in an unnecessary duplication of work and the "inefficient expenditure of valuable judicial resources." Sea Colony, 653 F.Supp. at 1329. In addition, because the Alabama Action was the first-filed action and has progressed further than this proceeding, staying the Delaware Action and allowing the parties and Alabama state court to move forward in the Alabama Action with

the understanding that this action is stayed would unquestionably further and promote comity between federal and state courts.

### 9.    Important Countervailing Federal Interest

There do not appear to be any important countervailing federal interests raised in the Delaware Action itself or by staying the Delaware Action. Where there is "no concrete federal interest present which a federal court is more likely to respect or enforce than [a] state court . . . . this factor counsels in favor of granting the stay." Horack, 1995 U.S. Dist. LEXIS 7583 at *29.

Based on the overwhelming number of factors that weigh heavily in favor of issuing a stay of the Delaware Action, this Court should grant such a stay and allow the Alabama Action to proceed to a conclusion before the stay is lifted.

### C.    ALTERNATIVELY, 28 U.S.C. § 1404 (A) AND CONSIDERATIONS OF *FORUM NON CONVENIENS* DICTATE THAT THE DELAWARE ACTION BE DISMISSED OR TRANSFERRED.

Section 1404(a) of the United States Code and the doctrine of *forum non conveniens* authorize this Court to transfer this action to the District Court for the Northern District of Alabama. Section 1404(a) states that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought. 28 U.S.C. § 1404(a); Lafferty v. Riel, 495 F.3d 72, 79 (3d Cir. 2007) (clarifying that the doctrine of *forum non conveniens* was codified in § 1404(a)). Pursuant to § 1404(a) and the doctrine of *forum non conveniens*, a district court has discretion to transfer any case to a district where it might have been brought to promote the convenience of the parties and witnesses and the interest of justice. Id.

A federal district court faced with a motion to transfer must engage in an "individualized case-by-case consideration of convenience and fairness." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988). A case should be transferred to "the forum in which judicial resources could most efficiently be utilized and the place in which the trial would be most 'easy, expeditious and inexpensive.'" Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947). Section 1404(a) and the doctrine of *forum non conveniens* are designed to "prevent the 'waste of time, energy, and money' and 'to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.'" Van Dusen v. Barrack, 376 U.S. 612, 616 (1964) (citing Cont'l Grain Co. v. Barge F.B.L.-585, 364 U.S. 19, 26-27 (1960)). In Bank of America v. S.I.P. Assets, LLC, a case decided by the District Court for the District of Delaware which also involved two separately filed lawsuits pending in different forums, the court stated that "[w]hen considering a motion to transfer, the court must determine 'whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum.'" 2007 U.S. Dist. LEXIS 67107, at *5 (D. Del. Sept. 11, 2007) (citing Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)).

To determine if a transfer is appropriate, courts should use a multi-factor balancing test, embracing not only the statutory criteria of the interests justice and the convenience of the parties and witnesses, but all relevant factors, including certain private and public interests. Bank of Am., 2007 U.S. Dist. LEXIS 67107 at *5 (citing Jumara, 55 F.3d at 875). The private interest factors to be considered include: "the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties; the convenience of expected witnesses; and the location of books and records, to the extent they could not be produced in the

alternative forum." <u>Bank of Am.</u>, 2007 U.S. Dist. LEXIS 67107 at *5 (<u>citing</u> <u>Jumara</u>, 55 F.3d at 879).

The private interest factors weigh heavily in favor of transferring this action to the District Court for the Northern District of Alabama. First, with respect to the choice and preference of forum, the Alabama Action is the first-filed action, as discussed in subsection III of this Motion. It was only after the Alabama Action was filed that JCI reactively filed the Delaware Action in an attempt to deprive the Alabama Plaintiffs of their choice of forum in Alabama state court. Consequently, while transferring the Delaware Action to the District Court for the Northern District of Alabama will not perfectly protect the Alabama Plaintiffs' selected state court forum, it will allow the subject matter of this dispute to be decided in a more convenient federal court forum. Second, the facts, issues, and claims in dispute are directly related to Arxceo, and the parties' negotiation and execution of the POS and subsequent business relationship, all of which took place in Madison County, Alabama. In fact, to the extent the business of Arxceo was and continues to be discussed either by Arxceo's President and Chief Executive Officer, Arxceo's Board of Directors, or Arxceo's majority shareholder—JCI, these discussions took place and continue to take place either in-person, by telephone, and/or via electronic means in Madison County, Alabama, and corresponding decisions were made and carried out in Madison County, Alabama, without any connection to or with Delaware.

Third, all of Arxceo's assets, books and records, and property are located in Madison County, Alabama. Litigating the disputed issues before the District Court for the Northern District of Alabama would ensure that the necessary sources of proof are readily available to all parties. Finally, litigating the disputed issues before the District Court for the Northern District of Alabama would unquestionably be much more convenient for the parties and witnesses

involved, almost all of whom reside in Madison County, Alabama. If the Delaware Defendants and other witnesses that reside in Madison County, Alabama — none of whom have any real connection with Delaware — are forced to defend themselves in this forum, geographical considerations (and associated costs) alone dictate that this forum would be substantially more inconvenient than litigating this dispute before the District Court for the Northern District of Alabama. Further, Izatt — in his individual capacity — was not a party to the POS, has no connection with Delaware, and is not subject to the personal jurisdiction of this Court. It is also important to note that the District Court for the Northern District of Alabama is no less convenient for JCI than this forum. JCI is not a Delaware corporation and does not conduct business in Delaware. Therefore, JCI cannot justifiably argue that litigating the disputed issues in either Delaware or Alabama is either more or less convenient for it.

 In addition to the private factors, the Court must consider certain public interest factors in determining whether or not to transfer the Delaware Action, including: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." <u>Bank of Am.</u>, 2007 U.S. Dist. LEXIS 67107 at *5-6 (<u>citing</u> <u>Jumara</u>, 55 F.3d at 879-80).

 First, a judgment entered by the Alabama state court will be equally enforceable as a judgment entered by this Court. Second, practical considerations weigh heavily in favor of transferring this action to the District Court for the Northern District of Alabama. Unquestionably, conducting discovery, obtaining sources of proof, deposing parties and witnesses, and ultimately trying the case will be much more expeditiously and inexpensively done in Alabama where almost all of the Alabama Defendants reside. Third, the local interest in

deciding local controversies in a local forum should weigh heavily in favor of issuing a stay. The sheer number of parties named as Delaware Defendants that reside in Madison County, Alabama, the fact that Arxceo was founded in and has its principal place of business in Madison County, Alabama, together will all of its assets, books and records, and property, demonstrate that this is a local controversy that a local Alabama court should decide.

## V.    CONCLUSION

For the foregoing reasons, the Delaware Defendants respectfully request this Court to dismiss, stay, or transfer the Delaware Action based on the first-filed doctrine. In the alternative, the Delaware Defendants request the Court to stay the Delaware Action pending the resolution of the Alabama Action in accordance with federal rules governing abstention. As a second alternative, the Delaware Defendants request the Court to transfer the Delaware Action to the District Court for the Northern District of Alabama in accordance with 28 U.S.C. § 1404 and the doctrine of *forum non conveniens*.

Dated: November 30, 2007                    Respectfully submitted,

                                            **GREENBERG TRAURIG, LLP**

                                            Donald J. Detweiler (No. 3087)
                                            Dennis A. Meloro (No. 4435)
                                            The Nemours Building
                                            1007 North Orange Street, Suite 1200
                                            Wilmington, Delaware 19801
                                            Telephone: (302) 661-7000
                                            detweilerd@gtlaw.com
                                            melorod@gtlaw.com

                                            **-and-**

                                            **MAYNARD, COOPER & GALE, P.C.**
                                            G. Bartley Loftin, III
                                            Douglas B. Hargett
                                            655 Gallatin Street, S.W.
                                            Huntsville, Alabama 35801

Telephone: (256) 512-0171

**-and-**

**MAYNARD, COOPER & GALE P.C.**
W. Percy Badham, III
Will A. Smith
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 254-1000

**Attorneys for the Defendants**

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that service of this document has been made upon

the following via electronic delivery and U.S. mail, properly addressed and postage prepaid:

Thomas C. Grimm
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
E-mail: tgrimm@mnat.com

Jay D. Bennett
Paul J. Kaplan
Jonathan B. Davis
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
E-mail: Jay.Bennett@alston.com
      Jonathan.Davis@alston.com
      Paul.Kaplan@alston.com

_____
Dennis A. Meloro (No. 4435)

## IN THE CIRCUIT COURT OF MADISON COUNTY, ALABAMA

RNR VENTURES, L.L.C., individually and on behalf of
all other shareholders of Arxceo Corporation;                    )
                                                                 )
                                                                 )
ANGUS ADAIR WOLFGANG, INC., individually and on )
behalf of all other shareholders of Arxceo Corporation;          )
                                                                 )
DONALD J. DAVIDSON, individually and on behalf of                )
all other shareholders of Arxceo Corporation; and                )
                                                                 )
J. CHANDLER HALL, individually and on behalf of                  )
all other shareholders of Arxceo Corporation;                    )        CIVIL ACTION NUMBER
                                                                 )
                                                                 )        $CV$-$07$-$1345$
           Plaintiffs,                                           )
                                                                 )
v.                                                               )
                                                                 )
JAPAN COMMUNICATIONS, INC.;                                      )
                                                                 )
COMMUNICATIONS SECURITY AND                                      )
COMPLIANCE TECHNOLOGIES, INC.;                                   )
                                                                 )
COMMUNICATION TECHNOLOGIES, INC.;                                )
                                                                 )
FRANK SEIJI SANDA, individually and as a member of               )
the Board of Directors of Arxceo Corporation;                    )
                                                                 )
J. MARC WINN, individually and as a member of the                )
Board of Directors of Arxceo Corporation; and                    )
                                                                 )
ARXCEO CORPORATION;                                              )
                                                                 )
           Defendants.                                           )

FILED IN OFFICE
2001 AUG 29 P 4: 32
JANE SMITH
CIRCUIT CLERK
CIRCUIT COURT DIVISION
MADISON COUNTY, ALABAMA

## <u>COMPLAINT</u>

RNR Ventures, L.L.C. ("<u>RNR</u>"), Angus Adair Wolfgang, Inc. ("<u>AAW</u>"), Donald J.

Davidson ("<u>Davidson</u>"), and J. Chandler Hall ("<u>Hall</u>," collectively with RNR, AAW, and

Davidson, the "<u>Common Stockholders</u>") state their Complaint against Japan Communications,

Inc. ("<u>JCI</u>"), Communications Security and Compliance Technologies, Inc. ("<u>CSCT</u>"), Computer

and Communication Technologies, Inc. ("<u>CCT</u>," collectively with JCI and CSCT, the "<u>JCI</u>

Group"), Frank Sanda ("Sanda"), Marc Winn ("Winn"), and Arxceo Corporation ("Arxceo") as
follows:

**JURISDICTION AND VENUE**

1.      This Court has exclusive original jurisdiction over this civil action pursuant to
Alabama Code § 12-11-30 because the matter in controversy exceeds $10,000, exclusive of
interest and costs.

2.      The JCI Group, Sanda, Winn, and Arxceo are subject to the personal jurisdiction
of this Court because these entities and/or individuals conduct business in Alabama and/or have
otherwise availed themselves to the jurisdiction of this Court through their contacts in and with
Alabama.

3.      Venue is proper in this Court pursuant to Alabama Code §§ 6-3-2 and 6-3-7.

**PARTIES**

4.      Defendant JCI is a Japanese-based company incorporated on or about May 24,
1996, and headquartered in Tokyo, Japan.  JCI is the parent corporation of several wholly owned
subsidiaries and/or affiliate companies, including: CSCT, CCT, Arxceo, and Arxceo Japan, Inc.
("Arxceo Japan").  *JCI is the majority shareholder of Arxceo*, owning 1,349,125 shares of its
Series C Preferred Stock and having a 58% ownership interest in Arxceo.

5.      Defendant CSCT is a Delaware corporation with its principal place of business
located in Atlanta, Georgia.  CSCT is a wholly owned subsidiary of JCI.

6.      Defendant CCT is a Delaware corporation with its principal place of business
located in Englewood, Colorado.  CCT is a wholly owned subsidiary of JCI.

2

7.      Defendant Sanda is an individual over the age of 19 years old and, upon information and belief, is a citizen of the State of New York. Sanda is the President and Chief Executive Officer of JCI and a member of Arxceo's Board of Directors.

8.      Defendant Winn is an individual over the age of 19 years old and, upon information and belief, is a citizen of the State of Georgia. Winn is the President and Chief Executive Officer of CSCT, a member of the Management Committee of JCI, and a member of Arxceo's Board of Directors.

9.      Defendant Arxceo is a Delaware corporation with its principal place of business in Huntsville, Alabama. Arxceo is named as a defendant in this action based on the derivative nature of the claims the Common Stockholders have asserted in this action. JCI owns a 58% majority interest in Arxceo, and the Common Stockholders (as well as other unnamed owners of Arxceo Common Stock) have a 42% ownership interest in Arxceo.

10.      Plaintiff RNR is an Alabama limited liability company with its principal place of business located in Huntsville, Alabama. RNR is a minority shareholder of Arxceo, owning 220,000 shares of Arxceo Common Stock.

11.      Plaintiff AAW is an Alabama corporation with its principal place of business in Huntsville, Alabama. AAW is a minority shareholder of Arxceo, owning 402,120 shares of Arxceo Common Stock.

12.      Plaintiff Davidson is an individual over the age of 19 years old and a citizen of the State of Alabama. Davidson is the President and Chief Executive Officer of Arxceo and a member of Arxceo's Board of Directors. Davidson is a minority shareholder of Arxceo, owning 250,000 shares of Arxceo Common Stock.

13.    Plaintiff Hall is an individual over the age of 19 years old and a citizen of the State of Alabama.  Hall is a minority shareholder of Arxceo, owning 53,616 shares of Arxceo Common Stock.

## FUTILITY OF DEMAND

14.    The Common Stockholders have not made a demand on Arxceo, Arxceo's officers, Arxceo's Board of Directors, or any other representative of Arxceo.  As discussed below and throughout this Complaint, the Common Stockholders have not done so because making such demand would in all respects have been futile.

15.    Arxceo's Board of Directors is comprised of three members: Sanda, Winn, and Davidson.  Neither Sanda nor Winn have or can act objectively or "independently," within the meaning of applicable law, as they are both intimately involved with the JCI Group.

16.    Sanda is the President and Chief Executive Officer of JCI, and Winn is the President and Chief Executive Officer of CSCT and a member of the Management Committee of JCI.  Acting in these capacities, Sanda and Winn have continually and exclusively sought to further the interests of the JCI Group to the exclusion and detriment of Arxceo and the Common Stockholders.

17.    Further, Sanda and Winn represent a two-thirds majority of Arxceo's Board of Directors, thereby allowing Sanda and Winn to exercise complete control of Arxceo and take actions contrary to Arxceo and the Common Stockholders' best interests without being held accountable for their acts and/or omissions.

18.    Davidson has repeatedly requested Sanda and Winn to discuss and vote on the material issues discussed in this Complaint.  Specifically, during Arxceo's June, 2007, and November, 21, 2006, board meetings Sanda and Winn rejected Davidson's requests to discuss

and abstained from voting on the restructurization of the POS (defined herein) and Earn-Out Schedule (defined herein). Sanda and Winn also failed and/or refused to approve the minutes of Arxceo's board meeting held during June, 2007, and refused to discuss and vote on other financial issues critical to Arxceo and the Common Stockholders, namely the demands the JCI Group, Sanda, and Winn placed on Arxceo related to the integration and/or embedding process and the funding required by Arxceo to meet these demands. Furthermore, Davidson has had numerous telephone conversations and exchanged multiple e-mails with Sanda, Winn, and other members of the JCI Group related to these issues since the execution of the POS.

19.    Davidson has taken numerous measures to bring the severity of these issues to the attention of Sanda and Winn. Specifically, Davidson raised these issues during the November 21, 2006, Arxceo board meeting. Davidson also traveled to Tokyo, Japan, to meet with Sanda for a pre-scheduled meeting to discuss these issues during April, 2007. However, upon Davidson's arrival in Tokyo, Japan, Sanda failed and/or refused to meet with Davidson. Moreover, during Arxceo's board meeting held during June, 2007, Davidson raised these issues for discussion and vote and emphasized that the timely resolution of these issues were critical to the financial well-being of Arxceo. Sanda and Winn refused to engage in any discussion or vote on these issues and directed Davidson to resolve these issues on his own. Neither Davidson nor the other Common Stockholders have received a response from Sanda or Winn and no action has been taken to resolve these issues. As a direct result, Arxceo and the Common Stockholders have suffered and will continue to suffer substantial damages as a result of Sanda and Winn's acts and/or omissions.

20.    Based on these allegations and others set forth in detail below in this Complaint, it is clear that Sanda and Winn have breached the fiduciary duties owed to and perpetrated fraud upon Arxceo and the Common Shareholders. For these reasons, Sanda and Winn could not have properly considered a demand to bring this lawsuit, therefore, establishing that the same would have been futile.

### FACTUAL INVESTIGATION

21.    The Common Stockholders have exhausted all means to investigate and substantiate the factual allegations set forth in this Complaint.

22.    Davidson, in his capacity as a member of Arxceo's Board of Directors, has reviewed Arxceo's books and records and brought the issues discussed in this Complaint to the attention of Sanda and Winn on a repeated basis through discussions during board meetings, e-mails, and telephone conversations.

23.    The remaining Common Stockholders have not been afforded access to review the books and records of Arxceo, as JCI, Sanda, and Winn have precluded the same based on their refusal to allow Arxceo to hold a shareholder meeting to discuss the financial condition of Arxceo and to otherwise give board approval of the disclosure of Arxceo's books and records to the Common Shareholders. This has prevented the Common Shareholders from determining the precise revenues and income generated by Arxceo and precluded the issues discussed in this Complaint from being timely and properly resolved.

24.    In their capacities as employees and/or consultants of Arxceo, Hall and David A. Izatt ("Izatt"), President of AAW, have been privy to monthly status meetings during which an overview of Arxceo's financial condition has been provided, including updates on Arxceo's revenues and income. Chandler and Izatt have also been updated on other issues related to

Arxceo, including, but not limited to, the resources and funding Arxceo needs to meet the integration and/or embedding demands made upon it by the JCI Group, Sanda, and Winn.

26.    Charles F. Lofty ("Lofty"), Managing Member of RNR, has not been privy to the monthly meetings related to the financial status of Arxceo and has not otherwise been afforded the opportunity to review Arxceo's books and records. However, through his discussions with other Common Shareholders, Lofty has become aware of the magnitude of the issues and problems caused by the JCI Group, Sanda, and Winn, which are discussed in this Complaint.

26.    Based on these and other circumstances set forth in the Complaint, the Common Stockholders determined that it was in the best interest of Arxceo to bring this action to redress the harm caused to Arxceo and the Common Stockholders by the JCI Group's, Sanda's, and Winn's actions and/or omissions.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### THE INITIAL NEGOTIATIONS OF THE PARTIES AND REPRESENTATIONS MADE BY THE JCI GROUP, SANDA, AND WINN TO ARXCEO AND THE COMMON STOCKHOLDERS

27.    The JCI Group provides mobile data and voice communications services for both businesses and individuals through the development and operation of mobile network products and technology.

28.    Arxceo develops products and technology used to secure communications networks and make these networks less vulnerable to attacks.

29.    On or around April, 2005, the Common Stockholders were contacted by representatives and/or associates of the JCI Group, including Sanda, Winn, and Jeff White, a former executive of both BellSouth Corp. ("BellSouth") and CSCT ("White," together with Sanda, Winn, and other representatives of the JCI Group, the "JCI Representatives"), to discuss the expansion of the JCI Group's network communications business in the United States.

30.     During discussions with the Common Shareholders, the JCI Representatives expressed their interest in Arxceo and represented and emphasized that Arxceo would be a valuable asset to the JCI Group; that the JCI Group wanted to grow its own security products and technology, as well as Arxceo's; and that the JCI Group was resolute to launch and/or expand its communications network business in the United States.

31.     The JCI Representatives assured the Common Stockholders that the JCI Group was committed to building and expanding its security solutions and offerings in the United States, thereby creating a unique mobile communications network product.

32.     In November, 2006, Arxceo and JCI agreed to the conditions expressed in a Term Sheet related to JCI's acquisition of Arxceo. During the following months, Arxceo and the JCI Group continued to discuss the terms of this acquisition.

33.     During December, 2006, the JCI Representatives represented to the Common Stockholders that BellSouth and its two primary suppliers, Westell Technologies, Inc. ("Westell") and Netopia, Inc., a corporation recently acquired by Motorola, Inc. ("Netopia"), had **committed** to include Arxceo's technology as a requirement for its vendors and assured Arxceo that the demand for and revenues and income generated by Arxceo's products would be substantial because of these guaranteed commitments.

34.     During January, 2006, the JCI Representatives also represented to the Common Stockholders that BellSouth was re-negotiating its contract with its vendors for DSL modems and Gateway business products, and these vendors would be **required** to integrate and/or embed Arxceo's technology into their products for BellSouth.

35.    Throughout continued discussions during January and February, 2006, the JCI Representatives emphasized that the integration and/or embedding requirements and commitments would generate substantial revenues and income for the Common Stockholders over a short duration.

36.    During this same time period, the JCI Representatives represented to the Common Stockholders that the JCI Group would take all necessary actions to further the integration and/or embedding process.

37.    The JCI Representatives further represented that Arxceo would be provided with technology development funding resources to enable the Common Stockholders to meet and exceed the demands of integrating its products with BellSouth.

38.    The JCI Representatives assured Arxceo and the Common Stockholders that the JCI Group would hire and fund the support of any additional software developers needed to meet the demands related to the integration and/or embedding process.

THE PARTIES EXECUTE THE PURCHASE OF SECURITIES AGREEMENT

39.    Relying on the representations made by JCI, on or about March 2, 2006, the shareholders of Arxceo, which included shareholders of Common Stock and Series A and B Preferred Stock, entered into a Purchase of Securities Agreement with JCI (the "POS").[1]

40.    At or around the time the parties executed the POS, JCI restructured Arxceo's Board of Directors to include the following three members: Davidson, Sanda, and Winn. Prior to this restructure, Arxceo's Board of Directors was made up of four members: Davidson, Lofty, Samuel McManus, and Richmond A. Wolf.

_____

[1] A true and correct copy of the Purchase of Securities Agreement is attached hereto as **Exhibit "1"** and incorporated herein by reference.

41.     Pursuant to the POS, JCI agreed to purchase all the outstanding shares of Arxceo over the course of three separate closings.

42.     At the First Closing, which occurred at or around the time the parties executed the POS, JCI agreed to purchase a percentage of Arxceo's Common Stock and Series A and B Preferred Stock and to convert all remaining Series A and B Preferred Stock to Arxceo Common Stock.

43.     JCI paid a total price of $5 million for the Arxceo stock it purchased at the First Closing, itemized as follows: (a) $3 million to purchase a portion of the Common Stock and Series A and B Preferred Stock (bearing in mind that all remaining Series A and B Preferred Stock converted to Arxceo Common Stock); and (b) $2 million for the newly created Series C Preferred Stock, which went directly to Arxceo's operating capital and served the purpose of giving JCI a 58% majority ownership interest in Arxceo.

44.     The Second and Third Closings relate specifically to the remaining Arxceo stock owned by the Common Stockholders.  The Second Closing occurred on April 30, 2007, and the Third Closing will transpire on April 30, 2008.

45.     At the Second and Third Closings, JCI agreed to pay the Common Stockholders a per-share purchase price for their remaining stock of Arxceo based on a mathematical calculation which considers Arxceo's actual and targeted Gross Revenue and Net Operating Income (the "Earn-Out Schedule").  A description of the Earn-Out Schedule provisions are set forth in detail in Section 1(c) and (e), Section 2(b) and (c), and Annex I of the POS.

46.     In short, the amount the Common Stockholders would receive from JCI for their remaining shares in Arxceo depended directly upon Arxceo generating high Gross Revenues and Net Operating Income and meeting and/or surpassing certain financial targets over a very short duration.

47.     If Arxceo does not meet or exceed the threshold percentages of Gross Revenues and Net Operating Income specified in the POS and Earn-Out Schedule over this short duration, JCI has the option to require the Common Shareholders to sell a substantial portion of their remaining shares in Arxceo for pennies on the dollar and effectively force the Common Stockholders out of Arxceo.

### THE COMMON STOCKHOLDERS LEARN OF MISREPRESENTATIONS AND/OR SUPPRESSIONS

48.     Almost immediately after the parties executed the POS, on or around April, 2006, the JCI Representatives and current and former employees of the JCI Group, informed the Common Stockholders that many of the representations made by the JCI Group related to Arxceo prior to the execution of the POS were incorrect and were made to convince Arxceo's management and shareholders of guaranteed revenues and income.

49.     Contrary to the JCI Group's representations, BellSouth *never committed or required* Westell, Netopia, or any of its other suppliers, vendors, re-sellers, and/or distributors to integrate and/or embed Arxceo's technology into their products.

50.     In fact, directly opposite to the representations made by the JCI Representatives, the JCI Group intended to require its own vendors, re-sellers, and/or distributors to integrate and/or embed Arxceo's products and technology for its own advantage and to the detriment of Arxceo.

51.     Instead of growing Arxceo's sales, revenues, and income, the JCI Group intended to use Arxceo as its workhorse software development group and leverage its technology for the benefit of the JCI Group and Arxceo Japan.

52.     After discussing these revelations with the JCI Group, the JCI Representatives re-assured the Common Stockholders that it was committed to building and expanding the securities technology capabilities of the JCI Group and Arxceo in the United States market.

53.     In May, 2006, White resigned from CSCT over his frustration with the JCI Group making empty promises and commitments to the Common Shareholders and because the JCI Group had changed directions and reneged on many of the prior representations it made to the Common Stockholders, including, but not limited to, representations of its commitment to grow and expand the United States market.

54.     Throughout the following months, the JCI Group demanded Arxceo to begin integrating and/or embedding its technology into the JCI Group's products.

55.     At this time, the Common Stockholders informed the JCI Group that this would significantly strain Arxceo's development resources and preclude Arxceo from generating short term revenues and income.   However, the JCI Group insisted that Arxceo complete the integration process and do so on an expedited basis.

56.     In July and August, 2006, the JCI Group made additional demands of Arxceo related to the integration and/or embedding process by presenting Arxceo with an increased number of development projects, the completion of which required Arxceo to exert more money and resources than it had as its disposal.

57.    These integration projects had no commitments for development funding from the JCI Group, and the revenue projections for these projects were all based on the generation of revenues and income over a lengthy duration with no short-term revenue or income objectives.

58.    In or around August, 2006, the JCI Group formed Arxceo Japan to represent and sell products and technology Arxceo developed for the JCI Group.

59.    Substantial amounts of Arxceo's resources were used to develop products and technology for Arxceo Japan.  However, the revenues and income generated from these sales were distributed to the JCI Group, which necessarily limited and reduced Arxceo's revenues and income.

60.    In September, 2006, the Common Stockholders again expressed their concern to the remaining JCI Representatives regarding the JCI Group's repeated demands that Arxceo focus solely on the JCI Group's integration projects without appropriate funding; that Arxceo did not have the necessary resources to handle the workload the JCI Group continued to demand; and that the overall business direction JCI was now forcing Arxceo to take contradicted the representations made by the JCI Representatives prior to the POS.

61.    The Common Stockholders further expressed their concern that Arxceo was being used to develop products and technology to generate revenue and income for the JCI Group over the long-term, primarily in the Japanese market, at the expense and to the detriment of Arxceo and the Common Stockholders.

62.    The JCI Group, Sanda, and Winn's actions prevented the Common Stockholders from meeting the revenue and income targets set forth in the Earn-Out Schedule of the POS.

63.    The Common Stockholders expressed these concerns to the remaining JCI Representatives prior to and during an Arxceo board meeting held during November, 2006.

64.    Arxceo's board members discussed presenting JCI with a proposal to align the objectives of Arxceo and the JCI Group.  This proposal was presented to Arxceo's board members on November 21, 2006, and the JCI Representatives on or about November 30, 2006.

65.    From December, 2006, through March, 2007, the Common Stockholders and remaining JCI Representatives discussed restructuring the Earn-Out Schedule.

66.    During March, 2007, the Common Stockholders and JCI reached a tentative agreement related to the restructured Earn-Out Schedule, which was reflected on a Term Sheet.

67.    On or around April, 2007, the remaining JCI Representatives informed the Common Stockholders that JCI did not intend to restructure the Earn-Out Schedule of the POS according to the Term Sheet or otherwise.

68.    Because the JCI Group refused to provide Arxceo with funding to develop the technology and products it demanded for the integration process, Arxceo was forced to accept multiple loans from JCI totaling more than $600,000 to enable it to continue its business operations.

69.    During May, 2007, the JCI Representatives informed the Common Stockholders that Arxceo was no longer strategic to the JCI Group; that the JCI Group intended to focus on its core communications network business; that the JCI Group did not intend to provide funding to Arxceo for development or integration; and that JCI did not intend to restructure the Earn-Out Schedule of the POS.

70.    During a June, 2007, Arxceo board meeting, Sanda and Winn recused themselves from any discussion or vote on issues related to the funding of Arxceo and the Earn-Out

14

Schedule restructure and directed Davidson to resolve these issues on his own.  In addition, Sanda and Winn refused to approve the minutes of the June, 2007, board meeting during which the above-described issues were discussed.

## COUNTS OF THE COMMON STOCKHOLDERS INDIVIDUALLY

### COUNT I – OPPRESSION/SQUEEZE OUT

**(Defendants JCI, Sanda, and Winn)**

71.     The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 70 of the Complaint, as if set forth herein in its entirety.

72.     JCI, as the majority shareholder of Arxceo, and Sanda and Winn, as members of Arxceo's Board of Directors, owed fiduciary duties to the Common Stockholders.

73.     Specifically, JCI, Sanda, and Winn owed fiduciary duties which required them not to commit misfeasance or malfeasance, as well as other fiduciary duties and responsibilities imposed upon shareholders and directors of a corporation in accordance with applicable law, including, but not limited to, duties of good faith, loyalty, and care.

74.     JCI, Sanda, and Winn breached their fiduciary duties to the Common Stockholders and committed misfeasance and/or malfeasance by acting and/or failing to act as described in paragraphs 25 through 70, *supra*.  Some of these actions and/or omissions include, but are not limited to: (a) misrepresenting their intent to support, grow, and expand the JCI Group's security offerings and solutions and network communications business in the United States; (b) misrepresenting that BellSouth, Westell, and Netopia had committed and were required to integrate Arxceo's technology and products; (c) assuring that the demand for and revenues and income to be generated by BellSouth, Westell, and Netopia's requirement and commitment would be substantial; (d) misrepresenting that BellSouth would require its vendors

for DSL modems and Gateway business products to embed Arxceo's technology and products; (e) misrepresenting that they would take all necessary action to further the integration and/or embedding process; (f) misrepresenting and failing to provide Arxceo with development funding resources to enable it to meet and exceed the demands of the integration and/or embedding process; (g) misrepresenting that they would hire and fund the support of additional software developers to meet the demands of the integration process; (h) misrepresenting and/or suppressing material facts to induce Arxceo and the Common Shareholders to enter into the POS; (i) misrepresenting and/or suppressing material facts to induce the Common Shareholders to accept the Earn-Out Schedule; (j) demanding Arxceo to integrate and/or embed its technology and products in the products of the JCI Group and Arxceo Japan to detriment of Arxceo and the Common Shareholders; (k) setting long-term projections for revenues and income without any short-term objectives to generate revenues and income for Arxceo and the Common Stockholders; (l) diverting Arxceo's corporate opportunities, assets, revenues, and income and wasting Arxceo and the Common Shareholders' corporate assets and resources to benefit the JCI Group and Arxceo Japan; (m) misrepresenting and changing the overall business direction of the JCI Group and Arxceo; (n) precluding Arxceo and the Common Stockholders from meeting certain Gross Revenue and Net Operating Income targets set out in the POS and Earn-Out Schedule; (o) failing and/or refusing to discuss and/or vote on the restructure of the POS and Earn-Out Schedule, the funding of Arxceo, and other issues critical to Arxceo and the Common Shareholders; (p) forcing Arxceo to accept over $600,000 in loan to continue the operation of its business; and (q) indicating that Arxceo was no longer strategic to the JCI Group.

75.    As a result of JCI, Sanda, and Winn's actions and/or inactions, as well as their continued oppression of the Common Stockholders interests as minority shareholders, the Common Stockholders have suffered and will continue to suffer substantial financial harm.

76.    JCI, Sanda, and Winn's breaches of their fiduciary duties are so extreme that Sanda and Winn should not be allowed to maintain any position with Arxceo which would include fiscal or fiduciary responsibilities, including serving on Arxceo's Board of Directors.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against JCI, Sanda, and Winn in an amount to be determined by the trier of fact for compensatory and punitive damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.   In addition, the Common Stockholders request the Court to remove Sanda and Winn from their positions members of Arxceo's Board of Directors, and preclude Sanda and Winn from exercising any control, oversight, or authority over Arxceo.

## COUNT II – PROMISSORY FRAUD/FRAUDULENT INDUCEMENT

### (Defendants the JCI Group, Sanda, and Winn)

77.    The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 76 of the Complaint, as if set forth herein in its entirety.

78.    The JCI Group, Sanda, and Winn intentionally, recklessly, negligently and/or innocently misrepresented certain material facts to the Common Stockholders prior to and at the time the Common Stockholders entered into the POS, including, but not limited to, the acts described in paragraphs 25 through 70, *supra*, some of which include: (a) misrepresenting the JCI Group's intent to support, grow, and expand their security offerings and solutions and network communications business in the United States, particularly over the short-term; (b)

misrepresenting that BellSouth, Westell, and Netopia had committed and were required to integrate and/or embed Arxceo's technology and products; (c) assuring that the demand for and revenues and income generated by BellSouth, Westell, Netopia's requirement and commitment would be substantial; (d) misrepresenting that BellSouth would require its vendors for DSL modems and Gateway business products to integrate and/or embed Arxceo's technology and products; (e) misrepresenting that they would take all necessary action to further the integration and/or embedding process; (f) misrepresenting that Arxceo would be provided with development funding resources to enable it to meet and exceed the demands of the integration and/or embedding process; (g) misrepresenting that they would hire and fund the support of additional software developers to meet the demands of the integration and/or embedding process; and (h) misrepresenting that they would use their good faith, best efforts to meet and exceed the Gross Revenue and Net Operating Income targets set out in the POS Earn-Out Schedule.

79.    The Common Stockholders reasonably relied on the above-described material misrepresentations to its detriment by, among other things: (a) entering into the POS; (b) accepting the Gross Revenue and Net Operating Income targets set out in the POS Earn-Out Schedule; (c) allowing Sanda and Winn to be appointed to Arxceo's Board of Directors; (d) investing time, money, and resources for the development and funding of technology and products for the JCI Group; and (e) otherwise electing to pursue a business relationship with the JCI Group.

80.    At the time the JCI Group, Sanda, and Winn made the misrepresentations to the Common Stockholders, they intended not to perform as promised and intended to deceive the Common Stockholders.

81.     As a result of the aforementioned material misrepresentations, the Common Stockholders have suffered and will continue to suffer substantial financial harm.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against the JCI Group, Sanda, and Winn in an amount to be determined by the trier of fact for compensatory and punitive damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.

## COUNT III – FRAUDULENT MISREPRESENTATION

### (Defendants the JCI Group, Sanda, and Winn)

82.     The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 81 of the Complaint, as if set forth herein in its entirety.

83.     The JCI Group, Sanda, and Winn intentionally, recklessly, negligently, and/or innocently misrepresented certain material facts to the Common Stockholders during their business relationship from April, 2005, through the present date, as described in paragraphs 25 through 70, *supra*, by misrepresenting, including but not limited to: (a) that they would support, grow, and expand JCI's security offerings and solutions and JCI's network communications business in the United States; (b) that BellSouth, Westell, and Netopia had committed and were required to integrate and/or embed Arxceo's technology and products; (c) that the demand for and revenues and income that would be generated by BellSouth, Westell, and Netopia's requirement and commitment would be substantial; (d) that BellSouth would require its vendors for DSL modems and Gateway business products to integrate and/or embed Arxceo's technology and products; (e) that they would take all necessary actions to further the integration and/or embedding process; (f) that Arxceo would be provided with development funding resources to enable it to meet and exceed the demands of the integration and/or embedding process; (g) that

they would hire and fund the support of additional software developers to meet the demands of the integration process; (h) that they would use their good faith, best efforts to meet and exceed the Gross Revenue and Net Operating Income targets set out in the Earn-Out Schedule of the POS; (i) that Arxceo would not be immediately required to integrate and/or embed its technology and products in the products of the JCI Group without additional funding and resources; (j) that they had short-term objectives to generate revenues and income for Arxceo and the Common Stockholders; (k) that they would not divert Arxceo's corporate opportunities, revenues, and income or waste Arxceo's assets and resources to benefit themselves and/or Arxceo Japan; (l) that the POS and Earn-Out Schedule would be restructured to align with the changed business direction of the JCI Group; (m) that they would discuss and/or vote on the restructure of the POS and Earn-Out Schedule, the funding of Arxceo, and other issues critical to Arxceo and the Common Shareholders; and (n) that Arxceo was strategic to the JCI Group.

84.     The Common Stockholders reasonably relied on the above-described material misrepresentations to their detriment by: (a) entering into the POS; (b) accepting the Gross Revenue and Net Operating Income targets set out in the POS Earn-Out Schedule; (c) allowing Sanda and Winn to be appointed to Arxceo's Board of Directors; (d) investing time, money, and resources for the development and funding of technology and products for the JCI Group; (e) accepting over $600,000 in loans from the JCI Group; and (f) otherwise electing to pursue a business relationship with the JCI Group.

85.     As a result of the aforementioned material misrepresentations, the Common Stockholders have suffered and will continue to suffer substantial financial harm.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against the JCI Group, Sanda, and Winn in an amount to be

determined by the trier of fact for compensatory and punitive damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.

## COUNT IV – FRAUDULENT SUPPRESSION

### (Defendants the JCI Group, Sanda, and Winn)

86.     The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 85 of the Complaint, as if set forth herein in its entirety.

87.     The JCI Group, Sanda, and Winn owed a duty to the Common Stockholders to disclose certain material information concerning the Common Stockholders during their business relationship from April, 2005, through the present date. Said material information included, but was not limited to, the acts described in paragraphs 25 through 70, *supra*. Some of the suppressed facts include: (a) that they did not intend to support, grow, and expand JCI's security offerings and solutions and JCI's network communications business in the United States over a short duration; (b) that BellSouth, Westell, and Netopia did not commit and were not required to integrate and/or embed Arxceo's technology and products; (c) that the demand for and revenues and income to be generated by BellSouth, Westell, and Netopia's requirement and commitment would not be substantial; (d) that BellSouth did not require its vendors for DSL modems and Gateway business products to integrate and/or embed Arxceo's technology and products; (e) that they would not take all necessary actions to further the integration and/or embedding process; (f) that Arxceo would not be provided with development funding resources to enable it to meet and exceed the demands of the integration and/or embedding process; (g) that they would not hire and fund the support of additional software developers to meet the demands of the integration process; (h) that they would not use their good faith, best efforts to meet and exceed the Gross Revenue and Net Operating Income targets set out in the Earn-Out Schedule of the POS; (i) that

they would demand Arxceo to integrate and/or embed its technology and products in the products of the JCI Group to detriment of Arxceo and the Common Shareholders; (j) that they did not have short-term objectives to generate revenues and income for Arxceo and the Common Stockholders; (k) that they intended to divert Arxceo's corporate opportunities, revenues, and income and waste Arxceo's corporate assets and resources to benefit the JCI Group and Arxceo Japan; (l) that the POS and Earn-Out Schedule would not be restructured to align with the changed business direction of the JCI Group; (m) that they would not discuss and/or vote on the restructure of the POS and Earn-Out Schedule, the funding of Arxceo, and other issues critical to Arxceo and the Common Shareholders; and (n) that Arxceo was not strategic to the JCI Group.

88.     The JCI Group, Sanda, and Winn had knowledge of these material facts and intentionally, recklessly, negligently, and/or innocently concealed or failed to disclose them to the Common Stockholders.

89.     The JCI Group, Sanda, and Winn's concealment or failure to disclose said material facts induced the Common Stockholders to take and/or refrain from taking action. Among other things, these suppressions caused the Common Stockholders to: (a) enter into the POS; (b) accept the Gross Revenue and Net Operating Income targets set out in the POS Earn-Out Schedule; (c) allow Sanda and Winn to be appointed to Arxceo's Board of Directors; (d) invest time, money, and resources for the development and funding of technology and products for the JCI Group; (e) accept over $600,000 in loans from the JCI Group; and (f) otherwise elect to pursue a business relationship with the JCI Group.

90.     The Common Stockholders have suffered substantial monetary damages as a result of the JCI Group, Sanda, and Winn's failure to disclose the above-described material facts.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against the JCI Group, Sanda, and Winn in an amount to be determined by the trier of fact for compensatory and punitive damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.

### COUNT V – BREACH OF FIDUCIARY DUTY

### (Defendants JCI, Sanda, and Winn)

91.    The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 90 of the Complaint, as if set forth herein in its entirety.

92.    JCI, as the majority shareholder of Arxceo, and Sanda and Winn, as members of Arxceo's Board of Directors, owed fiduciary duties to the Common Stockholders.

93.    Specifically, JCI, Sanda, and Winn owed fiduciary duties which required them not to commit misfeasance or malfeasance, as well as other fiduciary duties and responsibilities imposed upon shareholders and directors of a corporation in accordance with applicable law, including, but not limited to, duties of good faith, loyalty, and care.

94.    JCI, Sanda, and Winn have breached their fiduciary duties and committed misfeasance and/or malfeasance by, among other things: acts described in paragraphs 25 through 68, *supra*, some of which include: (a) misrepresenting material facts related to and failing to support, grow, and expand the JCI Group's security offerings and solutions and network communications business in the United States; (b) misrepresenting that BellSouth, Westell, and Netopia had committed and were required to integrate and/or embed Arxceo's technology and products; (c) assuring that the demand for and revenues and income to be generated by BellSouth, Westell, Netopia's requirement and commitment would be substantial; (d) misrepresenting that BellSouth would require its vendors for DSL modems and Gateway

business products to embed Arxceo's technology and products; (e) misrepresenting that they would take all necessary action to further the integration and/or embedding process; (f) misrepresenting and failing to provide Arxceo with development funding resources to enable it to meet and exceed the demands of the integration and/or embedding process; (g) misrepresenting that they would hire and fund the support of additional software developers to meet the demands of the integration and/or embedding process; (h) misrepresenting and/or suppressing material facts to induce Arxceo and the Common Shareholders to enter into the POS; (i) misrepresenting and/or suppressing material facts to induce the Common Shareholders to accept the Earn-Out Schedule; (j) demanding Arxceo to integrate and/or embed its technology and products in the products of the JCI Group to detriment of Arxceo and the Common Shareholders; (k) setting long-term projections for revenues and income without any short-term objectives to generate revenues and income for Arxceo; (l) diverting Arxceo's corporate opportunities, revenues, and income and wasting Arxceo's corporate assets and resources to benefit the JCI Group and Arxceo Japan; (m) misrepresenting and changing the overall business direction of the JCI Group and Arxceo; (n) precluding Arxceo and the Common Stockholders from meeting certain revenue and income targets set out in the POS and Earn-Out Schedule; (o) failing and/or refusing to discuss and/or vote on the restructure of the POS and Earn-Out Schedule, the funding of Arxceo, and other issues critical to Arxceo and the Common Shareholders; (p) forcing Arxceo to accept over $600,000 in loan to continue the operation of its business; and (q) indicating that Arxceo was no longer strategic to the JCI Group.

95.    As a result of JCI, Sanda, and Winn's actions and/or inactions, the Common Stockholders have suffered and will continue to suffer substantial financial harm.

96.     JCI, Sanda, and Winn's breaches of their fiduciary duties are so extreme that Sanda and Winn should not be allowed to maintain any position with Arxceo which would include fiscal or fiduciary responsibilities, including serving on Arxceo's Board of Directors.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against the JCI Group, Sanda, and Winn in an amount to be determined by the trier of fact for compensatory and punitive damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.   In addition, the Common Stockholders request the Court to remove Sanda and Winn from their positions members of Arxceo's Board of Directors, and preclude Sanda and Winn from exercising any control, oversight, or authority over Arxceo.

## COUNT VI – BREACH OF CONTRACT

### (Defendant JCI)

97.     The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 96 of the Complaint, as if set forth herein in its entirety.

98.     Pursuant to the POS, JCI agreed to pay the Common Stockholders in accordance with the terms of the POS and Earn-Out Schedule.

99.     JCI breached the POS by, among other things, failing to use its good faith, best efforts to generate Gross Revenues and Net Operating Income during the term of the Earn-Out Schedule set forth in the POS.

100.    The Common Stockholders fully performed their obligations under the POS and has suffered substantial financial damages as a result of JCI's breaches.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against JCI in an amount to be determined by the trier of fact for compensatory damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.

## DERIVATIVE COUNTS

## COUNT VII – PROMISSORY FRAUD/FRAUDULENT INDUCEMENT

### (Defendants the JCI Group, Sanda, Winn, and Arxceo)

101.    The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 100 of the Complaint, as if set forth herein in its entirety.

102.    The JCI Group, Sanda, and Winn intentionally, recklessly, negligently and/or innocently misrepresented certain material facts to the Common Stockholders prior to and at the time the Common Stockholders entered into the POS, including, but not limited to, the acts described in paragraphs 25 through 70, *supra*, some of which include: (a) misrepresenting the JCI Group's intent to support, grow, and expand their security offerings and solutions and network communications business in the United States, particularly over the short-term; (b) misrepresenting that BellSouth, Westell, and Netopia had committed and were required to integrate and/or embed Arxceo's technology and products; (c) assuring that the demand for and revenues and income generated by BellSouth, Westell, Netopia's requirement and commitment would be substantial; (d) misrepresenting that BellSouth would require its vendors for DSL modems and Gateway business products to integrate and/or embed Arxceo's technology and products; (e) misrepresenting that they would take all necessary action to further the integration and/or embedding process; (f) misrepresenting that Arxceo would be provided with development funding resources to enable it to meet and exceed the demands of the integration and/or

embedding process; (g) misrepresenting that they would hire and fund the support of additional software developers to meet the demands of the integration and/or embedding process; and (h) misrepresenting that they would use their good faith, best efforts to meet and exceed the Gross Revenue and Net Operating Income targets set out in the POS Earn-Out Schedule.

103.    The Common Stockholders reasonably relied on the above-described material misrepresentations to its detriment by, among other things: (a) entering into the POS; (b) accepting the Gross Revenue and Net Operating Income targets set out in the POS Earn-Out Schedule; (c) allowing Sanda and Winn to be appointed to Arxceo's Board of Directors; (d) investing time, money, and resources for the development and funding of technology and products for the JCI Group; and (e) otherwise electing to pursue a business relationship with the JCI Group.

104.    At the time the JCI Group, Sanda, and Winn made the misrepresentations to the Common Stockholders, they intended not to perform as promised and intended to deceive the Common Stockholders.

105.    As a result of the aforementioned material misrepresentations, the Common Stockholders have suffered and will continue to suffer substantial financial harm.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against the JCI Group, Sanda, Winn, and Arxceo in an amount to be determined by the trier of fact for compensatory and punitive damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.

## COUNT VIII – FRAUDULENT MISREPRESENTATION

### (Defendants the JCI Group, Sanda, Winn, and Arxceo)

106.    The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 105 of the Complaint, as if set forth herein in its entirety.

107.    The JCI Group, Sanda, and Winn intentionally, recklessly, negligently, and/or innocently misrepresented certain material facts to the Common Stockholders during their business relationship from April, 2005, through the present date, as described in paragraphs 25 through 70, *supra*, by misrepresenting, including but not limited to: (a) that they would support, grow, and expand JCI's security offerings and solutions and JCI's network communications business in the United States; (b) that BellSouth, Westell, and Netopia had committed and were required to integrate and/or embed Arxceo's technology and products; (c) that the demand for and revenues and income that would be generated by BellSouth, Westell, and Netopia's requirement and commitment would be substantial; (d) that BellSouth would require its vendors for DSL modems and Gateway business products to integrate and/or embed Arxceo's technology and products; (e) that they would take all necessary actions to further the integration and/or embedding process; (f) that Arxceo would be provided with development funding resources to enable it to meet and exceed the demands of the integration and/or embedding process; (g) that they would hire and fund the support of additional software developers to meet the demands of the integration process; (h) that they would use their good faith, best efforts to meet and exceed the Gross Revenue and Net Operating Income targets set out in the Earn-Out Schedule of the POS; (i) that Arxceo would not be immediately required to integrate and/or embed its technology and products in the products of the JCI Group without additional funding and resources; (j) that they had short-term objectives to generate revenues and income for Arxceo and the Common

Stockholders; (k) that they would not divert Arxceo's corporate opportunities, revenues, and income or waste Arxceo's assets and resources to benefit themselves and/or Arxceo Japan; (l) that the POS and Earn-Out Schedule would be restructured to align with the changed business direction of the JCI Group; (m) that they would discuss and/or vote on the restructure of the POS and Earn-Out Schedule, the funding of Arxceo, and other issues critical to Arxceo and the Common Shareholders; and (n) that Arxceo was strategic to the JCI Group.

108.    The Common Stockholders reasonably relied on the above-described material misrepresentations to their detriment by: (a) entering into the POS; (b) accepting the Gross Revenue and Net Operating Income targets set out in the POS Earn-Out Schedule; (c) allowing Sanda and Winn to be appointed to Arxceo's Board of Directors; (d) investing time, money, and resources for the development and funding of technology and products for the JCI Group; (e) accepting over $600,000 in loans from the JCI Group; and (f) otherwise electing to pursue a business relationship with the JCI Group.

109.    As a result of the aforementioned material misrepresentations, the Common Stockholders have suffered and will continue to suffer substantial financial harm.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against the JCI Group, Sanda, Winn, and Arxceo in an amount to be determined by the trier of fact for compensatory and punitive damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.

## COUNT IX – FRAUDULENT SUPPRESSION

### (Defendants the JCI Group, Sanda, Winn, and Arxceo)

110.    The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 109 of the Complaint, as if set forth herein in its entirety.

111.    The JCI Group, Sanda, and Winn owed a duty to the Common Stockholders to disclose certain material information concerning the Common Stockholders during their business relationship from April, 2005, through the present date. Said material information included, but was not limited to, the acts described in paragraphs 25 through 70, *supra*. Some of the suppressed facts include: (a) that they did not intend to support, grow, and expand JCI's security offerings and solutions and JCI's network communications business in the United States over a short duration; (b) that BellSouth, Westell, and Netopia did not commit and were not required to integrate and/or embed Arxceo's technology and products; (c) that the demand for and revenues and income to be generated by BellSouth, Westell, and Netopia's requirement and commitment would not be substantial; (d) that BellSouth did not require its vendors for DSL modems and Gateway business products to integrate and/or embed Arxceo's technology and products; (e) that they would not take all necessary actions to further the integration and/or embedding process; (f) that Arxceo would not be provided with development funding resources to enable it to meet and exceed the demands of the integration and/or embedding process; (g) that they would not hire and fund the support of additional software developers to meet the demands of the integration process; (h) that they would not use their good faith, best efforts to meet and exceed the Gross Revenue and Net Operating Income targets set out in the Earn-Out Schedule of the POS; (i) that they would demand Arxceo to integrate and/or embed its technology and products in the products of the JCI Group to detriment of Arxceo and the Common Shareholders; (j) that they

did not have short-term objectives to generate revenues and income for Arxceo and the Common Stockholders; (k) that they intended to divert Arxceo's corporate opportunities, revenues, and income and waste Arxceo's corporate assets and resources to benefit the JCI Group and Arxceo Japan; (l) that the POS and Earn-Out Schedule would not be restructured to align with the changed business direction of the JCI Group; (m) that they would not discuss and/or vote on the restructure of the POS and Earn-Out Schedule, the funding of Arxceo, and other issues critical to Arxceo and the Common Shareholders; and (n) that Arxceo was not strategic to the JCI Group.

112.    The JCI Group, Sanda, and Winn had knowledge of these material facts and intentionally, recklessly, negligently, and/or innocently concealed or failed to disclose them to the Common Stockholders.

113.    The JCI Group, Sanda, and Winn's concealment or failure to disclose said material facts induced the Common Stockholders to take and/or refrain from taking action. Among other things, these suppressions caused the Common Stockholders to: (a) enter into the POS; (b) accept the Gross Revenue and Net Operating Income targets set out in the POS Earn-Out Schedule; (c) allow Sanda and Winn to be appointed to Arxceo's Board of Directors; (d) invest time, money, and resources for the development and funding of technology and products for the JCI Group; (e) accept over $600,000 in loans from the JCI Group; and (f) otherwise elect to pursue a business relationship with the JCI Group.

114.    The Common Stockholders have suffered substantial monetary damages as a result of the JCI Group, Sanda, and Winn's failure to disclose the above-described material facts.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against the JCI Group, Sanda, Winn, and Arxceo in an amount to be determined by the trier of fact for compensatory and punitive damages, interest,

costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.

## COUNT X – BREACH OF FIDUCIARY DUTY

### (Defendants JCI, Sanda, Winn, and Arxceo)

115.    The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 114 of the Complaint, as if set forth herein in its entirety.

116.    JCI, as the majority shareholder of Arxceo, and Sanda and Winn, as members of Arxceo's Board of Directors, owed fiduciary duties to the Common Stockholders.

117.    Specifically, JCI, Sanda, and Winn owed fiduciary duties which required them not to commit misfeasance or malfeasance, as well as other fiduciary duties and responsibilities imposed upon shareholders and directors of a corporation in accordance with applicable law, including, but not limited to, duties of good faith, loyalty, and care.

118.    JCI, Sanda, and Winn have breached their fiduciary duties and committed misfeasance and/or malfeasance by, among other things: acts described in paragraphs 25 through 68, *supra*, some of which include: (a) misrepresenting material facts related to and failing to support, grow, and expand the JCI Group's security offerings and solutions and network communications business in the United States; (b) misrepresenting that BellSouth, Westell, and Netopia had committed and were required to integrate and/or embed Arxceo's technology and products; (c) assuring that the demand for and revenues and income to be generated by BellSouth, Westell, Netopia's requirement and commitment would be substantial; (d) misrepresenting that BellSouth would require its vendors for DSL modems and Gateway business products to embed Arxceo's technology and products; (e) misrepresenting that they would take all necessary action to further the integration and/or embedding process; (f)

32

misrepresenting and failing to provide Arxceo with development funding resources to enable it to meet and exceed the demands of the integration and/or embedding process; (g) misrepresenting that they would hire and fund the support of additional software developers to meet the demands of the integration and/or embedding process; (h) misrepresenting and/or suppressing material facts to induce Arxceo and the Common Shareholders to enter into the POS; (i) misrepresenting and/or suppressing material facts to induce the Common Shareholders to accept the Earn-Out Schedule; (j) demanding Arxceo to integrate and/or embed its technology and products in the products of the JCI Group to detriment of Arxceo and the Common Shareholders; (k) setting long-term projections for revenues and income without any short-term objectives to generate revenues and income for Arxceo; (l) diverting Arxceo's corporate opportunities, revenues, and income and wasting Arxceo's corporate assets and resources to benefit the JCI Group and Arxceo Japan; (m) misrepresenting and changing the overall business direction of the JCI Group and Arxceo; (n) precluding Arxceo and the Common Stockholders from meeting certain revenue and income targets set out in the POS and Earn-Out Schedule; (o) failing and/or refusing to discuss and/or vote on the restructure of the POS and Earn-Out Schedule, the funding of Arxceo, and other issues critical to Arxceo and the Common Shareholders; (p) forcing Arxceo to accept over $600,000 in loan to continue the operation of its business; and (q) indicating that Arxceo was no longer strategic to the JCI Group.

119.    As a result of JCI, Sanda, and Winn's actions and/or inactions, the Common Stockholders have suffered and will continue to suffer substantial financial harm.

120.    JCI, Sanda, and Winn's breaches of their fiduciary duties are so extreme that Sanda and Winn should not be allowed to maintain any position with Arxceo which would include fiscal or fiduciary responsibilities, including serving on Arxceo's Board of Directors.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against the JCI Group, Sanda, Winn, and Arxceo in an amount to be determined by the trier of fact for compensatory and punitive damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate. In addition, the Common Stockholders request the Court to remove Sanda and Winn from their positions members of Arxceo's Board of Directors, and preclude Sanda and Winn from exercising any control, oversight, or authority over Arxceo.

**COUNT XI – BREACH OF CONTRACT**

**(Defendants JCI and Arxceo)**

121.    The Common Stockholders adopt and incorporate by reference the allegations set forth in paragraphs 1 through 120 of the Complaint, as if set forth herein in its entirety.

122.    Pursuant to the POS, JCI agreed to pay the Common Stockholders in accordance with the terms of the POS and Earn-Out Schedule.

123.    JCI breached the POS by, among other things, failing to use its good faith, best efforts to generate Gross Revenues and Net Operating Income during the term of the Earn-Out Schedule set forth in the POS.

124.    The Common Stockholders fully performed their obligations under the POS and has suffered substantial financial damages as a result of JCI's breaches.

For the foregoing reasons, the Common Stockholders respectfully request the Court to enter a judgment in their favor and against JCI and Arxceo in an amount to be determined by the trier of fact for compensatory damages, interest, costs, expenses, a reasonable attorneys' fee, and any other amount the trier of fact deems appropriate.

---

### JURY DEMAND

The Common Stockholders hereby demand a trial by struck jury as to all claims
asserted in this Complaint and which may be asserted in any subsequent amendment,
excluding their individual claim for breach of contract against JCI and
their derivative claim for breach of contract against JCI and Arxceo.

---

Respectfully submitted this 29th day of August, 2007.

G. Bartley Loftin, III (LOF009)

Douglas B. Hargett (HAR278)

**MAYNARD, COOPER & GALE, P.C.**
655 Gallatin Street, S.W.
Huntsville, Alabama 35801
(256) 512-0171 (Telephone)
(256) 512-0119 (Facsimile)

W. Percy Badham, III (BAD002)

Will A. Smith (SMI284)

**MAYNARD, COOPER & GALE P.C.**
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203
(205) 254-1000 (Telephone)
(205) 254-1999 (Facsimile)

## SERVICE WILL BE PERFECTED UPON THE FOLLOWING DEFENDANTS:

**Japan Communications, Inc.**
Attention: Mr. Frank Seiji Sanda
Shinagawa-ku
Tokyo 140-0013 JAPAN

**Communications Security and Compliance Technologies, Inc.**
Attention: Corporation Service Company – Registered Agent
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808

**Computer and Communication Technologies, Inc.**
Attention: The Corporation Trust Company – Registered Agent
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**Frank Seiji Sanda**
Shinagawa-ku
Tokyo 140-0013 JAPAN

**J. Marc Winn**
1032 Cumberland Road
Atlanta, Georgia 30306-3216

**Arxceo Corporation**
Attention: Mr. Charles F. Lofty – Registered Agent
1525 Perimeter Parkway, Suite 225
Huntsville, Alabama 35806

## VERIFICATION

Charles F. Lofty, Managing Member of RNR Ventures, L.L.C., being first duly sworn, deposes and says that he has read the foregoing Complaint and knows the contents thereof; that the same is true to the best of his knowledge except those matters and things based upon information and belief and as to those matters and things, he believes the same to be true.

This the _27_ day of _August_, 2007.

_Charles F. Lofty_
MANAGING MEMBER

Sworn and subscribed before me this the _27th_ day of _August_, 2007.

_Kelly Mae Stadthagen_
Notary Public
My Commission Expires My Commission Expires 1/08/2011

**[NOTARY SEAL]**

H0004743.5

## VERIFICATION

David A. Izatt, President of Angus Adair Wolfgang, Inc., being first duly sworn, deposes and says that he has read the foregoing Complaint and knows the contents thereof; that the same is true to the best of his knowledge except those matters and things based upon information and belief and as to those matters and things, he believes the same to be true.

This the _27_ day of _August_, 2007.

_____
President   Angus Adair Wolfgang, Inc.

Sworn and subscribed before me this the _27th_ day of _August_, 2007.

_____
Notary Public
My Commission Expires: _____

**[NOTARY SEAL]**

My Commission Expires 1/08/2011

H0004743.5

## VERIFICATION

Donald J. Davidson, being first duly sworn, deposes and says that he has read the foregoing Complaint and knows the contents thereof; that the same is true to the best of his knowledge except those matters and things based upon information and belief and as to those matters and things, he believes the same to be true.

This the _27_ day of _AUGUST_, 2007.

Sworn and subscribed before me this the _27th_ day of _August_, 2007.

Notary Public
My Commission Expires: _____

**[NOTARY SEAL]**

My Commission Expires 1/08/2011

## VERIFICATION

J. Chandler Hall, being first duly sworn, deposes and says that he has read the foregoing Complaint and knows the contents thereof; that the same is true to the best of his knowledge except those matters and things based upon information and belief and as to those matters and things, he believes the same to be true.

This the 27 day of August , 2007.

*J. Chandler Hall*

Sworn and subscribed before me this the 27th day of August , 2007.

*Kelly Grace Gladshagn*
Notary Public

**[NOTARY SEAL]**

My Commission Expires: _____

My Commission Expires 1/08/2011

# Exhibit "1"
## Securities Purchase Agreement

SECURITIES PURCHASE AGREEMENT


dated as of February 28, 2006


among

JAPAN COMMUNICATIONS, INC.

ARXCEO CORPORATION

and

THE STOCKHOLDERS OF ARXCEO CORPORATION PARTY HERETO

# SECURITIES PURCHASE AGREEMENT

**THIS SECURITIES PURCHASE AGREEMENT** (this "Agreement"), dated as of February 28, 2006, by and among Arxceo Corporation, a Delaware corporation (the "Company"), Japan Communications, Inc., a Japanese company (the "Purchaser"), for the purposes of Section 3 only, the Stockholders set forth on the signature pages hereto and, for purposes of Section 4 only, Donald Davidson and David Izatt (collectively, the "Representatives"). Capitalized words used and not defined herein have the meanings set forth in Annex I hereto.

## PREAMBLE

**WHEREAS,** the Company provides internet security software and services;

**WHEREAS,** the Stockholders own all of the issued outstanding capital stock of the Company, consisting of: (i) 371,000 shares of Series B Preferred Stock, $0.0001 par value (the "Series B Preferred Stock"), (ii) 300,000 shares of Series A Preferred Stock, $0.0001 par value (the "Series A Preferred Stock") and 1,000,000 shares of Common Stock, $0.0001 par value (the "Common Stock", together with the Series B Preferred Stock, Series A Preferred Stock and Series C Preferred Stock collectively, the "Company Stock");

**WHEREAS,** at the First Closing, the Purchaser wishes to purchase from the Stockholders, and the Stockholders are willing to sell to Purchaser that number of shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock set forth on Annex II hereto (the "Tendered Stock");

**WHEREAS,** the Purchaser wishes to commit, subject to the terms and conditions contained herein, $3.0 million (the "Tendered Stock Purchase Price") to purchase the Tendered Stock and $2.0 million (the "Series C Amount") to purchase the Series C Preferred Stock at the First Closing;

**WHEREAS,** at the First Closing the Company desires to sell to the Purchaser and the Purchaser desires to purchase from the Company that number of shares of the Company's Series C Preferred Stock, $0.0001 par value per share (the "Series C Preferred Stock"), equal to 58% of the Fully-Diluted Capitalization of the Company as of the First Closing (the "Post-Closing 58% Number"), with the designations, preferences, and rights set forth in the Second Amended and Restated Certificate of Incorporation of the Company (the "Restated Certificate") attached hereto as Exhibit A, on the terms and subject to the conditions set forth herein; and

**WHEREAS,** the Company shall purchase such additional shares of Common Stock from the Common Holders at the respective Additional Closings at the price and subject to the additional terms and conditions set forth in Section 1.

**NOW THEREFORE,** in consideration of the foregoing and of the agreements set forth below, the parties agree as follows:

**Section 1.**    **Sale and Purchase.**

(a)    **Authorization of Issuance and Sale; Reservation of Reserved Shares.**

Subject to the terms and conditions hereof, the Company has authorized: (i) the issuance and sale of the Post-Closing 58% Number of shares of Series C Preferred Stock, and (ii) the reservation of an equal number of shares of Common Stock for issuance upon conversion of the Series C Preferred Stock (the "Reserved Shares").

(b)    **Commitment to Purchase and Sell the Tendered Stock and the Series C Preferred Stock.**

(i)    Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements contained in this Agreement, at the First Closing, each of the Series A Holders, Series B Holders and Common Holders hereby sells, assigns and conveys to the Purchaser that number of shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock, respectively, set forth on Annex II hereto, and the Purchaser hereby purchases, acquires and accepts from such Stockholders, all of such Series B Preferred Stock, Series A Preferred Stock and Common Stock in the amounts set forth on Annex II hereto. At the First Closing, each Stockholder shall deliver to the Purchaser stock certificates and, if required by Purchaser, accompanying stock powers representing the shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock purchased from such Stockholder by the Purchaser. Immediately thereafter: (i) Purchaser shall deliver such stock certificates to the Company for cancellation; (ii) the Company shall issue new stock certificates (the "New Purchaser Stock Certificates") to the Purchaser representing the transfer of such shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock from such Stockholder to Purchaser; (iii) the Purchaser shall deliver the New Purchaser Stock Certificates to the Company to be treated in accordance with Section 7(k); and (iv) the Company shall issue new stock certificates to such Stockholder (the "New Stockholder Certificates") representing shares of Common Stock equal to the sum of all shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock held by such Stockholder immediately prior to the First Closing and not sold to the Purchaser at the First Closing, it being the intent of the parties that the shares of Series B Preferred Stock and Series A Preferred Stock not sold to the Purchaser at the First Closing shall, effective as of the filing of the Restated Certificate with the Delaware Secretary of State and the date of the First Closing, automatically be converted to Common Stock.

(ii)    Notwithstanding the foregoing, the Stockholders acknowledge and agree that the New Stockholder Certificates (other than the New Stockholder Certificates delivered to the Secretary of the Company pursuant to the terms of the Key Management Vesting Agreement) shall be delivered by or on behalf of the Stockholders to the Escrow Agent and held in escrow pursuant to the terms and provisions of the Escrow Agreement.

(iii)    Also notwithstanding the foregoing, in no event shall the Purchaser purchase, in the aggregate, more than 106,400 shares of Common Stock at the First Closing. Each Common Holder shall have the right to sell up to its Pro Rata Amount of Common Stock at the First Closing.

(iv)    Subject to the terms and conditions of this Agreement, at the First Closing, the Purchaser shall purchase from the Company the Post-Closing 58% Number of shares of Series C Preferred Stock for an amount equal to (A) the Series C Amount ($2.0 million) plus (B) any portion of the Tendered Stock Purchase Price not used to purchase Tendered Stock (collectively, the "First Closing Company Receipts"). The Company shall issue and deliver to the Purchaser a stock certificate representing the Post-Closing 58% Number of shares of Series C Preferred Stock at the First Closing.

(c)    **Commitment to Purchase and Sell Common Stock at the Additional Closings.**

(i)    Second Closing. Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements contained in this Agreement, on or before April 30, 2007 (the "Second Closing"):

(A)    If the Company's Gross Revenue for the period from and including the First Closing Date through and including March 31, 2007 exceeds fifty percent (50%) of the 2007 GR Target, then each Common Holder shall have the right, but not the obligation, to cause the Purchaser to, and the Purchaser shall, purchase up to (in the sole discretion of each Common Holder) twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock at the Second Closing Purchase Price; and

(B)    If the Company's Net Operating Income for the period from and including the First Closing Date through and including March 31, 2007 exceeds the 2007 NOI Target, then each Common Holder shall have the right, but not the obligation, to cause the Purchaser to, and the Purchaser shall, purchase up to (in the sole discretion of each Common Holder) twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock at the Second Closing Purchase Price; and

(C)    If the Company's Gross Revenue for the period from and including the First Closing Date through and including March 31, 2007 does not exceed fifty percent (50%) of the 2007 GR Target, then the Purchaser shall have the right, but not the obligation, to cause each Common Holder, and each Common Holder shall, sell up to (in the Purchaser's sole discretion) twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock at the Second Closing Purchase Price; and

(D)    If the Company's Net Operating Income for the period from and including the First Closing Date through and including March 31, 2007

3

does not exceed fifty percent (50%) of the 2007 NOI Target, then the Purchaser shall have the right, but not the obligation, to cause each Common Holder, and each Common Holder shall, sell up to (in the Purchaser's sole discretion) twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock at the Second Closing Purchase Price.

(ii)    <u>Third Closing</u>.    Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements contained in this Agreement, on or prior to April 30, 2008 (the "<u>Third Closing</u>"), each Common Holder (other than the Purchaser) will sell, and the Purchaser will purchase, all of the Common Stock held by such Common Holder at the Third Closing Purchase Price.

(d)    **Purchase Price at the First Closing.**

(i)    <u>Series B Preferred Stock Purchase Price</u>.    The purchase price for Series B Preferred Stock at the First Closing shall be $4.80 per share, less any and all amounts to be paid at the First Closing in accordance with <u>Section 11(b)</u>.

(ii)    <u>Series A Preferred Stock Purchase Price</u>.    The purchase price for Series A Preferred Stock at the First Closing shall be $3.00 per share, less any and all amounts to be paid at the First Closing in accordance with <u>Section 11(b)</u>.

(iii)    <u>Common Stock Purchase Price</u>.    The purchase price for Common Stock at the First Closing shall be $3.00 per share, less any and all amounts to be paid at the First Closing in accordance with <u>Section 11(b)</u>.

(iv)    <u>Series C Preferred Stock Purchase Price</u>.    The per-share purchase price for Series C Preferred Stock at the First Closing shall be an amount equal to A/B; where "A" is the First Closing Company Receipts and "B" is the Post-Closing 58% Number.

(v)    <u>Timing of Payment</u>.    The amounts to be paid to the Series B Holders, Series A Holders and Common Holders pursuant to this <u>Section 1(d)</u> shall be paid by check, sent by the Purchaser to each applicable Stockholder promptly after the satisfaction or waiver, to the extent waivable, of the conditions set forth in <u>Section 6</u>.

(e)    **Purchase Price at the Additional Closings.**

(i)    <u>Second Closing Purchase Price</u>.    The per-share purchase price for Common Stock at the Second Closing (the "<u>Second Closing Purchase Price</u>") shall be determined by calculating the Company's Gross Revenue and Net Operating Income during the relevant period, and shall be the quotient of: (A) the sum of: (1) the 2007 GR Amount <u>plus</u> (2) the 2007 NOI Amount; and (B) the number of shares of Common Stock to be sold by the Common Holders and purchased by Purchaser at the Second Closing (not to exceed twenty-five percent (25%) of each Common Holder's shares of Common Stock, in accordance with <u>Section 1(c)(i)</u>).

4

(ii)    Third Closing Purchase Price.  The per-share purchase price for Common Stock at the Third Closing (the "Third Closing Purchase Price") shall be determined by calculating the Company's Gross Revenue and Net Operating Income during the relevant period, and shall be the quotient of: (A) the sum of: (1) the 2008 GR Amount plus (2) the 2008 NOI Amount and (B) the total number of shares of Common Stock held by all Common Holders other than the Purchaser.

**Section 2.    Closings.**

(a)    **First Closing.**

(i)    The closing of the sale of the Tendered Stock and Series C Preferred Stock shall take place at the offices of Kilpatrick Stockton LLP, 1100 Peachtree St. NE, Suite 2800, Atlanta, Georgia 30309.  Each closing of the sale and purchase of any Common Stock after the First Closing is referred to herein as an "Additional Closing"; the First Closing and each Additional Closing are referred to herein as the "Closings", and each a "Closing"; and the date of any such Closing is referred to herein as a "Closing Date".

(ii)    The First Closing shall occur as promptly as practicable, but in no event later than the third (3rd) Business Day after the satisfaction or waiver, to the extent waivable, of the conditions set forth in Section 6, or on such other date as may be agreed upon by the Purchaser and the Stockholders' Representatives.

(b)    **Closing Mechanics.**

(i)    At least ten (10) Business Days prior to any proposed Additional Closing, the Company shall provide written notice (a "Purchase Price Notice") to each Common Holder and the Purchaser setting forth the Company's Gross Revenue and Net Operating Income for the applicable period, the Second Closing Purchase Price or Third Closing Purchase Price, as applicable and, to the extent: (i) JCI elects to offer its publicly traded common stock as part of the consideration in the Second Closing or Third Closing, as applicable; and (ii) the Purchaser Common Stock Valuation can be determined at such time, the Purchaser Common Stock Valuation.

(ii)    Second Closing:

(A)    At least five (5) Business Days prior to the Second Closing, if the Company's Gross Revenue or Net Operating Income exceeded the 2007 GR Target or NOI Target, as applicable, then the Common Holders wishing to sell Common Stock held by them shall provide written notice (the "Common Holder's Second Closing Notice") to the Purchaser setting forth the number of shares of Common Stock such Common Holder wishes to sell, and the extent to which such Common Holder desires to have the Second Closing Common Stock Purchase Price paid in cash or in Purchaser's publicly issued stock at the Purchaser Common Stock Valuation.  Notwithstanding the foregoing: (1) to the

5

extent the Company's Gross Revenue for the applicable period exceeded the 2007 GR Target, then each Common Holder shall be entitled to sell, and, to the extent required by each Common Holder, Purchaser shall purchase, up to twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock; and (2) to the extent the Company's Net Operating Income for the applicable period exceeded the 2007 NOI Target, then each Common Holder shall be entitled to sell, and, to the extent required by each Common Holder, Purchase shall purchase, up to twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock. In no event shall any Common Holder be entitled to sell greater than twenty-five percent (25%) of such Common Holder's total shares of Common Stock at the Second Closing. To the extent a Common Holder fails to deliver such Common Holder's Common Holder's Second Closing Notice within the five (5) Business Day period set forth above, such Common Holder shall lose his, her or its rights to sell Common Stock pursuant to this <u>Section 2(b)(ii)</u>.

(B)    At least five (5) Business Days prior to the Second Closing, if the Company's Gross Revenue or Net Operating Income did not exceed the 2007 GR Target or NOI Target, as applicable, then the Purchaser shall provide written notice (the "<u>Purchaser's Second Closing Notice</u>") to each Common Holder setting forth the number of shares of Common Stock the Purchaser wishes to purchase from such Common Holder, and the extent to which the Purchaser desires to have the Second Closing Purchase Price paid in cash or Purchaser's publicly issued stock at the Purchaser Common Stock Valuation. Notwithstanding the foregoing: (1) to the extent the Company's Gross Revenue for the applicable period did not exceed the 2007 GR Target, then the Purchaser shall be entitled to purchase, and, to the extent required by the Purchaser, the Common Holder shall sell, up to twelve and one-half percent (12.5%) of each Common Holder's total shares of Common Stock; and (2) to the extent the Company's Net Operating Income for the applicable period did not exceed the 2007 NOI Target, then the Purchaser shall be entitled to purchase, and, to the extent required by the Purchaser, the Common Holder shall sell, up to twelve and one-half percent (12.5%) of each Common Holder's total shares of Common Stock. In no event shall the Purchaser be entitled to purchaser greater than twenty-five percent (25%) of any Common Holder's total shares of Common Stock at the Second Closing. To the extent the Purchaser fails to deliver its Purchaser's Second Closing Notice within the five (5) Business Day period set forth above, the Purchaser shall lose its rights to purchase Common Stock pursuant to this <u>Section 2(b)(ii)</u>.

(iii)    At least ten (10) Business Days prior to the Third Closing, each Common Holder shall provide written notice (the "<u>Third Closing Notice</u>") to the Purchaser setting forth the number of shares of Common Stock held by such Common Holder and the extent to which such Common Holder desires to have the Third Closing Purchase Price paid in cash or Purchaser's publicly issued stock at the Purchaser

6

Common Stock Valuation; *provided*, that any Common Holder's failure to deliver the Third Closing Notice in such ten (10) Business Day period shall not in any manner effect the purchase and sale of such Common Holder's Common Stock in the Third Closing.

(iv)    Subject to the terms and conditions of this Agreement, at each Additional Closing: (a) the Purchaser shall purchase from each Common Holder the number of shares of Common Stock listed in: (1) with respect to the Second Closing: (A) the Common Holder's Second Closing Notice; and/or (B) the Purchaser's Second Closing Notice, as applicable, and (2) with respect to the Third Closing, the Third Closing Notice; and (b) each Common Holder shall deliver (either by and through the Representatives and in accordance with the Escrow Agreement or pursuant to the Key Management Vesting Agreement, as applicable) to the Purchaser stock certificates (properly endorsed for transfer) representing the shares of Common Stock purchased from such Common Holder by the Purchaser at such Additional Closing. Immediately after the Second Closing, the Company shall issue new stock certificates (the "Second Closing New Stockholder Certificates") to each of the Purchaser and, with respect to the Second Closing only, the applicable Common Holder, representing the transfer of such shares of Common Stock from such Common Holder to Purchaser. Notwithstanding the foregoing, the Stockholders acknowledge and agree that the Second Closing New Stockholder Certificates (other than the Second Closing New Stockholder Certificates delivered to the Secretary of the Company pursuant to the terms of the Key Management Vesting Agreement) shall be delivered to the Escrow Agent and held in escrow pursuant to the terms and provisions of the Escrow Agreement. Immediately after the Third Closing, the Company shall issue new stock certificates to the Purchaser representing the transfer of shares of Common Stock from the Common Holders to Purchaser.

(v)    As payment for such Common Shares, at each Additional Closing, the Purchaser shall deliver to each Common Holder an amount equal to the number of shares of Common Stock purchased from such Common Holder by Purchaser at such Additional Closing multiplied by the Second Closing Purchase Price or Third Closing Purchase Price, as applicable. All amounts payable at such Additional Closing shall be: (i) if mutually agreed upon between the applicable Common Holder and Purchaser, payable in the Purchaser's common stock, valued at the Purchaser Common Stock Valuation, or (ii) if not payable in the Purchaser's common stock, payable in cash.

(c)    **Terms of Each Closing.**

The Purchaser's agreement with each Stockholder is a separate agreement, and each Stockholder's sale to the Purchaser of: (i) Series B Preferred Stock, Series A Preferred Stock and/or Common Stock in the First Closing, and/or (ii) Common Stock in the Second Closing, and/or (iii) Common Stock in the Third Closing, as applicable, is a separate sale. The Purchaser shall not be obligated to purchase any fractional shares of Company Stock. No Common Holder shall be permitted to sell more than his, her or its allotted shares in the First Closing or Second Closing, as applicable, notwithstanding that one or more other Common Holders elect to sell less than their respective allotted shares in such Closing. Each Additional

7

Closing shall take place at the offices of Kilpatrick Stockton LLP, 1100 Peachtree St. NE, Suite 2800, Atlanta, Georgia 30309, or at such other place as the parties to such Additional Closing shall mutually agree.

**Section 3.**     **Representations and Warranties of the Stockholders.**

The Stockholders, severally and not jointly and severally, hereby represent and warrant to the Purchaser as of each Closing Date as follows:

(a)     **Organization.**

Each Stockholder (if a corporation or other entity) is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or other formation.

(b)     **Authorization; No Conflicts.**

The execution, delivery and performance by each Stockholder of the Documents to which such Stockholder is a party have been duly authorized by all requisite action (corporate or otherwise) of such Stockholder, and each Document to which such Stockholder is a party constitutes a valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditor's rights and to general equitable principles. Each Stockholder's execution, delivery and performance of the Documents to which such Stockholder is a party, such Stockholder's consummation of the transactions contemplated thereby and its compliance with the provisions thereof will not (i) violate any provision of any Law applicable to such Stockholder or any of such Stockholder's properties or assets or (ii) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default or give rise to any right of termination, cancellation or acceleration under, or result in the creation of any Encumbrance upon any of the properties or assets of such Stockholder or under any formation documents (if any) or Contract applicable to such Stockholder.

(c)     **Brokers.**

No Stockholder has employed or has any obligation with respect to any broker or finder in connection with the transactions contemplated by this Agreement.

(d)     **Capitalization.**

Each Stockholder holds of record and owns beneficially the number and class of Company Stock set forth next to his, her, or its name in Schedule 3(d), free and clear of any restrictions on transfer (other than any restrictions under the Securities Act and state securities laws). Other than this Agreement and any agreement entered into by a Stockholder related to the Company's 2004 Long Term Incentive Plan, no Stockholder is party to any option, warrant, purchase right, or other contract or commitment that could require such Stockholder to sell,

8

transfer, or otherwise dispose of any capital stock of the Company. No Stockholder is party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of the Company.

**Section 4.**    **Representations and Warranties of the Company.**

The Company and the Representatives hereby, jointly and severally, represent and warrant to the Purchaser as of the First Closing Date as follows:

(a)    **Organization.**

The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, is duly qualified to do business and in good standing in each other jurisdiction in which the conduct of its business requires such qualification and has all requisite corporate power and authority to own, lease and operate the assets used in its business, to carry on its business as presently conducted, to enter into the Documents to which it is a party, to perform its obligations thereunder, and to consummate the transactions contemplated thereby. Attached as Schedules 4(a)(i) and (ii), respectively, are correct and complete copies of the Certificate of Incorporation, as in effect immediately before the filing of the Restated Certificate, and the By-laws of the Company, as in effect on the date hereof (the "Certificate of Incorporation" and the "By-laws," respectively).

(b)    **Subsidiaries.**

The Company has no subsidiaries or controlled Affiliates and does not otherwise own or control, directly or indirectly, any equity or voting interest in any Person, nor has the Company made any commitment or subscribed for the purchase of any such equity or voting interest.

(c)    **Authorization of the Documents; No Conflicts.**

The Company has all requisite corporate power and authority to execute, deliver and perform the Documents to which it is a party and to consummate the transactions contemplated thereby. The execution, delivery and performance by the Company of the Documents to which it is a party has been duly authorized by all requisite corporate and stockholder action of the Company and its stockholders, and each Document to which the Company is a party constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms (to the extent the Company is a party thereto), subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditor's rights and to general equitable principles. The Company's execution, delivery and performance of the Documents to which it is a party, its consummation of the transactions contemplated thereby and its compliance with the provisions thereof will not (i) violate any provision of any Law applicable to the Company or any of its properties or assets or (ii) except as set forth in Schedule 4(c) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default or give rise to any right of termination, cancellation or

9

acceleration under, or result in the creation of any Encumbrance upon any of the properties or assets of the Company or under the Certificate of Incorporation, By-laws or any Contract.

(d)    **Authorization of Series C Preferred Stock and Reserved Shares.**

As of the First Closing Date, (i) the authorization, issuance, sale and delivery of the Series C Preferred Stock and the reservation of the Reserved Shares has been duly authorized by all requisite corporate and stockholder action on the part of the Company and its stockholders; (ii) the Series C Preferred Stock is validly issued and outstanding, fully paid and nonassessable and not subject to any preemptive rights, rights of first refusal or other similar rights of the stockholders of the Company (other than those rights set forth in the Stockholders Agreement).

(e)    **No Consent or Approval Required.**

Except as set forth on Schedule 4(e) hereto, no consent, approval or authorization of, or declaration to or filing with (including pursuant to any federal or state securities laws), any Person is required for the valid authorization, execution and delivery by the Company of any Document to which it is a party or for its consummation of the transactions contemplated thereby or for the valid authorization, issuance and delivery of the Series C Preferred Stock or for the valid authorization, reservation, issuance and delivery of the Reserved Shares, other than those consents, approvals, authorizations, declarations or filings which have been obtained or made, as the case may be.

(f)    **Capitalization.**

The capital stock of the Company immediately prior to the Closing consists solely of: (i) 5,000,000 shares of Common Stock, of which: (A) 1,000,000 shares are issued and outstanding and owned by the Persons listed on Schedule 3(d), (B) 300,000 shares are reserved for issuance upon the exercise of options granted or to be granted under the Company's 2004 Long Term Incentive Plan, (C) 300,000 shares are reserved for issuance upon conversion of the Series A Preferred Stock, and (D) 371,000 shares are reserved for issuance upon conversion of the Series B Preferred Stock; and (ii) 2,000,000 shares of authorized preferred stock, $0.001 par value, of which 300,000 shares have been designated Series A Preferred Stock, all of which are issued and outstanding and owned by the Persons listed on Schedule 3(d) and of which 371,000 shares have been designated Series B Preferred Stock, 371,000 of which are issued and outstanding and owned by the Persons listed on Schedule 3(d).

All of the Company's issued and outstanding shares of capital stock (or other equity securities) have been duly authorized and validly issued and are fully paid and nonassessable. Except as provided in this Agreement or pursuant to the Company's 2004 Long Term Incentive Plan, (i) no subscription, warrant, option, convertible security or other right (contingent or otherwise) to purchase or acquire any shares of capital stock of the Company is authorized or outstanding, (ii) the Company has no obligation (contingent or otherwise) to issue any subscription, warrant, option, convertible security or other such right or to issue or distribute to holders of any shares of its capital stock or other equity securities any evidences of indebtedness or assets of the Company, (iii) the Company has no obligation (contingent or

10

otherwise) to purchase, redeem or otherwise acquire any shares of its capital stock (or other equity securities) or any interest therein or to pay any dividend or make any other distribution in respect thereof (other than any such obligation set forth in the Certificate of Incorporation), and (iv) there are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to the Company. All of the issued and outstanding shares of the Company's capital stock (or other equity securities) have been offered, issued and sold by the Company in compliance with applicable federal and state securities Laws.

Immediately after the First Closing, the Series C Preferred Stock shall represent (on an as-converted basis) fifty-eight percent (58%) of the Fully-Diluted Capitalization of the Company. Immediately after the conversion contemplated by <u>Section 7(k)</u>, the capitalization of the Company shall be as set forth on <u>Schedule 4(f)</u>.

(g)    **Defaults.**

Except as set forth on <u>Schedule 4(g)</u> hereto, the Company is not in default (i) under the Certificate of Incorporation or the By-laws, or, to the Knowledge of the Company or the Knowledge of the Representatives, any Contract to which the Company is a party or by which the Company or any of the Company's properties are bound or affected or (ii) to the Knowledge of the Company and the Knowledge of the Representatives, under any Law. To the Knowledge of the Company and the Knowledge of the Representatives, there exists no condition, event or act which constitutes, or which, after notice, lapse of time or both, would constitute, a default under any of the foregoing.

(h)    **Financial Information; Projections.**

(i)    The Company has furnished to the Purchaser a complete and correct copy of (i) the unaudited balance sheet of the Company (the "Balance Sheet") as at December 31, 2005 (the "Balance Sheet Date") and the related statements of income and cash flows for the fiscal year then ended and (ii) the unaudited balance sheet of the Company as at January 31, 2006 and the related statements of income and cash flows for the one (1) month fiscal period then ended (collectively, the "Financial Statements"). The Financial Statements were prepared in accordance with the books and records of the Company and present fairly in all respects the financial condition and results of operations of the Company, at the dates and for the periods indicated.

(ii)    The business plan of the Company and the initial budget for calendar year 2006 as set forth on <u>Schedule 4(h)</u> have been prepared in good faith, using assumptions which are reasonable. Such projections set forth in reasonable detail the principal assumptions upon which such projections are based and represent the Company's reasonable, good faith estimate of future performance and costs.

(i)    **Absence of Undisclosed Liabilities.**

Except as set forth on <u>Schedule 4(i)</u> and except for Liabilities which have not had and could not reasonably be expected to have a material adverse effect on the Company or its

11

business, the Company has no Liability that would be required to be reserved against or disclosed in a financial statement prepared in accordance with GAAP, except for (a) Liabilities disclosed on the Balance Sheet or otherwise reserved against, (b) Liabilities which have arisen since the Balance Sheet Date in the ordinary course of business and which are similar in nature and amount to the Liabilities which arose during the comparable period of time in the immediately preceding fiscal period and (c) contractual Liabilities incurred in the ordinary course of business.

(j)    **Absence of Changes.**

Except as set forth on <u>Schedule 4(j)</u> hereto, since the Balance Sheet Date, the Company has been operated only in the usual, regular and ordinary course and manner and there has not been (i) a Material Adverse Change, (ii) any borrowing or agreement to borrow funds or to the Knowledge of the Company and the Knowledge of the Representatives, any Liability incurred by the Company, other than current Liabilities incurred in the ordinary course of business consistent in type and amount with past practice, (iii) any asset or property of the Company made subject to any Encumbrance of any kind, (iv) any waiver of any right of the Company, or the cancellation of any debt owed to or claim held by the Company, (v) any payment of dividends on, or other distribution with respect to, or any direct or indirect redemption, purchase or acquisition of, any shares of the capital stock or other securities of the Company, (vi) any issuance of any stock, bond or other security of the Company other than as contemplated by the Company's 2004 Long Term Incentive Plan, (vii) any disposition of any tangible or intangible asset of the Company, (viii) any loan by the Company to any officer, director, employee, consultant, agent, Affiliate or Stockholder (other than advances to such persons in the ordinary course of business consistent with past practice in connection with bona fide business expenses), (ix) any material damage, destruction or loss (whether or not covered by insurance) of any asset of the Company, (x) any extraordinary increase, direct or indirect, in the compensation paid or payable to any officer, director, employee, consultant or agent of the Company, (xi) any write-down of the value of any inventory, or any write-off as uncollectible of any account or note receivable of the Company that is not consistent in type and amount with the Company's past practice, (xii) any change in the accounting methods, practices or policies followed by the Company or any change in depreciation or amortization policies or rates theretofore adopted, which has not been adequately provided for or disclosed in the Financial Statements or (xiii) any agreement or commitment with respect to any of the foregoing matters.

(k)    **Title to Assets, Properties and Rights.**

Except as is set forth on <u>Schedule 4(k)</u>, the Company has good and marketable title to all properties, interests in properties and assets (real, personal or mixed) used by the Company in the conduct of its business, or necessary for use by the Company in the conduct of such business, free and clear of all Encumbrances.

(l)    **Intellectual Property Rights.**

(i)    <u>Schedule 4(l)(i)</u> includes a list of all registered Intellectual Property Rights and all pending applications for registration of Intellectual Property

12

Rights (but with respect to software excluding any readily available commercial software programs having an acquisition price of less that $5,000 ("General Commercial Software")), that are owned by or licensed to the Company (the "Company Intellectual Property").

(ii)    Other than pending applications and Intellectual Property Rights licensed to the Company, the Company Intellectual Property listed on Schedule 4(l)(i) that is registered and issued in the name of the Company is presently in full force and effect, and has not been cancelled, expired, or abandoned, and to the Knowledge of the Company and the Knowledge of the Representatives, the same are valid and enforceable. The applications listed on Schedule 4(l)(i) are pending and have not been abandoned. Except for Company Intellectual Property that is licensed to the Company or that is identified in Schedule 4(l)(ii), the Company is the exclusive owner of the registration or application for such Company Intellectual Property, free and clear of any Encumbrance (provided that this sentence shall not be interpreted to refer to validity, enforceability, right to use, freedom from infringement, or any matters addressed in the remaining provisions of this Section 4(l)). With the exception of governmental fees (for example, maintenance fees, renewal fees, issue fees, extension fees, or publication fees) and service fees to third parties related to securing, maintaining, or protecting the Company Intellectual Property, no royalties, honoraria or fees are payable by the Company to other Persons by reason of the Company's ownership of the Company Intellectual Property.

(iii)    The patents and patent applications (including any provisional patent applications) and registrations set forth in Schedule 4(l)(i) have been timely filed in accordance with the applicable rules and regulations of the United States and such other foreign patent offices and no use, disclosure, publication, sale or offer for sale, by the Company, or to the Knowledge of the Company and the Knowledge of the Representatives, by any third party, have resulted in the loss of any rights to such patents, applications and registrations.

(iv)    Except as described in Schedule 4(l)(iv), the Company has not received any threat, demand or notice of claim from any Person, whether in writing or otherwise, asserting that the Company's use, manufacture, importation, or sale of products constitutes any infringement, interference, violation, misappropriation, breach or legally actionable use of the Intellectual Property Rights of any other Person. The Company is not a party to any Proceeding (other than Proceedings filed by the Company to obtain registration, issuance, or renewal) or outstanding decree, order, Judgment, agreement or stipulation restricting in any manner that would result in a Material Adverse Change to the use, transfer, or licensing by the Company of any Intellectual Property Rights to the extent necessary to conduct its business as presently conducted, or which reasonably may be anticipated to result in a Material Adverse Change to the validity, right of the Company to use or enforceability of the Company Intellectual Property. To the Knowledge of the Company and the Knowledge of the Representatives, the Company has not been named in any suit, action or Proceeding which involves a claim of infringement, misappropriation or violation of any Intellectual Property Rights of any

13

third party.  The Company believes, and neither the Company nor the Representatives have Knowledge to the contrary, that the use, manufacturing, marketing, importing to the United States, licensing and sale of the products of the Company as presently conducted do not infringe, misappropriate or violate any valid and enforceable Intellectual Property Rights of any third party.

(v)     The Company does not possess any copies it has illegally made  of any General Commercial Software.

(vi)     Except as set forth on <u>Schedule 4(l)(vi)</u>, all current and former employees of the Company, and independent contractors of the Company, in each case who were or are reasonably expected in the course of performance of their duties to the Company to create or have created Intellectual Property Rights that govern the ownership or use of the Company's products or services, have executed written agreements with the Company, substantially in the form attached hereto as <u>Exhibit C-1</u>.  To the Knowledge of the Company and the Knowledge of the Representatives, no employee of the Company has entered into any contract in favor of a third party that restricts or limits in any way the scope or type of work in which he may be engaged for the Company or requires him to transfer, assign, or disclose information concerning work devised, developed, or designed by such employee within the scope of their employment for the Company to any Person other than the Company.

(vii)     Except as set forth on <u>Schedule 4(l)(vii)</u>, the Company is not currently participating in any discussions, negotiations, correspondence or meetings with third parties with respect to new licensing or similar arrangements (other than licensing to customers in the ordinary course of business and renewals of existing licenses to the Company), whether involving the licensing of any of the Company-owned Company Intellectual Property or the licensing of a third party's Intellectual Property Rights.

(viii)     The Company has taken actions, measures and precautions intended to safeguard and protect the information the Company considers to be its trade secrets, with a view to being reasonable, prudent and customary in the internet security industry.

(m)     **Employment of Officers, Employees and Consultants.**

Except as set forth on <u>Schedule 4(m)</u>, no Person has asserted, or may assert, any valid claim against the Company with respect to: (a) employment not terminable at will by, or association with, the Company, of any of the present officers or employees of or consultants to the Company (collectively, the "<u>Designated Persons</u>") or (b) the use, in connection with any business presently conducted or proposed to be conducted by the Company or any of the Designated Persons, of any information which the Company or any of the Designated Persons would be prohibited from using under any prior agreements or arrangements or any legal considerations applicable to unfair competition, trade secrets or proprietary information.

(n)     **ERISA Plans.**

14

(i)     Except as set forth on <u>Schedule 4(n)</u>, the Company does not maintain and is not a party to (and has never maintained or been a party to) any "employee welfare benefit plan," as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), or any other written, unwritten, formal or informal plan or agreement involving direct or indirect compensation other than workers' compensation, unemployment compensation and other government programs, under which the Company has any present or future obligation or Liability.  The Company does not maintain and is not a party to (or ever maintained or was a party to) any "employee pension benefit plan," as defined in Section 3(2) of ERISA, and the Company does not contribute to any "multiemployer plan" as defined in Section 3(37) of ERISA.

(ii)     There is no Contract, plan or arrangement covering any employee or former employee of the Company that, individually or collectively, could give rise to the payment of any amount that would not be deductible by the Company by reason of Section 280G of the Code.

(iii)     <u>Schedule 4(n)</u> hereto lists each employment, severance or other similar Contract, arrangement or policy (written or oral) providing for insurance coverage (including any self-insured arrangements), non-statutory workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock appreciation or other forms of incentive compensation or post-retirement insurance, compensation or benefits entered into, maintained or contributed to by the Company.

(o)     **Agreements.**

Schedule 4(o) sets forth an accurate and complete list of all material contracts, indentures, leases, agreements and instruments (each, a "<u>Contract</u>" and collectively, the "<u>Contracts</u>"), whether written or oral (including any and all amendments, modifications, supplements and side letters with respect thereto) to which the Company is a party, or by which the Company or any of the Company's assets are bound.  All of the Contracts are enforceable against the Company and, to the Knowledge of the Company and the Knowledge of the Representatives, the other parties thereto, in accordance with their terms and neither the Company nor, to the Knowledge of the Company and the Knowledge of the Representatives, any other party thereto, is in material breach or in material default under (and no event has occurred which with notice or the passage of time or both would constitute a breach or default under) any such Contract.  Except as set forth on <u>Schedule 4(o)</u> hereto, no Person has indicated that it may terminate or cancel any Contract.  Except as set forth on <u>Schedule 4(o)</u> hereto, no party to any Contract has any rights of setoff, banker's lien or similar rights with respect to any amounts due on any such Contract.  Except as set forth on <u>Schedule 4(o)</u> hereto, no Contract or to the Knowledge of the Company and the Knowledge of the Representatives, no Law restricts or inhibits in any way the Company's right or ability to conduct its business in the United States or any other jurisdiction in which it currently conducts or proposes to conduct its business or to use any Intellectual Property Rights or other rights related to the conduct of such business.

15

(p)    **Compliance; Licenses and Permits; Environmental Matters.**

(i)    The Company has complied in all respects with, and is not in violation in any respect of, any Law or Permit applicable to the business of the Company as presently or previously conducted, or as currently proposed to be conducted, except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Change.    The Company has all licenses and permits of all Governmental Authorities (collectively, "Permits") which are required for the conduct of the business presently or previously conducted by the Company, which Permits are in full force and effect, and no violations are outstanding or uncured with respect to any such Permits and no Proceeding is pending or, to the Knowledge of the Company and the Knowledge of the Representatives, threatened to revoke or limit any such Permits. Schedule 4(p) attached hereto lists all Permits of the Company which are used in or relate to such Person's business, copies of which have been previously delivered to the Purchaser. To the Knowledge of the Company and the Knowledge of the Representatives, no condition or event has occurred which, with notice or the passage of time or both, would constitute a violation of any Law or Permit.

(ii)    The Company is in compliance with all Environmental and Safety Requirements, and there are no Proceedings pending or, to the Knowledge of the Company and the Knowledge of the Representatives, threatened against the Company alleging any failure to so comply or involving any of its past operations or any real property currently used by the Company. The Company has not received any written or oral notice or report with respect to it or its facilities regarding any (A) actual or alleged violation of Environmental and Safety Requirements or (B) actual or potential Liability arising under Environmental and Safety Requirements, including, without limitation, any investigatory, remedial or corrective obligation.    The Company has not expressly assumed or undertaken any Liability of any other Person under any Environmental and Safety Requirements. The Company has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled or released any substance, or owned or operated any real property in a manner that has given rise to Liabilities pursuant to CERCLA, SWDA or any other Environmental and Safety Requirement, including any Liability for response costs, corrective action costs, personal injury, property damage, natural resources damage or attorney fees, or any investigatory, corrective or remedial obligations.

(q)    **Labor Relations; Employees.**

The Company's employees as of the date hereof are listed on Schedule 4(q). Except as set forth on Schedule 4(q) hereto, (i) the Company is not delinquent in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed by them prior to any Closing Date or amounts required to be reimbursed to such employees, (ii) there is no labor strike, dispute, slowdown or stoppage actually pending or, to the Knowledge of the Company and the Knowledge of the Representatives, threatened against or involving the Company, and (iii) the Company is not a

16

party to or bound by any collective bargaining agreement and neither any grievance nor any arbitration proceeding arising out of or under any collective bargaining agreement is pending and no such claim has been asserted.

    (r)    **Litigation.**

Except as set forth on Schedule 4(r) hereto, there is no action, suit, customer claim, counterclaim, proceeding or investigation at law or in equity or by or before any Governmental Authority or other agency (collectively, "Proceedings") now pending or, to the Knowledge of the Company and the Knowledge of the Representatives, threatened against or by the Company, or affecting the Company or any of the Company's assets or properties, nor to the Knowledge of the Company and the Knowledge of the Representatives, does there exist any basis for any such pending or threatened Proceeding.

    (s)    **Tax Matters.**

Except as set forth on Schedule 4(s) hereto, (i) the Company has filed all Tax returns, declarations of estimated Tax, Tax reports, information returns and statements (collectively, the "Returns") required to be filed by it prior to the First Closing Date (other than those for which extensions shall have been granted prior to such Closing Date); (ii) as of the time of filing, the Returns were true, complete and correct and the Company has paid all Taxes required to be paid, whether or not shown on the Returns to be due; (iii) the Company has timely paid or made provisions on its books and records for all Taxes payable for any period that ended on or before the Initial Closing Date and for any period that began on or before such Closing Date and ends after such Closing Date, to the extent such Taxes are attributable to income earned or accrued in the portion of any such period ending on such Closing Date; (iv) the Company is not delinquent in the payment of any Taxes, nor has the Company requested any extension of time within which to file any Return, which Return has not since been filed; (v) there are no pending Tax audits of any Returns of the Company; (vi) no Encumbrance with respect to Taxes has been filed and, to the Knowledge of the Company and the Knowledge of the Representatives, no deficiency or addition to Taxes, interest or penalties for any Taxes with respect to any income, properties or operations of the Company has been proposed, asserted or assessed in writing against the Company; (vii) the Company has not been granted any extension of the statute of limitations applicable to any Return or other Tax claim; (viii) the Company has not, since its inception, been a personal holding company within the meaning of Section 542 of the Internal Revenue Code of 1986, as amended (the "Code"); (ix) the Company has not made any election under Section 341(f) of the Code; (x) the Company has never been a "United States real property holding corporation" as defined in Section 897(c)(2) of the Code and Section 1.897-2(b) of the Regulations promulgated thereunder; (xi) neither the Company, nor any of its stockholders, has ever filed an election pursuant to Section 1362 of the Code that the Company be taxed as an S Corporation; and (xii) the Company and each of its predecessors has complied with all applicable Laws relating to the payment and withholding of Taxes, including sales and use Taxes, and has withheld and paid over all amounts required by Law to be withheld and paid from the wages or salaries of employees, and to the Knowledge of the Company and the

17

Knowledge of the Representatives, the Company is not liable for any Taxes for failure to comply with such Laws.

(t)    **Customers and Suppliers.**

Schedule 4(t) sets forth a correct and complete list of each of the top five (5) customers and top five (5) suppliers of the Company who made purchases from or sales to the Company since January 1, 2005 and indicates with respect to each the nature of the relationship (including the principal categories of products or services bought or sold and the annual dollar value of products or services bought or sold). Except as set forth in Schedule 4(t), the Company is not required to provide any bonding or other financial security arrangements in connection with any of its transactions with any such customer or supplier. Since the Balance Sheet Date, no such customer or supplier has terminated its relationship with, or materially reduced its purchases from or sales to, the Company, and the Company does not have any knowledge that any such customer or supplier intends to terminate its relationship with, or materially reduce its purchases from or sales to, the Company.

(u)    **Accounts Receivable; Deferred Revenue:**

All of the accounts receivable of the business conducted by the Company are owned by and in the name of the Company, and Schedule 4(u) discloses all accounts receivable of the Company outstanding as of the First Closing Date, presented on an aged basis, and separately identifies the name of each account debtor and the total amount of each related accounts receivable. All of the Company's accounts receivable represent bona fide amounts owed for products previously delivered or services previously rendered, and none of the Company's accounts receivable is subject to any counterclaim, defense or set off or is otherwise in dispute. The Company has not accepted any prepayment or other payment for products to be delivered or services to be performed on or after the Closing Date. The Company does not have any Deferred Revenue.

(v)    **Insurance.**

Schedule 4(v) sets forth a list of all insurance policies carried by the Company, and also sets forth an accurate list of all insurance loss runs and worker's compensation claims received for the most recently ended two (2) policy years to the extent reasonably available. True, complete and correct copies of all insurance policies carried by the Company that are presently in effect have been provided to the Purchaser, and all such insurance policies have been issued by insurers of recognized responsibility and currently are in full force and effect. No insurance carried by the Company has been cancelled by the insurer and the Company has never been denied insurance coverage in any regard or to any degree.

(w)    **Related Party Transactions; Competing Business Interests.**

Except as set forth on Schedule 4(w) hereto, no current or former stockholder, director, officer or employee of the Company, nor any "associate" (as defined in the rules and regulations promulgated under the Securities Act), of the Company is presently, or since the

18

inception of the Company has been, directly or indirectly through his, her or its affiliation with any other Person, a party to any transaction with the Company, providing for the furnishing of services by or to, or rental of real or personal property from or to, or otherwise requiring cash payments to or by any such Person (other than the payment of salaries and benefits to employees in the ordinary course of business). To the Knowledge of the Company and the Knowledge of the Representatives, none of the Stockholders nor any of their Affiliates engages in any business activity relating to or competitive with the Company.

(x)    **Offering Exemption.**

To the Knowledge of the Company and the Knowledge of the Representatives and assuming the accuracy of the representations of the Purchaser in Section 5(a), the offering, sale, and issuance of the Series C Preferred Stock and the Reserved Shares by the Company are, or will be, exempt from registration under the Securities Act and the Exchange Act, and such offerings, sales and issuances are also exempt from registration under applicable state securities and "blue sky" laws. The Company has made or will make all requisite filings and has taken or will take all action necessary to be taken to comply with such state securities or "blue sky" laws in connection with the offering, sale and issuance of the Series C Preferred Stock and the Reserved Shares by the Company.

(y)    **Brokers and Finders.**

Neither the Company nor any of the officers, directors, employees or stockholders of the Company, has employed or has any obligation with respect to any broker or finder in connection with the transactions contemplated by this Agreement.

(z)    **Registration Rights.**

No Person has any right to cause the Company to effect the registration under the Securities Act of any shares of Common Stock or any other securities (including debt securities) of the Company.

(aa)    **Disclosure.**

None of the Documents or any other document provided to the Purchaser pursuant to the Documents, in any case to which the Company is a party, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading as of the date thereof or the First Closing Date. To the Knowledge of the Company and the Knowledge of the Representatives, there is no fact which adversely affects, or in the future may adversely affect, the business, operations, affairs, prospects, condition, properties or assets of the Company. No investigation or due diligence conducted by, or knowledge obtained by, the Purchaser shall limit, modify or negate any of the foregoing representations and warranties.

(bb)    **Use of Proceeds.**

The First Closing Company Receipts received by the Company from the sale of the Series C Preferred Stock shall be used by the Company as follows:

(i)    For the payment in full, on the First Closing Date, of the Company's indebtedness to First Commercial Bank;

(ii)    In accordance with <u>Section 11</u> related to certain fees and expense of Company and Purchaser; and

(iii)    for general corporate and working capital purposes.

**Section 5.    Representations of the Purchaser.**

The Purchaser represents to the Company as follows:

(a)    **Investment Representations.**

(i)    The Purchaser is acquiring the Series C Preferred Stock for its own account, for investment and not with a view to the distribution thereof, nor with any present intention of distributing the same.

(ii)    The Purchaser understands that the Series C Preferred Stock has not been, and any shares of capital stock issuable upon conversion of the Series C Preferred Stock will not be, registered under the Securities Act, by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act, and that they must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from registration.

(iii)    The Purchaser understands that the exemption from registration afforded by Rule 144 (the provisions of which are known to the Purchaser) promulgated under the Securities Act depends on the satisfaction of various conditions and that, if applicable, Rule 144 may only afford the basis for sales under certain circumstances and only in limited amounts.

(iv)    The Purchaser has had a reasonable time prior to the date hereof to ask questions and receive answers concerning the terms and conditions of the offering of the Series C Preferred Stock, and to obtain any additional information which the Company possesses or could acquire without unreasonable effort or expense, and has generally such knowledge and experience in business and financial matters and with respect to investments in securities of privately held companies as to enable the Purchaser to understand and evaluate the risks of such investment and form an investment decision with respect thereto.

20

(v)     The Purchaser is an "accredited investor," as such term is defined in Rule 501 (the provisions of which are known to such the Purchaser) promulgated under the Securities Act.

(b)     **Organization.**  The Purchaser is a company duly organized, validly existing and in good standing under the laws of Japan, is duly qualified to do business and in good standing in each other jurisdiction in which the conduct of its business requires such qualification and has all requisite corporate power and authority to own, lease and operate the assets used in its business, to carry on its business as presently conducted, to enter into the Documents to which it is a party, to perform its obligations thereunder, and to consummate the transactions contemplated thereby.

(c)     **Authorization of the Documents; No Conflicts.**

The Purchaser has all requisite corporate power and authority to execute, deliver and perform the Documents to which it is a party and to consummate the transactions contemplated thereby.  The execution, delivery and performance by the Purchaser of the Documents to which it is a party has been duly authorized by all requisite corporate action, and each Document to which the Purchaser is a party constitutes a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms (to the extent the Company is a party thereto), subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditor's rights and to general equitable principles.  The Purchaser's execution, delivery and performance of the Documents to which it is a party, its consummation of the transactions contemplated thereby and its compliance with the provisions thereof will not: (i) violate any provision of any Law applicable to the Purchaser or any of its properties or assets; or (ii) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default or give rise to any right of termination, cancellation or acceleration under, or result in the creation of any Encumbrance upon any of the properties or assets of the Purchaser or under the Purchaser's formation and organizational documents.

(d)     **No Consents or Approvals Required.**

No consent, approval or authorization of, or declaration to or filing with (including pursuant to any federal or state securities laws), any Person is required for the valid authorization, execution and delivery by the Purchaser of any Document to which it is a party or for its consummation of the transactions contemplated thereby, other than those consents, approvals, authorizations, declarations or filings which have been obtained or made, as the case may be.

(e)     **Brokers and Finders.**

No Person acting on behalf or under the authority of the Purchaser is or will be entitled to any broker's, finder's, or similar fee or commission in connection with the transactions contemplated hereby.

**Section 6.**  **Prior or Simultaneous Actions.**

(a)  **First Closing.**

(i)  The obligation of the Purchaser to purchase the Series A Preferred, the Series B Preferred Stock, the Series C Preferred Stock and the Common Stock at the First Closing is subject to the fulfillment, or the waiver by the Purchaser, of each of the following conditions:

(A)  **Accuracy of Representations and Warranties.**  The representations and warranties of the Stockholders, the Company and the Representatives contained in the Documents shall be true and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as of the date of this Agreement and the First Closing Date as if made on and as of the First Closing, and the Purchaser shall have received a certificate of an officer of the Company to such effect with regard to the representations and warranties of the Company and the Representatives on the First Closing Date.

(B)  **Compliance with Covenants.**  The Company shall have performed and complied in all material respects with all agreements and covenants contained in the Documents to which it is a party as of the date of the First Closing, and the Purchaser shall have received a certificate of an officer of the Company attesting as to such compliance.

(C)  **Due Diligence.**  Prior to the First Closing Date, the Purchaser shall have been satisfied in all respects with the results of its and its advisors' business, intellectual property, legal, tax and accounting due diligence investigation of the Company.

(D)  **Restated Certificate.**  On the First Closing Date, the Restated Certificate shall have been filed with and accepted by the Secretary of State of the State of Delaware and shall have become effective. The By-Laws of the Company shall be amended in a manner satisfactory to the Purchaser prior to the First Closing Date.

(E)  **Stockholders' Agreement.**  The Stockholders' Agreement substantially in the form attached hereto as <u>Exhibit B</u> shall have been executed and delivered by all parties thereto and shall be in full force and effect.

(F)  **Required Consents.**  All consents, approvals and other actions of, and notices and filings with, all Persons as may be necessary or required to be obtained by the Company with respect to the execution and delivery by the Company of the Documents to which it is a party, and the consummation by the Company of the transactions contemplated thereby, have been obtained or made including all filings, consents and approvals required

22

Competition and Employment Agreement substantially in the form attached hereto as <u>Exhibit C</u>, and such agreements shall be in full force and effect.

(M)   <u>Option Exercise</u>.  On or prior to the First Closing Date, the Company will grant the balance of its option pool existing as of the date hereof (such amount set forth on <u>Schedule 6(a)(i)(M)</u>) to existing employees (at the sole discretion of the Board of Directors of the Company immediately prior to the First Closing Date).   Such options shall be granted with an exercise price of $3.00/share, and shall vest in accordance with the following schedule: (a) 50% of each grantee's options shall vest on March 31, 2007; and (b) 50% of each grantee's options shall vest on March 31, 2008.

(N)   <u>Option Sale Agreements</u>.  On or prior to the First Closing Date, each holder of options to purchase Common Stock (each, an "Optionholder") shall have executed and delivered an Option Sale Agreement substantially in the form attached hereto as <u>Exhibit D</u>, and such agreements shall be in full force and effect.

(O)   <u>Key Management Vesting Agreements</u>.  On or prior to the First Closing Date, each of Donald Davidson, David Izatt and Chandler Hall shall have executed and delivered a Key Management Vesting Agreement substantially in the form attached hereto as <u>Exhibit E</u>, such agreements shall be in full force and effect.

(P)   <u>Patent Search</u>.  On or prior to the First Closing Date, the Purchaser shall have completed a "freedom to operate" search for third-party United States patent rights.

(Q)   <u>Escrow Agreement; Escrowed Shares</u>.  On or prior to the First Closing Date: (a) the Purchaser shall have received a duly executed copy of the Escrow Agreement, substantially in the form attached hereto as <u>Exhibit F</u>; and (b) the Stockholders or on behalf of the Stockholders, the Representatives shall have deposited the New Stockholder Certificates with the Escrow Agent under the Escrow Agreement (other than those New Stockholder Certificates to be deposited with the Secretary of the Company pursuant to the Key Management Vesting Agreement).

(ii)   The obligation of the Company to sell the Series C Preferred Stock at the First Closing is subject to the fulfillment, or waiver by the Stockholders' Representatives, of each of the following conditions on or before the First Closing:

(A)   <u>Accuracy of Representations and Warranties</u>.   The representations and warranties of the Purchaser contained in the Documents shall be true and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as of the date of this Agreement and the First Closing Date as if made

24

on and as of the First Closing, and the Company shall have received a certificate of an officer of the Purchaser to such effect.

(B)    <u>Compliance with Covenants</u>.    The Purchaser shall have performed and complied in all material respects with all agreements and covenants contained in the Documents to which it is a party as of the date of the First Closing, and the Company shall have received a certificate of an officer of the Purchaser attesting as to such compliance.

(C)    <u>Required Consents</u>.    All consents, approvals and other actions of, and notices and filings with, all Persons as may be necessary or required to be obtained by the Purchaser with respect to the execution and delivery by the Purchaser of the Documents to which it is a party, and the consummation by the Company of the transactions contemplated thereby, have been obtained or made, and an authorized officer of the Purchaser shall deliver a certificate to the Company to such effect on the First Closing Date.

(D)    <u>Payment of Fees</u>.    On the First Closing Date, Bradley Arant Rose & White LLP shall have been reimbursed in accordance with <u>Section 11(b)</u>, by wire directly to Bradley Arant Rose &White LLP, the amounts set forth on <u>Schedule 6(a)(i)(H)</u>.

(E)    <u>Termination of Line of Credit</u>.    On the First Closing Date, the Company shall have received evidence that the Company's indebtedness to First Commercial Bank is paid in full and the personal guaranty of Donald J. Davidson in connection therewith is released.

(F)    <u>Payment of Stockholders</u>.    The Purchaser shall have delivered to the Company the New Purchaser Stock Certificates to be treated in accordance with <u>Section 7(k)</u>, and shall have sent (in accordance with <u>Section 1(d)(v)</u>) to the Stockholders the amounts required pursuant to <u>Section 1(d)</u>, for the purchase by Purchaser of the number of shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock set forth on <u>Annex II</u>.

(G)    <u>Execution of Documents</u>.    The Purchaser shall have executed and delivered to the Company the Escrow Agreement and any other agreement the Purchaser is required to execute pursuant to this Agreement.

(b)    **Obligation of the Purchaser at Additional Closings.**

The obligation of the Purchaser to purchase the Common Stock at each Additional Closing is subject to the fulfillment, or the waiver by the Purchaser, of each of the following conditions on or before such Closing:

(i)    <u>Accuracy of Representations and Warranties</u>.    (A)  The representations and warranties of the Company contained in the Documents shall be true

25

and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as if made on and as of such Closing, and the Purchaser shall have received a certificate of an officer of the Company to such effect on such Closing Date; and (B) the representations and warranties of each Stockholder contained in the Documents to which such Stockholder is a party shall be true and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as if made on and as of such Closing.

(ii)    <u>Compliance with Covenants</u>.  The Company shall have performed and complied in all material respects with all agreements and covenants contained in the Documents to which it is a party as of the date of such Closing, and the Purchaser shall have received a certificate of an officer of the Company attesting as to such compliance.

(iii)    <u>Stock Certificates</u>.  On the date of each Additional Closing, the Purchaser shall have received stock certificates evidencing its purchase of Common Stock hereunder and the Company, or the Escrow Agent (or escrow agent under the Key Management Vesting Agreement), as applicable, shall have delivered to the Purchaser the stock certificates in the manner set forth in <u>Section 2(b)(iv)</u>.

(iv)    <u>Option Sale Agreements</u>.    Each Optionholder that had not previously entered into an Option Sale Agreement shall have executed and delivered an Option Sale Agreement in substantially the form attached as <u>Exhibit D</u>, and such agreements shall be in full force and effect.

(c)    **Obligation of the Stockholders at Additional Closings.**  The obligation of the Stockholders to sell the Common Shares at each Additional Closing is subject to fulfillment, or the waiver by the Stockholders' Representatives, of each of the following conditions on or before such Closing:

(i)    <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of the Purchaser contained in the Documents shall be true and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as of the date of this Agreement and each Closing Date as if made on and as of such Closing Date, and the Company shall have received a certificate of an officer of the Purchaser to such effect.

(ii)    <u>Compliance with Covenants</u>.  The Purchaser shall have performed and complied in all material respects with all agreements and covenants contained in the Documents to which it is a party as of the date each Closing, and the Company shall have received a certificate of an officer of the Purchaser to such effect.

(iii)    <u>Required Consents</u>.  All consents, approvals and other actions of, and notices and filings with, all Persons as may be necessary or required with respect the execution and delivery by the Purchaser of the Documents, and the consummation by the

26

Purchaser of the transactions contemplated thereby have been obtained or made and the Company shall have received a certificate of an officer of the Purchaser to such effect.

**Section 7.     Covenants of the Company.**

Until the earliest to occur of: (i) the date of the QIPO (as defined in the Restated Certificate), (ii) the Third Closing, or (iii) the termination of this Agreement, the Company (and, where applicable, the Purchaser) shall comply with the following agreements:

(a)     **Access to Records.**

The Company shall afford to the Purchaser and its authorized employees, counsel, accountants and other representatives, (i) full access at the Company's offices and to true and correct copies of (A) all of its and their books of account, records and properties (including the opportunity to inspect its and their properties at such times as the Purchaser may reasonably request) and (B) all documents, reports financial data and other information as the Purchaser may reasonably request (including any information necessary to comply with 22 U.S.C. 3102, 3103 and 3104), and (ii) the opportunity to interview, consult with and advise any officer or director, representative, accountant, and other advisor of the Company regarding the Company's affairs.

(b)     **Budget.**

At least fifteen (15) days prior to the beginning of each fiscal quarter and thirty (30) days prior to the beginning of each fiscal year of the Company, respectively, the Company shall deliver to the Purchaser quarterly and annual management projections and budgets for the Company for such fiscal period, in form, methodology, and level of detail consistent with the Initial Budget delivered to the Purchaser and otherwise reasonably satisfactory to the Purchaser. Such budgets shall be deemed satisfactory if they shall have received the approval of the director designated by the Purchaser. Each of the Initial Budget and the other budgets to be delivered hereunder (including any revisions thereof) is referred to herein as a "Budget".

(c)     **Financial Reporting.**

The Company shall deliver to the Purchaser the following:

(i)     within twenty (20) Business Days after the end of each month and within forty-five (45) days of the end of each quarter, commencing with the month ended February 2006 (A) the unaudited balance sheet of the Company at the end of such period, (B) the unaudited statements of income and cash flows of the Company for such period, (C) the unaudited comparative statements of income of the Company for the year-to-date and the current Budget for the year-to-date, each as of the last day of such period and (D) an unaudited schedule of total expenses by account for such period;

(ii)     within ninety (90) Business Days after the end of each fiscal year of the Company, (A) the balance sheet of the Company at the end of such fiscal year, together with comparisons to the balance sheet of the Company at the end of the prior

fiscal year and to the current Budget, (B) the statements of income and cash flows of the Company for such fiscal year, together with comparisons to the statements of income and cash flows of the Company for the prior fiscal year and to the current Budget, and (C) an audit report of a nationally-recognized firm of independent certified public accountants (or such other accounting firm as is mutually acceptable to the Company and the Purchaser) on such financial statements; and

(iii)    to the extent the Company is required by law or pursuant to the terms of any outstanding indebtedness of the Company to prepare such reports, any annual reports, quarterly reports and other periodic reports pursuant to Sections 13 or 15(d) of the Exchange Act of 1934, as amended, actually prepared by the Company, as soon as available.

All financial statements to be delivered under this Section shall be presented in a format satisfactory to the Purchaser and in accordance with the books and records of the Company. At any time at which the Company has any subsidiaries or controlled Affiliates, all such financial statements shall be the consolidated financial statements of the Company and such subsidiaries.

The Purchaser shall have the right to consult with and advise the management of the Company, upon reasonable notice at any time or from time to time, on all matters relating to the operation of the Company.

(d)    **Payment of Obligations.**

The Company shall pay or discharge or cause to be paid or discharged all material claims or demands, and all Taxes levied or imposed upon such Person or upon the income, profits or property of such Person; provided, however, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such claim, demand, or Tax the amount, applicability or validity of which is being contested in good faith by appropriate Proceedings and for which adequate reserves have been made.

(e)    **Noncompetition Agreements and Related Matters.**

The Company shall use all reasonable efforts to cause all future employees of the Company or any of its subsidiaries to enter into an agreement with respect to non-competition, non-solicitation of customers and employees of the Company or any of its subsidiaries, non-disclosure proprietary information and patent and invention assignment substantially similar in effect to the form currently used by the Company, or in such other form as approved from time to time by the Board of Directors of the Company.

(f)    **Notice of Disputes; Defaults.**

The Company shall promptly notify the Purchaser of (i) the commencement of any Proceeding against or affecting the Company or any of its subsidiaries which, if adversely

28

determined, might reasonably be expected to result in a Material Adverse Change and (ii) any default under any indebtedness of the Company or any of its subsidiaries.

(g) **Conduct of Business.**

The Company shall (i) take all actions required to assure that the Company and each of its subsidiaries (if any) remains duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, (ii) take all actions required to assure that the Company and each of its subsidiaries (if any) maintains all requisite Permits to conduct its business, and (iii) conducts its business, and causes each of its subsidiaries (if any) to conduct its business in material compliance with all Laws.

(h) **Other Businesses.**

Neither the Company nor any of its subsidiaries (if any) shall engage in any material business or activity, other than those currently conducted or those from time to time included within the then current business plan of the Company as approved by the Board of Directors of the Company.

(i) **Employee Compensation.**

Except for salary increases, incentive compensation or bonuses determined and granted or paid in accordance with salary or compensation plans approved by the Board of Directors of the Company, the Company shall not, and shall not permit any subsidiary or controlled Affiliate to, directly or indirectly grant any salary increase or pay any bonuses or pay any compensation to any of its directors, officers, or management employees outside the ordinary course of business consistent with the Company's past practices.

(j) **Significant Events.**

The Company shall promptly provide the Purchaser with written notice of any proposed public offering of its shares of its Common Stock or any transaction that would constitute a Liquidation (as defined in the Restated Certificate) (a "Significant Event"). In connection with a Significant Event, the Purchaser shall be entitled to retain separate legal counsel (whose fees and expenses shall be paid by the Company) to review the proposed definitive documentation implementing such Significant Event and such counsel shall be afforded sufficient time and opportunity to review and comment on such proposed definitive documentation.

(k) **Conversion of Tendered Stock.**

Immediately after the First Closing, the Purchaser and the Company shall take all actions necessary to cancel any and all shares of Series A Preferred Stock and Series B Preferred Stock and to contribute any and all shares of Common Stock purchased by the Purchaser to the Company (at no cost to the Company). The Common Stock so contributed shall be treated as treasury shares and shall be cancelled by the Company.

29

(l)    **Declaration of Dividends.**

The Purchaser shall not cause the Company to declare any dividends or other distributions on its Stock.

(m)    **Additional Issuances.**

The Purchaser shall not cause the Company to issue any securities other than Excluded Stock (as defined in the Restated Certificate), without the prior written approval of the holders of a majority of all outstanding Common Stock.

**Section 8.    Survival.**

Irrespective of any investigation, inquiry or examination made by, for or on behalf of the Purchaser, or the acceptance by the Purchaser of any certificate or opinion, the representations, warranties and covenants contained herein with respect to each Closing shall terminate upon the second anniversary of each Closing.

**Section 9.    Indemnification.**

(a)    **General.**

(i)    The Company and each Stockholder (jointly and severally with the Company) shall indemnify, defend and hold the Purchaser and their respective officers, directors, members, partners, affiliates, employees, agents and representatives (collectively, the "Purchaser Indemnitees") harmless against all Liability, loss and damage together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from the untruth, inaccuracy or breach of any of the representations by such Stockholder set forth in Section 3.

(ii)    The Company and each Representative, jointly and severally with the Company and each other Representative, shall indemnify, defend and hold the Purchaser Indemnitees harmless against all Liability, loss and damage (including taxes thereon) together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from: (a) the untruth, inaccuracy or breach of any of the representations, warranties, covenants or agreements made by the Company or the Representatives contained in the Documents to which either the Company or the Representatives is a party; (b) the execution or delivery by the Company or any Representative of any Document or any other agreement or instrument contemplated hereby or thereby or the performance by the Company or any Representative of their respective obligations under the Documents or the consummation of the transactions contemplated hereby or thereby, in all events only to the extent Company and/or the Representatives are a party to the Documents; and (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the events in Section 10(a)(ii)(a) or Section 10(a)(ii)(b) (including as may be commenced by third

30

(l)    **Declaration of Dividends.**

The Purchaser shall not cause the Company to declare any dividends or other distributions on its Stock.

(m)    **Additional Issuances.**

The Purchaser shall not cause the Company to issue any securities other than Excluded Stock (as defined in the Restated Certificate), without the prior written approval of the holders of a majority of all outstanding Common Stock.

Section 8.    **Survival.**

Irrespective of any investigation, inquiry or examination made by, for or on behalf of the Purchaser, or the acceptance by the Purchaser of any certificate or opinion, the representations, warranties and covenants contained herein with respect to each Closing shall terminate upon the second anniversary of each Closing.

Section 9.    **Indemnification.**

(a)    **General.**

(i)    The Company and each Stockholder (jointly and severally with the Company) shall indemnify, defend and hold the Purchaser and their respective officers, directors, members, partners, affiliates, employees, agents and representatives (collectively, the "Purchaser Indemnitees") harmless against all Liability, loss and damage together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from the untruth, inaccuracy or breach of any of the representations by such Stockholder set forth in Section 3.

(ii)    The Company and each Representative, jointly and severally with the Company and each other Representative, shall indemnify, defend and hold the Purchaser Indemnitees harmless against all Liability, loss and damage (including taxes thereon) together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from: (a) the untruth, inaccuracy or breach of any of the representations, warranties, covenants or agreements made by the Company or the Representatives contained in the Documents to which either the Company or the Representatives is a party; (b) the execution or delivery by the Company or any Representative of any Document or any other agreement or instrument contemplated hereby or thereby or the performance by the Company or any Representative of their respective obligations under the Documents or the consummation of the transactions contemplated hereby or thereby, in all events only to the extent the Company and/or the Representatives are a party to the Documents; and (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the events in Section 10(a)(ii)(a) or Section 10(a)(ii)(b) (including as may be commenced by third

30

parties), whether based in contract, tort or any other theory and regardless of whether any Purchaser Indemnitee is a party thereto.

(iii)     The Purchaser shall indemnify, defend and hold the Company and its respective officers, directors, members, partners, affiliates, employees, agents and representatives (the "Company Indemnitees") harmless against all Liability, loss and damage (including taxes thereon) together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from: (a) the untruth, inaccuracy or breach of any of the representations, warranties, covenants or agreements of the Purchaser contained in the Documents to which the Purchaser is a party; (b) the execution or delivery by the Purchaser of any Document or any other agreement or instrument contemplated hereby or thereby or the performance by the Purchaser of its respective obligations under the Documents or the consummation of the transactions contemplated hereby or thereby, in all events only to the extent the Purchaser is a party to the Documents; (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the events in Section 10(a)(iii)(a) or Section 10(a)(iii)(b) (including as may be commenced by third parties), whether based in contract, tort or any other theory and regardless of whether any Company Indemnitee is a party thereto.

(b)     **Notice and Resolution of Third-Party Claims.**

An indemnified party under this Agreement shall promptly give written notice to the indemnifying party of any third-party claim against the indemnified party as to which recovery may be sought against the indemnifying party pursuant to this Section 9, specifying in reasonable detail the claim and the basis for indemnification. The indemnified party shall permit the indemnifying party to assume the defense of any such third-party claim on the indemnified party's behalf; provided, however, the indemnifying party shall permit the indemnified party to participate in such defense through counsel chosen by the indemnified party, with the fees and expenses of such counsel borne by the indemnified party. Failure by the indemnifying party to notify the indemnified party of its election to assume the defense of any such claim by a third party within thirty (30) days after notice thereof has been given to the indemnifying party shall be deemed a waiver by the indemnifying party of its right to assume the defense of such claim, in which case the indemnified party may defend such claim at the expense of the indemnifying party.

(c)     **Limitation of Liability.**

Notwithstanding the foregoing Section 9(a), in no event shall any Stockholder or Representative have any indemnification obligation to the Purchaser Indemnitees, in the aggregate, in excess of the gross proceeds received by such Stockholder or Representative through the sale of his, her or its Company Stock.

**Section 10.     Termination.**

Certain of the parties to this Agreement may terminate this Agreement as provided below:

31

(a)    **By the Purchaser.**

The Purchaser may terminate this Agreement by giving written notice to the Company and the Representative at any time prior to the Closing: (i) in the event the Company has committed a material breach of any representation, warranty, or covenant contained in this Agreement, the Purchaser has notified the Company and the Representative of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach; or (ii) if the Second Closing shall not have occurred on or prior to April 30, 2007 (unless the Purchaser itself is in material breach of any representation, warranty, or covenant contained in this Agreement at such time) and the breach has continued without cure for a period of 5 days after the notice of breach; or (iii) if the Third Closing shall not have occurred on or prior to April 30, 2008 (unless the Purchaser itself is in material breach of any representation, warranty, or covenant contained in this Agreement at such time) and the breach has continued without cure for a period of 5 days after the notice of breach; and

(b)    **By the Company.**

The Company may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing: (i) in the event the Purchaser has committed a material breach of any representation, warranty, or covenant contained in this Agreement, the Company has notified the Purchaser of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach; or (ii) if the Second Closing shall not have occurred on or prior to April 30, 2007 (unless the Company itself is in material breach of any representation, warranty, or covenant contained in this Agreement at such time) and the breach has continued without cure for a period of 5 days after the notice of breach; or (iii) if the Third Closing shall not have occurred on or prior to April 30, 2008 (unless the Company itself is in material breach of any representation, warranty, or covenant contained in this Agreement at such time) and the breach has continued without cure for a period of 5 days after the notice of breach.

(c)    **Effect of Termination.**

(i)    If any party terminates this Agreement pursuant to this Section 10, all rights and obligations of the parties hereunder shall terminate without any Liability of any party to any other party (except as set forth in Section 9).

(ii)    The terms and provisions of Sections 9, 10, and 11 shall survive the termination of this Agreement.

**Section 11.    Fees and Expenses.**

(a)    **Fees and Expenses of Purchaser.**

The Company shall pay all of its expenses incurred in connection with the preparation, execution and delivery of the Documents and the consummation of the transactions contemplated thereby.  In addition, the Company shall pay, and hold the Purchaser and its

representatives harmless against all liability for the payment of: (i) the fees and expenses incurred by the Purchaser and the fees and charges of Kilpatrick Stockton LLP, counsel to the Purchaser, actually incurred in connection with the preparation, execution and delivery of the Documents and the consummation of the transactions contemplated thereby, in an amount not to exceed $40,000.00, (ii) the reasonable costs and expenses (including fees and expenses of counsel, accountants and other advisors) incurred by the Purchaser in connection with any amendment or waiver of any Document, (iii) the reasonable out-of-pocket costs incurred by the Purchaser in sending their representatives to participate in meetings of the Board of Directors (or any committee thereof) of the Company or any of its subsidiaries, (iv) any costs reasonably incurred by the Purchaser in rendering assistance to the Company or any of their subsidiaries, (v) any stamp or similar taxes which may be determined to be payable in connection with the execution and delivery and performance of any Document to which the Company is a party or any modification, amendment or alteration of any Document to which the Company is a party, and all issue taxes in respect of the issuance of any Series C Preferred Stock or the Reserved Shares (or any other securities issued in respect thereof) and (vi) the reasonable fees and expenses incurred by the Purchaser in any filing with any Governmental Authority with respect to the Company or any of its subsidiaries that mentions the Purchaser or its Affiliates. The provisions of this Section are automatically assignable to any Person who acquires any Series C Preferred Stock from the Purchaser. The Company and the Purchaser hereby acknowledge and agree that the Company's obligation to reimburse the Purchaser for the fees and charges of Kilpatrick Stockton LLP pursuant to this Section 11(a) shall be fulfilled at the First Closing by permitting the Purchaser to deduct such fees and charges from the First Closing Company Receipts and to wire such amounts directly to Kilpatrick Stockton LLP at the Closing.

(b)     **Fees and Expenses of Bradley Arant Rose & White LLP.**

In addition, the Company and the Purchaser hereby acknowledge and agree that the payment of the fees and expenses of Bradley Arant Rose & White LLP, counsel to the Company, actually incurred by the Company, in an amount not to exceed $20,000.00, shall be paid out of the First Closing Company Receipts on the First Closing Date; *provided*, that any fees and expenses of Bradley Arant Rose & White LLP actually incurred by the Company in excess of $20,000.00, whether in connection with the preparation, execution and delivery of the Documents and the consummation of the transactions contemplated thereby and set forth on Schedule 6(a)(i)(H), or otherwise, shall be deducted *pro rata* (based on the dollar amount of proceeds to be received by the Stockholders in the First Closing) from each Stockholder by the Purchaser and wired directly to Bradley Arant Rose & White LLP.

**Section 12.     Assignment; Parties in Interest.**

This Agreement shall bind and inure to the benefit of the parties and each of their respective successors and permitted assigns. The Company may not assign either this Agreement or any of its rights, interests, or obligations hereunder. The Purchaser may assign any of its rights hereunder; provided, however, that the transferee agrees to be bound by, and entitled to the benefits of, this Agreement as an original party hereto.

33

9034153.14

Shinagawa-ku
Tokyo 140-0013 JAPAN
Telephone: 011-81-3-5767-9101
Fax: 011-81-3-5767-9123
Attention: Frank Seiji Sanda

with a copy (which shall not constitute notice) to:

Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Fax: 404-815-6555
Telephone: 404-815-6500
Attention: Steven L. Berson

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith. Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery if a business day or, if not a business day, the next succeeding business day, (ii) in the case of internationally-recognized overnight courier, on the second business day after the date when sent, (iii) in the case of fax transmission, when received if a business day or, if not a business day, the next succeeding business day, and (iii) in the case of mailing, on the seventh business day following that on which the piece of mail containing such communication is posted.

**Section 15.    Amendments; Waivers.**

The terms and provisions of this Agreement may only be modified or amended pursuant to an instrument signed by the Company, the holders of at least a majority of the outstanding shares of Common Stock and the holders of at least a majority of the outstanding shares of Series C Preferred Stock. Any waiver of any term or provision of this Agreement requested by any party hereto must be granted in advance, in writing: (i) by the holders of at least a majority of all then outstanding shares of Series C Preferred Stock (if the Company or the holders of a majority of all the then outstanding shares of Common Stock is requesting such waiver); or (ii) by the holders of a majority of all the then outstanding shares of Common Stock (if the Company or the holders of at least a majority of all then outstanding shares of Series C Preferred Stock is requesting such waiver), as the case may be.

**Section 16.    Counterparts.**

This Agreement may be executed in any number of original or facsimile counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

**Section 17.    Headings.**

35

The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 18.** **<u>Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial</u>.**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied.

**ANY PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF DELAWARE OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR, AND THE PARTIES IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH SUCH COURTS IN RESPECT OF ANY SUCH PROCEEDING. EACH OF THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDING IN THE COURTS OF THE STATE OF DELAWARE LOCATED IN NEW CASTLE COUNTY OR THE DISTRICT OF DELAWARE AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM. ANY JUDGMENT MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.**

**EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

**Section 19.** **<u>Specific Performance</u>.** The Company Stock and the Series C Preferred Stock (collectively, the "<u>Stock</u>") cannot be readily purchased or sold in the open market, and for that reason, among others, the parties will be irreparably damaged in the event that this Agreement is not specifically enforced. Should any dispute arise concerning the sale or disposition of the Stock in any Closing, an injunction may be issued restraining any sale or disposition pending the determination of such controversy. In the event of any controversy concerning the right or obligation to purchase or sell any of the Stock in any Closing, such right or obligation shall be enforceable in a court of equity by a decree of specific performance. Such remedy shall, however, be cumulative and not exclusive, and shall be in addition to any other remedy which the parties may have.

\* \* \* \*

36

# INDEX OF SCHEDULES & EXHIBITS

| | |
|---|---|
| Annex I: | Definitions |
| Annex II: | Securities Purchased by Purchaser |
| | |
| Exhibit A: | Restated Certificate of Incorporation |
| Exhibit B: | Form of Stockholders Agreement |
| Exhibit C: | Form of Non-Competition and Employment Agreement |
| Exhibit C-1 | Form of Intellectual Property Agreements |
| Exhibit D: | Form of Option Sale Agreement |
| Exhibit E: | Form of Key Management Vesting Agreement |
| Exhibit F: | Form of Escrow Agreement |
| | |
| Schedule 3(d) | Ownership of Company Stock |
| Schedule 4(a)(i): | Certificate of Incorporation |
| Schedule 4(a)(ii): | By-laws |
| Schedule 4(c): | Conflicts |
| Schedule 4(e): | Consents and Approvals |
| Schedule 4(f) | Capitalization Before and After First Closing |
| Schedule 4(g): | Defaults |
| Schedule 4(h): | Initial Budget |
| Schedule 4(i): | Undisclosed Liabilities |
| Schedule 4(j): | Absence of Changes |
| Schedule 4(k): | Encumbrances |
| Schedule 4(l)(i): | Company Intellectual Property |
| Schedule 4(l)(ii): | Exceptions to Intellectual Property Rights |
| Schedule 4(l)(iv): | Intellectual Property Infringement |
| Schedule 4(l)(vi): | Employee Intellectual Property Matters |
| Schedule 4(l)(vii): | Licensing Arrangements |
| Schedule 4(m): | Employment Matters |
| Schedule 4(n): | Benefit Plans |
| Schedule 4(o): | Material Contracts |
| Schedule 4(p): | Permits |
| Schedule 4(q): | Employees |
| Schedule 4(r): | Litigation |
| Schedule 4(s): | Tax Matters |
| Schedule 4(t): | Customers and Suppliers |
| Schedule 4(u): | Accounts Receivable |
| Schedule 4(v): | Insurance |
| Schedule 4(w): | Related Party Transactions |
| Schedule 6(a)(i)(H): | Fees and Expenses of Bradley Arant Rose & White LLP |
| Schedule 6(a)(i)(M): | Option Pool |

ANNEX I

## DEFINITIONS

"**2007 GR Amount**" means a specified percentage of $625,000 based upon the Company's Gross Revenue relative to the 2007 GR Target for the period from and including the First Closing Date through and including March 31, 2007, based upon the following formula:

| PERCENTAGE OF 2007 GR TARGET | 2007 GR AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | 32.5% |
| Greater than or equal to 60% but less than 65% | 40% |
| Greater than or equal to 65% but less than 70% | 47.5% |
| Greater than or equal to 70% but less than 75% | 55% |
| Greater than or equal to 75% but less than 80% | 62.5% |
| Greater than or equal to 80% but less than 85% | 70% |
| Greater than or equal to 85% but less than 90% | 77.5% |

2

| | |
|---|---|
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | 92.5% |
| Greater than or equal to 100% but less than 105% | 100% |
| Greater than or equal to 105% but less than 110% | 108.5% |
| Greater than or equal to 110% but less than 115% | 117% |
| Greater than or equal to 115% but less than 120% | 125.5% |
| Greater than or equal to 120% but less than 125% | 134% |
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"**2007 GR Target**" means $3,300,000.

"**2007 NOI Amount**" means a specified percentage of $625,000 based upon the Company's Net Operating Income relative to the 2007 NOI Target for the period from and including the First Closing Date through and including March 31, 2007, based upon the following formula:

3

| PERCENTAGE OF 2007 NOI TARGET | 2007 NOI AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | 32.5% |
| Greater than or equal to 60% but less than 65% | 40% |
| Greater than or equal to 65% but less than 70% | 47.5% |
| Greater than or equal to 70% but less than 75% | 55% |
| Greater than or equal to 75% but less than 80% | 62.5% |
| Greater than or equal to 80% but less than 85% | 70% |
| Greater than or equal to 85% but less than 90% | 77.5% |
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | 92.5% |
| Greater than or equal to 100% but less than 105% | 100% |

4

| | |
|---|---|
| Greater than or equal to 105% but less than 110% | 108.5% |
| Greater than or equal to 110% but less than 115% | 117% |
| Greater than or equal to 115% but less than 120% | 125.5% |
| Greater than or equal to 120% but less than 125% | 134% |
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"**2007 NOI Target**" means $600,000.

"**2008 GR Amount**" means a specified percentage of $1,875,000 based upon the Company's Gross Revenue relative to the 2008 GR Target for the twelve month period from and including April 1, 2007 through and including March 31, 2008, based upon the following formula:

| PERCENTAGE OF 2008 GR TARGET | 2008 GR AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |

5

| | |
|---|---|
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | 32.5% |
| Greater than or equal to 60% but less than 65% | 40% |
| Greater than or equal to 65% but less than 70% | 47.5% |
| Greater than or equal to 70% but less than 75% | 55% |
| Greater than or equal to 75% but less than 80% | 62.5% |
| Greater than or equal to 80% but less than 85% | 70% |
| Greater than or equal to 85% but less than 90% | 77.5% |
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | 92.5% |
| Greater than or equal to 100% but less than 105% | 100% |
| Greater than or equal to 105% but less than 110% | 108.5% |
| Greater than or equal to 110% but less than 115% | 117% |
| Greater than or equal to 115% but less than 120% | 125.5% |
| Greater than or equal to 120% but less than 125% | 134% |

6

| | |
|---|---|
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

**"2008 GR Target"** means $7,000,000.

**"2008 NOI Amount"** means a specified percentage of $1,875,000 based upon the Company's Net Operating Income relative to the 2008 NOI Target for the twelve month period from and including April 1, 2007 through and including March 31, 2008, based upon the following formula:

| PERCENTAGE OF 2008 NOI TARGET | 2008 NOI AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |

7

| | |
|---|---|
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"**2008 GR Target**" means $7,000,000.

"**2008 NOI Amount**" means a specified percentage of $1,875,000 based upon the Company's Net Operating Income relative to the 2008 NOI Target for the twelve month period from and including April 1, 2007 through and including March 31, 2008, based upon the following formula:

| PERCENTAGE OF 2008 NOI TARGET | 2008 NOI AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |

7

| | |
|---|---|
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | 32.5% |
| Greater than or equal to 60% but less than 65% | 40% |
| Greater than or equal to 65% but less than 70% | 47.5% |
| Greater than or equal to 70% but less than 75% | 55% |
| Greater than or equal to 75% but less than 80% | 62.5% |
| Greater than or equal to 80% but less than 85% | 70% |
| Greater than or equal to 85% but less than 90% | 77.5% |
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | 92.5% |
| Greater than or equal to 100% but less than 105% | 100% |
| Greater than or equal to 105% but less than 110% | 108.5% |
| Greater than or equal to 110% but less than 115% | 117% |
| Greater than or equal to 115% but less than 120% | 125.5% |
| Greater than or equal to 120% but less than 125% | 134% |
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |

8

| | |
|---|---|
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"**2008 NOI Target**" means $1,400,000.

"**Additional Closing**" shall have the meaning set forth in <u>Section 1(c)</u>.

"**Affiliate**" means, with respect to any Person, any (a) director, officer, limited or general partner, member or stockholder holding 5% or more of the outstanding capital stock or other equity interests of such Person, (b) any spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of a Person specified in clause (i) above relating to such Person) and (c) other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. References herein to the Company's "subsidiaries" or a "subsidiary" include both direct and indirect subsidiaries of the Company.

"**Agreement**" shall have the meaning set forth in the preamble hereto.

"**Balance Sheet**" shall have the meaning set forth in <u>Section 4(g)</u>.

"**Balance Sheet Date**" shall have the meaning set forth in <u>Section 4(g)</u>.

"**Budget**" shall have the meaning set forth in <u>Section 7(b)</u>.

"**Business Days**" means days other than Saturdays, Sundays and other legal holidays or days on which banks in the State of Delaware are authorized or required by law to close.

"**Bylaws**" shall have the meaning set forth in <u>Section 4(a)</u>.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, and the rules and regulations promulgated thereunder.

"**Certificate of Incorporation**" shall have the meaning set forth in <u>Section 4(a)</u>.

9

"**Closing**" shall have the meaning set forth in <u>Section 2(a)</u>.

"**Closing Date**" shall have the meaning set forth in <u>Section 1(c)</u>.

"**Code**" shall have the meaning set forth in <u>Section 4(r)</u>.

"**Common Holders**" means those Persons owning shares of Common Stock.

"**Common Holders Second Closing Notice**" shall have the meaning in <u>Section 2(b)(ii)(A)</u>.

"**Common Stock**" shall have the meaning set forth in the recitals hereto.

"**Company**" shall have the meaning set forth in the preamble hereto.

"**Company Indemnitee**" shall have the meaning set forth in <u>Section 9(a)(i)</u>.

"**Company Intellectual Property**" shall have the meaning set forth in <u>Section 4(k)(i)</u>.

"**Company Stock**" shall have the meaning set forth in the recitals hereto.

"**Contract**" shall have the meaning set forth in <u>Section 4(n)</u>.

"**Deferred Revenue**" means the amount of all payments due under invoices issued by the Company as of the Closing Date for services not yet rendered or goods not yet delivered as of the Closing Date.

"**Designated Persons**" shall have the meaning set forth in <u>Section 4(l)</u>.

"**Documents**" means (i) this Agreement, (ii) the Restated Certificate, (iii) the Stockholders' Agreement, and (iv) all other documents, agreements and instruments executed and delivered in connection herewith, in each case, as amended, modified or supplemented from time to time.

"**Encumbrances**" means all mortgages, Judgments, claims, liens, security interests, pledges, escrows, charges, pre-emptive rights, rights of first offer or first refusal or other encumbrances of any kind or character whatsoever.

"**Environmental and Safety Requirements**" means all Laws, orders, contractual obligations and all common law concerning public health and safety, worker health and safety, and pollution or protection of the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts,

10

asbestos, polychlorinated biphenyls, noise or radiation, including, but not limited to, the SWDA, the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq., the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251 et seq., the Emergency Planning and Community Right-to-Know Act, as amended, 42 U.S.C. §§ 11001 et seq., CERCLA, the Hazardous Materials Transportation Uniform Safety Act, as amended, 49 U.S.C. §§ 5101 et seq., the Occupational Safety and Health Act of 1970, as amended, and the rules and regulations promulgated thereunder.

"**ERISA**" shall have the meaning set forth in <u>Section 4(m)</u>.

"**Escrow Agent**" means the escrow agent under the Escrow Agreement.

"**Escrow Agreement**" means that certain Escrow Agreement, dated as of the date hereof, substantially in the form set forth as <u>Exhibit F</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and any successor statute, together with the rules and regulations promulgated thereunder.

"**Financial Statements**" shall have the meaning set forth in <u>Section 4(h)</u>.

"**Fully-Diluted Capitalization of the Company**" means, as of any given date, the sum of (i) all shares of Common Stock then outstanding assuming (A) the conversion into Common Stock of all of the then outstanding shares of Preferred Stock and (B) the conversion, exercise or exchange of any other securities into Common Stock (in each case in accordance with the terms of such Preferred Stock and other securities convertible, exercisable or exchangeable into Common Stock) plus (ii) all shares of Common Stock authorized or reserved for issuance under the Company's 2004 Long Term Incentive Plan, whether or not options for all of such shares have been granted or are vested.

"**GAAP**" means the generally accepted accounting principles in the United States in effect as of the date hereof.

"**General Commercial Software**" shall have the meaning set forth in <u>Section 4(l)</u>.

"**Governmental Authority**" means any federal, state, municipal, foreign or other government, governmental department, commission, board, bureau, agency or instrumentality, or any public court or tribunal.

"**Gross Revenue**" shall be defined in accordance with GAAP.

"**First Closing**" means the date hereof.

"**First Closing Company Receipts**" shall have the meaning set forth in <u>Section 1(b)(iv)</u>.

11

9034153.14

"**Intellectual Property Rights**" means all industrial and intellectual property rights to the extent recognized and protected under any Laws of any country or jurisdiction in which the Company presently sells its products and services, including, without limitation, to the extent protected under such applicable Laws, rights in patents, patent applications, and patent rights, trademarks, trademark applications and registrations, service marks, service mark applications and registrations, trade dress, logos and designs, trade names, brands, product configurations, and the goodwill connected with the foregoing, copyrights and copyright rights (including, without limitation, those in source code), copyright applications and registrations, mask works, proprietary business methods, trade secrets, confidential information, proprietary processes and technology, proprietary data bases, inventions, discoveries, technical advances, and any manual, formulae and/or documentation constituting, describing or related to the foregoing.

"**Judgments**" means all judgments, injunctions, citations, orders and decrees of all courts and arbitrators in proceedings or actions in which the Person in question is a party or by which any of its assets or properties is bound.

"**Key Management Vesting Agreement**" means the Key Management Vesting Agreement dated as of the date hereof, in the form of <u>Exhibit E</u> hereto, as amended.

"**Knowledge**" or "**Knowledge of the Company**" or "**Knowledge of the Representatives**" means (i) with respect to the Company, the actual knowledge of any officer of the Company, or the knowledge reasonably ascribed to such person through such person's performance of his/her duties in the ordinary course of business and (ii) with respect to the Representatives, the actual knowledge of such person or the knowledge reasonably ascribed to such person through such person's performance of his duties in the ordinary course of business.

"**Law**" means, as to any Person, all provisions of laws, statutes, ordinances, rules, regulations, permits, certificates or orders of any Governmental Authority applicable to such Person or any of its properties or assets, and all Judgments applicable to such Person.

"**Liability**" means any liability or obligation of any nature (whether known or unknown, matured or unmatured, secured or unsecured, fixed or contingent, accrued or unaccrued).

"**Material Adverse Change**" means any material adverse change in the business, affairs, operations, assets, properties, Liabilities, results of operations or condition (financial or otherwise) of the Company or any of its subsidiaries (taken as a whole).

"**Net Operating Income**" means the gross income of the Company, net of: (i) selling, general and administrative expenses; and (ii) costs of good s sold (in each case, defined in accordance with GAAP).

"**New Purchaser Stock Certificates**" shall have the meaning set forth in <u>Section 1(b)(i)</u>.

"**New Stockholder Certificates**" shall have the meaning set forth in <u>Section 1(b)(i)</u>.

12

"**Optionholder**" shall have the meaning set forth in <u>Section 6(a)(iv)</u>.

"**Permits**" shall have the meaning set forth in <u>Section 4(o)(i)</u>.

"**Person**" shall be construed in the broadest sense and means any individual, corporation, partnership, limited liability company, association, trust, Governmental Authority or other entity or organization.

"**Post-Closing 58% Number**" means that number of shares of the Series C Preferred Stock equal to 58% of the Fully-Diluted Capitalization of the Company immediately following the First Closing.

"**Pro Rata Amount**" means a percentage equal to the number of shares of Common Stock held by such Common Holder divided by the total number of shares held by all Common Holders.

"**Proceeding**" shall have the meaning set forth in <u>Section 4(q)</u>.

"**Purchaser**" shall have the meaning set forth in the preamble hereto.

"**Purchaser Common Stock Valuation**" means a value equal to the average of the closing prices of the Purchaser's common stock on the Osaka Exchange during the last ten (10) trading days prior to the date of the filing of a registration statement for fixing the price of the common stock of the Purchaser to be issued in connection with the relevant Additional Closing.

"**Purchaser Indemnitee**" shall have the meaning set forth in <u>Section 9(a)(i)</u>.

"**Purchaser's Second Closing Notice**" shall have the meaning set forth in <u>Section 2(b)(ii)(B)</u>.

"**Representatives**" shall have the meaning set forth in the preamble hereto.

"**Reserved Shares**" shall have the meaning set forth in <u>Section 1(a)</u>.

"**Restated Certificate**" shall have the meaning set forth in the recitals hereto.

"**Returns**" shall have the meaning set forth in <u>Section 4(r)</u>.

"**Second Closing**" shall have the meaning set forth in <u>Section 1(c)(i)</u>.

"**Second Closing New Stockholder Certificates**" shall have the meaning set forth in <u>Section 2(b)(iv)</u>.

"**Second Closing Purchase Price**" shall have the meaning set forth in <u>Section 1(e)(i)</u>.

13

"**Securities Act**" means the Securities Act of 1933, as amended, and any successor statute, together with the rules and regulations promulgated thereunder.

"**Series A Holders**" means those Persons owning shares of Series A Preferred Stock.

"**Series B Holders**" means those Persons owning shares of Series B Preferred Stock.

"**Series A Preferred Stock**" shall have the meaning set forth in the recitals hereto.

"**Series B Preferred Stock**" shall have the meaning set forth in the recitals hereto.

"**Series C Amount**" shall have the meaning set forth in the recitals hereto.

"**Series C Preferred Stock**" shall have the meaning set forth in the recitals hereto.

"**Significant Event**" shall have the meaning set forth in Section 7(j).

"**Stock**" shall have the meaning set forth in Section 19.

"**Stockholders**" means, collectively, the Common Holders, Series A Holders and Series B Holders.

"**Stockholders Agreement**" means the Stockholders Agreement dated as of the date hereof, in the form of Exhibit B hereto, as amended.

"**SWDA**" means the Solid Waste Disposal Act, as amended, and the rules and regulations promulgated thereunder.

"**Tax**" means any of the Taxes and "**Taxes**" means, with respect to any Person: (A) all income Taxes (including any tax on or based upon net income, or gross income, or income as specially defined, or earnings, or profits, or selected items of income, earnings or profits) and all gross receipts, sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property or windfall profits taxes, alternative or add-on minimum taxes, customs duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any taxing authority (domestic or foreign) on such Person; and (B) any Liability for the payment of any amount of the type described in the immediately preceding clause (A) as a result of: (1) being a "transferee" (within the meaning of Section 6901 of the Code or any other applicable law) of another Person; (2) being a member of an affiliated, combined, consolidated or unitary group; or (3) any Contractual Liability.

"**Tendered Stock**" shall have the meaning set forth in the preamble hereto.

"**Tendered Stock Purchase Price**" shall have the meaning set forth in the recitals hereto.

14

"**Third Closing**" shall have the meaning set forth in <u>Section 1(c)(ii)</u>.

"**Third Closing Notice**" shall have the meaning set forth in <u>Section 2(b)(iii)</u>.

"**Third Closing Purchase Price**" shall have the meaning set forth in <u>Section 1(e)(ii)</u>.

"**Work for Hire**" shall have the meaning set forth in <u>Section 4(k)(iv)</u>.

15

ANNEX II

### SECURITIES PURCHASED BY PURCHASER

| Stockholder | (1) Number of Series A Preferred Stock Purchased at First Closing | (2) Number of Series B Preferred Stock Purchased at First Closing | (3) Number of Common Stock Purchased at First Closing |
|---|---|---|---|
| Angus Adair Wolfgang, Inc. | | | 47,880 |
| Donald J. Davidson | | | 20,000 |
| RNR Ventures, L.L.C. | | | 17,500 |
| J. Chandler Hall | | | 6,384 |
| David S. Butler | 10,000 | | |
| John Jurenko | 37,037 | | |
| William and Billie Joe McCary | 18,519 | | |
| William Scott McCary | 18,518 | | |
| Lioce Investments, L.L.C. | 37,037 | | |
| Jean T. and Margaret T. Moore | 37,037 | | |
| HRC, L.L.C. | 37,037 | | |
| National Investor Services Corp., FBO: Dawn Darnell Shelton Account No. 385-97378-13 | 10,186 | | |
| Bryan W. and Jacalyn A. Butler | 8,518 | | |
| Shatas Partners, Ltd. | 10,000 | 1,000 | |
| David J. Slyman | | 1,000 | |
| Todd J. Slyman | 9,000 | 4,812 | |

16

| | |
|---|---|
| DB Securities, Inc. (Tax I.D. No. 502208880) as Custodian F/B/O IRA FBO David J. Slyman, Jr. | 10,000 |
| Heide Williams | 9,375 |
| David and Mark Nicolas | 5,208 |
| James V. Balch | 15,625 |
| Alan L. Nordlinger | 31,250 |
| Forrest R. Hairston | 4000 |
| Dixie D. Wolf | 10,000 |
| Michael W. Solley | 15,625 |
| Samuel P. McManus | 8,000 |
| Steven D. Marz | 8,000 |
| Anthony A. Gann | 30,000 |
| Gregory J. Clayton | 9,375 |
| J. Jeffrey and Vicki C. Irons | 1,600 |
| City Light Capital, LLC | 78,125 |
| Louis K. Sisco | 7,850 |
| Gregory K. Gum | 10,000 |
| E. Wayne Bonner | 10,000 |
| Thomas M. and Dale B. Griggs | 10,625 |
| Brindlee Capital, LLC | 31,250 |
| Webber Investments, LLC | 8,000 |
| Franklin Street Investments, LLC | 18,750 |
| John R. and Donna C. Coleman | 1,600 |

17

| | | | |
|---|---|---|---|
| Charles T. Houser | 7,850 | | |
| Prasada R. Bhavani K.D. Kakani | 3,850 | | |
| Robert E. and Eleanor B. Thurber | 15,625 | | |
| Lioce Investments, L.L.C. | 1,000 | | |
| | | | |
| **TOTAL** | **242,889** | **359,395** | **91,764** |

18

**IN WITNESS WHEREOF**, the parties have executed and delivered this Securities Purchase Agreement on the date first above written.

**COMPANY:**

ARXCEO CORPORATION

By: _____

    Name: Donald J. Davidson

    Title: President and Chief Executive Officer

**PURCHASER:**

JAPAN COMMUNICATIONS, INC.

By: _____

    Name: Frank Seiji Sanda

    Title: President and Chief Executive Officer

9034153.14

**IN WITNESS WHEREOF**, the parties have executed and delivered this Securities Purchase Agreement on the date first above written.

COMPANY:

ARXCEO CORPORATION

By:_____
    Name:  Donald J. Davidson
    Title:  President and Chief Executive Officer

PURCHASER:

JAPAN COMMUNICATIONS, INC.

By:_____
    Name:  Frank Seiji Sanda
    Title:  President and Chief Executive Officer

SERIES A STOCKHOLDERS:

HRC, LLC

By:_____
Name:
Title:

LIOCE INVESTMENTS, LLC

By:_____
Name:
Title:

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:

**REPRESENTATIVES:**

_____
Donald Davidson

_____
David Izatt

[Signature Page to Securities Purchase Agreement]

**IN WITNESS WHEREOF**, the parties have executed and delivered this Securities Purchase Agreement on the date first above written.

**COMPANY:**

ARXCEO CORPORATION

By:_____

    Name:  Donald J. Davidson
    Title:  President and Chief Executive Officer

**PURCHASER:**

JAPAN COMMUNICATIONS, INC.

By:_____

    Name:  Frank Seiji Sanda
    Title:  President and Chief Executive Officer

**SERIES A STOCKHOLDERS:**

HRC, LLC

By:_____
Name: RBLAND WARREN
Title: MANAGING MEMBER

LIOCE INVESTMENTS, LLC

By:_____
Name:
Title:

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:

**IN WITNESS WHEREOF**, the parties have executed and delivered this Securities Purchase Agreement on the date first above written.

**COMPANY:**

ARXCEO CORPORATION

By:_____
    Name:  Donald J. Davidson
    Title:  President and Chief Executive Officer

**PURCHASER:**

JAPAN COMMUNICATIONS, INC.

By:_____
    Name:  Frank Seiji Sanda
    Title:  President and Chief Executive Officer

**SERIES A STOCKHOLDERS:**

HRC, LLC

By:_____
Name:
Title:

LIOCE INVESTMENTS, LLC

By: _Nichola Lioce Jr_
Name:
Title: _MGR._

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:

**IN WITNESS WHEREOF**, the parties have executed and delivered this Securities Purchase Agreement on the date first above written.

**COMPANY:**

ARXCEO CORPORATION

By:_____
    Name:  Donald J. Davidson
    Title:  President and Chief Executive Officer

**PURCHASER:**

JAPAN COMMUNICATIONS, INC.

By:_____
    Name:  Frank Seiji Sanda
    Title:  President and Chief Executive Officer

**SERIES A STOCKHOLDERS**:

HRC, LLC

By:_____
Name:
Title:

LIOCE INVESTMENTS, LLC

By:_____
Name:
Title:

SHATAS PARTNERS, LTD.

By: *Remi Shatas, G.P*
Name: *Remigius Shatas, G.P.*
Title: *General Partner*

DB SECURITIES, INC. TAX ID # 522208880 AS
CUSTODIAN F/B/O IRA FBO DAVID J. SLYMAN,
JR., IRA

By:_____
Name:
Title:

BRYAN W. BUTLER AND JACALYN A. BUTLER
(JTWROS)

By:_____
             Bryan W. Butler

By:_____
             Jacalyn A. Butler

WILLIAM MCCARY AND BILLIE JOE MCCARY
(JTWROS)

By:_____
             William McCary

By:_____
             Billie Jo McCary

JEAN T. MOORE AND MARGARET T. MOORE
(JTWROS)

By:_____
             Jean T. Moore

By:_____
             Margaret T. Moore

NATIONAL INVESTOR SERVICES CORP. FBO:
DAWN DARNELL SHELTON ACCOUNT NO. 385-
97378-13

By:_____
Name:
Title:

2

DB SECURITIES, INC. TAX ID # 522208880 AS
CUSTODIAN F/B/O IRA FBO DAVID J. SLYMAN,
JR., IRA

By:_____
Name: David J. Slyman, Jr.
Title:

_Chris Harvey_

**POWER OF ATTORNEY**
**DEUTSCHE BANK SECURITIES INC.**

BRYAN W. BUTLER AND JACALYN A. BUTLER
(JTWROS)

By:_____
　　　　　Bryan W. Butler

By:_____
　　　　　Jacalyn A. Butler

WILLIAM MCCARY AND BILLIE JOE MCCARY
(JTWROS)

By:_____
　　　　　William McCary

By:_____
　　　　　Billie Jo McCary

JEAN T. MOORE AND MARGARET T. MOORE
(JTWROS)

By:_____
　　　　　Jean T. Moore

By:_____
　　　　　Margaret T. Moore

NATIONAL INVESTOR SERVICES CORP. FBO:
DAWN DARNELL SHELTON ACCOUNT NO. 385-
97378-13

By:_____
Name:
Title:

ALL REPRESENTATIONS AND WARRANTIES
ARE MADE BY THE CLIENT. DEUTSCHE BANK
SECURITIES INC. WILL NOT BE RESPONSIBLE
FOR ANY SUCH REPRESENTATIONS AND
WARRANTIES MADE BY THE CLIENT IN
APPROVING THIS INVESTMENT.

DB SECURITIES, INC. TAX ID # 522208880 AS
CUSTODIAN F/B/O IRA FBO DAVID J. SLYMAN,
JR., IRA

By: _____
Name: _____
Title: _____


BRYAN W. BUTLER AND JACALYN A. BUTLER
(JTWROS)

By:_____
　　　　　Bryan W. Butler

By:_____
　　　　　Jacalyn A. Butler


WILLIAM MCCARY AND BILLIE JOE MCCARY
(JTWROS)

By:_____
　　　　　William McCary

By:_____
　　　　　Billie Jo McCary


JEAN T. MOORE AND MARGARET T. MOORE
(JTWROS)

By:_____
　　　　　Jean T. Moore

By:_____
　　　　　Margaret T. Moore


NATIONAL INVESTOR SERVICES CORP. FBO:
DAWN DARNELL SHELTON ACCOUNT NO. 385-
97378-13

By: _____
Name: _____
Title: _____

2

DB SECURITIES, INC. TAX ID # 522208880 AS
CUSTODIAN F/B/O IRA FBO DAVID J. SLYMAN,
JR., IRA

By:_____
Name:
Title:


BRYAN W. BUTLER AND JACALYN A. BUTLER
(JTWROS)

By:_____
          Bryan W. Butler

By:_____
          Jacalyn A. Butler


WILLIAM MCCARY AND BILLIE JOE MCCARY
(JTWROS)

By:_____
          William McCary

By:_____
          Billie Jo McCary


JEAN T. MOORE AND MARGARET T. MOORE
(JTWROS)

By:_____
          Jean T. Moore

By:_____
          Margaret T. Moore


NATIONAL INVESTOR SERVICES CORP. FBO:
DAWN DARNELL SHELTON ACCOUNT NO. 385-
97378-13

By:_____
Name:
Title:


2

DB SECURITIES, INC. TAX ID # 522208880 AS
CUSTODIAN F/B/O IRA FBO DAVID J. SLYMAN,
JR., IRA

By:_____
Name:
Title:


BRYAN W. BUTLER AND JACALYN A. BUTLER
(JTWROS)

By:_____
           Bryan W. Butler

By:_____
           Jacalyn A. Butler


WILLIAM MCCARY AND BILLIE JOE MCCARY
(JTWROS)

By:_____
           William McCary

By:_____
           Billie Jo McCary


JEAN T. MOORE AND MARGARET T. MOORE
(JTWROS)

By:_____
           Jean T. Moore

By:_____
           Margaret T. Moore


NATIONAL INVESTOR SERVICES CORP. FBO:
DAWN DARNELL SHELTON ACCOUNT NO. 385-
97378-13

By:_____
Name:
Title:


2

DB SECURITIES, INC. TAX ID # 522208880 AS
CUSTODIAN F/B/O IRA FBO DAVID J. SLYMAN,
JR., IRA

By:_____
Name:
Title:


BRYAN W. BUTLER AND JACALYN A. BUTLER
(JTWROS)

By:_____
        Bryan W. Butler

By:_____
        Jacalyn A. Butler


WILLIAM MCCARY AND BILLIE JOE MCCARY
(JTWROS)

By:_____
        William McCary

By:_____
        Billie Jo McCary


JEAN T. MOORE AND MARGARET T. MOORE
(JTWROS)

By:_____
        Jean T. Moore

By:_____
        Margaret T. Moore


NATIONAL INVESTOR SERVICES CORP. FBO:
DAWN DARNELL SHELTON ACCOUNT NO. 385-
97378-13

By:_____
Name:
Title:


2

DB SECURITIES, INC. TAX ID # 522208880 AS
CUSTODIAN F/B/O IRA FBO DAVID J. SLYMAN,
JR., IRA

By:_____

Name:

Title:


BRYAN W. BUTLER AND JACALYN A. BUTLER
(JTWROS)

By:_____

            Bryan W. Butler

By:_____

            Jacalyn A. Butler


WILLIAM MCCARY AND BILLIE JOE MCCARY
(JTWROS)

By:_____

            William McCary

By:_____

            Billie Jo McCary


JEAN T. MOORE AND MARGARET T. MOORE
(JTWROS)

By:_____

            Jean T. Moore

By:_____

            Margaret T. Moore


NATIONAL INVESTOR SERVICES CORP. FBO:
DAWN DARNELL SHELTON ACCOUNT NO. 385-
97378-13

By:_____

Name:

Title:

_____
DAVID S. BUTLER


_____
JOHN JURENKO


_____
WILLIAM SCOTT MCCARY


_____
TODD J. SLYMAN


**SERIES B STOCKHOLDERS:**


FRANKLIN STREET INVESTMENTS, LLC


By:_____
Name:
Title:


LIOCE INVESTMENTS, LLC


By:_____
Name:
Title:


BRINDLEE CAPITAL LLC


By:_____
Name:
Title:


3

_____
DAVID S. BUTLER


*John Jurenko*
_____
JOHN JURENKO



_____
WILLIAM SCOTT MCCARY



_____
TODD J. SLYMAN



**SERIES B STOCKHOLDERS:**


FRANKLIN STREET INVESTMENTS, LLC


By:_____
Name:
Title:



LIOCE INVESTMENTS, LLC


By:_____
Name:
Title:



BRINDLEE CAPITAL LLC


By:_____
Name:
Title:



3

_____

DAVID S. BUTLER


_____

JOHN JURENKO


_____

WILLIAM SCOTT MCCARY


_____

TODD J. SLYMAN


**SERIES B STOCKHOLDERS:**


FRANKLIN STREET INVESTMENTS, LLC


By:_____

Name:

Title:


LIOCE INVESTMENTS, LLC


By:_____

Name:

Title:


BRINDLEE CAPITAL LLC


By:_____

Name:

Title:


3

_____
DAVID S. BUTLER


_____
JOHN JURENKO


_____
WILLIAM SCOTT MCCARY

_____
TODD J. SLYMAN


**SERIES B STOCKHOLDERS:**


FRANKLIN STREET INVESTMENTS, LLC


By:_____
Name:
Title:


LIOCE INVESTMENTS, LLC


By:_____
Name:
Title:


BRINDLEE CAPITAL LLC


By:_____
Name:
Title:


3

_____
DAVID S. BUTLER


_____
JOHN JURENKO


_____
WILLIAM SCOTT MCCARY


_____
TODD J. SLYMAN


**SERIES B STOCKHOLDERS:**


FRANKLIN STREET INVESTMENTS, LLC

By: _W. donner_____
Name: _W. Scott McCary_____
Title: _President_____


LIOCE INVESTMENTS, LLC


By: _____
Name:
Title:


BRINDLEE CAPITAL LLC


By: _____
Name:
Title:


3

_____

DAVID S. BUTLER


_____

JOHN JURENKO


_____

WILLIAM SCOTT MCCARY


_____

TODD J. SLYMAN


**SERIES B STOCKHOLDERS:**

FRANKLIN STREET INVESTMENTS, LLC


By:_____
Name:
Title:


LIOCE INVESTMENTS, LLC

By: _____
Name:
Title: M G R.


BRINDLEE CAPITAL LLC


By:_____
Name:
Title:

_____
DAVID S. BUTLER


_____
JOHN JURENKO


_____
WILLIAM SCOTT MCCARY


_____
TODD J. SLYMAN


**SERIES B STOCKHOLDERS:**


FRANKLIN STREET INVESTMENTS, LLC


By:_____
Name:
Title:


LIOCE INVESTMENTS, LLC


By:_____
Name:
Title:


BRINDLEE CAPITAL LLC


By: _____
Name:    Foster McDonald
Title:    Manager


3

CITY LIGHT CAPITAL, LLC

By: _____
Name: MARC WEILL
Title: CHAIRMAN

JOHN R. COLEMAN AND DONNA C. COLEMAN
(JTWROS)

By: _____
        John R. Coleman

By: _____
        Donna C. Coleman

THOMAS M. GRIGGS AND DALE B. GRIGGS
(JTWROS)

By: _____
        Thomas M. Griggs

By: _____
        Dale B. Griggs

J. JEFFREY IRONS AND VICKI C. IRONS
(JTWROS)

By: _____
        J. Jeffrey Irons

By: _____
        Vicki C. Irons

PRASADA R. KAKANI AND BHAVANI K.D.
KAKANI (JTWROS)

By: _____
        Prasada R. Kakani

By: _____
        Bhavani K.D. Kakani

CITY LIGHT CAPITAL, LLC

By:_____
Name:
Title:

JOHN R. COLEMAN AND DONNA C. COLEMAN
(JTWROS)

By:_____
        John R. Coleman

By:_____
        Donna C. Coleman

THOMAS M. GRIGGS AND DALE B. GRIGGS
(JTWROS)

By:_____
        Thomas M. Griggs

By:_____
        Dale B. Griggs

J. JEFFREY IRONS AND VICKI C. IRONS
(JTWROS)

By:_____
        J. Jeffrey Irons

By:_____
        Vicki C. Irons

PRASADA R. KAKANI AND BHAVANI K.D.
KAKANI (JTWROS)

By:_____
        Prasada R. Kakani

By:_____
        Bhavani K.D. Kakani

4

CITY LIGHT CAPITAL, LLC

By:_____
Name:
Title:


JOHN R. COLEMAN AND DONNA C. COLEMAN
(JTWROS)

By:_____
        John R. Coleman

By:_____
        Donna C. Coleman


THOMAS M. GRIGGS AND DALE B. GRIGGS
(JTWROS)

By:_____
        Thomas M. Griggs

By:_____
        Dale B. Griggs


J. JEFFREY IRONS AND VICKI C. IRONS
(JTWROS)

By:_____
        J. Jeffrey Irons

By:_____
        Vicki C. Irons


PRASADA R. KAKANI AND BHAVANI K.D.
KAKANI (JTWROS)

By:_____
        Prasada R. Kakani

By:_____
        Bhavani K.D. Kakani


4

CITY LIGHT CAPITAL, LLC

By:_____
Name:
Title:


JOHN R. COLEMAN AND DONNA C. COLEMAN
(JTWROS)

By:_____
              John R. Coleman

By:_____
              Donna C. Coleman


THOMAS M. GRIGGS AND DALE B. GRIGGS
(JTWROS)

By:_____
              Thomas M. Griggs

By:_____
              Dale B. Griggs


J. JEFFREY IRONS AND VICKI C. IRONS
(JTWROS)

By:_____
              J. Jeffrey Irons

By:_____
              Vicki C. Irons


PRASADA R. KAKANI AND BHAVANI K.D.
KAKANI (JTWROS)

By:_____
              Prasada R. Kakani

By:_____
              Bhavani K.D. Kakani

4

CITY LIGHT CAPITAL, LLC

By:_____
Name:
Title:


JOHN R. COLEMAN AND DONNA C. COLEMAN
(JTWROS)

By:_____
             John R. Coleman

By:_____
             Donna C. Coleman


THOMAS M. GRIGGS AND DALE B. GRIGGS
(JTWROS)

By:_____
             Thomas M. Griggs

By:_____
             Dale B. Griggs


J. JEFFREY IRONS AND VICKI C. IRONS
(JTWROS)

By:_____
             J. Jeffrey Irons

By:_____
             Vicki C. Irons


PRASADA R. KAKANI AND BHAVANI K.D.
KAKANI (JTWROS)

By:_____
             Prasada R. Kakani

By:_____
             Bhavani K.D. Kakani


4

SHATAS PARTNERS, LTD.

By: _Remm Shatas, G.P._
Name: _Remigius Shatas_
Title: _General Partner_


DAVID NICOLAS AND MARK NICOLAS (JTWROS)

By:_____
          David Nicolas

By:_____
          Mark Nicolas


ROBERT E. THURBER AND ELEANOR B.
THURBER (JTWROS)

By:_____
          Robert E. Thurber

By:_____
          Eleanor B. Thurber


WEBBER INVESTMENTS, LLC


By:_____
Name:
Title:


_____
JAMES V. BALCH


_____
E. WAYNE BONNER


_____
GREGORY J. CLAYTON


_____
ANTHONY A. GANN


5

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:


DAVID NICOLAS AND MARK NICOLAS (JTWROS)

By:_____
               David Nicolas

By:_____
               Mark Nicolas


ROBERT E. THURBER AND ELEANOR B.
THURBER (JTWROS)

By:_____
               Robert E. Thurber

By:_____
               Eleanor B. Thurber


WEBBER INVESTMENTS, LLC

By:_____
Name:
Title:


_____
JAMES V. BALCH


_____
E. WAYNE BONNER


_____
GREGORY J. CLAYTON


_____
ANTHONY A. GANN

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:


DAVID NICOLAS AND MARK NICOLAS (JTWROS)

By:_____
          David Nicolas

By:_____
          Mark Nicolas


ROBERT E. THURBER AND ELEANOR B. THURBER (JTWROS)

By:_____
          Robert E. Thurber

By:_____
          Eleanor B. Thurber


WEBBER INVESTMENTS, LLC

By:_____
Name:
Title:


_____
JAMES V. BALCH


_____
E. WAYNE BONNER


_____
GREGORY J. CLAYTON


_____
ANTHONY A. GANN


5

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:


DAVID NICOLAS AND MARK NICOLAS (JTWROS)

By:_____
            David Nicolas

By:_____
            Mark Nicolas


ROBERT E. THURBER AND ELEANOR B.
THURBER (JTWROS)

By:_____
            Robert E. Thurber

By:_____
            Eleanor B. Thurber


WEBBER INVESTMENTS, LLC

By:_____
Name:  J. Kevin Webber
Title:  president


_____
JAMES V. BALCH


_____
E. WAYNE BONNER


_____
GREGORY J. CLAYTON


_____
ANTHONY A. GANN


5

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:


DAVID NICOLAS AND MARK NICOLAS (JTWROS)

By:_____
　　　　David Nicolas

By:_____
　　　　Mark Nicolas


ROBERT E. THURBER AND ELEANOR B.
THURBER (JTWROS)

By:_____
　　　　Robert E. Thurber

By:_____
　　　　Eleanor B. Thurber


WEBBER INVESTMENTS, LLC

By:_____
Name:
Title:

_____
JAMES V. BALCH


_____
E. WAYNE BONNER


_____
GREGORY J. CLAYTON


_____
ANTHONY A. GANN


5

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:


DAVID NICOLAS AND MARK NICOLAS (JTWROS)

By:_____
         David Nicolas

By:_____
         Mark Nicolas


ROBERT E. THURBER AND ELEANOR B.
THURBER (JTWROS)

By:_____
         Robert E. Thurber

By:_____
         Eleanor B. Thurber


WEBBER INVESTMENTS, LLC

By:_____
Name:
Title:


_____
JAMES V. BALCH

_____
E. WAYNE BONNER


_____
GREGORY J. CLAYTON


_____
ANTHONY A. GANN


5

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:

DAVID NICOLAS AND MARK NICOLAS (JTWROS)

By:_____
         David Nicolas

By:_____
         Mark Nicolas

ROBERT E. THURBER AND ELEANOR B.
THURBER (JTWROS)

By:_____
         Robert E. Thurber

By:_____
         Eleanor B. Thurber

WEBBER INVESTMENTS, LLC

By:_____
Name:
Title:

_____
JAMES V. BALCH

_____
E. WAYNE BONNER

_____
GREGORY J. CLAYTON

_____
ANTHONY A. GANN

5

SHATAS PARTNERS, LTD.

By:_____
Name:
Title:


DAVID NICOLAS AND MARK NICOLAS (JTWROS)

By:_____
          David Nicolas

By:_____
          Mark Nicolas


ROBERT E. THURBER AND ELEANOR B.
THURBER (JTWROS)

By:_____
          Robert E. Thurber

By:_____
          Eleanor B. Thurber


WEBBER INVESTMENTS, LLC

By:_____
Name:
Title:


_____
JAMES V. BALCH


_____
E. WAYNE BONNER

_____
GREGORY J. CLAYTON

_____
ANTHONY A. GANN

5

_____
GREGORY K. GUM

_____
FORREST R. HAIRSTON, SR.

_____
CHARLES T. HOUSER

_____
STEVEN D. MARZ

_____
LOUIS K. SISCO, JR.

_____
SAMUEL P. MCMANUS

_____
ALAN L. NORDLINGER

_____
DAVID J. SLYMAN, JR.

_____
TODD J. SLYMAN

_____
MICHAEL W. SOLLEY

_____
HEIDE WILLIAMS

_____
DIXIE D. WOLF

6

GREGORY K. GUM

_Forrest R. Hairston Sr._
FORREST R. HAIRSTON, SR. 4,005 "B" SHARES

CHARLES T. HOUSER

STEVEN D. MARZ

LOUIS K. SISCO, JR.

SAMUEL P. MCMANUS

ALAN L. NORDLINGER

DAVID J. SLYMAN, JR.

TODD J. SLYMAN

MICHAEL W. SOLLEY

HEIDE WILLIAMS

DIXIE D. WOLF

6

_____
GREGORY K. GUM


_____
FORREST R. HAIRSTON, SR.

_____
CHARLES T. HOUSER


_____
STEVEN D. MARZ


_____
LOUIS K. SISCO, JR.


_____
SAMUEL P. MCMANUS


_____
ALAN L. NORDLINGER


_____
DAVID J. SLYMAN, JR.


_____
TODD J. SLYMAN


_____
MICHAEL W. SOLLEY


_____
HEIDE WILLIAMS


_____
DIXIE D. WOLF


6

_____

GREGORY K. GUM


_____

FORREST R. HAIRSTON, SR.


_____

CHARLES T. HOUSER


_____

STEVEN D. MARZ


_____

LOUIS K. SISCO, JR.


_____

SAMUEL P. MCMANUS


_____

ALAN L. NORDLINGER


_____

DAVID J. SLYMAN, JR.


_____

TODD J. SLYMAN


_____

MICHAEL W. SOLLEY


_____

HEIDE WILLIAMS


_____

DIXIE D. WOLF

_____

GREGORY K. GUM


_____

FORREST R. HAIRSTON, SR.


_____

CHARLES T. HOUSER


_____

STEVEN D. MARZ

*Louis K Sisco Jr.*
_____

LOUIS K. SISCO, JR.


_____

SAMUEL P. MCMANUS


_____

ALAN L. NORDLINGER


_____

DAVID J. SLYMAN, JR.


_____

TODD J. SLYMAN


_____

MICHAEL W. SOLLEY


_____

HEIDE WILLIAMS


_____

DIXIE D. WOLF


6

_____

GREGORY K. GUM


_____

FORREST R. HAIRSTON, SR.


_____

CHARLES T. HOUSER


_____

STEVEN D. MARZ


_____

LOUIS K. SISCO, JR.

_____

SAMUEL P. MCMANUS


_____

ALAN L. NORDLINGER


_____

DAVID J. SLYMAN, JR.


_____

TODD J. SLYMAN


_____

MICHAEL W. SOLLEY


_____

HEIDE WILLIAMS


_____

DIXIE D. WOLF


6

_____

GREGORY K. GUM


_____

FORREST R. HAIRSTON, SR.


_____

CHARLES T. HOUSER


_____

STEVEN D. MARZ


_____

LOUIS K. SISCO, JR.


_____

SAMUEL P. MCMANUS


_____

ALAN L. NORDLINGER


_____

DAVID J. SLYMAN, JR.


_____

TODD J. SLYMAN


_____

MICHAEL W. SOLLEY


_____

HEIDE WILLIAMS


_____

DIXIE D. WOLF


6

_____

GREGORY K. GUM


_____

FORREST R. HAIRSTON, SR.


_____

CHARLES T. HOUSER


_____

STEVEN D. MARZ


_____

LOUIS K. SISCO, JR.


_____

SAMUEL P. MCMANUS


_____

ALAN L. NORDLINGER


_____

DAVID J. SLYMAN, JR.


_____

TODD J. SLYMAN


_____

MICHAEL W. SOLLEY


_____

HEIDE WILLIAMS


_____

DIXIE D. WOLF


6

_____
GREGORY K. GUM


_____
FORREST R. HAIRSTON, SR.


_____
CHARLES T. HOUSER


_____
STEVEN D. MARZ


_____
LOUIS K. SISCO, JR.


_____
SAMUEL P. MCMANUS


_____
ALAN L. NORDLINGER


_____
DAVID J. SLYMAN, JR.


_____
TODD J. SLYMAN


_____
MICHAEL W. SOLLEY


_____
HEIDE WILLIAMS


_____
DIXIE D. WOLF


6

_____

GREGORY K. GUM


_____

FORREST R. HAIRSTON, SR.


_____

CHARLES T. HOUSER


_____

STEVEN D. MARZ


_____

LOUIS K. SISCO, JR.


_____

SAMUEL P. MCMANUS


_____

ALAN L. NORDLINGER


_____

DAVID J. SLYMAN, JR.


_____

TODD J. SLYMAN


_____

MICHAEL W. SOLLEY

_Heide Williams_
_____

HEIDE WILLIAMS


_____

DIXIE D. WOLF

_____

GREGORY K. GUM


_____

FORREST R. HAIRSTON, SR.


_____

CHARLES T. HOUSER


_____

STEVEN D. MARZ


_____

LOUIS K. SISCO, JR.


_____

SAMUEL P. MCMANUS


_____

ALAN L. NORDLINGER


_____

DAVID J. SLYMAN, JR.


_____

TODD J. SLYMAN


_____

MICHAEL W. SOLLEY


_____

HEIDE WILLIAMS


_____

DIXIE D. WOLF


6

**COMMON STOCKHOLDERS:**

RNR VENTURES, L.L.C.

By: _Charles F. Lofty_____
Name: CHARLES F. LOFTY
Title: MANAGING PARTNER

ANGUS ADAIR WOLFGANG, INC.

By: _____
Name:
Title:

_____

DONALD J. DAVIDSON

_____

J. CHANDLER HALL

**COMMON STOCKHOLDERS:**

RNR VENTURES, L.L.C.

By:_____
Name:
Title:

ANGUS ADAIR WOLFGANG, INC.

By:_____
Name: David A. Izatt
Title: President

_____
DONALD J. DAVIDSON

_____
J. CHANDLER HALL

7

**COMMON STOCKHOLDERS:**

RNR VENTURES, L.L.C.


By:_____
Name:
Title:

ANGUS ADAIR WOLFGANG, INC.


By:_____
Name:
Title:

_____
DONALD J. DAVIDSON


_____
J. CHANDLER HALL

7

**COMMON STOCKHOLDERS:**

RNR VENTURES, L.L.C.


By:_____
Name:
Title:

ANGUS ADAIR WOLFGANG, INC.


By:_____
Name:
Title:


_____
DONALD J. DAVIDSON

_____
J. CHANDLER HALL

7

# Exhibit "A"

Restated Certificate of Incorporation

# SECOND AMENDED AND RESTATED

# CERTIFICATE OF INCORPORATION

## OF

## ARXCEO CORPORATION

---

Arxceo Corporation, a Delaware corporation (the "Corporation"), does hereby certify that:

**FIRST:** The present name of the Corporation is "Arxceo Corporation". The Corporation was originally incorporated by the filing of its original Certificate of Incorporation with the Secretary of State of the State of Delaware on December 10, 2003 under the name "Arxceo Corporation" pursuant to the General Corporation Law.

**SECOND:** A First Amended and Restated Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 2, 2004.

**THIRD:** An Amendment to the First Amended and Restated Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on October 29, 2004.

**FOURTH:** This Second Amended and Restated Certificate of Incorporation (the "Certificate") amends and restates in its entirety the present First Amended and Restated Certificate of Incorporation of the Corporation, as amended, and has been approved in accordance with Sections 141, 228, 242 and 245 of the General Corporation Law of the State of Delaware.

**FIFTH:** This Certificate shall become effective immediately upon its filing with the Secretary of State of the State of Delaware.

**SIXTH:** Upon the filing of this Certificate with the Secretary of State of the State of Delaware, the Certificate of Incorporation of the Corporation shall be restated in its entirety to read as set forth on Exhibit A attached hereto.

9037952.6

**IN WITNESS WHEREOF**, the undersigned, being the President of the Corporation hereinabove named, DOES HEREBY CERTIFY, under penalties of perjury, that the facts hereinabove stated are truly set forth and, accordingly, such officer has hereunto set his hand as of February 28, 2006.

_____
Donald J. Davidson
President

**Exhibit A**

# SECOND AMENDED AND RESTATED

# CERTIFICATE OF INCORPORATION

## OF

## ARXCEO CORPORATION

### ARTICLE I

The name of the Corporation (herein called the "Corporation") is Arxceo Corporation.

### ARTICLE II

The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, in the city of Wilmington, County of New Castle. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

### ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "DGCL"), including, without limitation, to develop, utilize and market software (including, but not limited to, so-called firewall software) and any and all activites incidental thereto.

### ARTICLE IV

1. Authorized Shares. The Corporation shall be authorized to issue 5,000,000 shares of all classes, consisting of (i) 2,000,000 shares of Common Stock, $0.0001 par value (the "Common Stock"), and (ii) 3,000,000 shares of Preferred Stock, $0.0001 par value (the "Preferred Stock").

2. Common Stock. Each share of Common Stock shall be identical in all respects and for all purposes and entitled to: (a) one (1) vote in all proceedings in which action may or is required to be taken by stockholders of the Corporation; (b) participate equally in all dividends payable with respect to the Common Stock, as, if and when declared by the Board of Directors of the Corporation (the "Board") subject to any rights and preference in favor of any class or series of Preferred Stock; and (c) share ratably in all distributions of assets of the Corporation in the event of any voluntary or involuntary liquidation, or winding up of the affairs of the Corporation, subject to any rights and preferences in favor of any class or series of Preferred Stock.

3. <u>Preferred Stock</u>.

(a)    Of the 3,000,000 authorized shares of Preferred Stock, 2,750,000 shares shall be designated as "Series C Preferred Stock" (the "<u>Series C Preferred Shares</u>").

(b)    With respect to the 250,000 shares of undesignated Preferred Stock as of the date hereof, the Board shall have authority to the fullest extent permitted under the DGCL, but subject to all contractual restrictions to which it or the Corporation is bound, to adopt by resolution from time to time one or more Certificates of Designation providing for the designation of one or more series of Preferred Stock, and such designations, limitations, voting rights (if any) and restrictions thereof, and to fix or alter the number of shares comprising any such series, subject to any requirements of the DGCL, all contractual restrictions by which the Corporation is bound and this Second Amended and Restated Certificate of Incorporation, as amended from time to time.

The authority of the Board with respect to each such series shall include, without limitation of the foregoing, the right to determine and fix the following preferences and powers, which may vary as between different series of Preferred Stock:

(i)    the distinctive designation of such series and the number of shares to constitute such series;

(ii)    the rate at which any dividends on the shares of such series shall be declared and paid, or set aside for payment, whether dividends at the rate so determined shall be cumulative or accruing, and whether the shares of such series shall be entitled to any participating or other dividends in addition to dividends at the rate so determined, and if so, on what terms;

(iii)    the right or obligation, if any, of the Corporation to redeem shares of the particular series of Preferred Stock and, if redeemable, the price, terms and manner of such redemption;

(iv)    the special and relative rights and preferences, if any, and the amount or amounts per share, which the shares of such series of Preferred Stock shall be entitled to receive upon any voluntary or involuntary liquidation, dissolution or winding up of the Corporation;

(v)    the terms and conditions, if any, upon which shares of such series shall be convertible into, or exchangeable for, shares of capital stock of any other series, including the price or prices or the rate or rates of conversion or exchange and the terms of adjustment, if any;

(vi)    the obligation, if any, of the Corporation to retire, redeem or purchase shares of such series pursuant to a sinking fund or fund of a similar nature or otherwise, and the terms and conditions of such obligation;

(vii)    voting rights, if any, including special voting rights with respect to the election of directors and matters adversely affecting any series of Preferred Stock; and

(viii)    limitations, if any, on the issuance of additional shares of such series or any shares of any other series of Preferred Stock.

4.  Dividends.

When, as, if and to the extent that dividends are declared and paid upon or set aside for any Common Stock, the holders of the Series C Preferred Stock shall be entitled to share in such dividends pro rata in accordance with the number of shares of Common Stock into which such Series C Preferred Shares are then convertible pursuant to Section 8.

5.  Liquidation.

(a)    Upon a Liquidation (as defined below), after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of the Series C Preferred Shares shall be entitled to receive, out of the remaining assets of the Corporation available for distribution to its stockholders, with respect to each Series C Preferred Share, an amount (the "Series C Preference Amount") equal to the sum of $1.68 (the "Series C Purchase Price") and (B) all accrued and unpaid dividends (subject to equitable adjustment as a result of any stock dividend, stock split, combination, reverse split, reclassification or similar event after the date of issuance of the first Series C Preferred Share) before any distribution shall be made to the holders of the Common Stock.

(b)    Notwithstanding the foregoing, upon any Sale of the Corporation (as defined below) that occurs on or prior to April 30, 2008, after payment or provision for payment of the debts and other liabilities of the Corporation, but prior to payment of the Series C Preference Amount and in preference to amounts payable to the holders of the Series C Preferred Shares, the holders of Common Stock shall be entitled to receive, out of the remaining assets of the Corporation available for distribution to its stockholders, with respect to each share of Common Stock, an amount (the "Common Special Preference Amount") equal to the quotient of (A) the remainder of (i) $10,000,000, less (ii) any amounts received by the holders of Common Stock pursuant to the 2007 GR Amount (as defined below), the 2007 NOI Amount (as defined below), the 2008 GR Amount (as defined below) and the 2008 NOI Amount (as defined below), divided by (B) the total number of shares of Common Stock outstanding immediately prior to the consummation of the Sale of the Corporation; provided, however, that the right of the holders of Common Stock to receive the Common Special Preference Amount shall terminate automatically on the date that Japan Communications, Inc. (or any successor) (hereinafter "JCI") acquires all shares of Common Stock outstanding as of the date of this Second Amended and Restated Certificate of Incorporation (the "Third Closing Date") pursuant to the terms and conditions of the Securities Purchase Agreement dated as of February 28, 2006 between the Corporation, JCI and the holders of all shares of Common Stock outstanding as of the date of this Second Amended and Restated Certificate of Incorporation (as may be modified, supplemented or amended from time to time, the "Series C Purchase Agreement").

3

Definitions:

"2007 GR Amount" means a specified percentage of $625,000 based upon the Corporation's Gross Revenues (as defined below) relative to the Corporation's 2007 GR Target (as defined below) for the period from and including February 28, 2006 through and including March 31, 2007, based upon the following formula:

| PERCENTAGE OF 2007 GR TARGET | 2007 GR AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | 32.5% |
| Greater than or equal to 60% but less than 65% | 40% |
| Greater than or equal to 65% but less than 70% | 47.5% |
| Greater than or equal to 70% but less than 75% | 55% |
| Greater than or equal to 75% but less than 80% | 62.5% |
| Greater than or equal to 80% but less than 85% | 70% |
| Greater than or equal to 85% but less than 90% | 77.5% |
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | 92.5% |
| Greater than or equal to 100% but less than 105% | 100% |
| Greater than or equal to 105% but less than 110% | 108.5% |

Greater than or equal to 110% but less than 115%....................................................... 117%

Greater than or equal to 115% but less than 120%....................................................... 125.5%

Greater than or equal to 120% but less than 125%....................................................... 134%

Greater than or equal to 125% but less than 130%....................................................... 142.5%

Greater than or equal to 130% but less than 135%....................................................... 151%

Greater than or equal to 135% but less than 140%....................................................... 159.5%

Greater than or equal to 140% but less than 145%....................................................... 168%

Greater than or equal to 145% but less than 150%....................................................... 176.5%

Greater than or equal to 150% but less than 155%....................................................... 185%

Greater than or equal to 155% but less than 160%....................................................... 193.5%

Greater than or equal to 160% ................................................................................. 200%

"2007 GR Target" means $3,300,000.

"2007 NOI Amount" means a specified percentage of $625,000 based upon the Corporation's Net Operating Income (as defined below) relative to the 2007 NOI Target (as defined below) for the period from and including February 28, 2006 through and including March 31, 2007, based upon the following formula:

| PERCENTAGE OF 2007 NOI TARGET | 2007 NOI AMOUNT |
|---|---|
| Less than 25%....................................................................................... | 0% |
| Greater than or equal to 25% but less than 30%.................................... | 10% |
| Greater than or equal to 30% but less than 35%.................................... | 10% |
| Greater than or equal to 35% but less than 40%.................................... | 10% |
| Greater than or equal to 40% but less than 45%.................................... | 10% |
| Greater than or equal to 45% but less than 50%.................................... | 17.5% |
| Greater than or equal to 50% but less than 55%.................................... | 25% |
| Greater than or equal to 55% but less than 60%.................................... | 32.5% |

Greater than or equal to 60% but less than 65%.......................................................... 40%

Greater than or equal to 65% but less than 70%.......................................................... 47.5%

Greater than or equal to 70% but less than 75%.......................................................... 55%

Greater than or equal to 75% but less than 80%.......................................................... 62.5%

Greater than or equal to 80% but less than 85%.......................................................... 70%

Greater than or equal to 85% but less than 90%.......................................................... 77.5%

Greater than or equal to 90% but less than 95%.......................................................... 85%

Greater than or equal to 95% but less than 100%......................................................... 92.5%

Greater than or equal to 100% but less than 105%........................................................ 100%

Greater than or equal to 105% but less than 110%........................................................ 108.5%

Greater than or equal to 110% but less than 115%........................................................ 117%

Greater than or equal to 115% but less than 120%........................................................ 125.5%

Greater than or equal to 120% but less than 125%........................................................ 134%

Greater than or equal to 125% but less than 130%........................................................ 142.5%

Greater than or equal to 130% but less than 135%........................................................ 151%

Greater than or equal to 135% but less than 140%........................................................ 159.5%

Greater than or equal to 140% but less than 145%........................................................ 168%

Greater than or equal to 145% but less than 150%........................................................ 176.5%

Greater than or equal to 150% but less than 155%........................................................ 185%

Greater than or equal to 155% but less than 160%........................................................ 193.5%

Greater than or equal to 160% ....................................................................... 200%

"2007 NOI Target" means $600,000.

"2008 GR Amount" means a specified percentage of $1,875,000 based upon the Corporation's Gross Revenues relative to the 2008 GR Target (as defined below) for the twelve month period from and including April 1, 2007 through and including March 31, 2008, based upon the following formula:

| PERCENTAGE OF 2008 GR TARGET | 2008 GR AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | 32.5% |
| Greater than or equal to 60% but less than 65% | 40% |
| Greater than or equal to 65% but less than 70% | 47.5% |
| Greater than or equal to 70% but less than 75% | 55% |
| Greater than or equal to 75% but less than 80% | 62.5% |
| Greater than or equal to 80% but less than 85% | 70% |
| Greater than or equal to 85% but less than 90% | 77.5% |
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | 92.5% |
| Greater than or equal to 100% but less than 105% | 100% |
| Greater than or equal to 105% but less than 110% | 108.5% |
| Greater than or equal to 110% but less than 115% | 117% |

| | |
|---|---|
| Greater than or equal to 115% but less than 120% | 125.5% |
| Greater than or equal to 120% but less than 125% | 134% |
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"2008 GR Target" means $7,000,000.

"2008 NOI Amount" means a specified percentage of $1,875,000 based upon the Corporation's Net Operating Income relative to the 2008 NOI Target (as defined below) for the twelve month period from and including April 1, 2007 through and including March 31, 2008, based upon the following formula:

| PERCENTAGE OF 2008 NOI TARGET | 2008 NOI AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | 32.5% |

Greater than or equal to 60% but less than 65%.......................................................  40%

Greater than or equal to 65% but less than 70%.......................................................  47.5%

Greater than or equal to 70% but less than 75%.......................................................  55%

Greater than or equal to 75% but less than 80%.......................................................  62.5%

Greater than or equal to 80% but less than 85%.......................................................  70%

Greater than or equal to 85% but less than 90%.......................................................  77.5%

Greater than or equal to 90% but less than 95%.......................................................  85%

Greater than or equal to 95% but less than 100%.....................................................  92.5%

Greater than or equal to 100% but less than 105%...................................................  100%

Greater than or equal to 105% but less than 110%...................................................  108.5%

Greater than or equal to 110% but less than 115%...................................................  117%

Greater than or equal to 115% but less than 120%...................................................  125.5%

Greater than or equal to 120% but less than 125%...................................................  134%

Greater than or equal to 125% but less than 130%...................................................  142.5%

Greater than or equal to 130% but less than 135%...................................................  151%

Greater than or equal to 135% but less than 140%...................................................  159.5%

Greater than or equal to 140% but less than 145%...................................................  168%

Greater than or equal to 145% but less than 150%...................................................  176.5%

Greater than or equal to 150% but less than 155%...................................................  185%

Greater than or equal to 155% but less than 160%...................................................  193.5%

Greater than or equal to 160% ...............................................................................  200%

"2008 NOI Target" means $1,400,000.

"Gross Revenue" shall be defined in accordance with generally accepted accounting principles in the United States in effect as of the date hereof.

"Net Operating Income" means the gross income of the Corporation, net of: (i) selling, general and administrative expenses; and (ii) costs of goods sold (in each case, defined in accordance with generally accepted accounting principles in the United States in effect as of the date hereof).

(c)    Upon any Liquidation, after payment in full of the Series C Preference Amount (and, in the case of Sale of the Corporation prior to the Third Closing Date, after the payment in full of the Common Special Preference Amount), the holders of Common Stock and the Series C Preferred Shares shall be entitled to share pro rata in the distribution of the remaining assets of the Corporation (assuming all of the Series C Preferred Shares were converted into Common Stock in accordance with Section 8 immediately prior to the consummation of the Liquidation and assuming that all vested options, warrants and other convertible securities (including such securities that have or would vest upon the consummation of a Liquidation) are converted into, or exercised for, Common Stock in accordance with their respective terms immediately prior to the consummation of a Liquidation).

(d)    If upon any Liquidation the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of the Series C Preferred Preferred Shares the full Series C Preferred Preference Amount to which they shall be entitled, the holders of the Series C Preferred Shares shall share, pro rata, in any distribution of assets. Notwithstanding the foregoing, if upon any Liquidation pursuant to a Sale of the Corporation prior to the Third Closing Date, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of the Common Stock the full Common Holders Special Preference (to which they shall be entitled) and the holders of the Series C Preferred Shares the full Series C Preference Amount (to which they shall be entitled), the holders of the Common Stock and the Series C Preferred Shares shall share in any distribution of assets in the following order: (i) first, if (and only if) a Sale of the Corporation occurs prior to the Third Closing Date, to the holders of the Common Stock until the Common Holders Special Preference is paid in full; and (ii) second, to the holders of the Series C Preferred Shares, pro rata.

(e)    Notwithstanding the foregoing, upon any Liquidation (after payment in full of the Common Holders Special Preference, if applicable), the holders of the Series C Preferred Shares shall be entitled to receive the greater of (i) the amount such holders would have received under Section 5(a) above and (ii) the amount such holders would have received if such holder had converted his, her or its Series C Preferred Shares into shares of Common Stock in accordance with Section 8.

(f)    "Liquidation" means (i) a Terminating Liquidation Event, or (ii) any Sale of the Corporation. "Terminating Liquidation Event" means any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, other than any dissolution, liquidation or winding up in connection with any reincorporation of the Corporation in another jurisdiction. "Sale of the Corporation" means (i) the sale of all or substantially all of the Corporation's assets, (ii) the sale or transfer of the outstanding shares of capital stock of the Corporation, or (iii) the

10

merger or consolidation of the Corporation with another person or entity, in each case in clauses (ii) and (iii) above under circumstances in which the holders of the voting power of outstanding capital stock of the Corporation, immediately prior to such transaction, own less than 50% in voting power of the outstanding capital stock of the Corporation or the surviving or resulting corporation or acquirer, as the case may be, immediately following such transaction. A sale (or multiple related sales) of one or more subsidiaries of the Corporation (whether by way or merger, consolidation, reorganization or sale of all or substantially all assets or securities) which constitutes all or substantially all of the consolidated assets of the Corporation shall be deemed a Sale of the Corporation.

(g)     In the event of a Liquidation involving the sale of shares by stockholders of the Corporation or merger, consolidation or similar stock transaction, the "remaining assets of the Corporation available for distribution" shall be deemed to be the aggregate consideration to be paid to all stockholders participating in such Liquidation. In connection with such a Liquidation, the Corporation shall either: (i) cause the definitive transaction document(s) to provide as a condition precedent to the consummation of such Liquidation for the conversion of the Series C Preferred Shares and Common Stock into the right to receive an amount in cash equal to the applicable amount payable with respect to such Series C Preferred Shares or Common Stock, as applicable, under this <u>Section 5</u> (subject to the priorities and limitations set forth herein); or (ii) concurrently with the consummation of such Liquidation, cause the redemption of all outstanding Series C Preferred Shares and Common Stock for an amount in cash equal to the applicable amount payable with respect to such Series C Preferred Shares or Common Stock, as applicable, under this <u>Section 5</u> (subject to the priorities and limitations set forth herein). In connection with such a Liquidation, any Series C Preferred Shares which shall continue to be outstanding after such Liquidation shall not be entitled to receive any Series C Preference Amounts or Common Special Preference Amount, as applicable, in respect thereof.

(h)     If any or all of the proceeds payable to the stockholders of the Corporation in connection with a Liquidation are in a form other than cash or marketable securities, the fair market value of such consideration shall be determined in good faith by the Board.

6.   <u>Protective Provisions</u>.

(a)     The Corporation shall not take any of the following actions without the prior written approval of the holders of a majority of all outstanding Series C Preferred Shares:

(i)     issue or authorize any security with any rights, preferences or privileges senior to those granted to the Common Stock or issue or authorize any security convertible into or exercisable for any security with any rights, preferences or privileges senior to those granted to the Common Stock, or create or authorize any debt instrument or any security interest in or encumbrance upon the Corporation's intellectual property (unless such debt instrument, security interest or other encumbrance has received the prior approval of the Board, including all of the members of the Board appointed by the holders of a majority of the Series C Preferred Shares);

(ii)     take any action that could result in a Liquidation;

11

(iii)    effect any changes in the Corporation's Certificate of Incorporation or By-laws;

(iv)    alter the size of the Board; or

(v)    agree to take any of the foregoing actions.

At any time that the Corporation has any subsidiary, it shall not permit such subsidiary to take any of the foregoing actions set forth in this <u>Section 6</u> (with all references to the Corporation deemed to be references to such subsidiary) without the prior written approval of the holders of a majority of all outstanding Series C Preferred Shares.

(b)    Until the earlier of: (i) the Third Closing Date, and (ii) the termination of the Series C Purchase Agreement in accordance with its terms, the Corporation shall not issue, without the prior written approval of the holders of a majority of all outstanding Common Stock, any Equity Securities (other than Excluded Stock).

7.  <u>Voting Rights</u>.

In addition to the rights provided by law, the holders of the Series C Preferred Shares shall be entitled to vote on all matters as to which holders of Common Stock shall be entitled to vote, in the same manner and with the same effect as such holders of Common Stock, voting together with the holders of Common Stock as one class (including, without limitation, for purposes of the third sentence of Section 242(b)(2) of the DGCL).  Each Series C Preferred Share shall entitle the holder thereof to such number of votes as shall equal the number of shares of Common Stock into which such Series C Preferred Share is then convertible pursuant to <u>Section 8</u>.  The affirmative vote of the holders of a majority of the Series C Preferred Shares and Common Stock, voting together as one class, shall be sufficient to increase or decrease the number of authorized shares of Common Stock (but not below the number of shares at the time outstanding).

8.  <u>Optional Conversion</u>.

(a)    Upon the terms set forth in this <u>Section 8</u>, each holder of Series C Preferred Shares shall have the right, at such holder's option, at any time and from time to time, to convert any such shares into the number of fully paid and nonassessable shares of Common Stock equal to the quotient obtained by dividing (i) the product of the Series C Preference Amount and the number of Series C Preferred Shares being converted, by (ii) the Series C Conversion Price (as defined below), as last adjusted and then in effect, by surrender of the certificates representing the Series C Preferred Shares to be converted.  The initial conversion price per share at which shares of Common Stock shall be issuable upon conversion of the Series C Preferred Shares (the "<u>Series C Conversion Price</u>") shall be the Series C Purchase Price.  The Series C Conversion Price shall be subject to adjustment from time to time in accordance with <u>Section 8(e)</u>.

(b)    Any holder of Series C Preferred Shares may exercise the conversion right pursuant to <u>Section 8(a)</u> by delivering to the Corporation the certificate or certificates for the shares to be converted, duly endorsed or assigned in blank or to the Corporation (if required by

12

it), accompanied by written notice stating that the holder elects to convert such shares and stating the name or names (with address) in which the certificate or certificates for the shares of Common Stock are to be issued. Conversion shall be deemed to have been effected on the date when such delivery is made (the "Conversion Date"). As promptly as practicable thereafter, the Corporation shall issue and deliver to or upon the written order of such holder, to the place designated by such holder, a certificate or certificates for the number of full shares of Common Stock to which such holder is entitled, and a cash amount in respect of any fractional interest in a share of Common Stock as provided in Section 8(c). The person in whose name the certificate or certificates for Common Stock are to be issued shall be deemed to have become a stockholder of record on the applicable Conversion Date unless the transfer books of the Corporation are closed on that date, in which event such person shall be deemed to have become a stockholder of record on the next succeeding date on which the transfer books are open, but the Series C Conversion Price shall be that in effect on the Conversion Date. Upon conversion of only a portion of the number of shares covered by a certificate representing the Series C Preferred Shares surrendered for conversion, the Corporation shall issue and deliver to or upon the written order of the holder of the certificate so surrendered for conversion, at the expense of the Corporation, a new certificate covering the number of shares of such Series C Preferred Shares representing the unconverted portion of the certificate so surrendered.

(c)      Upon conversion, the Corporation (unless otherwise requested by the holder of the Series C Preferred Shares subject to conversion) will not issue fractional shares of its Common Stock, and shall distribute cash in lieu of such fractional shares. In lieu of any fractional shares of Common Stock which would otherwise be issuable upon the conversion of the Series C Preferred Shares, the Corporation shall pay to the holder of such Series C Preferred Shares being so converted a cash adjustment in respect of such fractional interest in an amount equal to the then fair market value, as determined in good faith by the Board, of a share of Common Stock multiplied by such fractional interest.

(d)      The initial Conversion Price for the Series C Preferred Shares was established based upon the Corporation's representation and warranty in the Series C Purchase Agreement, that the Series C Preferred Shares (on an as-converted basis) represented no less than 58.0% of the Corporation's fully diluted capital stock as of the date of the Series C Purchase Agreement. If such representation and warranty is determined after the date hereof to be untrue or incorrect, the Series C Conversion Price then in effect shall be reduced (but not increased) by an amount such that the shares of Common Stock issuable upon the conversion of the Series C Preferred Shares issued on the date hereof was equal to not less than 58.0% of the Corporation's capital stock as of such date (calculated as described in the immediately preceding sentence).

(e)      The applicable Series C Conversion Prices shall be subject to adjustment from time to time as follows:

(i)      If the Corporation shall, at any time or from time to time after the date of this Second Amended and Restated Certificate of Incorporation, issue any Equity Securities (as defined below) other than Excluded Stock (as defined below) without consideration or for a consideration per share less than the Conversion Price for the Series C Preferred Shares in effect immediately prior to the issuance of such Equity Securities, then the Conversion Price for the Series C Preferred Shares in effect

immediately prior to each such issuance shall be lowered to an amount equal to the lowest amount of per share consideration that was received for such Equity Securities that were issued.

(ii)    For the purposes of any adjustment of the Series C Conversion Price pursuant to Section (8)(e)(i), the following provisions shall be applicable:

(A)    In the case of the issuance of any shares of Common Stock for cash, the consideration shall be deemed to be the amount of cash paid therefor after deducting therefrom any discounts, commissions or placement fees payable by the Corporation to any underwriter or placement agent in connection with the issuance and sale thereof.

(B)    In the case of the issuance of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof as determined in good faith by the Board, irrespective of any accounting treatment.

(C)    In the case of the issuance of options to purchase or rights to subscribe for Common Stock, securities by their terms convertible into or exchangeable for Common Stock, or options to purchase or rights to subscribe for such convertible or exchangeable securities:

(1)    the aggregate maximum number of shares of Common Stock deliverable upon exercise of such options to purchase or rights to subscribe for Common Stock shall be deemed to have been issued at the time such options or rights were issued and for a consideration equal to the consideration (determined in the manner provided in Sections 8(e)(ii)(A) and (B) above), if any, received by the Corporation upon the issuance of such options or rights plus the minimum purchase price provided in such options or rights for the Common Stock covered thereby;

(2)    the aggregate maximum number of shares of Common Stock deliverable upon conversion of, or in exchange for, any such convertible or exchangeable securities or upon the exercise of options to purchase or rights to subscribe for such convertible or exchangeable securities and subsequent conversion or exchange thereof shall be deemed to have been issued at the time such securities, options, or rights were issued and for a consideration equal to the consideration received by the Corporation for any such securities and related options or rights (excluding any cash received on account of accrued interest or accrued dividends), plus the additional consideration, if any, to be received by the Corporation upon the conversion or exchange of such securities or the exercise of any related options or rights (the consideration in each case to be determined in the manner provided in Sections 8(e)(ii)(A) and (B) above);

14

(3)    on any change in the number of shares or exercise price of Common Stock deliverable to the Corporation upon exercise of any such options or rights or upon conversions of or in exchange for such convertible or exchangeable securities, other than a change resulting from the antidilution provisions thereof, the Series C Conversion Price shall forthwith be readjusted to such Series C Conversion Price as would have been obtained had the adjustment made upon the issuance of such options, rights or securities not converted prior to such change or options or rights related to such securities not converted prior to such change been made upon the basis of such change; and

(4)    on the expiration of any such options or rights, the termination of any such rights to convert or exchange or the expiration of any options or rights related to such convertible or exchangeable securities, the Conversion Price shall forthwith be readjusted to such Conversion Price as would have been obtained had the adjustment made upon the issuance of such options, rights, securities or options or rights related to such securities been made upon the basis of the issuance of only the number of shares of Common Stock actually issued upon the exercise of such options or rights, upon the conversion or exchange of such securities, or upon the exercise of the options or rights related to such securities and subsequent conversion or exchange thereof.

(iii)    "Excluded Stock" means: (1) shares of Common Stock issuable upon conversion of the Series C Preferred Shares, (2) shares of Common Stock issued to employees, consultants or directors in accordance with plans approved by the Board (not to exceed, in the aggregte, fifteen percent (15%) of the Equity Securities outstanding as of the date of this Second Amended and Restated Certificate of Incorporation, (3) shares of Common Stock issuable upon the exercise of options, warrants or other securities exchangeable or exercisable for, or convertible into, shares of Common Stock that are outstanding as of the date of this Second Amended and Restated Certificate of Incorporation and disclosed to the purchasers of the Series C Preferred Shares pursuant to the Series C Purchase Agreement, (4) shares of Common Stock issued or issuable as a dividend or distribution on the Series C Preferred Shares, (5) shares of Common Stock issued in connection with a QIPO (as defined below), (6) stock, warrants or other securities issued to a bank or other financial institution in connection with an equipment lease or other financing arrangement approved by the Board, and (7) shares of Common Stock issued to suppliers of goods or services pursuant to transactions approved by the Board.

(iv)    "Equity Securities" means all shares of capital stock of the Corporation, all securities convertible or exchangeable for shares of capital stock of the Corporation, and all options, warrants, and other rights to purchase or otherwise acquire from the Corporation shares of such capital stock, including any stock appreciation or similar rights, contractual or otherwise.

(v)    If, at any time after the date of this Second Amended and Restated Certificate of Incorporation, the number of shares of Common Stock outstanding is increased by a stock dividend payable in shares of Common Stock or by a subdivision or split-up of shares of Common Stock, then, following the record date for the determination of holders of Common Stock entitled to receive such stock dividend, subdivision or split-up, the Series C Conversion Price shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of each Series C Preferred Share shall be increased in proportion to such increase in outstanding shares. The provisions of this clause shall similarly apply to successive combinations or reverse-splits.

(vi)    If, at any time after the date of this Second Amended and Restated Certificate of Incorporation, the number of shares of Common Stock outstanding is decreased by a combination of the outstanding shares of Common Stock, then, following the record date for such combination, the Series C Conversion Price shall be appropriately increased so that the number of shares of Common Stock issuable on conversion of each Series C Preferred Share shall be decreased in proportion to such decrease in outstanding shares. The provisions of this clause shall similarly apply to successive combinations or reverse-splits.

(vii)    Except in connection with a Liquidation, in the event of any capital reorganization of the Corporation, any reclassification of the stock of the Corporation (other than a change in par value or from no par value to par value or from par value to no par value or as a result of a stock dividend or subdivision, split-up or combination of shares), or any consolidation or merger of the Corporation, each Series C Preferred Share shall after such reorganization, reclassification, consolidation, or merger be convertible into the kind and number of shares of stock or other securities or property of the Corporation or of the corporation resulting from such consolidation or surviving such merger to which the holder of the number of shares of Common Stock deliverable (immediately prior to the time of such reorganization, reclassification, consolidation or merger) upon conversion of such Series C Preferred Share would have been entitled upon such reorganization, reclassification, consolidation or merger. The provisions of this clause shall similarly apply to successive reorganizations, reclassifications, consolidations or mergers.

(viii)    All calculations under this paragraph shall be made to the nearest one hundredth (1/100) of a cent or the nearest one tenth (1/10) of a share, as the case may be.

(ix)    In any case in which the provisions of this Section 8(e) shall require that an adjustment shall become effective immediately after a record date of an event, the Corporation may defer until the occurrence of such event (i) issuing to the holder of any Series C Preferred Share converted after such record date and before the occurrence of such event the shares of capital stock issuable upon such conversion by reason of the adjustment required by such event in addition to the shares of capital stock issuable upon such conversion before giving effect to such adjustments, and (ii) paying to such holder any amount in cash in lieu of a fractional share of capital stock pursuant to Section 8(c); provided, however, that the Corporation shall deliver to such holder an

16

appropriate instrument evidencing such holder's right to receive such additional shares and such cash.

(f)    Whenever the Series C Conversion Price shall be adjusted as provided in Section 8(e), the Corporation shall make available for inspection during regular business hours, at its principal executive offices or at such other place as may be designated by the Corporation, a statement, signed by its chief executive officer, showing in detail the facts requiring such adjustment and the Series C Conversion Price that shall be in effect after such adjustment. The Corporation shall also cause a copy of such statement to be sent by nationally recognized overnight carrier or by first class certified mail, return receipt requested and postage prepaid, to each holder of the Series C Preferred Shares at such holder's address appearing on the Corporation's records. Where appropriate, such copy may be given in advance and may be included as part of any notice required to be mailed under the provisions of Section 8(h).

(g)    If the Corporation shall propose to take any action of the types described in clauses (vi), (vii) or (viii) of Section 8(e), the Corporation shall give notice to each holder of the Series C Preferred Shares, in the manner set forth in Section 8(f), which notice shall specify the record date, if any, with respect to any such action and the date on which such action is to take place. Such notice shall also set forth such facts with respect thereto as shall be reasonably necessary to indicate the effect of such action (to the extent such effect may be known at the date of such notice) on the Series C Conversion Price and the number, kind or class of shares or other securities or property which shall be deliverable or purchasable upon the occurrence of such action or deliverable upon conversion of the Series C Preferred Shares. In the case of any action which would require the fixing of a record date, such notice shall be given at least twenty (20) days prior to the date so fixed, and in case of all other action, such notice shall be given at least thirty (30) days prior to the taking of such proposed action. Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.

(h)    The Corporation shall reserve, and at all times from and after the date of this Second Amended and Restated Certificate of Incorporation keep reserved, free from preemptive or similar rights, out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the Series C Preferred Shares, sufficient shares of Common Stock to provide for the conversion of all outstanding Series C Preferred Shares.

(i)    Any adjustment to any Series C Conversion Price hereunder shall, for all tax purposes, be treated as an adjustment to the Series C Purchase Price and not as a deemed exchange of the Series C Preferred Shares.

9. Mandatory Conversion.

(a)    The Series C Preferred Shares shall, upon the first to occur of (i) the election to convert by holders of at least a majority of such series of Series C Preferred Shares then outstanding or (ii) the consummation of the first firm commitment underwritten public offering pursuant to an effective registration statement filed on Form S-1 (or its successor form) under the Securities Act of 1933, as amended (the "Securities Act") underwritten by a nationally recognized underwriter satisfactory to the holders of a majority of the Series C Preferred Shares resulting in aggregate proceeds (net of underwriting discounts and commissions) to the

Corporation of not less than twenty-five million dollars ($25,000,000) and a per share price of not less than three (3) times the Series C Purchase Price (subject to equitable adjustment as a result of any stock dividend, stock split, combination, reverse split, reclassification or similar event after the date of issuance of the first Series C Preferred Share) (a "QIPO"), by virtue of and simultaneously with such occurrence, be deemed automatically converted into the number of fully paid and nonassessable shares of Common Stock which would be issuable in respect thereof pursuant to Section 8.

(b)     As promptly as practicable after the satisfaction of either of the conditions set forth in Section 9(a) to occur and the delivery to the Corporation of the certificate or certificates for the Series C Preferred Shares which have been converted, duly endorsed or assigned in blank to the Corporation (if required by it), the Corporation shall issue and deliver to or upon the written order of each holder of Series C Preferred Shares so converted, to the place designated by such holder, a certificate or certificates for the number of full shares of Common Stock to which such holder is entitled, and a cash amount in respect of any fractional interest in a share of Common Stock as provided in Section 8(c). The person in whose name the certificate or certificates for Common Stock are to be issued shall be deemed to have become a stockholder of record on the date of such occurrence and on such date such Series C Preferred Shares shall cease to be outstanding, whether or not the certificates representing such shares have been received by the Corporation.

## ARTICLE V

The number of directors of the Corporation shall be such as from time to time shall be fixed in the manner provided in the By-laws of the Corporation. The election of directors of the Corporation need not be by ballot unless the By-laws so require.

## ARTICLE VI

To the fullest extent permitted by the DGCL, as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages or breach of fiduciary duty as a director. The Corporation shall indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative, or investigative (a "Proceeding"), by reason of the fact that he or she or his or her testator or intestate is or was a director of the Corporation or any subsidiary of the Corporation or any predecessor of the Corporation or any subsidiary of the Corporation, or serves or served at any other enterprise as director at the request of the Corporation or any predecessor to the Corporation, or acted at the direction of any such director against all expense, liability and loss actually and reasonably incurred or suffered by such person in connection therewith.

Any indemnification under this Article VI (unless ordered by a court) shall be made by the Corporation upon a determination that indemnification of the director is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, as the same exists or hereafter may be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader

indemnification rights than said law permitted the Corporation to provide prior to such amendment).

Expenses (including attorneys' fees) incurred by a director of the Corporation in defending a Proceeding shall be paid by the Corporation in advance of the final disposition of such Proceeding upon receipt of an undertaking by or on behalf of the director to repay all amounts so advanced in the event that it shall ultimately be determined that such director is not entitled to be indemnified by the Corporation as authorized in this Article VI.

The indemnification and advancement of expenses provided by this Article VI shall not be deemed exclusive of any other rights to which a person seeking indemnification or advancement of expenses may be entitled under any law (common or statutory), by-law, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding office or while employed by or acting as agent for the Corporation. All rights to indemnification under this Article VI shall be deemed to be a contract between the Corporation and each director of the Corporation or any of its subsidiaries who serves or served in such capacity at any time while this Article VI is in effect.

The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was or has agreed to become a director of the Corporation or any of its subsidiaries, or is or was serving at the request of the Corporation as a director of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her or on his or her behalf in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of this Article VI.

If this Article VI or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify or advance expenses to each person entitled to indemnification or advancement of expenses, as the case may be, as to all expense, liability and loss actually and reasonably incurred or suffered by such person and for which indemnification or advancement of expenses, as the case may be, is available to such person pursuant to this Article VI to the full extent permitted by any applicable portion of this Article VI that shall not have been invalidated and to the full extent permitted by applicable law.

Neither any amendment nor repeal of this Article VI, nor the adoption of any provision of this Second Amended and Restated Certificate of Incorporation inconsistent with this Article VI, shall eliminate or reduce the effect of this Article VI in respect of any matter occurring, or any cause of action, suit or claim that, but for this Article VI would accrue or arise, prior to such amendment, repeal of adoption of an inconsistent provision.

## ARTICLE VII

For the management of the business and for the conduct of the affairs of the Corporation, and in further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders, it is further provided:

(a)    In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Board is expressly authorized and empowered:

(i)    to make, alter, amend or repeal the By-laws in any manner not inconsistent with the laws of the State of Delaware or this Second Amended and Restated Certificate of Incorporation;

(ii)    to determine whether any, and if any, what part, of the net profits of the Corporation or of its surplus shall be declared in dividends and paid to the stockholders, and to direct and determine the use and disposition of any such net profits or such surplus; and

(iii)    to fix from time to time the amount of net profits of the Corporation or of its surplus to be reserved as working capital or for any other lawful purpose.

In addition to the powers and authorities herein or by statute expressly conferred upon it, the Board may exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the laws of the State of Delaware, of this Second Amended and Restated Certificate of Incorporation and of the By-laws of the Corporation.

(b)    The Corporation and the holders of a majority of the outstanding Series C Preferred Shares shall be entitled to waive or amend any provision hereunder unless such provision explicitly requires otherwise, or unless the waiver or amendment of such provision is otherwise prohibited in any other agreement to which the Corporation or the holders of the Series C Preferred Shares are a party.

## ARTICLE VIII

Whenever a compromise or arrangement is proposed between the Corporation and its creditors or any class of them and/or between the Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of the Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for the Corporation under the provisions of Section 291 of the DGCL or on the application of trustees in dissolution or of any receiver or receivers appointed for the Corporation under the provisions of Section 279 of the DGCL order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, agree on any compromise or arrangement and to any reorganization of the Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders of the Corporation, as the case may be, and also on the Corporation.

The Corporation shall not enter into any agreement or become subject to any agreement which could restrict in any manner its ability to comply with this Second Amended and Restated Certificate of Incorporation or any agreement which benefits or grants rights to the holders of the Series C Preferred Shares.

If the holders of a majority of the outstanding Series C Preferred Shares shall at any time disagree with the Board's determination of "fair market value" hereunder, such holders may submit a notice of disagreement to the Corporation. During the three business days immediately following the Corporation's receipt of such notice, such holders and the Corporation shall negotiate in good faith to determine a mutually agreeable fair market value. If the parties remain unable to reach agreement after such period, they shall engage a valuation firm reasonably acceptable to the Corporation and such majority of holders to resolve such dispute (the "Valuation Firm"). Each of the holders and the Corporation shall provide (at each's own expense) the Valuation Firm with copies of any documents, analyses or other information within its possession or control that the Valuation Firm reasonably requests in order to resolve such dispute. The Valuation Firm shall determine the fair market value as soon as practicable after its engagement to resolve the dispute using customary valuation techniques for other companies or businesses in the same or similar industries as the Corporation (and shall not apply any discount due to the fact that the Series C Preferred Shares or other securities may constitute "restricted securities", may be illiquid or represent a minority interest in the Corporation). The Valuation Firm's determination of the fair market value shall be binding on all of the holders and the Corporation, and not subject to challenge or collateral attack for any reason. The Corporation shall pay all fees, costs and expenses of the Valuation Firm in connection with its engagement to resolve such dispute.

The Corporation hereby elects not to be governed by Section 203 of the DGCL.

# Exhibit "B"

Stockholders Agreement

**ARXCEO CORPORATION**

**STOCKHOLDERS AGREEMENT**

**FEBRUARY 28, 2006**

9130792.3

This **STOCKHOLDERS AGREEMENT** (this "Agreement") is dated as of February 28, 2006, by and among Arxceo Corporation (the "Corporation"), Japan Communications, Inc. (the "Purchaser"), and each existing and future stockholder of the Corporation.

## PREAMBLE

Each current stockholder of the Corporation owns, as of the date hereof, that number of Shares set forth opposite such stockholder's name on Annex I hereto. The stockholders believe it to be in the best interests of the Corporation and the stockholders to provide for the continued stability of the business and policies of the Corporation and its subsidiaries, as the same may exist from time to time, and, to that end, the parties hereto set forth this Agreement.

**ACCORDINGLY**, in consideration of the mutual covenants and agreements contained in this Agreement, the sufficiency of which is hereby acknowledged, the parties agree as follows:

## ARTICLE I

## DEFINITIONS; RULES OF CONSTRUCTION

The following terms have the following meanings:

"Affiliate" means, with respect to any Person, any (a) director, officer, limited or general partner, member or stockholder holding 5% or more of the outstanding capital stock or other equity interests of such Person, (b) spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of a Person specified in clause (a) above relating to such Person) and (c) other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Approved Sale" shall have the meaning set forth in Section 3.6 hereof.

"Board" means the Board of Directors of the Corporation.

"Charter" means the Second Amended and Restated Certificate of Incorporation of the Corporation in effect as of the date hereof, as the same may be amended, modified or supplemented after the date hereof.

"Common Stockholder Director" shall have the meaning set forth in Section 2.1(b)(ii).

"Co-Sale Offeree" shall have the meaning set forth in Section 3.4.

"Co-Sale Offeror" shall have the meaning set forth in Section 3.4

"Equity Securities" means all shares of capital stock of the Corporation, all securities convertible into or exchangeable for shares of capital stock of the Corporation, and all options, warrants, and other rights to purchase or otherwise acquire from the Corporation shares of such capital stock, including any stock appreciation or similar rights, contractual or otherwise.

"Excluded Stock" shall have the meaning set forth in the Charter.

"Future Stockholder" shall have the meaning set forth in Section 3.1.

"Group" means:

(a)       in the case of any Stockholder who is an individual, (i) such Stockholder, (ii) the spouse, parent, sibling or descendants of such Stockholder, (iii) all trusts for the benefit of such Stockholder, (iv) all Persons principally owned by and/or organized or operating for the benefit of any of the foregoing and (v) all Affiliates of such Stockholder;

(b)       in the case of any Stockholder that is a partnership, (i) such Stockholder, (ii) its limited, special and general partners, (iii) any Person to which such Stockholder shall Transfer all or substantially all of its assets, and (iv) all Affiliates and employees of and consultants to, such Stockholder or any of its Affiliates; and

(c)       in the case of any Stockholder which is a corporation or a limited liability company, (i) such Stockholder, (ii) its stockholders or members as the case may be, (iii) any Person to which such Stockholder shall Transfer all or substantially all of its assets, and (iv) all Affiliates of such Stockholder;

"Liquidation" shall have the meaning set forth in the Charter.

"New Securities" means all Equity Securities other than Excluded Stock.

"Person" shall be construed in the broadest sense and means and includes a natural person, a partnership, a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization and any other entity and any federal, state, municipal, foreign or other government, governmental department, commission, board, bureau, agency or instrumentality, or any private or public court or tribunal.

"Pro Rata Amount" means the quotient obtained by dividing (i) the number of shares of Common Stock held by such Co-Sale Offeree by (ii) the number of shares of Common Stock held by the Purchaser, assuming in each case the conversion or exchange of all securities by their terms convertible into or exchangeable for Common Stock and the exercise of all vested and "in the money" options to purchase or rights to

2

subscribe for Common Stock (including warrants) or such convertible or exchangeable securities.

"Purchase Agreement" means that certain Securities Purchase Agreement, dated as of February 28, 2006, among the Corporation, the Purchaser and certain stockholders of the Corporation.

"Purchaser Directors" shall have the meaning set forth in Section 2.1(b)(i).

"Purchaser Nominee" shall have the meaning set forth in Section 3.6 hereof.

"Purchaser Shares" means all Equity Securities of the Corporation held at any time during the term of this Agreement by the Purchaser.

"QIPO" shall have the meaning set forth in the Charter.

"Sale of the Corporation" shall have the meaning set forth in the Charter.

"Shares" means all outstanding shares of capital stock of the Corporation. Any reference to a number of "Shares" shall treat each share of Preferred Stock as the number of shares of Common Stock into which it is then convertible pursuant to the Charter and any warrants or convertible securities as the number of shares of Preferred Stock or Common Stock for which it is then exercisable or convertible.

"Stockholders" means: (i) the Purchaser; (ii) the signatories to this Agreement (other than the Corporation) for so long as such Persons own capital stock of the Corporation; and (iii) Future Stockholders.

"Subsidiary" means, with respect to any Person, any other Person the majority of whose Equity Securities or voting securities are directly or indirectly owned or controlled by such Person.

"Terminating Liquidation Event" shall have the meaning set forth in the Charter.

"Termination Date" means the earlier to occur of: (i) the closing of a QIPO; and (ii) the closing of a Liquidation; (iii) the expiration of this Agreement on the Third Closing Date.

"Third Closing Date" shall have the meaning set forth in the Purchase Agreement.

"Third Party" means, with respect to any Stockholder, any Person that is not (i) the Corporation or (ii) a member of the Group of such Stockholder.

"Transfer" means to sell, transfer, assign, pledge, hypothecate or otherwise dispose of Shares, either voluntarily or involuntarily and with or without

3

consideration excluding by employees to the Corporation upon a termination of employment or by Purchaser to the Corporation.

"Transferee" means any Person to whom a Stockholder shall Transfer Shares.

## ARTICLE II

## BOARD REPRESENTATION

**2.1    Board Representation.**

(a)    The Corporation and the Stockholders shall take such corporate actions as may be required to ensure that (i) the number of directors constituting the Board is at all times three (3), and (ii) the presence of two (2) directors (including at least one (1) director nominated under Section 2.1(b)(i) hereof) is required to constitute a quorum of the Board.

(b)    Subject to Section 2.1 (c) below:

(i)    the holder(s) of a majority of all Purchaser Shares shall be entitled: (A) to nominate two (2) individuals to the Board to serve as directors (the "Purchaser Directors") until their respective successors are elected and qualified, (B) to nominate each successor to the Purchaser Directors and (C) to direct the removal from the Board of any director nominated under the foregoing clauses (A) or (B); the Purchaser Directors shall initially be Marc Winn and Frank Sanda; and

(ii)    the holder(s) of a majority of the Shares (other than the Purchaser) shall be entitled: (A) to nominate one (1) individual to the Board to serve as a director (the "Common Stockholder Director") until his respective successor is elected and qualified, (B) to nominate each successor to the Common Stockholder Director, and (C) to direct the removal from the Board of any director nominated under the foregoing clauses (A) or (B); the Common Stockholder Director shall initially be Donald J. Davidson.

(c)    Each nomination or any proposal to remove from the Board any director shall be made by delivering to the Corporation a notice signed by the party or parties entitled to such nomination or proposal. As promptly as practicable, but in any event within ten (10) days, after delivery of such notice, the Corporation shall take or cause to be taken such corporate actions as may be reasonably required to cause the election or removal proposed in such notice. Such corporate actions may include calling a meeting or soliciting a written consent of the Board, or calling a meeting or soliciting a written consent of the Stockholders.

**2.2    Voting Agreement.**

(a)    Each Stockholder shall vote all Shares held by such Stockholder for the election to the Board of all individuals nominated in accordance with Section 2.1 and for the removal from the Board of all directors proposed to be removed in accordance with Section 2.1 and shall take all actions required on its behalf to give effect to the agreements set forth in this Section 2. Each Stockholder shall use all reasonable efforts to cause each director originally nominated by such Stockholder to vote for the election to the Board of all individuals nominated in accordance with Section 2.1.

(b)    Until the Termination Date, the Purchaser agrees not to vote any or all of the Purchaser shares in favor of an amendment to the Second Amended and Restated Charter (in effect as of the date hereof) which alters the number or rights with respect to the authorized securities of the Corporation, without the approval of the holders of a majority of the Shares (other than the Purchaser).

**2.3    Interim Director.**

The Corporation shall notify each Stockholder of the occurrence of any vacancy in any seat of the Board. If the Stockholders entitled to nominate a successor to fill such vacancy fail to do so within thirty (30) days after delivery of such notice, such vacancy may be filled in accordance with the By-laws of the Corporation until a successor has been nominated and elected to the Board in accordance with Sections 2.1 and 2.2.

**2.4    Committees; Subsidiaries.**

(a)    Each Stockholder shall use all reasonable efforts to cause each director of the Corporation originally nominated by such Stockholder to take such corporate actions as may be reasonably required to ensure that (i) the Board has at all times a compensation committee, and an audit committee and (ii) at least one (1) director nominated under Section 2.1(b)(i) shall be appointed to each such committee. The Compensation Committee shall approve all increases in executive compensation, executive bonuses and all option grants (including the vesting schedules with respect to such option grants) (other than those option grants contemplated by the Purchase Agreement). The Audit Committee shall approve the engagement of the Corporation's auditors and approve the audit prior to its issuance each year.

(b)    The Corporation and each Stockholder shall take, and each Stockholder shall use all reasonable efforts to cause each director of the Corporation originally nominated by such Stockholder to take, such corporate actions as may be reasonably required to ensure that the composition of the board of directors of all direct and indirect Subsidiaries of the Corporation is identical to the composition of the Board.

**2.5    Meetings; Expenses; Compensation.**

(a)    The Corporation shall convene meetings of the Board at least once every three (3) months. Upon any failure by the Corporation to convene any meeting

5

required by this paragraph, a director nominated under <u>Section 2.1(b)(i)</u> shall be empowered to convene such meeting.

(b)    The Corporation shall reimburse each director who is not an employee of the Corporation (and any advisors) for his or her reasonable out-of-pocket expenses (including travel) incurred in connection with the attendance of meetings of the Board or any committee thereof or the performance of his or her duties.

**ARTICLE III**

**SHARES**

**3.1    <u>Future Stockholders.</u>**

The Corporation shall require each Person that acquires Equity Securities after the date hereof (a "<u>Future Stockholder</u>"), as a condition to the effectiveness of such acquisition, to execute a counterpart to this Agreement, agreeing to be treated in the same manner as the transferring Stockholder. The Stockholders agree to take all actions to permit the Corporation to comply with all of its obligations under all agreements with the Purchaser (including authorization of sufficient Equity Securities to permit conversion of the Purchaser Shares in accordance with the Charter or the exercise of any warrants or other convertible securities (including convertible notes)).

**3.2    <u>Limitations on Transfers.</u>**

(a)    No Transfer of any Shares by any Stockholder shall become effective unless and until the transferee (unless already subject to this Agreement) executes and delivers to the Corporation a counterpart to this Agreement, agreeing to be treated in the same manner as the transferring Stockholder. Upon such Transfer and such execution and delivery, the transferee shall be bound by, and entitled to the benefits of, this Agreement with respect to the transferred Shares in the same manner as the transferring Stockholder. Any Transfer of Shares by any Stockholder not in accordance with this paragraph shall be void.

(b)    No Stockholder shall be permitted to Transfer any Shares or participate in any transaction constituting a Liquidation unless: (i) such Transfer complies in all respects with this Agreement and the Charter and the holders of a majority of shares of the Corporation's Series C Preferred Stock consent in writing in advance of such Transfer; *provided*, that no consent shall be required from a majority of the shares of Series C Preferred Stock for any Transfers by a Stockholder to a member of such Stockholder's Group, or (ii) all of the holders of Preferred Stock receive the full amounts that they are entitled to receive pursuant to the Charter in connection with a Liquidation. In the event of a Liquidation, each Stockholder shall use his, her or its best efforts to ensure that the holders of the Purchaser Shares receive (out of the proceeds of such Liquidation distributable to the Corporation's stockholders) the full amount that they are entitled to receive pursuant to the Charter in connection with a Liquidation.

6

(c)    Each Stockholder that is an entity that was formed for the sole purpose of directly or indirectly acquiring Shares or that has no substantial assets other than Shares or direct or indirect interests in Shares agrees that: (i) certificates for shares of its common stock or other instruments reflecting equity interests in such entity (and the certificates for shares of common stock or other equity interests in any similar entities controlling such entity) will note the restrictions contained in this Agreement on the restrictions on transfer of shares as if such common stock or other equity interests were Shares, (ii) no shares of such common stock or other equity interests may be transferred to any person other than in accordance with the terms and provisions of this Agreement as if such common stock or other equity interests were Shares and (iii) any transfer of such common stock or other equity interests shall be deemed to be a transfer of a pro rata number of Shares hereunder.

**3.3    Right of First Refusal.**

If any Stockholder (other than the Purchaser) (the "First Offeror") proposes to Transfer any Shares to any Person other than to a member of the Group of such Stockholder, the First Offeror shall, before such Transfer:

(a)    Simultaneously deliver to the Corporation and the Purchaser an offer (the "First Offer") to Transfer such Shares upon the terms set forth in this Section 3.3, including: (i) the number of Shares to which the First Offer relates (the "Offered Shares") and the name of the First Offeror, (ii) the name and address of the proposed offeree (the "First Offeree"), (iii) the proposed amount and type of consideration (including, if the consideration consists in whole or in part of non-cash consideration, such information available to the First Offeror as may be reasonably necessary for the Corporation and the Purchaser to properly analyze the economic value and investment risk of such non-cash consideration) and the terms and conditions of payment offered by the First Offeror. The First Offer shall remain open to the Corporation and irrevocable for a period of thirty (30) days from the date of the Corporation's receipt (the "Corporation Acceptance Period") and open to the Purchaser and irrevocable for a period of forty-five (45) days from the date of the Purchaser's receipt (the "Purchaser Acceptance Period").

(b)    The Corporation may accept the First Offer and purchase the Offered Shares by delivering to the First Offeror (with a copy to the Purchaser) a notice (the "Acceptance Notice") in writing within the Corporation Acceptance Period.

(c)    To the extent such Offered Shares are not purchased by the Corporation pursuant to Section 3.3(b), the Purchaser may accept the First Offer and purchase any such remaining Offered Shares by delivering to the First Offeror an Acceptance Notice in writing (with a copy to the Corporation) within the Purchaser Acceptance Period.

(d)    The First Offeror may Transfer any or all of the Offered Shares not purchased by the Corporation or the Purchaser, on terms and conditions no more favorable to the First Offeree than are described in the First Offer, within thirty (30) days after expiration of the Purchaser Acceptance Period. If such Transfer is not made within

such thirty (30) day period, the restrictions provided for in this <u>Section 3.3</u> shall again become effective.

**3.4    <u>Co-Sale Rights.</u>**

(a)    If the rights granted to the Corporation and the Purchaser pursuant to <u>Section 3.3</u> are not exercised in full, then, the Purchaser shall have a right of co-sale with respect to any Shares to which such rights are not exercised (the "<u>Co-Sale Shares</u>"). In the event of a proposed Transfer by a Stockholder (the "<u>Co-Sale Offeree</u>") of Co-Sale Shares, the Co-Sale Offeree shall deliver a notice (the "<u>Co-Sale Notice</u>") to the Corporation and the Purchaser that sets forth substantially the same information as the First Offer in <u>Section 3.3(a)</u> hereof; <u>provided</u>, <u>however</u>, that such Co-Sale Notice shall indicate that the Third Party to which such Co-Sale Shares are to be Transferred (the "<u>Co-Sale Offeror</u>") has been informed of the co-sale rights provided for in this <u>Section 3.4</u> and has agreed to purchase Shares in accordance with the terms hereof.

(b)    The Co-Sale Offeree shall not Transfer any Co-Sale Shares to the Co-Sale Offeror unless the Purchaser is permitted to Transfer its Pro Rata Amount of the aggregate number of Co-Sale Shares to which the Co-Sale Offer relates.

(c)    The Co-Sale Offeree shall, in addition to complying with the provisions of this <u>Section 3.4</u>, comply with the other provisions of this Article III (it being understood that the notice contemplated by <u>Section 3.3(a)</u> and the Co-Sale Notice contemplated by this <u>Section 3.4</u> may be included in a single notice).

(d)    Within thirty (30) days after delivery of the Co-Sale Notice, the Purchaser may elect to participate in the proposed Transfer by delivering to such Co-Sale Offeree a notice (the "<u>Tag-Along Notice</u>") specifying the number of Shares (up to its Pro Rata Amount) with respect to which the Purchaser shall exercise its rights under this <u>Section 3.4</u>.

(e)    Any Shares requested to be included in any Co-Sale Notice shall be Transferred on at least the same terms and conditions as are set forth in the Co-Sale Notice, <u>provided</u>, <u>however</u>, that the price for each Purchaser Share shall be the product of (x) the price per share of common stock Transferred or to be Transferred by the Co-Sale Offeror and (y) the number of shares of common stock into which such Purchaser Share is then convertible into in accordance with the Charter.

**3.5    <u>First Offer Rights.</u>**

(a)    If the Corporation proposes to offer New Securities to any Person, the Corporation shall, before such offer, deliver to the Purchaser an offer (the "<u>Offer</u>") to issue to the Purchaser such New Securities upon the terms set forth in this <u>Section 3.5</u>. The Offer shall state that the Corporation proposes to issue New Securities and specify their number and terms (including purchase price). The Offer shall remain open and irrevocable for a period of thirty (30) days (the "<u>First Offer Period</u>") from the date of its delivery.

(b)     The Purchaser may accept the Offer by delivering to the Corporation a notice (the "Purchase Notice") within the First Offer Period. The Purchase Notice shall state the number (the "First Offer Number") of New Securities such Purchaser desires to purchase.

(c)     The issuance of New Securities to the Purchaser shall be made on a business day, as designated by the Corporation, not less than ten (10) and not more than thirty (30) days after expiration of the First Offer Period on those terms and conditions of the Offer not inconsistent with this Section 3.5.

(d)     If the number of New Securities exceeds the First Offer Number, the Corporation may issue such excess or any portion thereof on the terms and conditions of the Offer to any Person within thirty (30) days after expiration of the First Offer Period. If such issuance is not made within such thirty (30) day period, the restrictions provided for in this Section 3.5 shall again become effective.

**3.6     Approved Sale; Sale of the Corporation.**

(a)     So long as the Purchaser owns Preferred Stock representing at least twenty-five percent (25%) of the Equity Securities of the Corporation, the Purchaser may propose a Sale of the Corporation that results in proceeds to the holders of Common Stock of the Corporation (other than the Purchaser) of not less than the Common Special Preference Amount (as defined in the Charter), and shall be entitled to deliver notice to the Corporation that the Purchaser desires the Corporation and/or the Stockholders to enter into agreements with one or more Persons that would result in a Sale of the Corporation (an "Approved Sale"), whereupon all Stockholders and the Corporation shall consent to and raise no objections against the Approved Sale, and if the Approved Sale is structured as (A) a merger or consolidation of the Corporation, each Stockholder shall, and hereby agrees to, waive any dissenter's rights, appraisal rights or similar rights in connection with such merger or consolidation and instruct the Board to vote in favor of such Approved Sale, or (B) a sale of shares of capital stock, each Stockholder shall, and hereby agrees to, agree to sell their Shares on the terms and conditions approved by the Purchaser. All Stockholders and the Corporation shall take all necessary and desirable actions in connection with the consummation of the Approved Sale, including the execution of such agreements and such instruments and other actions reasonably necessary to: (i) provide the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements relating to such Approved Sale; and (ii) allocate the expenses in accordance with Section 3.6(b).

(b)     The Corporation shall provide the Stockholders with written notice of any Approved Sale at least ten (10) days prior to the consummation thereof. Each Stockholder shall pay his pro rata amount of reasonable expenses incurred (based on the proportion of the aggregate transaction consideration received (in accordance with the terms of the Charter)) in connection with a consummated Approved Sale to the extent such expenses are incurred for the benefit of all Stockholders and are not otherwise paid by the Corporation or the acquiring party (expenses incurred by or on behalf of a

9130792.3

Stockholder for its or his sole benefit not being considered expenses incurred for the benefit of all Stockholders).

(c)    Each Stockholder and the Corporation hereby grants an irrevocable proxy and power of attorney to any nominee of the Purchaser (the "Purchaser Nominee") to take all necessary actions and execute and deliver all documents deemed necessary and appropriate by such Person to effectuate the consummation of any Approved Sale. The Stockholders hereby indemnify, defend and hold the Purchaser Nominee harmless (severally in accordance with their pro rata share of the consideration received in any such Approved Sale (and not jointly and severally)) against all liability, loss or damage, together with all reasonable costs and expenses (including reasonable legal fees and expenses), relating to or arising from its exercise of the proxy and power of attorney granted hereby.

**3.7    No Terminating Liquidation Event.**

The Purchaser shall not, on or prior to April 30, 2008, cause a Terminating Liquidation Event; *provided*, that this Section 3.7 shall not restrict the Purchaser from causing a Terminating Liquidation Event on or prior to the Third Closing so long as the Corporation becomes insolvent or otherwise becomes unable to pay its debts as they become due.

## ARTICLE IV

## MISCELLANEOUS

**4.1    Termination.**

This Agreement shall automatically terminate and be of no further force or effect as of the Termination Date.

**4.2    Legend on Stock Certificates.**

Each certificate representing shares of capital stock that are subject to this Agreement shall bear a legend substantially in the following form:

> "THE SALE, TRANSFER, ASSIGNMENT, PLEDGE, OR ENCUMBRANCE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE AND THE RIGHTS OF THE HOLDER OF SUCH SECURITIES IN RESPECT OF THE ELECTION OF DIRECTORS ARE SUBJECT TO A STOCKHOLDERS AGREEMENT DATED FEBRUARY 28, 2006, AMONG ARXCEO CORPORATION AND THE HOLDERS OF ITS OUTSTANDING CAPITAL STOCK. COPIES OF SUCH AGREEMENT MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE

9130792.3

HOLDER OF RECORD OF THIS CERTIFICATE TO THE SECRETARY OF ARXCEO CORPORATION."

**4.3    Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

Other than with respect to matters relating to the internal governance of the Corporation, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied. All matters which are the subject of this Agreement relating to matters of internal governance of the Corporation shall be governed and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied.

**ANY ACTION OR PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF DELAWARE OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR, AND THE PARTIES IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH SUCH COURTS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING. EACH OF THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING IN THE COURTS OF THE STATE OF DELAWARE LOCATED IN NEW CASTLE COUNTY OR THE DISTRICT OF DELAWARE AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM. ANY JUDGMENT MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.**

**EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

**4.4    Severability.**

It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the law and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, in the event that any provision of this Agreement would be held in any jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

11

9130792.3

**4.5**    **Assignments; Successors and Assigns.**

Except in connection with any Transfer of Shares in accordance with this Agreement, the rights of each party under this Agreement may not be assigned. This Agreement shall bind and inure to the benefit of the parties and their respective successors, permitted assigns, legal representatives and heirs.

**4.6**    **Amendments; Waivers.**

This Agreement may only be modified or amended by an instrument in writing signed by (i) the Corporation, (ii) the holders of at least a majority of the outstanding Purchaser Shares and (iii) the holders of at least a majority of the Shares (other than the Purchaser Shares). Any waiver of any provision of this Agreement requested by any party hereto must be granted in advance, in writing by the party granting such waiver. Notwithstanding the foregoing, the holders of a majority of all then outstanding Purchaser Shares may grant a waiver or effect any modification or amendment on behalf of Purchaser and the holders of a majority of all then outstanding Shares (other than the Purchaser Shares) may grant a waiver or effect any modification or amendment on behalf of all Stockholders (other than the Purchaser).

**4.7**    **Notices.**

All notices, claims, certificates, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or if sent by nationally-recognized overnight courier, by telecopy, or by registered or certified mail, return receipt requested and postage prepaid, addressed as follows:

    if to the Corporation:

        Arxceo Corporation
        1525 Perimeter Parkway, Suite 225
        Huntsville, Alabama 35806
        Telephone: (256) 837-8388 x110
        Fax: (256) 837-2888
        Attention: Donald J. Davidson

    with a copy (which shall not constitute notice) to:

        Bradley Arant Rose & White LLP
        200 Clinton Avenue West, Suite 900
        Huntsville, Alabama 35801-4900
        Telephone: (256) 517-5146
        Fax: (256) 517-5246
        Attention: S. Revelle Gwyn, Esq.

    if to the Purchaser:

9130792.3

Japan Communications, Inc.
6-25-3 Minami Oi
Shinagawa-ku
Tokyo 140-0013 JAPAN
Telephone: 011-81-3-5767-9101
Fax: 011-81-3-5767-9123
Attention: Frank Seiji Sanda

with a copy (which shall not constitute notice) to:

Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Fax:  404-815-6555
Telephone:  404-815-6500
Attention: Steven L. Berson

if to the Stockholders:

to their respective addresses
set forth on Schedule I hereto.

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith.  Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery if a business day or, if not a business day, the next succeeding business day, (ii) in the case of internationally-recognized overnight courier, on the second business day after the date when sent, (iii) in the case of fax transmission, when received if a business day or, if not a business day, the next succeeding business day, and (iii) in the case of mailing, on the seventh business day following that on which the piece of mail containing such communication is posted.

**4.8**     **Headings.**

The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

**4.9**     **Nouns and Pronouns.**

Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

**4.10**    **Entire Agreement.**

This Agreement contains the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to such subject matter. The parties hereto represent and warrant that there are no

13

other agreements or understandings regarding any of the subject matter hereof other than as set forth herein and covenant not to enter into any such agreements or understandings after the date hereof except pursuant to an amendment, modification or waiver of the provisions of this Agreement.

**4.11    Counterparts.**

This Agreement may be executed in any number of original or facsimile counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

9130792.3

**IN WITNESS WHEREOF,** the parties hereto have executed this Stockholders Agreement on the date first written above.

**ARXCEO CORPORATION:**

By:_____

Name:  Donald J. Davidson

Title:  President and Chief Executive Officer

**PURCHASER:**

JAPAN COMMUNICATIONS, INC.

By:_____

Name:  Frank Seiji Sanda

Title:  President and Chief Executive Officer

[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

15

9130792.3

**IN WITNESS WHEREOF,** the parties hereto have executed this Stockholders Agreement on the date first written above.

**SERIES A STOCKHOLDERS:**

HRC, L.L.C.

By:_____
Name:
Title:

LIOCE INVESTMENTS, L.L.C.

By:_____
Name:
Title:

SHATAS FAMILY PARTNERS

By:_____
Name:
Title:

SLYMAN INVESTMENTS

By:_____
Name:
Title:

_____
BRYAN BUTLER

_____
DAVID BUTLER

_____
JOHN JURENKO

[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

9130792.3

_____

BILL MCCARY


_____

SCOTT MCCARY


_____

JEAN MOORE


_____

GARY SHELTON


_____

TODD SLYMAN

**SERIES B STOCKHOLDERS:**

FRANKLIN STREET INVESTMENTS,
LLC


By:_____
Name:
Title:

LIOCE INVESTMENTS, L.L.C.


By:_____
Name:
Title:

BRINDLEE CAPITAL, L.L.C.


By:_____
Name:
Title:

[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

9130792.3

CITY LIGHT CAPITAL, L.L.C.

By:_____
Name:
Title:

_____
JV BALCH


_____
WAYNE BONNER


_____
GREG CLAYTON


_____
DONNA COLEMAN


_____
TONY GANN


_____
TOM GRIGGS


_____
GREG GUM


_____
RANDY HAIRSTON


_____
TOM HOUSER


[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

9130792.3

_____
JEFF IRONS


_____
RAO KAKANI


_____
BAVANH KAKANI


_____
STEVE MARZ


_____
SAM MCMANUS


_____
DAVE NICOLAS


_____
ALAN NORDLINGER


_____
REMIGIUS SHATAS


_____
LOUIS SISCO


_____
DAVID SLYMAN


_____
TODD SLYMAN


[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

19

9130792.3

_____

MIKE SOLLEY


_____

BOB THURBER


_____

HEIDE WILLIAMS


_____

DIXIE WOLF

**COMMON STOCKHOLDERS:**


RNR VENTURES, LLC


By:_____
Name:
Title:


AAW, LLC


By:_____
Name:
Title:


_____

DONALD DAVIDSON


_____

CHANDLER HALL


[SIGNATURE PAGE TO ARXCEO CORPORATION STOCKHOLDERS AGREEMENT]

9130792.3

# Exhibit "C"

## Non-Competition and Employment Agreement

## NONCOMPETITION AND EMPLOYMENT AGREEMENT

**THIS NON-COMPETITION AND EMPLOYMENT AGREEMENT** is made and entered into as of the 28th day of February, 2006, by and between Arxceo Corporation, a Delaware corporation (the "Company"), and **J. Chandler Hall** an individual and resident of the State of Alabama ("Employee").

## W I T N E S S E T H:

**WHEREAS,** Japan Communications, Inc., a Japanese company ("Purchaser"), the Company and the other signatories thereto entered into that certain Securities Purchase Agreement, dated as of February 28, 2006 (the "Purchase Agreement"), pursuant to which Purchaser became a majority investor in the Company, with the intention of becoming the sole holder of securities of the Company (the "Transaction");

**WHEREAS,** prior to the Transaction, Employee was a principal stockholder and officer of the Company;

**WHEREAS,** Employee will be receiving substantial consideration upon the consummation of the Transaction and the nonsolicitation and noncompetition covenants of Employee in favor of the Company set forth herein are express conditions to closing of the Transaction and, without such covenants, neither the Company nor the Purchaser would have entered into the Purchase Agreement; and

**WHEREAS,** as a condition to the consummation of the Transaction, the Company desires to employ Employee for the period provided in this Agreement, and Employee is willing and obligated to accept such employment with the Company, in accordance with the terms and conditions set forth below.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1. Duties and Extent of Services.** The Company hereby enters into this Agreement to evidence and provide for the employment of Employee following the Transaction.

**1.1** During the Term (as defined in Section 3), Employee shall serve as the Vice President of Marketing of the Company and shall have the duties, responsibilities and authority assigned by the President and Chief Executive Officer of the Company, subject to the power of the Board of Directors of the Company (the "Board") to assign different and additional duties, responsibilities and authorities within the scope of Employee's initial employment hereunder.

**1.2** Employee shall report to the President and Chief Executive Officer of the Company, or another senior officer designated by the President and Chief Executive Officer, and shall devote

his best efforts and substantially all of his active business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity) to the business and affairs of the Company, and the entities owned or controlled directly or indirectly by the Company (collectively, the "Affiliates" of the Company).   Employee shall perform his duties and responsibilities to the best of his abilities in a diligent and professional manner.  During the Term, Employee shall not engage in any business activity which, in the reasonable judgment of the Board, conflicts with the duties of Employee hereunder, whether or not such activity is pursued for gain, profit or other pecuniary advantage.

1.3    The foregoing restrictions shall not limit or prohibit Employee from engaging in passive investment, inactive business ventures and community, charitable and social activities and industry trade associations not interfering with Employee's performance and obligations hereunder.

## 2.    **Salary and Benefits.**

2.1.    During the Term, Employee's annual salary shall be $130,000 per annum, which shall be payable in regular installments in accordance with the Company's general payroll practices and subject to withholding and other payroll taxes.  In addition, during the Term, Employee shall: (a) be entitled to participate in all employee benefit programs for which executives of the Company are generally eligible; and (b) be eligible to participate in all insurance plans available generally to employees of the Company.  The Employee's salary shall be subject to an annual review by the President and Chief Executive Officer of the Company.

2.2    Employee shall be entitled to four (4) weeks paid vacation per calendar year during the Term, which shall include sick days, personal days, vacation time and other similar days off.  During the first partial calendar year of employment, Employee shall be entitled to a pro rated amount of vacation.  Employee shall take vacation at such times and intervals as shall be appropriate and consistent with the proper performance of Employee's duties hereunder. Except as otherwise required by law or as otherwise provided under the Company's policies regarding vacations for employees, (i) the Company shall not pay Employee any additional compensation for any vacation time which is not used prior to the end of a year or any termination of employment, and (ii) any vacation time which is not used prior to the end of a year may not be used in any subsequent year.  In all other respects, Employee shall be subject to the Company's vacation policies that are in effect during Employee's employment.

## 3.    **Term; Termination.**

3.1    **Term**.  The term of this Agreement (the "Term") shall commence effective as of the date hereof (the "Commencement Date") and shall continue until March 31, 2008, unless this Agreement is earlier terminated in accordance with Section 3.2 (the effective date of termination of this Agreement being the "Termination Date"); provided, however, that the covenants of Employee set forth in Section 5 and Section 6 in favor of the Company shall survive any termination of this Agreement in accordance with the terms of such covenants. Upon termination of this Agreement pursuant to Section 3.2, the Company shall have no further obligation to Employee hereunder

-2-

except: (i) as set forth in <u>Section 3.2</u>; and (ii) to reimburse Employee, in cash on the Termination Date, any reimbursable amount accrued pursuant to <u>Section 4</u> but unpaid hereunder as of the Termination Date.

### 3.2     <u>Termination</u>.

(a)     If Employee's employment terminates due to a Without Cause Termination (as defined below), the Company will pay Employee upon such Without Cause Termination the aggregate sum equal to fifty percent (50%) of his annual salary in effect at the time of such termination (the "<u>Base Salary</u>") payable in six (6) equal monthly payments. In the case of such a Without Cause Termination, the Company shall also pay to Employee any incentive bonus (an "<u>Incentive Bonus</u>") earned by Employee prior to Employee's Without Cause Termination on a pro rated basis based on an annual term commencing on the Commencement Date. Earned but unpaid salary for the year in which the termination occurs will also be paid in addition to the Base Salary and Incentive Bonus. If Employee's employment terminates due to a Without Cause Termination, all stock options ("<u>Options</u>") granted to Employee under any stock option program or plan of the Company (each and collectively, the "<u>Plan</u>") shall be deemed vested.

(b)     If Employee's employment terminates due to a Termination for Cause (as defined below), earned but unpaid Base Salary will be paid on a pro-rated basis for the year in which the termination occurs. No other payments will be made by the Company and no benefits under this Agreement shall continue. If Employee's employment terminates due to a Termination for Cause, all Options granted to Employee under any Plan that have not yet vested as of the date of the Termination for Cause shall be automatically forfeited.

(c)     For this Agreement, the following terms have the following meanings:

(i )     "<u>Termination for Cause</u>" means termination of Employee's employment by the Company's Board of Directors, due to: (i) an act of dishonesty made by Employee in connection with Employee's responsibilities hereunder; (ii) Employee's conviction for or plea of *nolo contendre* to a felony or perpetration of a common law fraud; (iii) Employee's gross misconduct; or (iv) Employee's continued and substantial failure to perform of his duties after Employee has received a written demand for performance from the Company which specifically sets forth the factual basis for the Company's belief that Employee has not substantially performed his duties.

(ii)     "<u>Without Cause Termination</u>" means termination of Employee's employment by the Company other than due to (a) a Termination for Cause or (b) as a result of death or disability.

-3-

**4.**     **Expenses and Indemnification.**  Company shall reimburse Employee for, or pay directly, all reasonable business expenses incurred by Employee in performing his services under this Agreement; provided, however, that such expenses are approved in advance by the President and Chief Executive Officer of the Company and Employee incurs and accounts for such expenses in accordance with all of the Company's written policies and directives as in effect from time to time.

**5.**     **Confidential Information.**

**5.1**     **Definition.**     For purposes of this Agreement, "Confidential Information" shall mean all trade secrets and other confidential, nonpublic and proprietary information of the Company (for purposes of this Section 5 and Section 6, references to the Company include its Affiliates), including (a) product specifications, service methods or techniques, databases, computer programs (whether in object or source code), know-how, strategies, operation methods or ideas, data, supplier lists, customer lists and customer information, price lists, market studies, market proposals, sales techniques, sales materials and business plans, (b) information regarding costs, profits, markets, historical and projected sales, pricing policies, projections and budgets, capital expenditure projects, other financial information, key personnel and personnel training, (c) notes, analyses, studies, reports, research, summaries and other material containing or based, in whole or in part, on any information included in the foregoing, and (d) any other information not readily available to the public, the disclosure of which to third parties would in each case have an adverse effect on the business operations of the Company, but does not include information which Employee proves to the reasonable satisfaction of the Company: (i) was at the date of this Agreement publicly available, (ii) subsequent to the date of this Agreement becomes publicly available without breach of this Agreement, or (iii) was obtained from a third party without breach by that third party of any obligation of confidence concerning that information.

**5.2**     **Acknowledgments and Agreements by Employee.**     Employee hereby acknowledges, agrees and covenants that, during Employee's employment hereunder and for a three (3) year period after termination of Employee's employment hereunder, Employee will keep confidential, will hold for the sole benefit of the Company, and will not use except on behalf of the Company, all Confidential Information, which Employee acknowledges is, or shall be, proprietary to the Company; provided, however, that any Confidential Information that is also considered a "trade secret" under applicable law, shall not be disclosed by Employee as long as such information remains a trade secret and is not generally known or available to the public other than as a result of unauthorized or unlawful disclosure directly or indirectly by Employee. Employee agrees that upon termination of Employee's employment by the Company for any reason, Employee shall forthwith return to the Company, or destroy to the satisfaction of the Company, all Confidential Information in whatever form such information is in the possession of Employee or under Employee's control, and shall additionally return all documents and other property that is in Employee's possession or under Employee's control and belonging to the Company that Employee does not otherwise have a valid independent right to possess or control.

-4-

6.    **Nonsolicitation and Noncompetition.**  Beginning on the date of this Agreement and continuing through the later of: (i) the first anniversary of the Third Closing; or (ii) one year after the employee's Termination Date (the "Non-Compete Period") (provided, however, that the Non-Compete Period shall be extended by any time periods during which Employee was in violation of his covenants in this Section 6), Employee will not, directly or indirectly, for any reason, for his own account, or on behalf of, or together with any other person:

(a)  solicit, induce, or conspire with, or attempt to solicit, induce, or conspire with, any of the officers or employees of the Company to terminate their engagement or relationship with, or to compete against, the Company;

(b)  solicit or induce, or attempt to solicit or induce, any of the customers or suppliers of the Company, with whom Employee has dealt with or otherwise has or had direct dealings with during the twelve (12) month period prior to such attempted solicitation or inducement, to terminate their business relationship with the Company;

(c)  divert or attempt to divert any or all of such customers' or suppliers' business from the Company in violation of this Agreement or applicable law (including the violation of any trade secrets law); or

(d)  be engaged as an officer or director or in any other managerial or sales capacity or as an owner, co-owner, or other investor of or in, whether as an employee, independent contractor, consultant or advisor, or sales representative or distributor of any kind, in any business that involved in the design, development, sale or provision of any product, hardware or software, with respect to any host-based or network-based security products that block or prevent network data traffic using any one of the following methods: (i) anomaly-based intrusion prevention; (ii) behavioral intrusion prevention; (iii) rate-based intrusion prevention, or (iv) signature-based intrusion prevention; provided, however, that nothing herein shall be construed to prohibit Employee from owning not more than 5% of the securities of a publicly traded company engaged in such business activity as a passive investor.

7.    **Miscellaneous.**

7.1    **General.**  The provisions contained in Section 5 and Section 6 shall survive the expiration or termination of this Agreement.  The waiver by any party to this Agreement of a breach by the other party of any of the provisions of this Agreement shall not operate as or be construed as a waiver of any different or subsequent breach.  This Agreement constitutes and expresses the entire agreement of the parties with respect to the subject matter hereof.  Should any clause or any other portion of this Agreement be determined to be void or unenforceable for any reason, such determination shall not affect the validity or enforceability of any other clause or portion of this Agreement, all of which shall remain in full force and effect, unless the result of any such invalidity or unenforceability shall be to cause a material failure of consideration to the party seeking to sustain the validity or enforceability of the subject provision.

-5-

7.2    **Remedies**.  Employee acknowledges and agrees that a remedy at law for any breach or threatened breach of the provisions of Section 5 and Section 6 would be inadequate and, therefore, agrees that the Company shall be entitled to injunctive relief in addition to any other available rights and remedies in case of any such breach or threatened breach; provided, however, that nothing contained herein shall be construed as prohibiting the Company from pursuing any other rights and remedies available for any such breach or threatened breach.  The prevailing party shall be entitled to recover from the unsuccessful party its costs and reasonable attorneys' fees incurred in connection with any action brought to enforce or interpret this Agreement.

7.3    **Notices.**    All notices, claims, certificates, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or if sent by internationally-recognized overnight courier, by telecopy, or by registered or certified mail, return receipt requested and postage prepaid, addressed as follows:

if to the Company:

Arxceo Corporation
1525 Perimeter Parkway, Suite 225
Huntsville, Alabama  35806
Telephone: (256) 837-8388 x110
Fax: (256) 837-2888
Attention: Donald J. Davidson

if to the Purchaser

Japan Communications, Inc.
6-25-3 Minami Oi
Shinagawa-ku
Tokyo 140-0013 JAPAN
Telephone: 011-81-3-5767-9101
Fax: 011-81-3-5767-9123
Attention:  Frank Seiji Sanda

with a copy (which shall not constitute notice) to:

Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Fax:  404-815-6555
Telephone:  404-815-6500
Attention:  Steven L. Berson

if to Employee, at the address set forth below

-6-

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith. Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery if a business day or, if not a business day, the next succeeding business day, (ii) in the case of internationally-recognized overnight courier, on the second business day after the date when sent, (iii) in the case of fax transmission, when received if a business day or, if not a business day, the next succeeding business day, and (iii) in the case of mailing, on the seventh business day following that on which the envelope containing such communication is posted.

7.4 **Severable Provisions**. The provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provision. In the event that a court of competent jurisdiction shall determine that any provision of this Agreement or the application thereof is unenforceable in whole or in part because of the duration or scope thereof, the parties hereto agree that said court in making such determination shall have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form shall be valid and enforceable to the full extent permitted by law.

7.5 **Governing Law.** This Agreement will be governed and construed in accordance with the laws of the State of Delaware, without regard to any applicable principles of conflicts of law.

7.6 **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.7 **Successors and Assigns.** This Agreement shall be binding upon each party hereto and such party's heirs, successors and assigns. Employee shall not have the right to assign his obligations under this Agreement.

7.8 **Entire Agreement.** This Agreement supersedes any other agreements by and between Company and Employee or understandings, oral or written, between Company, or any predecessor of Company, and Employee, and Employee has no oral representations, understandings or agreements with Company or any of its officers, directors or representatives covering the same subject matter as this Agreement; provided, however, that this Agreement shall not supersede any agreement which, by its terms, assigns any or all of Employee's rights in any patents, copyrights or other inventions to the Company, and the same shall remain in full force and effect.

## [SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the Company and Employee have caused this Agreement to be executed as of the date first written above.

<u>**COMPANY:**</u>

**ARXCEO CORPORATION**

By: _____

Name: _____

Title: _____

<u>**EXECUTIVE:**</u>

_____

J. Chandler Hall

Address for notice purposes:

_____

_____

Facsimile: (___) ___-_____

# Exhibit "C-1"

Intellectual Property Agreements

## INDEPENDENT CONTRACTOR/CONSULTANT
## CONFIDENTIALITY AND NON-DISCLOSURE, NON COMPETITION,
## AND TRANSFER OF INTELLECTUAL PROPERTY RIGHTS AGREEMENT

THIS AGREEMENT made and entered in to as of the _13_ day of _February_, 200_6_, by and between _John T. White, Jr._, _Consultant_, a _Huntsville, AL_ having its principal office in Corporation, a Delaware corporation having its principal place of business in Huntsville, Alabama (the "Company").

In consideration of one dollar ($1.00) and the agreements and understandings set forth herein and other good and valuable consideration, Independent Contractor and the Company, intending to be legally bound, agree as follows:

1.      Independent Contractor agrees to keep in confidence and to prevent disclosure to others of any Confidential Information without the express prior written consent of the Company. "Confidential Information" shall include, without limitation, customer information, business plans, business operations, product and financial information, inventions, innovations, information, trade secrets, computer designs, computer programs, schematics, design specifications, product and/or system designs of the Company, and information personal to the Company (or to any third party with or to which the Company has a contractual relationship or an obligation of confidentiality) which has been or may be disclosed by the Company to Independent Contractor orally, in writing, by electronic or magnetic media, by visual observation, and/or by other means. The parties agree that all Confidential Information shall have been obtained by Independent Contractor in strict confidence and Independent Contractor shall take all commercially reasonable actions to maintain the Confidential Information in strict confidence. The Confidential Information shall not be deemed to include information that is approved for release by express written authorization of the Company prior to release.

2.      The Confidential Information shall be and at all times remain the property of the Company. Nothing in this Agreement shall be construed as granting or conferring any rights in any Confidential Information disclosed.

3.      Independent Contractor agrees that it has used and will use the Confidential Information disclosed to it only for the purpose of (i) evaluation of the Confidential Information and/or business opportunities relating to the development, marketing, sale, licensing, distribution, acquisition, or disposition of technology, innovations, products and/or services based on or related to the Confidential Information, or (ii) performing its other duties as an independent contractor of the Company, and that is has not and shall not directly or indirectly utilize the Confidential Information disclosed to it hereunder for any other business or commercial purpose, whether for its own benefit or for that of third parties, or in any other way whatsoever, in all events without the prior written consent of the Company. Independent Contractor shall advise each of its employees, independent contractors, officers, agents, representatives, and affiliates who has a reason to know of or deal with the Confidential Information of the terms and conditions of this Agreement and shall obtain the written agreement of each such employee, independent contractor, officer, agent, representative, or affiliate to be bound by the terms and conditions hereof; Independent Contractor shall be liable for any damages, losses, costs or expenses (including reasonable attorneys' fees) suffered or incurred by the Company which arise from or in connection with breach of this Agreement by Independent Contractor or any such person or entity.

4.      Independent Contractor hereby transfers and assigns all Independent Contractor's right, title, and interest in and to all inventions, innovations, ideas, trade secrets and/or works (as such term is defined in 17 U.S.C. § § 101, *et seq*.) developed, conceived, or created, or which may hereafter be developed, conceived, or created by Independent Contractor, whether solely or jointly with others, at any time during the term of Independent Contractor's services as an independent contractor of the Company which relate to business of the nature now or hereafter carried on or contemplated by the Company during

the period of Independent Contractor's engagement and/or services and (ii) which Independent Contractor may make, conceive, originate, devise, discover or develop during the one (1) year following termination of the last to occur of Independent Contractor's engagement with or services to the Company and which directly or indirectly results from work initiated, conducted, observed or contemplated during the period of such engagement and/or services, which innovations, inventions, ideas, trade secrets, and/or works relate to the actual or anticipated business of the Company or services which Independent Contractor provides, has provided, and/or is engaged to provide for the Company. To the extent any such ideas, innovations, inventions, or trade secrets are patentable or are the subject of or claimed in any letters patent or applications for letters patent, whether foreign or domestic, Independent Contractor hereby transfers and assigns to the Company all of Independent Contractor's right, title and interest arising under or in connection with such letters patent or applications for letters patent; and further, to the extent any such works are or may be considered works made for hire under the Copyright Act, Independent Contractor hereby acknowledges that such works shall be considered works made for hire and that the Company shall be the owner of copyright therein upon their creation.

5.      Upon either the request of the Company or termination of services as an independent contractor with the Company (for whatever reason and irrespective of whether such termination is voluntary on Independent Contractor's part or not), Independent Contractor shall deliver to the Company all Confidential Information transmitted to Independent Contractor in any form and all copies thereof and all records, notes, data, memoranda, models, equipment, software and other property of any nature which are in Independent Contractor's possession and/or control and which are the property of the Company and/or relate to Independent Contractor's services or to the business, activities, or facilities of the Company. If Independent Contractor looses or makes an unauthorized disclosure of any of the Confidential Information, it shall notify the Company immediately and use reasonable efforts to retrieve the lost or wrongfully disclosed Confidential Information.

6.      Within the area in which the Company or such other person or entity is then doing business, for a period of one (1) year from the last to occur of the date of this Agreement, termination of engagement by the Company, or termination of services with the Company, for whatever reason and irrespective of whether such termination is voluntary or not, Independent Contractor agrees not to (i) engage, either directly or indirectly, in an activity which competes with or is adverse to the business interests of the Company or of any other person or entity to whom the Company may have transferred the Confidential Information or (ii) own or control more than a five percent (5%) interest in any corporation, partnership, limited liability company, trust or other entity or to be a director, officer, employee, manager, trustee, consultant or independent contractor, agent, or representative of a person or entity that engages in any activity which competes with or is adverse to the business interests of the Company or such transferee.

7.      In order to establish their status, Independent Contractor may, in its discretion, list on **Schedule A** attached hereto, its previous ideas, concepts, processes, improvements, inventions and writings, including software, which relate to the services which Independent Contractor has or is reasonably expected to perform for the Company, which were made, conceived or written prior to Independent Contractor's service with the Company, which were made, conceived or written prior to Independent Contractor's service with the Company, and which have not yet been patented or covered by pending applications for patent or are the subject of a copyright owned by Independent Contractor or another and which Independent Contractor wishes to exclude from this Agreement.

8.      Independent Contractor and the Company shall execute and deliver such other instruments and do such other acts as may be necessary to carry out the intent and purpose of this Agreement without further consideration. This Agreement may be assigned by the Company and may be executed in any number of counterparts, all of which, when executed, shall constitute one and the same agreement. This Agreement may be executed in any number of counterparts, all executed counterparts shall constitute one and the same document. This Agreement shall be binding upon and inure to the benefit of the successors, assigns, heirs, and representatives of the parties hereto. This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama. The parties agree that, among other relief that may be afforded, specific performance and injunctive relief may be available to prohibit breach of the obligations set forth herein, since money damages are inadequate to compensate fully

for such breach. In the event any provision or portion of this Agreement is deemed to be invalid or unenforceable, in whole or in part, for any reason, the remainder thereof shall not be invalidated or rendered unenforceable or otherwise adversely affected. Without limiting the generality of the foregoing, if the provisions of the preceding paragraphs shall be deemed to create a restriction which is unreasonable as to scope, duration, or geographical area, any or all of them, the parties agree that the provisions of this Agreement shall be enforceable with respect to such activities, in such scope, for such duration or in such geographical area as any court of competent jurisdiction may determine to be reasonable.

**IN WITNESS WHEREOF**, the parties hereto have caused the due execution of this Agreement as of the day first above written.

_____
[Name of Independent Contractor]


By: _____
Its: _____

ARXCEO CORPORATION

By: _Donald J Davidson_
Its: _President & CEO_

3/160829.2

3

February 13, 2006

TO:    Don Davidson

SUBJECT:    Health Care Cost for Arxceo

In response to your inquiry, I am able to provide the following information I have at this office based upon data provided by Blue Cross and Blue Shield of Alabama. Additional information would have to be provided by Blue Cross and Blue Shield of Alabama and would take considerable time. Our policy covers RNR, Arxceo, Team Aviation and Inergi with Inergi being the larger company participating. Policy period and reporting period is June 1 to May 31 of each year. Arxceo Corporations health care premiums from its beginning until February 13, 2006 amounted to $ 81,722.87. The current rate for Arxceo's policy is $836. For family coverage (6 employees covered); $307. For single coverage (1 employee covered). Results were as follows:

**Health Care————June 1, 2003 to May 31, 2004**

| | | |
|---|---|---|
| Negotiated Health Care Claims paid | | $ 153,248.27 |
| Number of contracts—Single | 12 | |
| ----Family | 25 | |
| Total | | 37 |
| Average Negotiated Health Care Claims per contract | | **$   4,141.85** |

**Health Care————June 1, 2004 to May 31, 2005**

| | | |
|---|---|---|
| Negotiated Health Care Claims paid | | $ 262,091.83 |
| Number of contracts—Single | 21 | |
| ——Family | 34 | |
| Total | | 55 |
| Average Negotiated Health Care Claims per contract | | **$   4,765.31** |

**Weighted Average Negotiated Health Care Claims per contract**
   **For two years ending May 31, 2005**                                **$   4,515.57**

The informational reports provided to me do not split out Health Care Claims paid by each division, however I would not believe that Health Care Claims for Arxceo which consisted of a total of no more than eight (8) insured employees of the above at any point in time would have been materially different than the average determined above.

Respectfully,


Charles F. "Chuck" Lofty
Managing Partner, RNR Ventures, LLC
Provider of master Blue Cross and Blue Shield policy

## ARXCEO CORPORATION
### PROJECTED INCOME STATEMENT FOR FISCAL 2007

| | Unit Price | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | | |
| Product Revenue - Ally IP1000 | 5,000 | 20,000 | 25,000 | 30,000 | 25,000 | 25,000 | 35,000 | 40,000 | 40,000 | 50,000 | 40,000 | 40,000 | 50,000 | 420,000 |
| Product Revenue - Ally IP100 | 625 | 78,125 | 125,000 | 171,875 | 203,125 | 250,000 | 296,875 | 312,500 | 375,000 | 453,125 | 343,750 | 375,000 | 468,750 | 3,453,125 |
| Software License Revenue | | 10,000 | 10,000 | 20,000 | 20,000 | 25,000 | 25,000 | 40,000 | 50,000 | 50,000 | 65,000 | 65,000 | 85,000 | 445,000 |
| **TOTAL REVENUE** | | 108,125 | 160,000 | 221,875 | 248,125 | 300,000 | 356,875 | 392,500 | 465,000 | 553,125 | 448,750 | 480,000 | 603,750 | 4,318,125 |
| **DIRECT COSTS** | Unit Cost | | | | | | | | | | | | | |
| Product Costs - Ally IP1000 | 39.50% | 7,900 | 9,875 | 11,850 | 9,875 | 9,875 | 13,825 | 15,800 | 15,800 | 19,750 | 15,800 | 15,800 | 19,750 | 165,900 |
| Product Costs - Ally IP100 | 39.20% | 28,125 | 45,000 | 61,875 | 73,125 | 90,000 | 106,875 | 112,500 | 135,000 | 163,125 | 123,750 | 135,000 | 168,750 | 1,243,125 |
| Software Costs | 12.00% | 1,200 | 1,200 | 2,400 | 2,400 | 3,000 | 3,000 | 4,800 | 6,000 | 6,000 | 7,800 | 7,800 | 7,800 | 53,400 |
| **TOTAL DIRECT COSTS** | | 37,225 | 56,075 | 76,125 | 85,400 | 102,875 | 123,700 | 133,100 | 156,800 | 188,875 | 147,350 | 158,600 | 196,300 | 1,462,425 |
| **GROSS PROFIT** | | 70,900 | 103,925 | 145,750 | 162,725 | 197,125 | 233,175 | 259,400 | 308,200 | 364,250 | 301,400 | 321,400 | 387,450 | 2,855,700 |
| **R&D EXPENSES** | | | | | | | | | | | | | | |
| Salaries | 6500 | 45,500 | 45,500 | 45,500 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 58,500 | 58,500 | 58,500 | 624,000 |
| Payroll Taxes | 7.85% | 3,572 | 3,572 | 3,572 | 4,082 | 4,082 | 4,082 | 4,082 | 4,082 | 4,082 | 4,592 | 4,592 | 4,592 | 48,984 |
| Health & Life Insurance | | 3,600 | 4,050 | 4,250 | 4,800 | 16,148 | 3,128 | 3,128 | 22,400 | 3,126 | 3,126 | 3,126 | 3,125 | 74,004 |
| Worker Compensation Insurance | 750 | 3,572 | 3,572 | 3,572 | 400 | 3,565 | 438 | 438 | 4,441 | 438 | 438 | 438 | 3,125 | 12,034 |
| Telephone & Internet Expenses | | 750 | 750 | 750 | 900 | 900 | 900 | 900 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,850 |
| R&D Materials expense | 50 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| R&D Equip & Maintenance (utilities) | | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,800 |
| R&D Equip & Maintenance R&D equipment | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Travel Expense, R&D | | 2,000 | 2,000 | 2,000 | 2,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Software Licensing | | 2,000 | 2,000 | 2,000 | 2,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 28,000 |
| Testing, Certifications & Miscellaneous | | 50,000 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 15,600 |
| Depreciation, R&D | | 1,000 | 500 | 500 | 590 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 56,500 |
| | | | | | | | | | | | | | | 15,609 |
| **TOTAL R&D EXPENSES** | | 110,372 | 61,572 | 61,572 | 89,332 | 84,545 | 68,396 | 68,696 | 92,073 | 68,796 | 75,806 | 75,806 | 75,806 | 912,772 |
| **SALES, MARKETING AND ADMIN EXPENSES** | | | | | | | | | | | | | | |
| Salaries | 6700 | 50,000 | 50,000 | 50,000 | 75,000 | 75,000 | 100,000 | 100,000 | 100,000 | 125,000 | 125,000 | 125,000 | 125,000 | 1,100,000 |
| Commissions, employee | 3.00% | 3,244 | 4,800 | 6,656 | 7,444 | 9,000 | 10,706 | 11,775 | 13,950 | 16,594 | 13,463 | 14,400 | 17,513 | 129,544 |
| Payroll Taxes | 7.85% | 2,090 | 2,497 | 2,734 | 2,993 | 4,590 | 2,105 | 2,105 | 19,416 | 2,105 | 2,105 | 2,105 | 2,915 | 57,568 |
| Health & Life Insurance | 7.85% | 4,500 | 4,500 | 4,500 | 4,500 | 5,259 | 5,250 | 5,250 | 5,259 | 5,259 | 6,000 | 6,000 | 6,750 | 62,550 |
| Worker Compensation Insurance | 50 | 500 | 500 | 500 | 700 | 750 | 900 | 900 | 900 | 900 | 1,000 | 1,000 | 1,000 | 9,600 |
| Rent Expense (includes utilities) | | 3,009 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Telephone & Internet | | 200 | 600 | 600 | 750 | 750 | 750 | 750 | 900 | 1,000 | 1,000 | 1,000 | 1,000 | 9,600 |
| Office Supplies, S&M | | 200 | 200 | 250 | 300 | 300 | 300 | 350 | 350 | 300 | 300 | 300 | 300 | 10,050 |
| Legal, patent and accounting expense | | 2,000 | 2,000 | 2,500 | 3,000 | 3,000 | 3,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 10,050 |
| Consultant expense, S&M | | 6,000 | 2,500 | 6,000 | 7,500 | 7,500 | 7,500 | 9,000 | 9,000 | 9,000 | 4,000 | 4,000 | 4,000 | 3,650 |
| Printing & Reproduction | | 1,500 | 6,000 | 1,500 | 2,000 | 2,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 43,500 |
| Sales & Marketing Collaterals | | 500 | 1,500 | 500 | 500 | 342 | 2,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 84,500 |
| Taxes, Licenses & Fees | | 300 | 300 | 300 | 900 | 500 | 500 | 500 | 1,342 | 500 | 500 | 500 | 2,500 | 25,500 |
| Postage & Delivery | | 200 | 200 | 200 | 250 | 250 | 250 | 750 | 750 | 750 | 750 | 750 | 750 | 6,884 |
| Advertising and PR Expense | | 10,000 | 10,000 | 10,000 | 16,000 | 10,000 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,150 |
| General Marketing Expense, Trade shows, Travel | | 12,500 | 6,500 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 130,000 |
| | | | | | | 7,500 | 12,500 | 12,500 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 115,500 |
| **TOTAL SALES & MARKETING EXPENSES** | | 85,134 | 87,097 | 89,241 | 118,440 | 132,049 | 146,761 | 151,430 | 171,738 | 181,348 | 178,987 | 179,905 | 183,767 | 1,821,396 |
| **TOTAL EXPENSE** | | 195,505 | 148,669 | 150,812 | 187,772 | 216,994 | 215,157 | 220,126 | 263,831 | 250,144 | 254,773 | 255,711 | 259,573 | 2,618,668 |
| **NET ORDINARY INCOME** | | (124,605) | (44,744) | (5,062) | (25,047) | (19,469) | 18,018 | 39,274 | 44,359 | 114,106 | 46,627 | 65,689 | 127,877 | 237,032 |
| **PROVISION FOR TAXES** | 40% | (49,842) | (17,898) | (2,025) | (10,019) | (7,788) | 7,207 | 15,710 | 17,744 | 45,642 | 18,651 | 26,276 | 51,151 | 94,813 |
| **NET INCOME AFTER TAXES** | | (74,763) | (26,846) | (3,037) | (15,028) | (11,681) | 10,811 | 23,555 | 26,621 | 68,463 | 27,976 | 39,413 | 76,728 | 142,219 |

| | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ably IP1000 units sold | 4 | 5 | 6 | 5 | 5 | 7 | 8 | 8 | 10 | 8 | 8 | 10 | 84 |
| Ably IP100 units sold | 125 | 200 | 275 | 325 | 400 | 475 | 500 | 600 | 725 | 550 | 600 | 750 | 5,525 |
| Head Count - R & D | 7 | 7 | 7 | 8 | 8 | 8 | 8 | 8 | 8 | 9 | 9 | 9 | |
| Head Count - S, M & A | 6 | 6 | 6 | 6 | 6 | 7 | 7 | 7 | 7 | 8 | 8 | 9 | |

# Exhibit "D"

Option Sale Agreement

# ARXCEO CORPORATION

## OPTION SALE AGREEMENT

**THIS OPTION SALE AGREEMENT** (this "Agreement") is made as of the ____ day of February, 2006, by and between Arxceo Corporation, a Delaware corporation (the "Company"), and David Freytag (the "Optionholder").

**WHEREAS,** On November 1, 2004, the Optionholder was granted an option (the "Current Option(s)") to purchase the Company's Common Stock, par value $0.0001 per share (the "Common Stock"), pursuant to the Company's 2004 Long Term Incentive Plan, or any additional or successor stock option plan of the Company (collectively, the "Plan") and that certain Incentive Stock Option Agreement, dated effective November 1, 2004, a copy of which is attached hereto (the "Option Agreements");

**WHEREAS,** the Company is party to that certain Securities Purchase Agreement, dated as of February 24, 2006, among the Company, Japan Communications, Inc. ("JCI") and the stockholders signatory thereto (the "Purchase Agreement"); and

**WHEREAS,** the execution by the Optionholder of this Agreement is required under the terms of the Purchase Agreement, pursuant to which the Optionholder has received a material benefit.

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual promises set forth below and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

I.     Definitions.

    A.     "Future Options" means any option to purchase Common Stock subsequently granted to the Optionholder after the date hereof.

    B.     "Options" means the Current Options and any Future Options.

    C.     "Option Shares" means those shares of Common Stock issued pursuant to, or issuable upon, the exercise of an Option.

    D.     "Other Options Rights" means: (i) any other options to purchase Common Stock granted to any Person (other than the Optionholder) under the Plan; and (ii) any outstanding shares of Common Stock issued in exchange for any options granted to any Person (other than the Optionholder) under the Plan, in each case to the extent outstanding on the Third Closing Date.

    E.     All capitalized terms used herein and not otherwise defined shall have the

meanings assigned to such terms in the Purchase Agreement.

II.     Cancellation of Options; Tender of Option Shares.  The Optionholder hereby grants to the Company the right to cause the Optionholder, by fifteen (15) days prior written notice, to, on the Third Closing Date: (i) cancel any Options then held by such Optionholder; and (ii) sell to Arxceo (or its designated Affiliate), all Option Shares then held by the Optionholder. The purchase price for the granting of such rights, which will be paid upon Arxceo's (or its designated Affiliate's) exercise of such rights will be an amount equal to: (i) with respect to each Option Share, the Third Closing Purchase Price; and (ii) with respect to each Option, the Third Closing Purchase Price less the exercise price of such Option.  In the event that the Company exercises its rights under this Section II with respect to the Optionholder, the Company shall also exercise its rights to cause the other Persons to cancel or sell, as applicable, to the Company all Other Option Rights.

III.    Failure to Exercise and Tender.  Upon the Optionholder's failure to cancel any Options (the "Failed Options") or sell any Option Shares (the "Failed Stock", together with the Failed Options, the "Failed Securities"), as the case may be, strictly in accordance with the terms of this Agreement (including the time constraints hereof), and the Optionholder's failure is not cured within thirty (30) days after written notice thereof, the Company shall have the right to cancel (with respect to the Failed Options) or purchase (with respect to the Failed Stock) such Failed Securities at a price per share equal to: (i) with respect to the Failed Options, the par value of the Option Shares underlying such Failed Options; and (ii) with respect to the Failed Stock, at the par value of such Failed Stock.

IV.    Amendment to Option Plan; Option Agreement.  The execution of this Agreement by the Optionholder and the Company shall be deemed to be an amendment of the Plan and the Option Agreements.

V.     Transfer Restrictions.  All Option Shares will be subject to the transfer restrictions (and other terms and conditions) of the Stockholders Agreement dated effective as of February 24, 2006 by and among the Company and the stockholders party thereto (the "Stockholders Agreement").  All Option Shares shall bear the transfer restriction legend set forth in the Stockholders Agreement.

VI.    Delivery of Shares and Documents.  Upon the closing of any purchase by JCI or the Company, as the case may be, of any Option Shares, the Optionholder, his executor, administrator or beneficiaries shall deliver to JCI or the Company, as the case may be, any and all documentation representing the Option Shares being sold, free and clear of all options, contracts, commitments, liens, pledges, security interests and other encumbrances, duly endorsed for transfer, and such assignments and other documents and instruments evidencing the title of the Optionholder and of the Optionholder's compliance with this Agreement as may be reasonably required by JCI or the Company, as the case may be, or by counsel for JCI or the Company, as the case may be, together with appropriate duly signed agreements transferring such Option Shares to JCI or the Company, as the case may be, and JCI or the Company, as the case may be, shall deliver to the Optionholder, his executor, administrator or beneficiaries a check in the amount of the purchase price for the shares being purchased.  Upon the closing of such purchase,

2

the Optionholder shall be deemed to have represented and warranted to JCI or the Company, as the case may be (and, if requested by JCI or the Company, as the case may be, shall then represent and warrant in writing) that the Optionholder owns the Option Shares being purchased, free and clear of all options, contracts, commitments, liens, pledges, security interests and other encumbrances.

VII.    Binding Upon Transferees.  In the event that, at any time or from time to time, any Options or any Option Shares are transferred to any party (other than JCI or the Company) pursuant to the provisions hereof, the transferee shall take such Options or Option Shares pursuant to all of the provisions, conditions and obligations of the Plan, this Agreement and the Stockholders Agreement (including, without limitation, the obligations to sell and transfer, and to offer to sell and transfer, such shares pursuant to the provisions of this Agreement and the Stockholders Agreement), and, as a condition precedent to the transfer of the Option and such Option Shares, the transferee shall agree in writing, for and on behalf of such transferee and such transferee's successors and assigns, to be bound by all provisions of the Plan, this Agreement and the Stockholders Agreement.  The foregoing shall not be construed to permit the Optionholder to transfer any Options or Option Shares in violation of the Plan, this Agreement or the Stockholders Agreement.

VIII.    Termination.  This Agreement shall automatically terminate and be of no further effect upon the earlier to occur of: (i) the termination of the Purchase Agreement and the transactions contemplated thereby; and (ii) the delivery to JCI of all Options and Option Shares held by the Optionholder in accordance with the terms of this Agreement.

IX.    Burden and Benefit.  This Agreement shall be binding upon, and shall inure to the benefit of, the Company, JCI and the Optionholder, and their respective heirs, personal and legal representatives, successors and permitted assigns.  As used in this Section 8, the term the "Company" and "JCI" shall also include their respective Affiliates.

X.    Time is of the Essence.  Time is of the essence of this Agreement.

XI.    Pronouns.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

XII.    Counterparts.  This Agreement may be executed in any number of original or facsimile counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

XIII.    Governing Law; Venue.  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware (without reference to its principles of choice or conflict of laws).  Each party consents to the personal jurisdiction of the State of Georgia for any and all actions arising out of or relating to this Agreement.

XIV.  <u>Notices</u>.    All  notices,  claims,  certificates,  requests,  demands  and  other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or if sent by nationally-recognized overnight courier, by telecopy, or by registered or certified mail, return receipt requested and postage prepaid, addressed as follows:

if to the Company:

> Arxceo Corporation
> 1525 Perimeter Parkway, Suite 225
> Huntsville, Alabama  35806
> Telephone: (256) 837-8388 x110
> Fax: (256) 837-2888
> Attention: Donald A. Davidson

if to JCI:

> Japan Communications, Inc.
> 6-25-3 Minami Oi
> Shinagawa-ku
> Tokyo 140-0013 JAPAN
> Telephone: 011-81-3-5767-9101
> Fax: 011-81-3-5767-9123
> Attention:  Frank Seiji Sanda

with a copy (which shall not constitute notice) to:

> Kilpatrick Stockton LLP
> 1100 Peachtree Street, NE, Suite 2800
> Atlanta, Georgia 30309
> Fax:  404-815-6555
> Telephone:  404-815-6500
> Attention:  Steven L. Berson

If to the Optionholder:

> at  the  address  set  forth  below  under  Optionholder's
> signature below

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith.  Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery if a business day or, if not a business day, the next succeeding business day, (ii) in the case of internationally-recognized overnight courier, on the second business day after the date when sent, (iii) in the case of fax transmission, when received if a business day or, if not a business day, the next succeeding business day, and (iii) in the case of mailing, on the seventh business day following that on which the piece of mail containing such communication is posted.

4

3/188539.1

IN WITNESS WHEREOF, the Company and Optionholder have executed this Agreement and affixed their seals hereto as of the day and year first above written.

**COMPANY:**

ARXCEO CORPORATION

By: _____
    Name
    Title:

**JCI:**

JAPAN COMMUNICATIONS, INC.

By: _____
    Name:
    Title:

**OPTIONHOLDER**

By: _____
    Name:     David Freytag
    Address:  2611 Deford Mill Rd.
               Huntsville, Alabama 35763

5

# Exhibit "E"

Key Management Vesting Agreement

## KEY MANAGEMENT VESTING AGREEMENT

This **KEY MANAGEMENT VESTING AGREEMENT** (this "Agreement") is dated as of the 28th day of February, 2006, between Arxceo Corporation, a Delaware corporation (the "Company"), and Donald J. Davidson (the "Executive").

## RECITALS

**WHEREAS,** Executive is a member of the Company's management team;

**WHEREAS,** the Company is party to that certain Securities Purchase Agreement, dated as of the 28th day of February, 2006, by and among the Company, Japan Communications, Inc., and the other signatories thereto, including Executive (the "Purchase Agreement");

**WHEREAS,** the execution and delivery of this Agreement is a condition precedent to the consummation of the transactions contemplated by the Purchase Agreement; and

**WHEREAS,** Executive will receive a material benefit from the consummation of the transactions contemplated by the Purchase Agreement.

**NOW THEREFORE,** for valuable consideration, receipt of which is acknowledged, the parties hereto agree as follows:

1.    Delivery of Escrowed Shares.

Executive is currently the owner of 250,000 shares of the Company's Common Stock, par value $0.0001 per share (the "Common Stock"). On the date hereof, Executive shall deliver certificate(s) representing fifty percent (50%) of the total number of shares of Common Stock held by Executive (the "Escrowed Shares"), to the Secretary of the Company, as escrow agent (the "Escrow Agent") pursuant to Section 5 hereof. The shares of Common Stock held by Executive that are not Escrowed Shares shall be treated in accordance with the Escrow Agreement (as defined in the Purchase Agreement). Executive agrees that the Escrowed Shares shall be subject to the vesting schedule set forth in Section 2 (and the automatic vesting provision of Section 6(b)) hereof and the other contractual restrictions contained in that certain Stockholders Agreement, dated as of February 28, 2006, by and among the Company and the other parties thereto, including Executive (the "Stockholders Agreement").

2.    Forfeiture of Unvested Shares.

(a)    Subject to Section 6(b), in the event that: (i) Executive voluntarily leaves the employment of the Company for any reason, with or without cause; or (ii) Executive is Terminated for Cause (defined in Section 6(b)), in either case prior to March 31, 2008, Executive shall be deemed to have forfeited to the Company the Unvested Shares (as defined below).

"Unvested Shares" means the total number of Shares multiplied by the Applicable Percentage based on the following dates on which Executive's employment with the Company ceases:

| APPLICABLE PERCENTAGE | DATE OF TERMINATION OF EMPLOYMENT |
|---|---|
| 100.0% | Before June 30, 2006 |
| 87.5% | On or after June 30, 2006 and before September 30, 2006 |
| 75.0% | On or after September 30, 2006 and before December 31, 2006 |
| 62.5% | On or after December 31, 2006 and before March 31, 2007 |
| 50.0% | On or after March 31, 2007 and before June 30, 2007 |
| 37.5% | On or after June 30, 2007 and before September 30, 2007 |
| 25.0% | On or after September 30, 2007 and before December 31, 2007 |
| 12.5% | On or after December 31, 2007 and before March 31, 2008 |
| 0% | On or after March 31, 2008 |

(b)      For purposes of this Agreement, employment with the Company shall include employment with a parent or subsidiary of the Company.

(c)      Vesting shall not apply to any fraction of an Escrowed Share, and any fraction of an Escrowed Share resulting from a computation made pursuant to <u>Section 2</u> of this Agreement shall be rounded upward to the nearest whole Escrowed Share.

3.      <u>Restrictions on Transfer</u>.

Executive shall not sell, assign, transfer, pledge, hypothecate or otherwise dispose of, by operation of law or otherwise (collectively "<u>transfer</u>"):

(a)      any Escrowed Shares, or any interest therein, that are Unvested Shares, except that Executive may transfer such Escrowed Shares: (i) to or for the benefit of any spouse, child or grandchild of Executive, or to a trust for their benefit, <u>provided</u> that such Escrowed Shares shall remain subject to this Agreement (including without limitation the restrictions on transfer set forth in this <u>Section 3</u>) and the Escrow Agreement and such permitted transferee shall, as a

9091328.5
3/188940.3

condition to such transfer, deliver to the Company a written instrument confirming that such transferee shall be bound by all of the terms and conditions of this Agreement and the Escrow Agreement; or (ii) as part of a Sale of the Company (as defined below), provided that, in accordance with Section 8(b), the securities or other property received by Executive in connection with such transaction shall remain subject to this Agreement and, if applicable, the Escrow Agreement; or

(b)    any Escrowed Shares, or any interest therein, that are no longer Unvested Shares, except in accordance with the Stockholders Agreement and the Escrow Agreement.

4.    Rights of Unvested Shares

(a)    Executive shall be treated as the owner of all Escrowed Shares with respect to any votes to which the Escrowed Shares are entitled under the Company's Certificate of Incorporation.

(b)    Executive shall not be entitled to receipt of any dividends or distributions in respect of any Escrowed Shares until such Escrowed Shares are no longer Unvested Shares. Any dividends or other distributions payable in respect of the Escrowed Shares shall be held by the Escrow Agent and delivered to the rightful owner of the Escrowed Shares upon their release from escrow in accordance with the Joint Written Instructions (defined below).

(c)    After the time at which the Escrowed Shares, if any, are required to be delivered to the Company for forfeiture, the Company shall not pay any dividend or distribution on account of such Escrowed Shares or permit Executive to exercise any of the privileges or rights of a stockholder with respect to such Escrowed Shares, but shall, in so far as permitted by law, treat the Company as the owner of such Escrowed Shares.

5.    Escrow.

Executive shall, upon the execution of this Agreement, execute Joint Escrow Instructions in the form attached to this Agreement as Exhibit B (the "Joint Escrow Instructions"). The Joint Escrow Instructions shall be delivered to the Escrow Agent thereunder. Executive shall deliver to the Escrow Agent certificate(s) evidencing the Escrowed Shares. If Executive is unable to deliver the aforementioned certificates, Executive shall execute an affidavit to that effect, in form and substance satisfactory to the Company, and the Company shall re-issue certificates to Executive and the Escrow Agent reflecting the amounts to be issued to Executive and the Escrow Agent, respectively. Such materials shall be held by the Escrow Agent pursuant to the terms of the Joint Escrow Instructions.

6.    Adjustments; Automatic Vesting

(a)    *Adjustments.* If from time to time there is any stock split, stock dividend, stock distribution or other reclassification of the Common Stock of the Company, any and all new, substituted or additional securities to which Executive is entitled by reason of his ownership of the Escrowed Shares shall be immediately subject to this Agreement in the same manner and to the same extent as the Escrowed Shares.

- 3 -

(b)    *Automatic Vesting.*

(i)    Immediately prior to a Sale of the Company (as defined below), all Unvested Shares shall automatically vest and be treated as outstanding shares of Common Stock of the Company. "Sale of the Company" means: (i) the sale or transfer of the outstanding shares of capital stock of the Company; or (ii) the merger or consolidation of the Company with another person or entity, in each case in clauses (i) and (ii) above, under circumstances in which the holders of the voting power of outstanding capital stock of the Company, immediately prior to such transaction, own less than 50% in voting power of the outstanding capital stock of the Company or the surviving or resulting corporation or acquirer, as the case may be, immediately following such transaction.

(ii)    Upon a Termination Without Cause (as defined below), all Unvested Shares shall automatically vest and be treated as outstanding shares of Common Stock of the Company, effective upon such Termination Without Cause.  "Termination Without Cause" means termination of Executive's employment by the Company other than due to (a) a Termination for Cause or (b) as a result of death or disability.  "Termination for Cause" means termination of Executive's employment by the Company's Board of Directors, due to: (i) an act of dishonesty made by Executive in connection with Executive's responsibilities hereunder; (ii) Executive's conviction for or plea of *nolo contendre* to a felony or perpetration of a common law fraud; (iii) Executive's gross misconduct; or (iv) Executive's continued and substantial failure to perform of his or her duties after Executive has received a written demand for performance from the Company which specifically sets forth the factual basis for the Company's belief that Executive has not substantially performed his or her duties

7.    No Rights To Employment.  Nothing contained in this Agreement shall be construed as giving Executive any right to be retained, in any position, as an employee of the Company.  Executive acknowledges and agrees that the vesting of the Shares may only be achieved pursuant to Section 2  and Section 6(b) and, with respect to the vesting of the Shares pursuant to Section 2, is earned only by continuing service as an employee of the Company.  Executive further acknowledges and agrees that the transactions contemplated hereunder and the vesting schedule set forth herein do not constitute an express or implied promise of continued engagement as an employee for the vesting period, for any period, or at all.

8.    Severability.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

9.    Waiver.

Any provision for the benefit of the Company contained in this Agreement may be waived, either generally or in any particular instance, only by the Board of Directors of the Company.

10.    Binding Effect.

9091328.5

3/188940.3

This Agreement shall be binding upon and inure to the benefit of the Company and Executive and their respective heirs, executors, administrators, legal representatives, successors and assigns, subject to the restrictions on transfer set forth in this Agreement.

11.     Notice.

All notices, claims, certificates, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or if sent by nationally-recognized overnight courier, by telecopy, or by registered or certified mail, return receipt requested and postage prepaid, addressed as follows:

> if to the Company:

> > Arxceo Corporation
> > 1525 Perimeter Parkway, Suite 225
> > Huntsville, Alabama  35806
> > Telephone: (256) 837-8388 x110
> > Fax: (256) 837-2888
> > Attention: Donald J. Davidson

> with a copy (which shall not constitute notice) to:

> > Japan Communications, Inc.
> > 6-25-3 Minami Oi
> > Shinagawa-ku
> > Tokyo 140-0013 JAPAN
> > Telephone: 011-81-3-5767-9101
> > Fax: 011-81-3-5767-9123
> > Attention:  Frank Seiji Sanda

> if to Executive, at the address set forth below Executive's signature
> below.

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith.  Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery if a business day or, if not a business day, the next succeeding business day, (ii) in the case of internationally-recognized overnight courier, on the second business day after the date when sent, (iii) in the case of fax transmission, when received if a business day or, if not a business day, the next succeeding business day, and (iii) in the case of mailing, on the seventh business day following that on which the piece of mail containing such communication is posted.

12.     Termination.

This Agreement shall automatically terminate upon the earlier to occur of: (i) the release of all Escrowed Shares pursuant to the terms hereof and the Joint Escrow Instructions; and (ii) the termination of the Purchase Agreement.  In the case of termination pursuant to clause (ii) of the foregoing sentence, the Board of Directors of the Company shall promptly provide written

9091328.5
3/188940.3

notice to the Escrow Agent stating: (i) that the Agreement has terminated; and (ii) to whom the Escrowed Shares should be delivered. Upon the termination of this Agreement, the Escrowed Shares shall be delivered to the Person (as defined in the Purchase Agreement) entitled to such shares in accordance with the terms of the Joint Escrow Instructions.

13.    Pronouns.

Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

14.    Entire Agreement.

This Agreement constitutes the entire agreement between the parties, and supersedes all prior agreements and understandings, relating to the subject matter of this Agreement.

15.    Amendment.

This Agreement may be amended or modified only by a written instrument executed by both the Company and Executive.

16.    Governing Law; Venue.

This Agreement shall be construed, interpreted and enforced in accordance with the internal laws of the State of Delaware without regard to any applicable conflicts of laws. Executive agrees that this Agreement is entered into in the State of Alabama and contemplates and requires performance in the State of Alabama. Each party consents to the personal jurisdiction of the State of Alabama for any and all actions arising out of or relating to this Agreement.

17.    Executive's Acknowledgments.

Executive acknowledges that the Executive: (i) has read this Agreement; (ii) has been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of Executive's own choice or has voluntarily declined to seek such counsel; (iii) understands the terms and consequences of this Agreement; and (iv) is fully aware of the legal and binding effect of this Agreement.

*[Signature Page Follows]*

9091328.5
3/188940.3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**ARXCEO CORPORATION**

By:_____
Name:
Title:

Executive has reviewed the provisions of this Agreement, has had an opportunity to obtain the advice of Executive's own tax and legal advisors prior to executing this Agreement and fully understands and agrees to the provisions hereof. Executive understands that the law firm of Bradley Arant Rose & White LLP is acting as counsel to the Company in connection with the transactions contemplated by the Agreement, and is not acting as counsel for Executive.

**EXECUTIVE**

_____
Name: J. Chandler Hall
Address:

9091328.5
3/188940.3

**EXHIBIT A**

**ARXCEO CORPORATION**

Joint Escrow Instructions

February 28, 2006

Charles F. Lofty
Secretary
Arxceo Corporation
1525 Perimeter Parkway, Suite 225
Huntsville, Alabama 35806
Dear Sir:

As Escrow Agent for Arxceo Corporation, a Delaware corporation (the "Company"), and the undersigned person ("Holder"), you are hereby authorized and directed to hold the documents delivered to you pursuant to the terms of that certain Key Management Vesting Agreement (the "Agreement"; capitalized terms used herein and not otherwise defined herein have the respective meanings set forth in the Agreement) of even date herewith, to which a copy of these Joint Escrow Instructions is attached, in accordance with the following instructions:

1.      Appointment.  Holder hereby deposits with you any certificates evidencing the Escrowed Shares (as defined in the Agreement) to be held by you hereunder and any additions and substitutions to said Escrowed Shares.  Holder does hereby irrevocably constitute and appoint you as his attorney-in-fact and agent for the term of this escrow to execute with respect to such Escrowed Shares all documents necessary or appropriate to make such Escrowed Shares negotiable and to complete any transaction herein contemplated.  Subject to the provisions of this paragraph 1 and the terms of the Agreement, Holder shall exercise all rights and privileges of a stockholder of the Company while the Escrowed Shares are held by you.

2.      Termination of Employment.

(a)      Upon written notice from the Board of Directors of the Company of: (i) Holder's voluntary termination of Holder's employment with the Company; or (ii) Holder's Termination for Cause (as defined in the Agreement), you are directed (a) to date the stock assignment form or forms necessary for the transfer of the Unvested Shares (as defined in the Agreement), (b) to fill in on such form or forms the number of Escrowed Shares being transferred, and (c) to deliver same, together with the certificate or certificates evidencing such Escrowed Shares to be transferred, to the Company.

- 8 -

3.   <u>Vested Shares</u>.  Upon the vesting of any shares in accordance with the terms of the Agreement (such vested shares, the "<u>Released Shares</u>"), and written notice of such vesting by the Company to you, the Released Shares shall be treated as follows:

(a)   If you receive written notice from the Company stating that the Escrow Agreement has not been terminated and such Released Shares have not been sold to JCI pursuant to the terms of the Purchase Agreement, you shall deliver the Released Shares to the escrow agent under the Escrow Agreement;

(b)   If you receive written notice from the Company stating that: (i) the Escrow Agreement has been terminated; and (ii) such Released Shares have not been sold to JCI pursuant to the terms of the Purchase Agreement, you shall deliver the Released Shares to the Executive; or

(c)   If you receive written notice from the Company stating that such Released Shares have been sold to JCI (whether or not the Escrow Agreement has been terminated) pursuant to and in accordance with the terms of the Purchase Agreement, you shall deliver the Released Shares to JCI.

4.   <u>Termination of Agreement</u>.  Upon written notice from the Board of Directors of the Company that the Agreement is terminated, you shall deliver the Escrowed Shares, vested or Unvested, to the Person (as defined in the Purchase Agreement) entitled to such shares pursuant to such written instructions.

5.   <u>Duties of Escrow Agent</u>.

(a)   Your duties hereunder may be altered, amended, modified or revoked only by a writing signed by all of the parties hereto.

(b)   You shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by you to be genuine and to have been signed or presented by the proper party or parties.  You shall not be personally liable for any act you may do or omit to do hereunder as Escrow Agent or as attorney-in-fact of Holder while acting in good faith and in the exercise of your own good judgment, and any act done or omitted by you pursuant to the advice of your own attorneys shall be conclusive evidence of such good faith.

(c)   You are hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or Company, excepting only orders or process of courts of law, and are hereby expressly authorized to comply with and obey orders, judgments or decrees of any court.  In case you obey or comply with any such order, judgment or decree of any court, you shall not be liable to any of the parties hereto or to any other person, firm or Company by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

- 9 -

(d)     You shall not be liable in any respect on account of the identity, authority or rights of the parties executing or delivering or purporting to execute or deliver the Agreement or any documents or papers deposited or called for hereunder.

(e)     You shall be entitled to employ such legal counsel and other experts as you may deem necessary properly to advise you in connection with your obligations hereunder and may rely upon the advice of such counsel.

(f)     Your rights and responsibilities as Escrow Agent hereunder shall terminate if: (i) you cease to be Secretary of the Company; or (ii) you resign by written notice to each party. In the event of a termination under clause (i), your successor as Secretary shall become Escrow Agent hereunder; in the event of a termination under clause (ii), the Company shall appoint a successor Escrow Agent hereunder.

(g)     If you reasonably require other or further instruments in connection with these Joint Escrow Instructions or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

(h)     It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the securities held by you hereunder, you are authorized and directed to retain in your possession without liability to anyone all or any part of said securities until such dispute shall have been settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but you shall be under no duty whatsoever to institute or defend any such proceedings.

(i)     These Joint Escrow Instructions set forth your sole duties with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into these Joint Escrow Instructions against you.

(j)     The Company shall indemnify you and hold you harmless against any and all damages, losses, liabilities, costs, and expenses, including attorneys' fees and disbursements, for anything done or omitted to be done by you as Escrow Agent in connection with this Agreement or the performance of your duties hereunder, except such as shall result from your gross negligence or willful misconduct.

6.     Notice.     All notices, claims, certificates, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or if sent by nationally-recognized overnight courier, by telecopy, or by registered or certified mail, return receipt requested and postage prepaid, addressed as follows:

if to the Company:

Arxceo Corporation
1525 Perimeter Parkway, Suite 225
Huntsville, Alabama  35806
Telephone: (256) 837-8388 x110
Fax: (256) 837-2888

- 10 -

Attention: Donald J. Davidson

with a copy (which shall not constitute notice) to:

Japan Communications, Inc.
6-25-3 Minami Oi
Shinagawa-ku
Tokyo 140-0013 JAPAN
Telephone: 011-81-3-5767-9101
Fax: 011-81-3-5767-9123
Attention:  Frank Seiji Sanda

if to the Holder, at the address set forth below Holder's signature below:

if to the Escrow Agent:

c/o Arxceo Corporation
1525 Perimeter Parkway, Suite 225
Huntsville, Alabama  35806
Telephone: (256) 508-2801
Fax: (256) 837-2888
Attention: Secretary

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith.  Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery if a business day or, if not a business day, the next succeeding business day, (ii) in the case of internationally-recognized overnight courier, on the second business day after the date when sent, (iii) in the case of fax transmission, when received if a business day or, if not a business day, the next succeeding business day, and (iii) in the case of mailing, on the seventh business day following that on which the piece of mail containing such communication is posted.

7.    Miscellaneous.

By signing these Joint Escrow Instructions, you become a party hereto only for the purpose of said Joint Escrow Instructions, and you do not become a party to the Agreement.

*[Signature page follows]*

- 11 -

This instrument shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

COMPANY

**Arxceo Corporation**

By:_____
    Donald J. Davidson
    President and Chief Executive Officer

HOLDER:

_____
    (Signature)

_____
Donald J. Davidson

Address:

_____

_____

Date Signed:_____

ESCROW AGENT:

_____

9091328.5
3/188940.3

# Exhibit "F"

Escrow Agreement

# ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (this "Agreement") is entered into as of February 28, 2006, by and among Donald J. Davidson, in his capacity as the Escrow Agent hereunder (the "Escrow Agent"), Japan Communications, Inc., a Japanese company ("JCI"), and Donald J. Davidson and David Izatt, in their capacity as representatives of the Stockholders (as defined below) (the "Stockholders' Representatives"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement (as defined below).

## Background

A.    Pursuant to that certain Securities Purchase Agreement, dated as of February 28, 2006, by and among Arxceo Corporation, a Delaware corporation ("Arxceo"), JCI and all of the stockholders of Arxceo party thereto, JCI has committed to, among other things, purchase all of the outstanding equity securities of Arxceo (the "Purchase Agreement").

B.    The parties to the Purchase Agreement have agreed that each holder (each, a "Stockholder", and collectively, the "Stockholders") of shares of Arxceo Common Stock (the "Common Stock") will deposit with the Escrow Agent such Stockholder's certificates representing one hundred percent (100%) of such Stockholder's shares of Common Stock not purchased by JCI in the First Closing, which such Common Stock shall be disbursed solely under the terms of this Agreement. Notwithstanding the foregoing, pursuant to the Purchase Agreement, certain members of Arxceo's management (the "Key Managers") must deposit with the Secretary of Arxceo (in the Secretary's capacity as escrow agent, the "Vesting Agent") under those certain Key Management Vesting Agreements between each Key Manager and Arxceo, certificates representing fifty percent (50%) of such Key Manager's shares of Common Stock not purchased by JCI in the first Closing.

## Agreement

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, JCI, the Stockholders' Representatives and the Escrow Agent agree as follows:

1.    **Escrow Agent.** JCI and the Stockholders' Representatives hereby designate and appoint the Escrow Agent to serve in accordance with the terms, conditions and provisions of this Agreement, and the Escrow Agent hereby accepts that designation and appointment.

2.    **Establishment of Escrow, Terms and Conditions.**

(a)    Deposit of Shares:

(i)    Contemporaneously with or promptly following the execution of this Agreement, each Stockholder (other than the Key Managers) will deposit with the Escrow Agent all of such Stockholder's certificates representing those shares of such Stockholder's Common Stock (including shares of Series B Preferred Stock and Series A Preferred Stock converted into Common Stock in connection with the First Closing) that are not purchased by JCI in the First Closing;

(ii)    Contemporaneously with or promptly following the execution of this Agreement, the Key Managers will deposit with the Escrow Agent such Key Manager's certificates representing fifty percent (50%) of those shares of such Key Manager's Common Stock (including shares of Series B Preferred Stock and Series A Preferred Stock converted into Common Stock in connection with the First Closing) that are not purchased by JCI in the first closing; and

(iii)    From time-to-time, the Vesting Agent may deposit with the Escrow Agent certificates representing those shares of Common Stock beneficially owned by the Key Managers but held by the Vesting Agent in accordance with the terms of each Key Management Vesting Agreement. All shares of Common Stock deposited with the Escrow Agent pursuant to this Section 2(a) are referred to herein as the "Escrowed Shares".

(b)    The Escrow Agent will hold the Escrowed Shares until the Escrow Agent is authorized to release the various portions thereof in accordance with Section 3 of this Agreement.

3.    **Release of Escrowed Shares.**

(a)    At the Second Closing, each Stockholder will sell, and JCI will purchase, that number of Escrowed Shares set forth in the Common Holder's Second Closing Notice or Purchaser's Second Closing Notice, as applicable (the "Second Closing Shares"). After the Second Closing, JCI shall provide to the Escrow Agent written instructions (the "Second Closing Instructions") (with a copy to the Stockholders' Representatives) setting forth: (i) which Stockholder's Escrowed Shares are to be released to JCI; (ii) how many Escrowed Shares of such Stockholder are to be released, and (iii) a statement to the effect that JCI has made all payments required by it under the Purchase Agreement with respect to such Escrowed Shares to be released.

(b)    After the Third Closing, JCI shall provide to the Escrow Agent written instructions (the "Third Closing Instructions", together with the Second Closing Instructions, the "Release Instructions") (with a copy to the Stockholders' Representatives) setting forth a statement to the effect that JCI has made all payments required by it under the Purchase Agreement with respect to the remaining Escrowed Shares.

(c)    Upon his receipt of the Second Closing Instructions, the Escrow Agent will release from escrow and deliver to JCI certificates representing the Escrowed Shares to be released as indicated in the Release Instructions. Upon his receipt of the Third Closing Instructions, the Escrow Agent will release from escrow and deliver to JCI certificates representing the remaining Escrowed Shares. Such Escrowed Shares will be released on or before the fifth (5th) Business Day following the date on which the Release Instructions are received by the Escrow Agent. If the Second Closing Instructions indicate that JCI is not going to purchase any Escrowed Shares in accordance with the Purchase Agreement, then the Escrow Agent will continue to hold such Escrowed Shares in accordance with the terms of this Agreement.

9113893.6

(d)    Whenever the Escrow Agent receives joint written instructions executed by JCI and the Stockholders' Representatives ("Joint Written Instructions"), he will, within five (5) Business Days of his receipt of the Joint Written Instructions, act in accordance with the Joint Written Instructions.

(e)    If, for any reason, the Purchase Agreement and the transactions contemplated thereby are terminated prior to the Third Closing, this Agreement shall terminate automatically and the Escrow Agent shall deliver the remaining Escrowed Shares to the Stockholders in accordance with Schedule 5(i).

(f)    Upon the earlier of: (i) the Escrow Agent's receipt of the Third Closing Instructions; or (ii) the termination of this Agreement pursuant to Section 3(e), the Escrow Agent will release the remaining Escrowed Shares in accordance with the Third Closing Instructions or Section 3(e), as applicable (the "Final Disbursement").

4.    **Provisions Relating to the Escrow Agent.**

(a)    Escrow Agent Expenses.    Payments of all reasonable, out-of-pocket expenses of the Escrow Agent, if any, will be the responsibility of JCI and the Stockholders' Representatives, jointly and severally (with JCI paying one-half and the Stockholders' Representatives paying one-half).    In the event that: (i) the Escrow Agent is made a party to litigation with respect to the Escrowed Shares held under this Agreement; (ii) the Escrow Agent brings an action in interpleader; or (iii) there is any assignment of the interest of this escrow or any modification of the escrow, then the Escrow Agent will be entitled to reimbursement by JCI and the Stockholders' Representatives, jointly and severally (with JCI paying one-half and the Stockholders' Representatives paying one-half), for all reasonable fees, costs, liabilities and expenses, including reasonable attorneys' fees, incurred by the Escrow Agent as a result of these conditions.

(b)    Limitation of the Escrow Agent's Duties.

(i)    This Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent to this Agreement and no implied duties or obligations will be read into this Agreement against the Escrow Agent.

(ii)    This Agreement shall remain in effect until such time as the Final Disbursement has been completed.

(c)    Authority to Act.

(i)    The Escrow Agent is hereby authorized and directed by JCI and the Stockholders' Representatives to deliver the various certificates representing the Escrowed Shares only in accordance with Section 3 of this Agreement.

(ii)    The Escrow Agent will be protected in acting upon any written notice, request, waiver, consent, certificate, receipt, authorization, power-of-attorney or other document or instrument which the Escrow Agent in good faith believes to be genuine and what it purports to be.

3

(iii)     In the event of any disagreement between any of the parties to this Agreement, or between any of them and any other person, resulting in adverse claims, conflicting instructions or demands being made in connection with the matters covered by this Agreement, or in the event that the Escrow Agent, in good faith, is in doubt as to what action he should take under this Agreement, the Escrow Agent may, at his option, refuse to comply with any claims or demands on him, or refuse to take any other action as long as the disagreement continues or the doubt exists. In any such event, the Escrow Agent will not be or become liable in any way or to any person for his failure or refusal to act, and the Escrow Agent will be entitled to refrain from acting until the earlier to occur of: (A) the rights of all interested parties have been fully and finally adjudicated as provided for in the Purchase Agreement; or (B) all differences have been adjudged and all doubt resolved by agreement among all of the interested persons, and the Escrow Agent has been so notified in writing signed by JCI and the Stockholders' Representatives. It is understood and agreed that in the event the Escrow Agent is confronted with conflicting demands with respect to the Escrowed Shares and he determines in his reasonable discretion that he risks incurring liability should take any action, the Escrow Agent may file an action of interpleader in any court of competent jurisdiction and deposit the Escrowed Shares with such court.

(iv)     The Escrow Agent will have the right, but not the obligation, to consult with counsel of choice (whether such counsel shall be regularly retained or specifically employed) and shall not be liable for action taken or omitted to be taken by the Escrow Agent in accordance with the advice of such counsel, provided that the Escrow Agent has disclosed all material facts, agreements and other items to such counsel in connection with such consultation.

(v)     The Escrow Agent will, on a joint and several basis, be indemnified and held harmless by each of JCI and the Stockholders' Representatives, jointly and severally, from costs or liability it may incur by virtue of acting as the Escrow Agent hereunder (including, without limitation, reasonable attorneys' fees and litigation expenses), except such costs or liability he may incur as a result of his own gross negligence, bad faith or willful misconduct. The foregoing indemnities in this paragraph shall survive the resignation or substitution of the Escrow Agent or the termination of this Agreement.

(d)     <u>Miscellaneous</u>.

(i)     In the event the Escrow Agent dies or becomes disabled prior to the satisfaction of his obligations hereunder, the parties hereto (other than the Escrow Agent) shall mutually agree to either: (A) have the Escrowed Shares transferred to a court of competent jurisdiction with a request to have a successor appointed; or (B) without transferring all funds and assets, petition a court of competent jurisdiction to have a successor appointed. Upon the earlier of: (A) the transfer of the Escrowed Shares to a court of competent jurisdiction with a request to have a successor appointed or (B) the appointment of a successor (and the acceptance of such appointment by such successor) for the Escrow Agent, the Escrow Agent's obligations and responsibilities under this Agreement will cease. Similarly, JCI and the Stockholders' Representatives may also jointly terminate the Escrow Agent and appoint a successor for the Escrow Agent by providing fifteen (15) days written notice to the Escrow Agent.

4

(ii)    This Agreement is binding upon the assigns, successors, personal representatives and heirs of the parties to this Agreement, and will be effective as of the date this Agreement is executed by all of the parties to this Agreement.

5.    **General Provisions.**

(a)    Upon the proper disbursement of the Escrowed Shares in accordance with the terms and conditions of this Agreement, the Escrow Agent will be discharged from any further obligation under this Agreement.

(b)    Any of the undersigned may act under this Agreement through an agent or attorney-in-fact, provided satisfactory written evidence of authority is first furnished to any party relying on such authority.

(c)    All notices, claims, certificates, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or if sent by nationally-recognized overnight courier, by telecopy, or by registered or certified mail, return receipt requested and postage prepaid, addressed as follows:

if to the Escrow Agent or the Stockholders' Representatives:

Arxceo Corporation
1525 Perimeter Parkway, Suite 225
Huntsville, Alabama  35806
Telephone: (256) 837-8388 x110
Fax: (256) 837-2888
Attention: Donald J. Davidson

with a copy (which shall not constitute notice) to:

Bradley Arant Rose & White LLP
200 Clinton Avenue West, Suite 900
Huntsville, Alabama 35801-4900
Telephone:  (256) 517-5146
Fax:  (256) 517-5246
Attention:  S. Revelle Gwyn, Esq.

if to JCI:

Japan Communications, Inc.
6-25-3 Minami Oi
Shinagawa-ku
Tokyo 140-0013 JAPAN
Telephone: 011-81-3-5767-9101
Fax: 011-81-3-5767-9123
Attention:  Frank Seiji Sanda

with a copy (which shall not constitute notice) to:

5

Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Fax:  404-815-6555
Telephone:  404-815-6500
Attention:  Steven L. Berson

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith.  Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery if a business day or, if not a business day, the next succeeding business day, (ii) in the case of internationally-recognized overnight courier, on the second business day after the date when sent, (iii) in the case of fax transmission, when received if a business day or, if not a business day, the next succeeding business day, and (iii) in the case of mailing, on the seventh business day following that on which the piece of mail containing such communication is posted.

(d)    This Agreement will be governed and construed in accordance with the laws of the State of Delaware, without regard to any applicable principles of conflicts of law, and will inure to and be binding upon the parties to this Agreement and their respective successors, heirs and assigns.

(e)    Words used in the singular number may include the plural and the plural may include the singular.  The section headings appearing in this instrument have been inserted for convenience only and have no substantive meaning or significance whatsoever in construing the terms and conditions of this Agreement.

(f)    The terms of this Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all of the parties to this Agreement.

(g)    This Agreement may be executed in counterparts, all of which together will constitute one and the same instrument; provided this Agreement will not be binding upon the parties unless and until all parties to this Agreement have executed and delivered this Agreement.

(h)    The parties agree that signatures transmitted and received via facsimile shall be treated for all purposes of this Agreement as original signatures and shall be deemed valid, binding and enforceable by and against all parties.

(i)    Attached hereto as Schedule 5(i) is a list of the Stockholders including their names, addresses and Escrowed Shares.  Upon notice to JCI and the Escrow Agent by the Stockholders' Representatives, this Schedule may be updated from time-to-time (and shall be updated in connection with any increase in Escrowed Shares pursuant to Section 2(a)(iii)).

*[Signature Page Follows]*

6

9113893.6

**IN WITNESS WHEREOF**, the undersigned have executed this Escrow Agreement to be effective as of the date first set forth above.

**JCI:**

JAPAN COMMUNICATIONS, INC.

By:_____
    Frank Seiji Sanda
    President and Chief Executive Officer


**THE STOCKHOLDERS'
REPRESENTATIVES:**


_____

Donald J. Davidson


_____

David Izatt


**THE ESCROW AGENT:**


_____

Donald J. Davidson


[SIGNATURE PAGE TO ESCROW AGREEMENT]

# SCHEDULES

# ARXCEO CORPORATION
## Schedules to Securities Purchase Agreement

### Dated as of February 28, 2006

### <u>SCHEDULE 3(d)</u>

Ownership of Company Stock

| Name | Common Shares |
|------|---------------|
| 1.  Donald J. Davidson | 270,000 |
| 2.  RNR  Ventures, L.L.C. | 220,000 |
| 3.  Angus Adair Wolfgang, Inc. | 450,000 |
| 4.  J. Chandler Hall | 60,000 |
| Total | 1,000,000 |

| Name | Series A Preferred Shares |
|------|---------------------------|
| 1.  Jean T. Moore and Margaret T. Moore (JTWROS) | 37,037 |
| 2.  John Jurenko | 37,037 |
| 3.  Lioce Investments, LLC | 37,037 |
| 4.  William Scott McCary | 18,518 |
| 5.  William McCary and Billie Joe McCary (JTWROS) | 18,519 |
| 6.  HRC, LLC | 37,037 |
| 7.  David S. Butler | 18,519 |
| 8.  Bryan W. Butler and Jacalyn A. Butler (JTWROS) | 18,518 |
| 9.  DB Securities, Inc. (Tax I.D. No. 502208880) as Custodian F/B/O IRA FBO David J. Slyman, Jr. IRA | 18,519 |
| 10. National Investor Services Corp. FBO: Dawn Darnell Shelton Account No. 385-97378-13 | 18,519 |
| 11. Shatas Partners, Ltd. | 22,222 |
| 12. Todd J. Slyman | 18,518 |
| Total | 300,000 |

| Name | Series B Preferred Shares |
|------|--------------------------|
| 1. Heide Williams | 9,375 |
| 2. David Nicolas and Mark Nicolas (JTWROS) | 7,813 |
| 3. James V. Balch | 15,625 |
| 4. Alan L. Nordlinger | 31,250 |
| 5. Forrest R. Hairston, Sr. | 4,000 |
| 6. Dixie D. Wolf | 10,000 |
| 7. Michael W. Solley | 15,625 |
| 8. Samuel P. McManus | 8,000 |
| 9. Steven D. Marz | 8,000 |
| 10. Anthony A. Gann | 30,000 |
| 11. Gregory J. Clayton | 9,375 |
| 12. J. Jeffrey Irons and Vicki C. Irons (JTWROS) | 1,600 |
| 13. City Light Capital, LLC | 78,125 |
| 14. Louis K. Sisco, Jr. | 7,850 |
| 15. Gregory K. Gum | 10,000 |
| 16. E. Wayne Bonner | 10,000 |
| 17. Thomas M. Griggs and Dale B. Griggs (JTWROS) | 15,625 |
| 18. Brindlee Capital, LLC | 31,250 |
| 19. Webber Investments, LLC | 8,000 |
| 20. Franklin Street Investments, LLC | 18,750 |
| 21. John R. Coleman and Donna C. Coleman (JTWROS) | 1,600 |
| 22. Charles T. Houser | 7,850 |
| 23. Prasada R. Kakani and Bhavani K.D. Kakani (JTWROS) | 7,850 |
| 24. Robert E. Thurber and Eleanor B. Thurber (JTWROS) | 15,625 |
| 25. Lioce Investments, LLC | 1,000 |
| 26. Todd J. Slyman | 4,812 |
| 27. David J. Slyman, Jr. | 1,000 |
| 28. Shatas Partners, Ltd. | 1,000 |
| Total | 371,000 |

## SCHEDULE 4(a)(i)

Articles of Incorporation

See Articles of Incorporation of Arxceo Corporation, attached hereto.

## CERTIFICATE OF AMENDMENT
## OF
## CERTIFICATE OF INCORPORATION
## OF
## ARXCEO CORPORATION

In accordance with the provisions of Sections 103 and 242 of the General Corporation Law of the State of Delaware, Arxceo Corporation, a corporation organized and existing under the laws of the State of Delaware, does hereby certify as follows:

**FIRST**: That the name of the Corporation is "Arxceo Corporation" and that the Corporation was originally incorporated on December 10, 2003, pursuant to the General Corporation Law.

**SECOND**:      That the Corporation filed a First Amended and Restated Certificate of Incorporation on February 2, 2004 (the "Certificate of Incorporation").

**THIRD**:      That the Certificate of Incorporation of the Corporation, as heretofore filed, shall, upon the filing and recording of this Certificate of Amendment, be further amended by amending Section D.2 of Article 4 thereof to read in its entirety as follows:

"2.     Liquidation Rights.     Upon a Liquidation Event of the Corporation, the holders of Common Stock then outstanding shall be entitled to receive the remaining assets of the Corporation available for distribution to its stockholders after payment of all preferential amounts required to be paid to any class or series of stock of the Corporation ranking in liquidation senior to or on parity with the Common Stock."

**FOURTH**:      Except as otherwise set forth above, all other provisions of the Corporation's Certificate of Incorporation shall remain as set forth in the Certificate of Incorporation.

**FIFTH**:      That such amendment has been duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, said Arxceo Corporation, a Delaware corporation, has caused this certificate to be signed by Donald J. Davidson, its President, as of the 18th day of October, 2004.

ARXCEO CORPORATION

By: _____

Donald J. Davidson
Its President

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 03:35 PM 02/02/2004*
*FILED 03:35 PM 02/02/2004*
*SRV 040071763 – 3728914 FILE*

# FIRST AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION

### OF

### ARXCEO CORPORATION

Arxceo Corporation (the "Corporation"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "General Corporation Law"), does hereby certify:

**FIRST:** That the name of the Corporation is Arxceo Corporation and that the Corporation was originally incorporated on December 10, 2003, pursuant to the General Corporation Law.

**SECOND:** That this First Amended and Restated Certificate of Incorporation restates and further amends the Certificate of Incorporation of the Corporation and has been adopted and approved in accordance with Sections 242 and 245 of the General Corporation Law. Stockholder approval of this First Amended and Restated Certificate of Incorporation was given by written consent of the stockholders of the Corporation in accordance with Section 228 of the General Corporation Law.

**THIRD:** That the text of the First Amended and Restated Certificate of Incorporation of the Corporation (hereinafter referred to as the "Certificate of Incorporation") is as follows:

"1.     The name of the Corporation is Arxceo Corporation.

2.     The address of its registered office in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3.     The purpose for which the Corporation is organized is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, including, without limitation, to develop, utilize, and market software (including, but not limited to, so-called firewall software) and any and all activities incident thereto.

4.     The total number of shares of all classes of stock which the Corporation shall have authority to issue is 7,000,000 shares, of which 2,000,000 shares, par value of $0.0001 per share, are to be preferred stock (hereinafter called "Preferred Stock"), and 5,000,000 shares, par value of $0.0001 per share, are to be common stock (hereinafter called "Common Stock"). The Common stock shall be subject to the prior rights of the holders of Preferred Stock. Of the

3/161485.3

2,000,000 shares of Preferred Stock, 300,000 shares shall be designated Series A Preferred Stock (the "Series A Preferred").

    A.    The Preferred Stock may be issued in such one or more series as shall from time to time be created and authorized to be issued by approval of the board of directors as hereinafter provided.

    The board of directors is hereby expressly authorized, by resolution or resolutions from time to time adopted providing for the issuance of Preferred Stock, to fix and state, to the extent not fixed by the provisions hereinafter set forth, the designations, voting powers, if any, preferences and relative, participating, optional and other special rights of the shares of each series of Preferred Stock, and the qualifications, limitations and restrictions thereof, including (but without limiting the generality of the foregoing) any of the following with respect to which the board of directors may make specific provisions:

    (1)    the distinctive name and any serial designations;

    (2)    the annual dividend rate or rates and the dividend payment dates;

    (3)    with respect to the declaration and payment of dividends upon each series of the Preferred Stock, whether such dividends are to be cumulative or noncumulative, preferred, subordinate or equal to dividends declared and paid upon other series of the Preferred Stock or upon any other shares of stock of the Corporation, and the participating or other special rights, if any, of such dividends;

    (4)    the redemption provisions, if any, with respect to any series, and if any series is subject to redemption, the manner and time of redemption and the redemption price or prices;

    (5)    the amount or amounts of preferential or other payment to which any series of Preferred Stock is entitled over any other series of Preferred Stock or over the Common Stock on voluntary or involuntary liquidation, dissolution or winding-up;

    (6)    any sinking fund or other retirement provisions and the extent to which the charges therefore are to have priority over the payment of dividends on or the making of sinking fund or other like retirement provisions for shares of any other series of Preferred Stock or for shares of the Common Stock;

    (7)    any conversion, exchange, purchase or other privileges to acquire shares of any other series of Preferred Stock or of the Common Stock;

    (8)    the number of shares of such series; and

    (9)    the voting rights, if any, of such series.

Each share of each series of Preferred Stock shall have the same relative rights and be identical in all respects with all the other shares of the same series.

Before the Corporation shall issue any shares of Preferred Stock of any series authorized as hereinbefore provided, a certificate setting forth a copy of the resolution or resolutions with respect to such series adopted by the board of directors of the Corporation pursuant to the foregoing authority vested in said board shall be made, filed and recorded in accordance with the then applicable requirements, if any, of the laws of the State of Delaware, or, if no certificate is then so required, such certificate shall be signed and acknowledged on behalf of the Corporation by its chairman of the board, president or a vice president and its corporate seal shall be affixed thereto and attested by its secretary or an assistant secretary and such certificate shall be filed and kept on file at the principal office of the Corporation in the State of Delaware and in such other place or places as the board of directors shall designate.

Shares of any series of Preferred Stock which shall be issued and thereafter acquired by the Corporation through purchase, redemption, conversion or otherwise, as, may be provided by resolution or resolutions of the board of directors and upon compliance with applicable law, be returned to the status of authorized but unissued Preferred Stock, undesignated as to series, or to the status of authorized but unissued Preferred Stock of the same series.

Unless otherwise provided in the resolution or resolutions of the board of directors providing for the issue thereof, the number of authorized shares of stock of any such series may be increased or decreased (but not below the number of shares thereof then outstanding) by resolution or resolutions of the board of directors, and the filing and recording of a certificate, setting forth that such increase or decrease has been authorized by the board of directors, in accordance with applicable law. In case the number of shares of any such series of Preferred Stock shall be decreased in accordance with the last sentence, the shares representing such decrease shall, unless otherwise provided in the resolution or resolutions of the board of directors providing for the issuance thereof, resume the status of authorized but unissued Preferred Stock, undesignated as to series.

B.    The authority of the board of directors to provide for the issuance of any shares of the Corporation's stock shall include, but shall not be limited to, authority to issue shares of stock of the Corporation for any purpose and in any manner (including issuance pursuant to rights, warrants, or other options) permitted by law, for delivery as all or part of the consideration for or in connection with the acquisition of all or part of the stock of another Corporation or of all or part of the assets of another Corporation or enterprise, irrespective of the amount by which the issuance of such stock shall increase the number of shares outstanding (but not in excess of the number of shares authorized).

C.    Rights, Preferences and Restrictions of Series A Preferred Stock. The following powers, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, of the Series A Preferred Stock of the Corporation are fixed as follows:

3

1.    <u>Dividends</u>.  In the event the Board of Directors shall declare a dividend payable upon the outstanding shares of Common Stock out of funds of the Corporation legally available therefor, the Board of Directors shall at the same time declare a dividend payable on each share of Series A Preferred Stock equal to the amount of the dividend payable on the number of shares of Common Stock into which each such share of Series A Preferred stock could then be converted into pursuant to the provisions of **Section C.4** below, such number to be determined as of the record date for the determination of holders of Common Stock entitled to receive such dividends.

2.    <u>Liquidation Preference</u>.

(a)    <u>Preferential Amounts</u>.  In the event of any liquidation, dissolution or winding up of the Corporation (a "Liquidation Event"), either voluntarily or involuntarily, the holders of the Series A Preferred shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of Common Stock, an amount equal to $1.35 per share (as adjusted for any stock dividends, combinations, recapitalizations, splits or otherwise) for each share of Series A Preferred then so held, plus a further amount equal to all declared but unpaid dividends, if any, on such shares (the "Series A Liquidation Preference").  All of the preferential amounts to be paid to the holders of the Series A Preferred under this **Section C.2** shall be paid or set apart for payment before the payment or setting apart for payment of any amount for, or the distribution of any assets or funds of the Corporation to, the holders of Common Stock in connection with such Liquidation Event.

(b)    <u>Insufficient Assets</u>.  If, upon a Liquidation Event, the assets and funds of the Corporation are insufficient to provide for the payment of the full amount of the Series A Liquidation Preference to the holders of the Series A Preferred, such assets and funds as are available shall be distributed ratably among the holders of the Series A Preferred in proportion to the full preferential amount each such holder is otherwise entitled to receive.

(c)    <u>Non-Participation</u>.  After the payment or the setting apart of payment of the Series A Liquidation Preference, the holders of the Common Stock shall be entitled to receive all remaining assets and funds of the Corporation ratably on a per-share basis.

(d)    <u>Deemed Liquidation</u>.  A sale of all or substantially all of the assets of the Corporation, or a merger, acquisition or similar transaction which results in the Corporation's stockholders immediately prior to such transaction holding less than a majority of the voting power of the surviving, continuing or purchasing entity shall be deemed to be a Liquidation Event within the meaning of this **Section C.2**.

(e)    <u>Non-cash Distribution</u>.  If any of the assets of the Corporation are to be distributed other than in cash under this **Section C.2**, then the board of directors of the Corporation shall promptly engage an independent appraiser to determine the value of the assets to be distributed, if any, to the holders of the Series A Preferred and Common Stock, as the case may be.  The Corporation shall, upon receipt of such appraiser's valuation, give prompt written notice to each holder of Series A Preferred and Common Stock, as appropriate, of the appraiser's

4

valuation. Notwithstanding the above, any securities to be distributed to the stockholders shall be valued as follows:

(i)    If traded on a securities exchange or through the Nasdaq National Market, the value shall be deemed to be the average of the closing prices of the securities on such exchange or quotation system for the thirty (30) calendar day period ending three (3) business days immediately prior to the closing of the transaction;

(ii)    If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid prices over the thirty (30) calendar day period ending three (3) business days immediately prior to the closing of the transaction; and

(iii)    If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the majority approval of the board of directors of the Corporation then in office.

(f)    <u>Notice of Liquidation Event</u>. The Corporation shall provide the holders of Series A Preferred with at least ten (10) days prior written notice of a proposed Liquidation Event, unless waived in writing by the holders of the Series A Preferred.

3.    <u>Voting Rights</u>. Except as set forth herein or as otherwise required by law, on all matters that may be submitted to the holders of Series A Preferred, the holder of each share of Series A Preferred shall be entitled to that number of votes allotted by law and the Certificate of Incorporation which is equal to the number of shares of Common Stock into which such share of Series A Preferred could be converted on the record date for determination of the stockholders entitled to vote on such matters, or, if no such record date is established, on the date such vote is taken or any written consent of stockholders is solicited, such votes to be counted together with all other shares of capital stock of the Corporation having general voting power and not counted separately as a class, except as set forth in the Certificate of Incorporation or as otherwise required by law. Holders of Series A Preferred shall be entitled to notice of any stockholders' meeting which notice shall be given in accordance with the Bylaws of the Corporation.

4.    <u>Conversion.</u> The holders of the Series A Preferred shall have conversion rights as follows (the "Conversion Rights"):

(a)    <u>Right to Convert</u>. Each share of Series A Preferred shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Series A Preferred, into such number of fully paid and nonassessable shares of Common Stock as is determined by dividing $1.00 by the Conversion Price in effect at the time of the conversion (the "Conversion Rate"). The "Conversion Price" of each share of the Series A Preferred shall initially be $1.00 and shall be subject to adjustment as provided in this <u>Section C.4</u>.

(b)    <u>Automatic Conversion</u>. Each share of Series A Preferred shall automatically be converted into shares of Common Stock at the then effective applicable

Conversion Rate upon the earlier to occur of (i) immediately prior to the closing of a firm commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the offer and sale of securities for the account of the Corporation to the public at a price per share equating to not less than a $75 million valuation for the equity of the Corporation with aggregate cash proceeds to the Corporation of at least $25 million, (ii) the election of holders of at least a majority of the then outstanding shares of Series A Preferred to convert their respective such shares into Common Stock, or (iii) such time as there are less than 5,000 shares of Series A Preferred or 5,000 shares of Common Stock outstanding (as adjusted for stock dividends, combinations, recapitalizations, splits or otherwise).

(c)     <u>Mechanics of Conversion</u>.  No fractional shares of Common Stock shall be issued upon conversion of Series A Preferred.  In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then effective Conversion Price.  Before any holder of Series A Preferred shall be entitled to convert the same into full shares of Common Stock and to receive certificates therefor, such holder shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for the Series A Preferred, as appropriate, and shall give written notice to the Corporation at such office that it elects to convert the same.  The Corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Series A Preferred, a certificate or certificates for the number of shares of Common Stock to which it shall be entitled as aforesaid and a check payable to the holder in the amount of any cash amounts payable as the result of a conversion into fractional shares of Common Stock.  Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Series A Preferred, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(d)     <u>Reservation of Stock Issuable upon Conversion</u>.  The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of the Series A Preferred such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series A Preferred; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred, in addition to such other remedies as shall be available to the holder of such Series A Preferred, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purposes.

(e)     Adjustments to Conversion Price.

(i)     <u>Adjustments · for Stock Dividends, Subdivisions, Combinations or Consolidations of Common Stock</u>.  In the event the outstanding shares of Common Stock shall be subdivided (by stock dividends, splits, or otherwise), into a greater number of shares of Common Stock, the Conversion Price then in effect shall, concurrently with the effectiveness of such subdivision, be proportionately decreased.  In the event the outstanding

shares of Common Stock shall be combined or consolidated, by reclassification or otherwise, into a lesser number of shares of Common Stock, the Conversion Price then in effect shall, concurrently with the effectiveness of such combination or consolidation, be proportionately increased.

(ii)    <u>Adjustments for Other Distributions</u>.   In the event the Corporation at any time or from time to time makes, or fixes a record date for the determination of holders of Common Stock entitled to receive any distribution payable in securities or assets of the Corporation other than shares of Common Stock, in each such event provision shall be made so that the holders of Series A Preferred shall receive upon conversion thereof, in addition to the number of shares of Common Stock receivable thereupon, the amount of securities or assets of the Corporation which they would have received had their Series A Preferred been converted into Common Stock on the date of such event and had they thereafter, during the period from the date of such event to and including the date of conversion, retained such securities or assets receivable by them as aforesaid during such period, subject to all other adjustments called for during such period under this <u>Section C. 4</u> with respect to the rights of the holders of the Series A Preferred.

(iii)   <u>Adjustments for Reclassification, Exchange and Substitution</u>.   If the Common Stock issuable upon conversion of the Series A Preferred shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for in <u>Section C.4(e)(f)</u> hereof), then and in each such event the holder of each share of Series A Preferred shall have the right thereafter to convert such share into the kind and amount of shares of stock and other securities and property receivable upon such reorganization or reclassification or other change by holders of the number of shares of Common Stock that would have been subject to receipt by the holders upon conversion of the Series A Preferred immediately before that change, all subject to further adjustment as provided in the Certificate of Incorporation.

(iv)    <u>No Impairment</u>.   Without the prior written consent of the holders of at least a majority of the outstanding shares of Series A Preferred, the Corporation will not, by amendment of the Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities, or any other voluntary action avoid or seek to avoid the observance or performance of any of the terms to be observed or performed under this <u>Section C.4</u> by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of <u>Section C.4</u> and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Series A Preferred against impairment.

(v)    <u>Certificate as to Adjustments</u>.   Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to <u>Section C.4</u>, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Series A Preferred a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, upon the written request at any time of any holder

of Series A Preferred, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect, and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Series A Preferred.

      D.    <u>Common Stock</u>.

      1.    <u>Dividend Rights</u>. Subject to the provisions of **Section C.1.** of this **Article 4**, the holders of the Common Stock shall be entitled to receive, out of any funds of the Corporation legally available therefor, such dividends as may be declared from time to time by the board of directors of the Corporation for the benefit of the holders of the Common Stock.

      2.    <u>Liquidation Rights</u>. Upon a Liquidation Event of the Corporation, the holders of Common Stock shall be entitled to receive the assets and funds of the Corporation as provided in **Section C.2** of this **Article 4**.

      3.    <u>Conversion Rights</u>. Holders of Common Stock do not have any conversion rights and Common Stock is not subject to conversion.

      4.    <u>Redemption</u>. The holders of Common Stock do not have any redemption rights.

      5.    <u>Voting Rights</u>. The holders of Common Stock of the Corporation shall be entitled to one (1) vote per share of Common Stock on all matters that may be submitted to holders of Common Stock of the Corporation, and shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Corporation.

      E.    Unless otherwise provided in the resolution or resolutions of the board of directors providing for the issue of one or more series of Preferred Stock as shall from time to time be created and authorized to be issued by approval of the board of directors, no holder of any share or shares of any class of stock of the Corporation shall have any pre-emptive right to subscribe for any shares of stock of any class of the Corporation now or hereafter authorized or for any securities convertible into or carrying any optional rights to purchase or subscribe for any shares of stock of any class of the Corporation now or hereafter authorized; **provided**, **however**, that no provision of the Certificate of Incorporation shall be deemed to deny to the board of directors the right, in its discretion, to grant to the holders of shares of any class of stock at the time outstanding the right to purchase or subscribe for shares of stock of any class or any other securities of the Corporation now or hereafter authorized, in all events at such prices and upon such other terms and conditions as the board of directors, in its discretion, may fix from time to time.

8

5.     The names and mailing addresses of the incorporators are as follows:

| NAME | MAILING ADDRESS |
|------|------|
| Donald J. Davidson | 1525 Perimeter Parkway, Suite 225<br>Huntsville, Alabama 35806 |
| RNR Ventures, L.L.C. | 1525 Perimeter Parkway, Suite 225<br>Huntsville, Alabama 35806 |

6.     The names and mailing addresses of the persons who are to serve as the initial directors until the first annual meeting of the stockholders or until their successors are elected and qualified are as follows:

| NAME | MAILING ADDRESS |
|------|------|
| Donald J. Davidson | 1525 Perimeter Parkway, Suite 225<br>Huntsville, Alabama 35806 |
| Charles F. Lofty | 1525 Perimeter Parkway, Suite 225<br>Huntsville, Alabama 35806 |
| Samuel P. McManus | 8 Dalonigei Court<br>Brevard, North Carolina 28712 |
| Richmond A. Wolf | 700 South Lake Ave., Unit 210<br>Pasadena, California 91106 |

7.     The board of directors is empowered to make, alter or repeal the by-laws of the Corporation.

8.     Whenever a compromise or arrangement is proposed between the Corporation and its creditors or any class of them and/or between the Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of the Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for the Corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for the Corporation under the provisions of Section 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, to be summoned in such manner as such court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of the Corporation as consequence

of such compromise or arrangement, the said compromise or arrangement and such reorganization shall, if sanctioned by the court to which such application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of the Corporation, as the case may be, and also on the Corporation.

9.    The election of directors need not be conducted by written ballot.

10.    The Corporation reserves the right to amend, alter, change or repeal any provision contained in the Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

11.    A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, as the same exists or may be hereafter amended, or (iv) for any transaction from which the director derived an improper personal benefit. If the General Corporation Law of the State of Delaware is hereafter amended to authorize the further elimination or limitation of the liability of directors, then the liability of a director of the Corporation, in addition to the limitation on personal liability provided herein, shall be limited to the full extent permitted by the General Corporation Law of the State of Delaware, as amended. Any repeal or modification of this **Section 11** by the stockholders of the Corporation shall be prospective only and shall not adversely affect any limitation on the personal liability of a director of the Corporation existing at the time of such repeal or modification.

12.    The Corporation may indemnify, and in connection with such indemnification may advance expenses to, any person who is or was a director or officer of the Corporation, to the fullest extent permitted by law, including without limitation the General Corporation Law of the State of Delaware. If the amount, extent, or quality of indemnification permitted by law should be in any way restricted after the adoption of this **Section 12** of the Certificate of Incorporation, then the Corporation may indemnify such persons to the fullest extent permitted by law as in effect at the time of the occurrence of the omission or the act giving rise to the claimed liability with respect to which indemnification is sought. The indemnification and advancement of expenses pursuant to the section of the Certificate of Incorporation shall be in addition to, and not exclusive of, any other right that the person seeking indemnification may have under the Certificate of Incorporation, the by-laws, any separate contract or agreement or applicable law."

[SIGNATURE ON NEXT PAGE]

10

IN WITNESS WHEREOF, the undersigned has executed this First Amended and Restated Certificate of Incorporation on _____January 9_____, 2004.

ARXCEO CORPORATION

By: _____

Donald J. Davidson

As Its:   President

11

3/161485.3

## <u>SCHEDULE 4(a)(ii)</u>

Bylaws

See Bylaws of Arxceo Corporation, attached hereto.

# B Y - L A W S

## OF

## ARXCEO CORPORATION

### A Delaware Corporation

## TABLE OF CONTENTS

**ARTICLE I - OFFICES** ............................................................................................ 1
    Section 1.    **Registered Office** ................................................................ 1
    Section 2.    **Additional Offices** .............................................................. 1
**ARTICLE II - MEETING OF STOCKHOLDERS** ................................................ 1
    Section 1.    **Place of Meeting** ................................................................ 1
    Section 2.    **Annual Meetings** ................................................................ 1
    Section 3.    **Notice of Annual Meetings** ............................................... 1
    Section 4.    **List of Stockholders** ......................................................... 2
    Section 5.    **Special Meetings** ............................................................... 2
    Section 6.    **Notice of Special Meetings** ............................................... 2
    Section 7.    **Business at Special Meetings** ............................................ 2
    Section 8.    **Quorum** ............................................................................. 2
    Section 9.    **Voting** ................................................................................ 2
    Section 10.    **Proxies** ............................................................................. 3
    Section 11.    **Action by Consent** ............................................................ 3
**ARTICLE III - DIRECTORS** .................................................................................. 3
    Section 1.    **Number and Term** ............................................................. 3
    Section 2.    **Vacancies; Removal** .......................................................... 4
    Section 3.    **Powers** .............................................................................. 4
    Section 4.    **Place of Meetings** ............................................................. 4
    Section 5.    **Annual Meetings** ............................................................... 4
    Section 6.    **Regular Meetings** ............................................................. 4
    Section 7.    **Special Meetings** ............................................................... 4
    Section 8.    **Quorum; Telephone Meetings** ......................................... 5
    Section 9.    **Action by Consent** ............................................................ 5
    Section 10.    **Committees** ...................................................................... 5
    Section 11.    **Minutes of Committees** ................................................... 6
    Section 13.    **Conflict of Interest** ......................................................... 6
    Section 1.    **Notice to Stockholders** ..................................................... 7
    Section 2.    **Notice to Directors** ........................................................... 7
    Section 3.    **Waiver of Notice** .............................................................. 8
**ARTICLE V - OFFICERS** ...................................................................................... 8
    Section 1.    **Officers** ............................................................................ 8
    Section 2.    **Additional Officers** .......................................................... 8
    Section 3.    **Compensation** .................................................................. 8
    Section 4.    **Term of Office; Removal; Vacancies** ............................... 8
    Section 5.    **Duties of Officers** ............................................................. 9
    (a)    **President and Chief Executive Officer** ............................ 9
    (b)    **Chairman of the Board** .................................................... 9
    (c)    **Vice Presidents** ............................................................... 9

(d)　　<u>Secretary</u> ............................................................................................................ 9
(e)　　<u>Assistant Secretaries</u> ..................................................................................... 9
(f)　　<u>Vice President, Chief Financial Officer and Treasurer</u> .......................... 10
(g)　　<u>Assistant Treasurers</u> ..................................................................................... 10
**ARTICLE VI - CERTIFICATES OF STOCK** ............................................................... 10
Section 1.　　<u>Certificates</u> ....................................................................................... 10
Section 2.　　<u>Signatures</u> ........................................................................................ 11
Section 3.　　<u>Lost, Stolen or Destroyed Certificates</u> .......................................... 11
Section 4.　　<u>Transfer of Stock</u> ............................................................................ 11
Section 5.　　<u>Record Date</u> .................................................................................... 11
Section 6.　　<u>Registered Stockholders</u> ................................................................ 12
**ARTICLE VII - INDEMNIFICATION** .......................................................................... 13
Section 1. <u>Indemnification</u> .................................................................................... 13
Section 2. <u>Insurance</u> ............................................................................................... 13
Section 3. <u>Survival of Right</u> .................................................................................. 13
**ARTICLE VIII - GENERAL PROVISIONS** ................................................................. 13
Section 1.　　<u>Dividends</u> ........................................................................................ 13
Section 2.　　<u>Reserves</u> .......................................................................................... 13
Section 3.　　<u>Annual Statement</u> ........................................................................... 14
Section 4.　　<u>Checks</u> .............................................................................................. 14
Section 5.　　<u>Fiscal Year</u> ....................................................................................... 14
Section 7.　　<u>Contracts</u> .......................................................................................... 14
Section 8.　　<u>Voting of Corporation's Securities</u> ............................................... 14
**ARTICLE VIII - AMENDMENT OF BY-LAWS** .......................................................... 15
Section 1.　　<u>Procedure</u> ........................................................................................ 15

# BY-LAWS OF

# ARXCEO CORPORATION

## A Delaware Corporation

## ARTICLE I

## OFFICES

**Section 1.**    **Registered Office**.  The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

**Section 2.**    **Additional Offices**.  The corporation may also have offices at such other places both within and without the State of Delaware as the board of directors may from time to time determine or the business of the corporation may require.

## ARTICLE II

## MEETINGS OF STOCKHOLDERS

**Section 1.**    **Place of Meeting**.   All meetings of the stockholders for the election of directors shall be held in the City of Huntsville, State of Alabama, at such place as may be fixed from time to time by the board of directors, or at such other place either within or without the State of Delaware as shall be designated from time to time by the board of directors and stated in the notice of the meeting.  Meetings of stockholders for any other purpose may be held at such time and place, within or without the State of Delaware, as shall be stated in the notice of the meeting.

**Section 2.**    **Annual Meetings**.  Annual meetings of stockholders, commencing with the year 2004, shall be held on the 15th day of April if not a legal holiday, and if a legal holiday, then on the next secular day following, at 10:00 a.m., Huntsville, Alabama time, or at such other date and time as shall be designated from time to time by the board of directors and stated in the notice of the meeting, at which they shall elect a board of directors and transact such other business as may properly be brought before the meeting.

**Section 3.**    **Notice of Annual Meetings**.  Unless otherwise required by law, written notice of the annual meeting stating the place, date and hour of the meeting shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.

3/160763.4                                  1

**Section 4.    List of Stockholders.**  The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

**Section 5.    Special Meetings.**  Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the certificate of incorporation, may be called by the chairman of the board, the president or the secretary and shall be called by the president or the secretary at the request in writing of a majority of the board of directors or at the request in writing of stockholders owning a majority of the shares of the entire capital stock of the corporation issued and outstanding and entitled to vote.  Such request shall state the purpose or purposes of the proposed meeting.

**Section 6.    Notice of Special Meetings.**  Unless otherwise required by law, written notice of a special meeting stating the place, date and hour of the meeting and the purpose or purposes for which the meeting is called, shall be given not less than ten nor more than sixty days before the date of the meeting, to each stockholder entitled to vote at such meeting.

**Section 7.    Business at Special Meetings.**  Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

**Section 8.    Quorum.**  The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the certificate of incorporation.  At any meeting of stockholders, whether annual or special, or any adjournment thereof, including any such meeting at which a quorum shall not be present or represented, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting.  At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.  If the adjournment is for more than thirty days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

**Section 9.    Voting.**  When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy at such meeting shall decide any question, other than the election of directors, brought before

such meeting, unless the question is one upon which by express provision of the statutes or of the certificate of incorporation, a different vote is required in which case such express provision shall govern and control the decision of such question. All elections of directors by the stockholders of the corporation shall be by plurality vote.

Section 10.    **Proxies**.    Unless otherwise provided in the certificate of incorporation, each stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.

Section 11.    **Action by Consent**.

(a)    Unless otherwise provided in the certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, but only if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

(b)    Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days after the earliest dated consent is delivered to the corporation in the manner required by Section 11(a), written consents signed by a sufficient number of holders to take action are delivered to the corporation in the manner provided in said Section 11(a).

(c)    Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

## ARTICLE III

## DIRECTORS

Section 1.    **Number and Term**.    The number of directors which shall constitute the whole board shall be not less than one (1) and not more than seven (7), with the exact number to be four (4) initially and thereafter such number as may be determined by the board of directors from time to time. The directors shall be elected at the annual meeting of the

stockholders, except as provided in **Section 2** of this Article, and each director elected shall hold office until such director's successor is elected and qualified. Directors need not be stockholders.

Section 2. **Vacancies; Removal**. Vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner removed. If there are no directors in office, then an election of directors may be held in the manner provided by statute. If, at the time of filling any vacancy or any newly created directorship, the directors then in office shall constitute less than a majority of the whole board (as constituted immediately prior to any such increase), the Court of Chancery may, upon application of any stockholder or stockholders holding at least ten percent of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office. Any director of the corporation may be removed from office at any time with or without cause, by the holders of a majority of shares of the corporation then entitled to vote at an election of directors.

Section 3. **Powers**. The business and operations of the corporation shall be managed by or under the direction of its board of directors which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the certificate of incorporation or by these by-laws directed or required to be exercised or done by the stockholders.

Section 4. **Place of Meetings**. The board of directors of the corporation may hold meetings, both regular and special, either within or without the State of Delaware.

Section 5. **Annual Meetings**. The first meeting of each newly elected board of directors shall be held at the same place as the annual meeting of the stockholders immediately following the adjournment thereof, and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present. In the event of the failure of the board of directors to hold such meeting at the same place as the annual meeting of the stockholders immediately following the adjournment thereof, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the board of directors, or as shall be specified in a written waiver signed by all of the directors.

Section 6. **Regular Meetings**. Regular meetings of the board of directors may be held without notice at such time and at such place as shall from time to time be determined by the board.

Section 7. **Special Meetings**. Special meetings of the board may be called by the chairman of the board, the president or the secretary on three (3) days' notice to each director, delivered in the manner provided in **Section 2** of **Article IV** of these by-laws; special meetings shall be called by the president or the secretary in like manner and on like notice upon the written request of three (3) directors.

**Section 8.    Quorum; Telephone Meetings**.  At all meetings of the board, a majority of the directors then constituting the total number of the board, but not less than [two (2)] directors except when a board of one director is authorized and acting, then one director, shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the board of directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation. If a quorum shall not be present at any meeting of the board of directors the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Any director may participate in any meeting of the board of directors or a committee of the board of directors by means of conference telephone or similar communications equipment by means of which all persons participating in such meeting can hear each other, and participation in a meeting pursuant to the provisions of this **Section 8** shall constitute presence in person at such meeting.

**Section 9.    Action by Consent**.  Unless otherwise restricted by the certificate of incorporation or these by-laws, any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting, if all members of the board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the board or committee.

**Section 10.    Committees**.  The board of directors may, by resolution passed by a majority of the whole board, designate one or more committees, each committee to consist of one or more of the directors of the corporation.  The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in the place of any such absent or disqualified member.  Any such committee, to the extent provided in the resolution of the board of directors, shall have and may exercise the powers and authority of the board of directors in the management of the business and operations of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the certificate of incorporation (except that a committee may, to the extent authorized in any resolution or resolutions providing for the issuance of shares of stock adopted by the board of directors as provided in Section 151(a) of the General Corporation Law of the State of Delaware, or any successor provision thereto, fix the designation and any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of assets of the corporation or the conversion into, or the exchange of such shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock of the corporation or fix the number of shares of any series of stock or authorize the increase or decrease of the shares of any series), adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the corporation's property and assets, recommending to the stockholders a dissolution of the corporation or a revocation of a dissolution, or amending the by-laws of the corporation; and, unless the resolution or the certificate of incorporation expressly so provides,

no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock, or to adopt a certificate of ownership and merger pursuant to Section 253 of the General Corporation Law of the State of Delaware, or any successor provision thereto. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.

Section 11.    **Minutes of Committees**.    Each committee shall keep regular minutes of its meetings and report the same to the board of directors when required.

Section 12.    **Compensation**.    Unless otherwise restricted by the certificate of incorporation, the board of directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the board of directors and may be paid a fixed sum for attendance at each meeting of the board of directors or a stated salary as director.    No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor.    Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 13.    **Conflict of Interest.**

(a)    No contract or other transaction between the corporation and one or more of its directors or officers, or between the corporation and any other corporation, partnership, association or other organization in which one or more of the corporation's directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for such reason, or solely because such director or directors or officer or officers are present at or participates in the meeting of the board of directors or a committee thereof which authorizes or approves the contract or transaction, or solely because such director's or directors' votes are counted for such purpose, if (1) the material facts as to such director's or directors' relationships or interests and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (2) the material facts as to such director's or directors' relationships or interests as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (3) the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee thereof, or the stockholders.

(b)    Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction.

# ARTICLE IV

## NOTICES

**Section 1.    Notice to Stockholders**.  (a) Whenever, under the provisions of applicable law or of the certificate of incorporation or of these by-laws, notice is required to be given to any stockholder, it shall be delivered by the chairman of the board, the president or the secretary to such stockholder within the time provided in **Article II** of these by-laws.  Such notice shall not be construed to mean personal notice only, but such notice may be given in writing, by mail, addressed to such stockholder, at such stockholder's address as it appears on the records of the corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail.  In addition, any notice to stockholders given by the corporation under any provision of applicable law, the certificate of incorporation, or these by-laws, shall be effective if given by a form of electronic transmission, as defined in this **Article IV, Section 4**, consented to by the stockholder to whom the notice is given.  Any such consent shall be revocable by the stockholder by written notice to the corporation.  Any such consent shall be deemed revoked if (1) the corporation is unable to deliver by electronic transmission two consecutive notices given by the corporation in accordance with such consent; and (2) such inability becomes known to the chairman of the board, the president or the secretary of the corporation, or other person responsible for the giving of notice; **provided, however**, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(b) Notice given by electronic transmission shall be deemed given: (1) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (2) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (3) if by a posting on an electronic network together with separate notice to the stockholder of such specific  posting, upon the later of (A) such posting and (b) the giving of such separate notice; and (4) if by any other form of electronic transmission, when directed to the stockholder.

**Section 2.    Notice to Directors**.  (a) Whenever, under the provisions of applicable law or of the certificate of incorporation or of these by-laws, notice is required to be given to any director, it shall be delivered by the chairman of the board, the president or the secretary to such director within the time provided in **Article III, Section 6** of these by-laws.  Such notice shall not be construed to mean personal notice only, but such notice may be given in writing, by mail, addressed to such director, at such director's address as it appears on the records of the corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail.  In addition, any notice to directors given by the corporation under and provision of applicable law, the certificate of incorporation, or these by-laws, shall be effective if given by a form of electronic transmission, as defined in this **Article IV, Section 4**.

(b)    Notice given by electronic transmission shall be deemed given: (1) if by facsimile telecommunication, when directed to a number as it appears on the records of the corporation;

(2) if by electronic mail, when directed to an electronic mail address as it appears on the records of the corporation; (3) if by a posting on an electronic network together with separate notice to the director of such specific posting, upon the later of (A) such posting and (b) the giving of such separate notice; and (4) if by any other form of electronic transmission, when directed to the director.

Section 3.   **Waiver of Notice**.   Whenever any notice is required to be given under the provisions of the statutes or of the certificate of incorporation or of these by-laws to a stockholder or director, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors, or members of a committee of directors need be specified in any written waiver of notice unless so required by the certificate of incorporation.

Section 4.   **Electronic Transmission.**   For purposes of this **Article IV,** "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that ay be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

# ARTICLE V

## OFFICERS

Section 1.   **Officers**.   The officers of the corporation shall be chosen by the board of directors and shall be a president, a vice president, a secretary and a treasurer.   The board of directors may also choose a chairman of the board, additional vice presidents, and one or more assistant secretaries and assistant treasurers. Any number of offices may be held by the same person unless the certificate of incorporation otherwise provides.

Section 2.   **Additional Officers**.   The board of directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the board.

Section 3.   **Compensation**.   The salaries and other compensation of all officers and agents of the corporation shall be fixed by the board of directors.

Section 4.   **Term of Office; Removal; Vacancies**.   The officers of the corporation shall serve at the pleasure of the board of directors and shall hold office until their successors are duly elected and qualified or until their earlier resignation or removal.   Any officer elected or appointed by the board of directors may be removed at any time with or without cause by the affirmative vote of a majority of the board of directors.   Any vacancy occurring in any office of the corporation shall be filled by the board of directors.

**Section 5.    Duties of Officers.**  The officers of the corporation, if and when elected by the board of directors of the corporation, shall have the following duties:

(a)    **President and Chief Executive Officer.**    The president and chief executive officer shall be the chief operating officer of the corporation, shall have general and active management and control of the business and operations of the corporation and, if there is no chairman of the board (or in the absence of the chairman of the board) shall preside at all meetings of the stockholders and the board of directors.  The president and chief executive officer shall see that all orders and resolutions of the board of directors are carried into effect.  The president and chief executive officer shall execute bonds, mortgages and other contracts requiring a seal, under the seal of the corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the board of directors to some other officer or agent of the corporation.

(b)    **Chairman of the Board.**  The board of directors may select a person to serve as chairman of the board of directors who shall serve at the pleasure of the board of directors and that person shall preside at all meetings of the board of directors and stockholders of the corporation. In general, the chairman of the board shall perform all duties incident to the office of chairman of the board and such other duties as may be prescribed by the board of directors.  If so designated by the board of directors, the chairman of the board may also be the chief executive officer of the corporation.

(c)    **Vice Presidents.**  In the absence of the president or in the event of the president's inability or refusal to act, the Chief Financial Officer and Treasurer shall perform the duties of the president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the president.  The vice presidents shall perform such other duties and have such other powers as the board of directors or president may from time to time prescribe.

(d)    **Secretary.**  The secretary shall attend all meetings of the board of directors and all meetings of the stockholders and record all the proceedings of the meetings of the stockholders and of the board of directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  The secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the board of directors, and shall perform such other duties as may be prescribed by the board of directors or president, under whose supervision the secretary shall be. The secretary shall have custody of the corporate seal of the corporation and the secretary, or an assistant secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the secretary's signature or by the signature of such assistant secretary.  The board of directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by such officer's signature.

(e)    **Assistant Secretaries.**  The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors (or if there be no such determination, then in the order of their election), shall, in the absence of the secretary or in the event of the secretary's inability or refusal to act, perform the duties and exercise the powers

of the secretary and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.

(f)    **Vice President, Chief Financial Officer and Treasurer**.   The vice president, chief financial officer and treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the board of directors.  The vice president, chief financial officer and treasurer shall disburse the funds of the corporation as may be ordered by the board of directors, taking proper vouchers for such disbursements, and shall render to the president and the board of directors, at its regular meetings or when the board of directors so requires, an account of all such vice president, chief financial officer and treasurer's transactions as vice president, chief financial officer and treasurer and of the financial condition of the corporation. If required by the board of directors, the vice president, chief financial officer and treasurer shall give the corporation a bond (which shall be renewed every six years) in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the vice president, chief financial officer and treasurer's office and for the restoration to the corporation, in case of the vice president, chief financial officer and vice president, chief financial officer and treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the treasurer's possession or under the vice president, chief financial officer and treasurer's control belonging to the corporation.

(g)    **Assistant Treasurers**.   The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors (or if there be no such determination, then in the order of their election), shall, in the absence of the vice president, chief financial officer and treasurer or in the event of the vice president, chief financial officer and treasurer's inability or refusal to act, perform the duties and exercise the powers of the vice president, chief financial officer and treasurer and shall perform such other duties and have such other powers as the board of directors may from time to time prescribe.  Each assistant treasurer, if required by the board of directors, shall give the corporation a bond (which shall be renewed every six years) in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the assistant treasurer's office and for the restoration to the corporation, in case of the assistant treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the assistant treasurer's possession or under the assistant treasurer's control belonging to the corporation.

## ARTICLE VI

## CERTIFICATES OF STOCK

Section 1.    **Certificates**.   Every holder of stock in the corporation shall be entitled to have a certificate, signed by, or in the name of the corporation by, the chairman of the board, the president or a vice president, and by the treasurer or an assistant treasurer or the

secretary or an assistant secretary of the corporation, certifying the number of shares owned by such holder of stock in the corporation. Certificates may be issued for partly paid shares and in such case upon the face or back of the certificates issued to represent any such partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of the State of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

Section 2.    **Signatures**.  Any of or all the signatures on the certificate may be facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

Section 3.    **Lost, Stolen or Destroyed Certificates**.  The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or such owner's legal representative, to advertise the same in such manner as it shall require and/or to give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

Section 4.    **Transfer of Stock**.  Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

Section 5.    **Record Date**.

(a)    In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the

resolution fixing the record date is adopted by the board of directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the board of directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the board of directors may fix a new record date for the adjourned meeting.

(b)    In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the board of directors. If no record date has been fixed by the board of directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the board of directors is required, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation in the manner provided by **Section 11(a)** of **Article II** hereof. If no record date has been fixed by the board of directors and prior action by the board of directors is required, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the board of directors adopts the resolution taking such prior action.

(c)    In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

**Section 6.    Registered Stockholders**. The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

# ARTICLE VII

# INDEMNIFICATION

**Section 1. <u>Indemnification</u>.** The corporation may indemnify, and in connection with such indemnification may advance expenses to, any person who is or was a director or officer of the corporation, to the fullest extent permitted by law, including without limitation the General Corporation Law of the State of Delaware. If the amount, extent, or quality of indemnification permitted by law should be in any way restricted after the adoption of this section of the certificate of incorporation, then the corporation may indemnify such persons to the fullest extent permitted by law as in effect at the time of the occurrence of the omission or the act giving rise to the claimed liability with respect to which indemnification is sought. The indemnification and advancement of expenses pursuant to this **Article VII** shall be in addition to, and not exclusive of, any other right that the person seeking indemnification may have under these by-laws, the certificate of incorporation, any separate contract or agreement or applicable law.

**Section 2. <u>Insurance</u>.** The corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or any person who is or was serving at the request of the corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprises, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under applicable law.

**Section 3. <u>Survival of Right</u>.** Any right to indemnification or advancement of expenses provided by or granted pursuant to this **Article VII** shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors, administrators and personal representatives of such a person.

# ARTICLE VIII

# GENERAL PROVISIONS

**Section 1.    <u>Dividends</u>.** Dividends upon the capital stock of the corporation, subject to the provisions of the certificate of incorporation, if any, may be declared by the board of directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the certificate of incorporation.

**Section 2.    <u>Reserves</u>.** Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the

corporation, or for such other purpose as the directors shall think conducive to the interest of the corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 3.    **Annual Statement**.  The board of directors shall present at each annual meeting, and at any special meeting of the stockholders when called for by vote of the stockholders, a full and clear statement of the business and condition of the corporation.

Section 4.    **Checks**.  All checks or demands for money and notes of the corporation shall be signed by such officer or officers or such other person or persons as the board of directors may from time to time designate.

Section 5.    **Fiscal Year**.  The fiscal year of the corporation shall be fixed by resolution of the board of directors.

Section 6.    **Seal**.  The corporate seal shall have inscribed thereon the name of the corporation and the words "Corporate Seal" and "Delaware."  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

Section 7.    **Contracts**.  The board of directors may authorize any officer, agent or employee to enter into any contract, instrument or agreement on behalf of the corporation, and the authority granted may be general or confined to specific instances.  Except as provided in this section or as authorized by the board of directors, no officer, agent, or employee, other than the chairman of the board, the president, any vice president, the secretary or the treasurer, shall have any power or authority to bind the corporation by any contract, instrument or agreement, to pledge its credit, or to render it liable, for any purpose or any amount.

Section 8.    **Voting of Corporation's Securities**.  Unless otherwise ordered by the board of directors, the chairman of the board, the president or any vice president, or, such other officer as may be designated by the board of directors to act in the absence of the chairman of the board, the president or any vice president, shall have full power and authority on behalf of the corporation to attend and to act and to vote, and to execute a proxy or proxies empowering others to attend and to act and to vote, at any meetings of security holders of any corporation in which the corporation may hold securities, and at such meetings the president, or such other officer of the corporation, or such proxy shall possess and may exercise any and all rights and powers incident to the ownership of such securities, and which as the owner thereof the corporation might have possessed and exercised, if present.  The secretary or any assistant secretary may affix the corporate seal to any such proxy or proxies so executed by the president, or such other officer, and attest the same.  The board of directors by resolution from time to time may confer like powers upon any other person or persons.

# ARTICLE VIII

## AMENDMENT OF BY-LAWS

**Section 1.**   **Procedure**.   These by-laws may be altered, amended or repealed or new by-laws may be adopted by the stockholders or by the board of directors, when such power is conferred upon the board of directors by the certificate of incorporation at any regular meeting of the stockholders or of the board of directors or at any special meeting of the stockholders or of the board of directors if notice of such alteration, amendment, repeal or adoption of new by-laws be contained in the notice of such special meeting.

History of Bylaws

Adopted ___January___ __5__, 2004

By: _Charles L. Lofty_
Secretary

**SCHEDULE 4(c)**

Authorization of Documents / No Conflict

1. See Schedule 4(v), Insurance

2. International Distributor Agreement, dated October 13, 2005, between Arxceo Corporation and Lindy-Elektronik GMBH.

## **SCHEDULE 4(e)**

Consents and Approvals

None.

### SCHEDULE 4(f)

Post-Conversion Capitalization

Common Stock

| Name | No. of shares held | Percentage (based on the Fully-Diluted Capitalization of the Company) |
|---|---|---|
| Donald J. Davidson | 250,000 | |
| RNR Ventures, L.L.C. | 202,500 | |
| Angus Adair Wolfgang, Inc. | 402,120 | |
| J. Chandler Hall | 53,616 | |
| David Nicolas and Mark Nicolas (JTWROS) | 2,605 | |
| Thomas M. Griggs and Dale B. Griggs | 5,000 | |
| Prasada R. Kakani and Bhavani K.D. Kakani | 4,000 | |
| David S. Butler | 8,519 | |
| Dawn Darnell Shelton | 8,333 | |
| Bryan W. Butler and Jacalyn A. Butler | 10,000 | |
| Shatas Family Partners, Ltd. | 12,222 | |
| DB Securities, Inc. as Custodian F/B/O IRA FBO David J. Slyman, Jr. IRA | 8,519 | |
| Todd Slyman | 9,518 | |
| Total | 976,952 | 42.0% |

[Schedule 4(f) cont. on next page]

| Series C Preferred Stock | No. of shares held | Percentage (based on the Fully-Diluted Capitalization of the Company) |
|---|---|---|
| Japan Communications, Inc. | 1,349,125 | 58% |

## SCHEDULE 4(g)

Defaults

None.

## **SCHEDULE 4(h)**

Initial Budget

Attached hereto.

## ARXCEO CORPORATION
## PROJECTED INCOME STATEMENT FOR FISCAL 2007

| | Unit Price | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | | |
| Product Revenue - AllyIP1000 | 5,000 | 20,000 | 25,000 | 30,000 | 25,000 | 25,000 | 35,000 | 40,000 | 40,000 | 50,000 | 40,000 | 40,000 | 50,000 | 420,000 |
| Product Revenue - AllyIP100 | 625 | 78,125 | 125,000 | 171,875 | 203,125 | 250,000 | 296,875 | 312,500 | 375,000 | 453,125 | 343,750 | 343,750 | 468,750 | 3,453,125 |
| Software License Revenue | | 10,000 | 10,000 | 20,000 | 20,000 | 25,000 | 25,000 | 40,000 | 50,000 | 50,000 | 65,000 | 65,000 | 65,000 | 445,000 |
| **TOTAL REVENUE** | | 108,125 | 160,000 | 221,875 | 248,125 | 300,000 | 356,875 | 392,500 | 465,000 | 553,125 | 448,750 | 480,000 | 583,750 | 4,318,125 |
| **DIRECT COSTS** | *Unit Cost* | | | | | | | | | | | | | |
| Product Costs - AllyIP1000 | 39.50% | 7,900 | 9,875 | 11,850 | 9,875 | 9,875 | 13,825 | 15,800 | 15,800 | 19,750 | 15,800 | 15,800 | 19,750 | 165,900 |
| Product Costs - AllyIP100 | 38.00% | 29,125 | 45,000 | 61,875 | 73,125 | 90,000 | 106,875 | 112,500 | 135,000 | 163,125 | 123,750 | 135,000 | 168,750 | 1,243,125 |
| Software Costs | 12.00% | 1,200 | 1,200 | 2,400 | 2,400 | 3,000 | 3,000 | 4,800 | 6,000 | 6,000 | 7,800 | 7,800 | 7,800 | 53,400 |
| **TOTAL DIRECT COSTS** | | 37,225 | 56,075 | 76,125 | 85,400 | 102,875 | 123,700 | 133,100 | 156,800 | 188,875 | 147,350 | 158,600 | 196,300 | 1,462,425 |
| **GROSS PROFIT** | | 70,900 | 103,925 | 145,750 | 162,725 | 197,125 | 233,175 | 259,400 | 308,200 | 364,250 | 301,400 | 321,400 | 387,450 | 2,855,700 |
| **R&D EXPENSES** | | | | | | | | | | | | | | |
| Salaries | 6500 | 45,500 | 45,500 | 45,500 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 58,500 | 58,500 | 58,500 | 624,000 |
| Payroll Taxes | 7.85% | 3,572 | 3,572 | 3,572 | 4,082 | 4,082 | 4,082 | 4,082 | 4,082 | 4,082 | 4,592 | 4,592 | 4,592 | 48,984 |
| Health & Life Insurance | 750 | 3,600 | 4,250 | 4,250 | 4,600 | 16,148 | 3,126 | 4,082 | 22,400 | 4,082 | 3,126 | 3,126 | 3,128 | 74,004 |
| Worker Compensation Insurance | 50 | 350 | 350 | 350 | 400 | 3,565 | 438 | 438 | 4,441 | 438 | 438 | 438 | 438 | 12,034 |
| Telephone & Internet Expenses | | 300 | 750 | 750 | 900 | 900 | 900 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,850 |
| R&D Materials expense | | 750 | 750 | 750 | 700 | 750 | 900 | 900 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,450 |
| Repairs & Maintenance R&D equipment | | 150 | 150 | 150 | 150 | 200 | 200 | 200 | 200 | 150 | 200 | 200 | 300 | 1,800 |
| R&D Consultants expense | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Travel Expense, R&D | | 2,099 | 2,000 | 2,000 | 2,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,000 | 2,500 | 2,500 | 2,500 | 24,000 |
| Software Licensing | | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 28,000 |
| Testing, Certifications & Miscellaneous | | 50,000 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 15,600 |
| Depreciation, R&D | | 1,000 | 1,000 | 1,000 | 1,200 | 1,200 | 1,200 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 15,000 |
| **TOTAL R&D EXPENSES** | | 110,372 | 81,572 | 81,572 | 69,332 | 64,545 | 68,396 | 68,696 | 92,073 | 68,796 | 75,806 | 75,806 | 73,806 | 912,772 |
| **SALES, MARKETING AND ADMIN EXPENSES** | | | | | | | | | | | | | | |
| Salaries | 6700 | 50,000 | 50,000 | 50,000 | 75,000 | 75,000 | 100,000 | 100,000 | 100,000 | 125,000 | 125,000 | 125,000 | 125,000 | 1,100,000 |
| Commissions, employees | 3.00% | 3,244 | 4,800 | 6,656 | 7,444 | 9,000 | 10,706 | 11,775 | 13,950 | 16,594 | 13,463 | 14,400 | 17,513 | 129,544 |
| Payroll Taxes | 7.85% | 4,920 | 2,497 | 2,734 | 2,998 | 15,207 | 2,105 | 2,105 | 19,415 | 2,105 | 2,105 | 2,105 | 2,105 | 57,568 |
| Health & Life Insurance | 750 | 4,500 | 4,500 | 4,500 | 4,500 | 5,250 | 5,250 | 5,250 | 5,250 | 5,250 | 6,000 | 6,000 | 6,750 | 82,250 |
| Worker Compensation Insurance | 50 | 500 | 600 | 500 | 600 | 700 | 900 | 900 | 900 | 1,000 | 1,000 | 1,000 | 1,000 | 9,600 |
| Rent Expenses (incl utilities) | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Telephone & Internet | | 600 | 600 | 750 | 750 | 750 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,050 |
| Office Supplies, S&M | | 200 | 200 | 250 | 300 | 300 | 350 | 350 | 350 | 350 | 350 | 350 | 300 | 3,650 |
| Legal, patent and accounting expense | | 2,500 | 2,000 | 2,500 | 3,000 | 3,000 | 3,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 43,500 |
| Consultant expense, S&M | | 6,000 | 6,000 | 6,000 | 7,500 | 7,500 | 7,500 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 84,500 |
| Printing & Reproduction | | 1,500 | 1,500 | 1,500 | 2,000 | 2,000 | 2,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 25,500 |
| Sales & Marketing Collaterals | | 500 | 500 | 500 | 500 | 342 | 500 | 500 | 1,342 | 500 | 500 | 500 | 500 | 8,684 |
| Taxes, Licenses & Fees | | 300 | 300 | 300 | 590 | 590 | 590 | 750 | 750 | 750 | 500 | 750 | 750 | 6,800 |
| Postage & Delivery | | 200 | 300 | 200 | 250 | 250 | 250 | 300 | 300 | 300 | 300 | 300 | 300 | 3,150 |
| Advertising and PR Expense | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| General Marketing Expense, Trade shows, Travel | | 12,500 | 6,500 | 6,500 | 7,500 | 10,000 | 12,500 | 12,500 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 115,500 |
| **TOTAL SALES & MARKETING EXPENSES** | | 85,134 | 87,097 | 89,241 | 118,440 | 132,049 | 146,761 | 151,430 | 171,258 | 181,348 | 178,967 | 179,905 | 183,767 | 1,821,396 |
| **TOTAL EXPENSE** | | 193,505 | 148,699 | 150,812 | 187,772 | 216,594 | 215,157 | 220,126 | 263,331 | 250,144 | 254,773 | 255,711 | 259,573 | 2,618,668 |
| **NET ORDINARY INCOME** | | (124,605) | (44,744) | (5,052) | (25,047) | (19,469) | 18,018 | 39,274 | 44,359 | 114,106 | 45,627 | 65,889 | 127,877 | 237,032 |
| **PROVISION FOR TAXES** | 40% | (49,842) | (17,898) | (2,025) | (10,019) | (7,288) | 7,207 | 15,710 | 17,748 | 45,642 | 18,651 | 26,276 | 51,151 | 94,813 |
| **NET INCOME AFTER TAXES** | | (74,763) | (26,846) | (3,037) | (15,028) | (11,681) | 10,811 | 23,585 | 26,621 | 68,463 | 27,976 | 39,413 | 76,726 | 142,219 |

| | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A/y IP1000 units sold | 4 | 5 | 6 | 5 | 5 | 7 | 8 | 8 | 10 | 8 | 8 | 10 | 84 |
| A/y IP100 units sold | 125 | 200 | 275 | 325 | 400 | 475 | 500 | 600 | 725 | 550 | 600 | 750 | 5,525 |
| Head Count - R & D | 7 | 7 | 7 | 8 | 8 | 8 | 8 | 8 | 8 | 9 | 9 | 9 | |
| Head Count - S, M & A | 6 | 6 | 6 | 6 | 6 | 7 | 7 | 7 | 7 | 8 | 8 | 9 | |

## <u>SCHEDULE 4(i)</u>

Undisclosed Liabilities

None.

## SCHEDULE 4(j)

Absence of Changes

1. Universal Note and Security Agreement, dated February 1, 2006, with a maturity date of November 5, 2006, between Arxceo Corporation (Borrower) and First Commercial Bank (Lender) in the original principal amount of $325,000.00.  To be paid at First Closing.

## SCHEDULE 4(k)

Title to Assets, Properties and Rights

1. RNR Ventures is providing office space to Arxceo as part of its position as co-founder in the company.  RNR Ventures has agreed to provide office space to Arxceo and its employees at no cost until such time as Arxceo has a liquidating event or change of control or RNR is no longer an investor in the company.  At such time as Arxceo begins to pay rent to RNR for use of its facilities, Arxceo will pay RNR fifty percent (50%) of its current monthly rental fees, until the earlier of (1) Arxceo moves to a different facility; (2) RNR does not renew its current lease agreement; or (3) Arxceo occupies one hundred percent (100%) of the current facility.

## SCHEDULE 4(l)(i)

Company Intellectual Property

1.  Pending U.S. Patent Application No. 10/056,629 for "An Undetectable Firewall"

2.  Pending U.S. Patent Application No. 11/065,688 for "An Intelligent Firewall"

3.  Pending U.S. Patent Application No. 11/205,351 for "Method of Processing Data Traffic at a Firewall"

4.  Pending U.S. Patent Application No. 11/205,374 for "A Method of Remotely Managing a Firewall"

5.  Pending U.S. Trademark Application No. 78/648,559 for "Arxceo"

6.  Pending U.S. Trademark Application No. 78/648,592 for Porcupine Logo

7.  Pending U.S. Trademark Application No. 78/648,607 for "PnPRO"

8.  Pending U.S. Trademark Application No. 78/648,618  for "Tag-UR-IT"

9.  The Company is the registered owner of arxceo.com, arxceo.biz, and arxceo.net.

## <u>SCHEDULE 4(l)(ii)</u>

Exceptions to Intellectual Property Rights

None.

## SCHEDULE 4(l)(iv)

Intellectual Property Infringement

None.

# SCHEDULE 4(l)(vi)

Employee Intellectual Property Matters

None.

## SCHEDULE 4(l)(vii)

Licensing Arrangements

The Company has participated in discussions, negotiations, correspondence or meetings with respect to new licensing or similar arrangements involving intellectual property of the Company or the licensing of a third party's intellectual property with the following:

Netopia Corporation
Computer and Communication Technologies
JCI
CISCO Systems
D-Link
Adtran
National Security Agency
Buffalo Technologies
Hawking Technology
ShotSpotter
Juniper Systems
Foundry Networks
iAnywhere Solutions
Digital Reasoning Systems
Symantec
Rymic Systems

## SCHEDULE 4(m)

Employment Matters

None.

## SCHEDULE 4(n)

Benefit Plans

1. Arxceo Corporation 2004 Long-Term Incentive Plan.

2. Nonqualified Stock Option Agreement, dated effective January 15, 2004, between Arxceo Corporation and Charles F. Lofty, providing for 10,000 total option shares at an exercise price per share of $0.34.

3. Nonqualified Stock Option Agreement, dated effective November 1, 2004, between Arxceo Corporation and Richmond A. Wolf, providing for 10,000 total option shares at an exercise price per share of $0.34.

4. Incentive Stock Option Agreement, dated effective July 1, 2004, between Arxceo Corporation and Billy Wilson, providing for 10,000 total option shares at an exercise price per share of $0.34.

5. Incentive Stock Option Agreement, dated effective January 15, 2004, between Arxceo Corporation and J. Chandler Hall, providing for 15,000 total option shares at an exercise price per share of $0.34.

6. Incentive Stock Option Agreement, dated effective February 1, 2005, between Arxceo Corporation and J. Chandler Hall, providing for 10,000 total option shares at an exercise price per share of $0.80.

7. Incentive Stock Option Agreement, dated effective February 1, 2005, between Arxceo Corporation and Charles F. Lofty, providing for 10,000 total option shares at an exercise price per share of $0.80.

8. Incentive Stock Option Agreement, dated effective November 1, 2004, between Arxceo Corporation and David Freytag, providing for 10,000 total option shares at an exercise price per share of $0.80.

9. Incentive Stock Option Agreement, dated effective February 1, 2005, between Arxceo Corporation and David A. Izatt, providing for 10,000 total option shares at an exercise price per share of $0.80.

10. Incentive Stock Option Agreement, dated effective February 1, 2005, between Arxceo Corporation and Donald J. Davidson, providing for 50,000 total option shares at an exercise price per share of $0.80.

11. Incentive Stock Option Agreement, dated effective January 30, 2004, between Arxceo Corporation and Jackie Smith-Cashion, providing for 10,000 total option shares at an exercise price per share of $0.34.

12. Incentive Stock Option Agreement, dated effective June 15, 2004, between Arxceo Corporation and Russ Langston, providing for 10,000 total option shares at an exercise price per share of $0.34.

13. Incentive Stock Option Agreement, dated effective February 1, 2005, between Arxceo Corporation and Sherry Hollman, providing for 3,000 total option shares at an exercise price per share of $0.80.

14. Incentive Stock Option Agreement, dated effective May 15, 2005, between Arxceo Corporation and Susan L. Spencer, providing for 10,000 total option shares at an exercise price per share of $0.80.

15. Nonqualified Stock Option Agreement, dated effective January 15, 2004, between Arxceo Corporation and J. Chandler Hall, providing for 10,000 total option shares at an exercise price per share of $0.34.

16. Nonqualified Stock Option Agreement, dated effective January 15, 2004, between Arxceo Corporation and Don Davidson, providing for 10,000 total option shares at an exercise price per share of $0.34.

17. Nonqualified Stock Option Agreement, dated effective February 1, 2005, between Arxceo Corporation and Joan Lyman, providing for 30,000 total option shares at an exercise price per share of $0.80.

18. Nonqualified Stock Option Agreement, dated effective January 15, 2004, between Arxceo Corporation and Sam McManus, providing for 10,000 total option shares at an exercise price per share of $0.34.

19. Blue Cross BlueShield of Alabama Group Health Care Plan, effective September 1, 2005 (Health and Dental).

## SCHEDULE 4(o)

Material Contracts

1. See Schedule 4(n)(ii), Benefit Plans.

2. See Schedule 4(v), Insurance.

3. See Schedule 4(w), Related Party Transactions.

4. Universal Note and Security Agreement, dated October 28, 2005, with a maturity date of November 5, 2006, between Arxceo Corporation (Borrower) and First Commercial Bank (Lender), in the original principal amount of $250,000.00.

5. Universal Note and Security Agreement, dated February 1, 2006, with a maturity date of November 5, 2006, between Arxceo Corporation (Borrower) and First Commercial Bank (Lender) in the original principal amount of $325,000.00.

6. International Distributor Agreement, dated October 13, 2005, between Arxceo Corporation and Lindy-Elektronik GMBH.

7. Assignment of Application, dated January 23, 2002, between David Izatt and Angus Adair Wolfgang, Inc.

8. Assignment of Application, dated December 31, 2003, between Angus Adair Wolfgang, Inc. and Arxceo Corporation.

9. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated February 13, 2006 between Charles F. Lofty and Arxceo Corporation.

10. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated July 1, 2005, between Sails Consulting, LLC and Arxceo Corporation.

11. Independent Contractor Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated February 13, 2006, between John White and Arxceo Corporation.

12. Independent Contractor Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated February 1, 2006, between LMG, LLC and Arxceo Corporation.

13. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated January 3, 2004, between David Izatt and Arxceo Corporation.

14. Independent Contractor / Consultant Confidentiality and Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated April 22, 2004, between Billy Ray Wilson and Arxceo Corporation.

15. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated June 14, 2004, between Russell L. Langston, Jr. and Arxceo Corporation.

16. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated January 3, 2004, between J. Chandler Hall and Arxceo Corporation.

17. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated January 19, 2004, between Jackie Smith Cashion and Arxceo Corporation.

18. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated January 5, 2005, between Sherry E. Hollman and Arxceo Corporation.

19. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated January 3, 2004, between Donald J. Davidson and Arxceo Corporation.

20. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated November 1, 2004, between David Freytag and Arxceo Corporation.

21. Employee Non-Disclosure, Non-Competition and Transfer of Intellectual Property Rights Agreement, dated May 15, 2005, between Susan L. Spencer and Arxceo Corporation.

22. Arxceo Corporation Confidentiality and Non-Disclosure Agreement, dated February 2, 2005, between Joan Lyman and Arxceo Corporation.

23. Cisco Systems, Inc. Mutual Non-Disclosure Agreement, dated July 27, 2005, between Arxceo Corporation and Cisco Systems, Inc.

24. Arxceo Corporation Confidentiality and Non-Disclosure Agreement, dated September 13, 2005, between Nathan Rlingerstein and Arxceo Corporation.

25. Cisco Systems, Inc. Mutual Non-Disclosure Agreement, dated July 20, 2005, between Arxceo Corporation and Cisco Systems, Inc.

26. iAnywhere Solutions Mutual Non-Disclosure Agreement, dated April 29, 2005, between iAnywhere Solutions, Inc. and Arxceo Corporation.

27. NitroSecurity, Inc. Mutual Non-Disclosure Agreement, dated May 18, 2005, between NitroSecurity, Inc. and Arxceo Corporation.

28. Arxceo Corporation Confidentiality and Non-Disclosure Agreement, dated September 22, 2004, between RSR Ventures, LLC and Arxceo Corporation.

29. Non-Disclosure Agreement, dated December 6, 2004, between Techni-Core Professionals, Inc. and Arxceo Corporation.

30. Preliminary Agreement (undated), between ShotSpotter, Inc. and Arxceo Corporation (Agreement not executed).

31. Reseller Agreement, dated January 27, 2006, between Arxceo Corporation and CAS, Inc.

32. Reseller Agreement, dated January 20, 2006, between Arxceo Corporation and Port 80 Software, Inc.

33. Reseller Agreement, dated July 26, 2005, between Arxceo Corporation and Advanced Network Systems, Inc.

34. Reseller Agreement (undated), between Arxceo Corporation and Systems Integration / Modeling & Simulation, Inc.

35. Reseller Agreement, dated September 26, 2006, between Arxceo Corporation and Net-Wall Internet Security, Inc.

36. Reseller Agreement (undated), between Arxceo Corporation and Digital Fusion Solutions, Inc.

37. Reseller Agreement (undated), between Arxceo Corporation and Re:Sources, Inc.

38. Reseller Agreement (undated), between Arxceo Corporation and IT Pros

39. Reseller Agreement (undated), between Arxceo Corporation and Security Management and Integration Company, Inc.

40. Reseller Agreement (undated), between Arxceo Corporation and Vigilar, Inc.

41. Reseller Agreement, dated July 7, 2005, between Arxceo Corporation and Secure Communication, Inc.

42. Reseller Agreement (undated), between Arxceo Corporation and Empire Computing and Consulting, Inc.

43. Reseller Agreement (undated), between Arxceo Corporation and Mindpower International, Inc.

44. Reseller Agreement (undated), between Arxceo Corporation and Acrobits Systems

45. Reseller Agreement (undated), between Arxceo Corporation and Optimus Solutions

46. Reseller Agreement (undated), between Arxceo Corporation and Cobalt Pacific

47. Reseller Agreement (undated), between Arxceo Corporation and Integrated Solutions, LLC

48. Reseller Agreement (undated), between Arxceo Corporation and Digital Operations Corp, Inc.

49. Reseller Agreement (undated), between Arxceo Corporation and Techni-Core Network Services, Inc.

50. Arxceo Corporation Reciprocal Non-Disclosure Agreement, dated December 6, 2005, between Arxceo Corporation and Netopia, Inc.

51. Mutual Use and Non-Disclosure Agreement, dated June 10, 2005, between Arxceo Corporation and National Security Agency.

52. Reciprocal Non-Disclosure Agreement, dated April 14, 2004, between Adrtan, Inc. and Arxceo Corporation.

53. Arxceo Corporation Reciprocal Non-Disclosure Agreement, dated September 6, 2005, between Arxceo Corporation and ShotSpotter, Inc.

54. Arxceo Corporation Reciprocal Non-Disclosure Agreement, dated February 9, 2005, between Arxceo Corporation and David Slyman.

55. Arxceo Corporation Reciprocal Non-Disclosure Agreement dated February 9, 2005, between Arxceo Corporation and Scott Kirby.

56. Digital Reasoning Systems, Inc. Mutual Nondisclosure Agreement, dated December 29, 2003, between Digital Reasoning Systems, Inc. and Arxceo Corporation.

57. Consulting Agreement, dated January 20, 2006, between Arxceo Corporation and MRB Public Relations, Inc.

3/188057.4

58. Service Agreement with Arxceo Corporation, dated September 20, 2005, between MoreMeetings.com, Inc. and Arxceo Corporation.

59. Microsoft OEM Customer License Agreement For Embedded Systems (CLA Version 2003), dated as of December 8, 2004, between Microsoft Licensing, GP and Arxceo Corporation.

60. Microsoft OEM Customer License Agreement For Use of Third Party Installer (2004 Version), dated January 6, 2005, between Microsoft Licensing, GP and Arxceo Corporation.

61. Nondisclosure Agreement, dated January 9, 2006, between Japan Communications, Inc. and Arxceo Corporation.

62. Mutual Nondisclosure Agreement, dated August 25, 2005, between Computer and Communication Technologies, Inc. and Arxceo Corporation.

63. License Agreement for Embedded Software and Notice of Third Party Software (two forms)

64. marcus evans Summit Sales Agreement, dated March 1, 2005, between marcus evans and Arxceo Corporation.

## SCHEDULE 4(p)

Permits

1. Classification Letter received from United States Department of Commerce Bureau of Industry and Security, dated October 21, 2005, for Model Number ALLY IP1000, Export Control Classification Number and Paragraph 5A002 (A.1), License Exceptions Available ENC, Country Chart Column (reason for control) NS1 AT1.

2. Classification Letter received from United States Department of Commerce Bureau of Industry and Security, dated February 14, 2006, for Model Number IP100, Export Control Classification Number and Paragraph 5A992 (A), Country Chart Column (reason for control) AT1.

3. Business License issued by State of Alabama.

## SCHEDULE 4(q)

Employees

1.  Donald J. Davidson

2.  Charles F. Lofty

3.  J. Chandler Hall

4.  Jackie Smith Cashion

5.  David A. Izatt

6.  Billy Ray Wilson

7.  Russ Langston

8.  Susan Spencer

9.  David Freytag

10. Sherry Hollman

**<u>SCHEDULE 4(r)</u>**

Litigation

None.

**SCHEDULE 4(s)**

Tax Matters

None.

## SCHEDULE 4(t)

Customers and Suppliers

<u>Top 5 Vendors or Suppliers</u>

| | |
|---|---:|
| Bradley Arant Rose & White (legal services) | $65,489.00 |
| Gumstix (hardware components for Ally ip100) | 45,521.54 |
| Superior Manufacturing (hardware for Ally IP1000) | 43,435.89 |
| Inergi Design Services (mechanical hardware design and trade show design services) | 37,161.24 |
| MBX Systems (hardware components for Ally IP1000) | 16,870.00 |
| bSquare Software (Microsoft Embedded XP Licenses) | 5,189.00 |
| | |
| TOTAL | $172,666.67 |

<u>Top 5 Customers</u>

| | |
|---|---:|
| Lindy Computer & Communication Technology | $19,924.00 |
| Advanced Network Systems | 14,494.00 |
| AgilQuest | 4,725.00 |
| Traveller Information Services | 4,317.00 |
| 10 or more customers | 4,000.00 (or less) |
| | |
| TOTAL | $ 47,458.00 |

**SCHEDULE 4(u)**

Accounts Receivable

See Arxceo Corporation A/R Aging Summary, attached hereto.

8:59 AM
04/06/06

# Arxceo Corporation
## A/R Aging Summary
### As of February 28, 2006

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Advanced Network Systems | 0.00 | 0.00 | -12,472.20 | 0.00 | 12,472.20 | 0 |
| Digital Operations | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| Empire Consulting | 0.00 | 0.00 | 447.50 | 0.00 | 0.00 | 44 |
| Integrated Information Solutions, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| Integrated Solutions | 0.00 | 0.00 | 447.50 | 0.00 | 0.00 | 44 |
| KSR | 0.00 | 450.00 | 0.00 | 0.00 | 0.00 | 45 |
| Lindy Computer Connection Technology | 0.00 | 0.00 | 0.00 | 0.00 | 19,924.00 | 19 |
| Mindpower | 0.00 | 0.00 | 895.00 | 0.00 | 0.00 | 89 |
| Port80 | 0.00 | 0.00 | 5,596.50 | 0.00 | 0.00 | 5,5 |
| RNR Ventures | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| Robert Half International | 0.00 | 3,580.00 | 0.00 | 0.00 | 0.00 | 3,5 |
| Techni-Core Network Services | 0.00 | 0.00 | 0.00 | 0.00 | 3,151.62 | 3,1 |
| Traveller | 0.00 | 0.00 | 0.00 | 0.00 | 4,317.30 | 4,3 |
| TOTAL | 0.00 | 4,030.00 | -5,085.70 | 0.00 | 39,865.12 | 38 |

## SCHEDULE 4(v)

Insurance

1. Directors and Officers Insurance, issued by Illinois Union Insurance Company an ACE USA Company; agent J. Smith Lanier & Co., with a coverage limit of $1,000,000 in the aggregate.

2. Business Insurance Policy, Policy Number 21 SBA NV0014 SA, effective February 7, 2005, to February 7, 2006, issued by Hartford Fire Insurance Company; agent J. Smith Lanier & Co., together with Spectrum Policy Declarations, Technology Stretch Summary, Common Policy Conditions, Special Property Coverage Form, and Alabama Changes, with the limits and types of coverage contained therein.

3. Workers Compensation and Employers Liability Policy, Policy Number 21 WEC PHI1908, effective December 14, 2004 to December 14, 2005, issued by Twin City Fire Insurance Company; agent J. Smith Lanier & Co., with the following coverage limits:

   a. Bodily Injury by Accident:    $1,000,000 each accident
   b. Bodily Injury by Disease     $1,000,000 policy limit
   c. Bodily Injury by Disease     $1,000,000 each employee

4. Blue Cross Blue Shield of Alabama Group Health Care Plan, effective September 1, 2005 (Health and Dental).

5. Insurance loss runs for medical claims attached hereto.

## SCHEDULE 4(w)

### Related Party Transactions

1. Arxceo provided a simple interest-free loan to one of its founders and current employee David Izatt. The original loan amount was for $10,000.00. The employee is repaying the loan back to the company in the amount of $500.00 each month through a payroll deduction plan. The current balance on the loan is approximately $7,500.00

2. RNR Ventures is providing office space to Arxceo as part of its position as co-founder in the company. RNR Ventures has agreed to provide office space to Arxceo and its employees at no cost until such time as Arxceo has a liquidating event or change of control or RNR is no longer an investor in the company. At such time as Arxceo begins to pay rent to RNR for use of its facilities, Arxceo will pay RNR fifty percent (50%) of its current monthly rental fees, until the earlier of (1) Arxceo moves to a different facility; (2) RNR does not renew its current lease agreement; or (3) Arxceo occupies one hundred percent (100%) of the current facility.

3/188057.4

## SCHEDULE 6(a)(i)(H)

Payment of Fees

$51,649.70

## SCHEDULE 6(a)(i)(M)

Option Pool

| Name | February 2006 Grant |
|------|---------------------|
| 1.  Chandler Hall | 5,000 |
| 2.  Jackie Smith-Cashion | 10,000 |
| 3.  Russ Langston | 5,000 |
| 4.  Billy Wilson | 10,000 |
| 5.  David Freytag | 10,000 |
| 6.  David Izatt | 5,000 |
| 7.  Sherry Hollman | 7,000 |
| 8.  Susan Spencer | 5,000 |
| 9.  John White | 10,000 |
| Total | 67,000 |

3/188057.4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NIHON TSUSHIN KABUSHIKI KAISHA d/b/a JAPAN COMMUNICATIONS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No.: 07-619-JJF |
| v. | ) ) | |
| DONALD DAVIDSON, et al., | ) ) | |
| Defendants. | ) | |

**STATE OF ALABAMA** )
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀ :
**COUNTY OF MADISON** )

**AFFIDAVIT OF DONALD J. DAVIDSON**

Before me, the undersigned Notary Public, personally appeared Donald J. Davidson, who, after being duly sworn, states as follows:

1.⠀⠀⠀⠀My name is Donald J. Davidson. I am over the age of twenty-one years, and I am a resident of Madison County, Alabama.

2.⠀⠀⠀⠀I was previously the President and Chief Executive Officer of Arxceo Corporation ("Arxceo"). I am currently a shareholder of Arxceo and a member of Arxceo's Board of Directors.

3.⠀⠀⠀⠀Japan Communications, Inc. ("JCI") and the individuals and entities named as defendants in this lawsuit (the "Delaware Defendants"), with the exception of David Izatt, entered into a Purchase of Securities Agreement (the "POS") on or about March 2, 2006, pursuant to which the Delaware Defendants sold and JCI acquired a 58% majority ownership interest in Arxceo.

4.      Certain of the Delaware Defendants retained a 42% minority ownership interest in Arxceo, which JCI agreed to purchase in accordance with the Earn-Out Schedule described in the POS that considered Arxceo's Gross Revenues and Net Operating Income over a two-year period.

5.      The amount the remaining minority Arxceo shareholders were to be paid by JCI for their remaining shares of Arxceo stock was tied directly to the target Gross Revenues and Net Operating Income levels of Arxceo over a short duration, as described in the POS and Earn-Out Schedule.

6.      As stated in the Complaint filed by Donald Davidson ("Davidson"), J. Chandler Hall ("Hall"), RNR Ventures, LLC ("RNR"), and Angus Adair Wolfgang, Inc. ("AAW," collectively, the "Alabama Plaintiffs") in the Circuit Court of Madison County, Alabama (the "Alabama Action"), JCI; Communications Security and Compliance Technologies, Inc. ("CSCT"); Computer and Communication Technologies, Inc. ("CCT"); Frank Seiji Sanda ("Sanda"); J. Marc Winn ("Winn," together with JCI, CSCT, CCT, and Sanda, the "Alabama Defendants") made numerous misrepresentations leading up to and after the parties executed the POS and completely changed the business direction of Arxceo.

7.      The Alabama Defendants' actions and/or inactions resulted in the minority shareholders of Arxceo receiving no benefit for their remaining 42% interest in Arxceo.

8.      The Alabama Plaintiffs filed the Alabama Action on August 29, 2007, to enforce their individual rights, as well as the rights of the other remaining minority shareholders of Arxceo under the POS.

9.      JCI filed the Delaware Action on October 9, 2007.

10.   Arxceo is a Delaware corporation; however, its principal place of business, assets, books and records, and property are all located in Madison County, Alabama.

11.   JCI is a Japanese corporation with its principal place of business located in Tokyo, Japan.  JCI does not have any connection with the State of Delaware.

12.   CSCT and CCT are wholly owned subsidiaries of JCI.

13.   Sanda is the President and Chief Executive Officer of JCI and is a member of Arxceo's Board of Directors.

14.   Winn is the President and Chief Executive Officer of both CSCT and Arxceo, a member of Arxceo's Board of Directors, Vice President of JCI's Group Executive Security, and a member of JCI's Management Board of U.S. Operations and Security.

Further affiant saith not.

**[SIGNATURE PAGE TO FOLLOW.]**

Donald J. Davidson

**SWORN TO and SUBSCRIBED** before me this ___ day of November, 2007.

[SEAL]

Notary Public
My Commission Expires: May 16, 2011

H0009682.1



**AlaFile E-Notice**

47-CV-2007-001345.00

To:  HARGETT DOUGLAS BARKLEY
     dhargett@maynardcooper.com

# NOTICE OF ELECTRONIC FILING

### IN THE CIRCUIT COURT OF MADISON COUNTY, ALABAMA

### RNR VENTURES LLC ET AL VS JAPAN COMMUNICATIONS INC ET AL
### 47-CV-2007-001345.00

The following answer was FILED on 10/8/2007 2:18:34 PM

Notice Date:     10/8/2007 2:18:34 PM

**JANE C. SMITH**
**CIRCUIT COURT CLERK**
MADISON COUNTY, ALABAMA
MADISON COUNTY, ALABAMA
HUNTSVILLE, AL 35801

256-532-3390
jane.smith@alacourt.gov



ELECTRONICALLY FILED
11/8/2007 2:18 PM
CV-2007-001345.00
CIRCUIT COURT OF
MADISON COUNTY, ALABAMA
JANE C. SMITH, CLERK

# IN THE CIRCUIT COURT
## OF MADISON COUNTY, ALABAMA

| | |
|---|---|
| RNR VENTURES, L.L.C., individually and on behalf of all other shareholders of Arxceo Corporation; | ) ) ) ) |
| ANGUS ADAIR WOLFGANG, INC., individually and on behalf of all other Shareholders of Arxceo Corporation DONALD J. DAVIDSON, individually and on behalf of all other shareholders of Arxceo Corporation; and | ) ) ) ) ) ) ) ) ) |
| J. CHANDLER HALL, individually and on behalf of all other shareholders of Arxceo Corporation; | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| JAPAN COMMUNICATIONS, INC.; | ) ) ) |
| COMMUNICATIONS SECURITY AND COMPLIANCE TECHNOLOGIES, INC.; | ) ) ) ) |
| COMMUNICATION TECHNOLOGIES, INC.; | ) ) ) ) |
| FRANK SEIJI SANDA, individually and as a member of the Board of Directors of Arxceo Corporation; | ) ) ) ) ) |
| J. MARC WINN, individually and as a member of the Board of Directors of Arxceo Corporation; and | ) ) ) ) |
| ARXCEO CORPORATION; | ) ) ) |
| Defendants, | ) ) ) |

**CIVIL ACTION NUMBER
CV07-1345 LHL**

### ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANTS, AND COUNTERCLAIMS OF DEFENDANTS JAPAN COMMUNCATIONS, INC. AND ARXCEO CORPORATION

Come Now Nihon Tsushin Kabushiki Kaisha d/b/a Japan Communications, Inc. ("JCI"), Communications Security and Compliance Technologies, Inc. ("CSCT"), Communications Technologies, Inc. ("CCT"), Frank Seigi Sanda ("Sanda"), J. Marc Winn ("Winn") and Arxceo Corporation ("Arxceo") (collectively, the "Defendants"), and file their Answer and Affirmative Defenses to Plaintiffs RNR Ventures, LLC ("RNR"), Angus Adair Wolfgang, Inc. ("AAW"), Donald J. Davidson ("Davidson"), and J. Chandler Hall's ("Hall") (collectively, the "Plaintiffs") Complaint in the above-styled action as follows:

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part because this Court lacks personal jurisdiction over Sanda and JCI.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part because Plaintiffs have not properly effectuated service of process upon Sanda and JCI.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part by Plaintiffs' failure to state a claim for which relief may be granted.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part by their fraudulent actions, detailed below in Defendants' Counterclaims and Cross-Claims.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims for Promissory Fraud/Fraudulent Inducement, Fraudulent Misreprepresentation, and Fraudulent Suppression are barred in whole or in part because Plaintiffs have failed to plead with particularity "the circumstances constituting fraud" as required by Rule 9(b) of the Alabama Rules of Civil Procedure.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part by the doctrine of estoppel.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in party by Plaintiffs' failure to satisfy all conditions precedent to recovery.

## NINTH AFFIRMATIVE DEFENSE

Any and all claims arising from or relating to the Securities Purchase Agreement, dated as of February 28, 2006 and entered into by and between the parties to this action, are governed by the law of the State of Delaware pursuant to Section 18 of that Agreement.

## TENTH AFFIRMATIVE DEFENSE

Any claims relating to the internal governance of Arxceo Corporation, or to the duties owed by the officers, directors and shareholders of Arxceo Corporation, are governed by the law of the State of Delaware.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendants respond to the allegations contained in the individually-numbered paragraphs of Plaintiffs' Complaint against them as follows:

### JURISDICTION AND VENUE

1.

Admitted that this Court has subject matter jurisdiction over this Action.

2.

Denied that this Court has jurisdiction over the Defendants. By agreement of the Parties, by filing this Answer Defendants Sanda and JCI do not concede personal jurisdiction, or otherwise submit to the jurisdiction of this Court.

3.

To the extent that it is determined that this Court has jurisdiction over any or all of the Defendants, it is admitted that venue is proper.

### PARTIES

4.

Admitted.

5.

Admitted.

6.

Admitted.

7.

Admitted that Sanda is over the age of 19 years old, that Sanda is the President and Chief Executive Officer of JCI, and that he is a member of Arxceo's Board of

Directors.  Denied that Sanda is citizen of the State of New York; Mr. Sanda is a citizen of Japan.

8.

Admitted.

9.

Admitted that "Arxceo is a Delaware Corporation with its principal place of business in Huntsville, Alabama."  Admitted that JCI owns a 58% interest in Arxceo, and that the remaining Stockholders collectively own a 42% interest in Arxceo.  The remaining allegations in Paragraph 9 are denied.

10.

Admitted.

11.

Admitted.

12.

Admitted.

13.

Admitted.

## **FUTILITY OF DEMAND**

14.

Admitted that the Plaintiffs "have not made a demand on Arxceo, Arxceo's officers, Arxceo's Board of Directors, or any other representative of Arxceo."  The remaining allegations in Paragraph 14 are denied.

15.

Admitted that "Arxceo's Board of Directors is comprised of three members: Sanda, Winn, and Davidson." The remaining allegations in Paragraph 15 are denied.

16.

Admitted that "Sanda is the President and Chief Executive Officer of JCI, and Winn is the President and Chief Executive Officer of CSCT and a member of the Management Committee of JCI." The remaining allegations in Paragraph 16 are denied.

17.

Denied.

18.

Denied.

19.

Denied.

20.

Denied.

**FACTUAL INVESTIGATION**

21.

Denied.

22.

Admitted that Davidson, in his capacity as a member of Arxceo's Board of Directors, has reviewed Arxceo's books and records. Admitted that Davidson expressed concern regarding "the issues discussed in [the] Complaint" to Sanda and Winn on

several occasions, but denied that those concerns had any merit or basis in fact.   All remaining allegations contained in Paragraph 22 are denied.

23.

Denied.

24.

Admitted.

25.

Denied.

26.

Denied.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

27.

Admitted.

28.

Admitted.

29.

Denied.

30.

Admitted.

31.

Admitted.

32.

Admitted that, in November 2005, "Arxceo and JCI agreed to the conditions expressed in a Term Sheet related to JCI's acquisition of Arxceo."  Admitted that, during the following months, Arxceo and JCI continued to discuss the terms of the acquisition.

33.

Denied.

34.

Denied.

35.

Denied.

36.

Denied

37.

Denied.

38.

Admitted that JCI offered to provide and fund the support of any additional software developers needed to meet the demands related to the integration and/or embedding process with respect to BellSouth, its suppliers and vendors, provided that BellSouth actually agreed to employ, and required its suppliers and vendors to employ, Arxceo's technology.

39.

Admitted that JCI entered into a Securities Purchase Agreement dated as of February 28, 2006 with Arxceo and the stockholders of Arxceo (hereinafter the "POS"). The remaining allegations in Paragraph 39 are denied.

40.

Admitted.

41.

Admitted that JCI entered into the POS, which speaks for itself.    Except as expressly admitted, the remaining allegations in Paragraph 41 are denied.

42.

Admitted that JCI entered into the POS, which speaks for itself.    Except as expressly admitted, the remaining allegations in Paragraph 42 are denied.

43.

Admitted that JCI entered into the POS, which speaks for itself.    Except as expressly admitted, the remaining allegations in Paragraph 43 are denied.

44.

Admitted that JCI entered into the POS, which speaks for itself.    Except as expressly admitted, the remaining allegations in Paragraph 44 are denied.

45.

Admitted that JCI entered into the POS, which speaks for itself.    Except as expressly admitted, the remaining allegations in Paragraph 46 are denied.

46.

Admitted that JCI entered into the POS, which speaks for itself.  Except as expressly admitted, the remaining allegations in Paragraph 46 are denied.

47.

Admitted that JCI entered into the POS, which speaks for itself.  Except as expressly admitted, the remaining allegations in Paragraph 47 are denied.

48.

Denied.

49.

Admitted that "BellSouth never committed or required Westell, Netopia, or any of its other suppliers, vendors, re-sellers, and/or distributors to integrate and/or embed Arxceo's technology into their products."  Denied that JCI, CSCT, CCT, Sanda, Winn or any of their representatives ever represented that BellSouth would make such a commitment or impose such a requirement upon Westell, Netopia, or any of its other suppliers, vendors, re-sellers, and/or distributors.

50.

Denied.

51.

Denied.

52.

Denied.

53.

Denied.

54.

Denied.

55.

Denied.

56.

Denied.

57.

Denied.

58.

Admitted.

59.

Denied.

60.

Admitted that, in September 2006, Davidson expressed the concerns detailed in Paragraph 60.  Denied that those concerns had any merit or basis in fact.

61.

Admitted that, in September 2006, Davidson expressed the concerns detailed in Paragraph 61.  Denied that those concerns had any merit or basis in fact.

62.

Denied.

63.

Admitted that Davidson expressed the concerns referred to in Paragraph 61. Denied that those concerns had any merit or basis in fact.

64.

Admitted.

65.

Admitted.

66.

Admitted that a Term Sheet relating to a restructuring of the Earn-Out Schedule was circulated between JCI and the Common Stockholders in March 2007. Denied that a "tentative agreement" was reached between JCI and the Common Stockholders regarding implementation of the Earn-Out Schedule restructuring contained in the Term Sheet.

67.

Admitted.

68.

Admitted that Arxceo, due to its failure to generate any significant revenue through the sale of its "signature" products, IP100 and IP1000, was forced to request multiple loans from JCI to enable Arxceo to continue its business operations. Admitted that JCI has provided loans now totaling $800,000 to Arxceo. Denied that JCI required Arxceo to accept the loans, or that Arxceo was "forced" to accept the loans as a result of JCI's conduct.

69.

Denied.

70.

Denied as stated. Sanda and Winn refused to approve the minutes for the June 2007 Arxceo Board of Directors meeting as drafted by Davidson.

## COUNTS OF THE COMMON STOCKHOLDERS INDIVIDUALLY

## COUNT I – OPPRESSION/SQUEEZE OUT

**(Defendants JCI, Sanda, and Winn)**

71.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 70.

72.

The allegations contained in Paragraph 72 amount to a conclusion of law and therefore no response is necessary.

73.

The allegations contained in Paragraph 73 amount to a conclusion of law and therefore no response is necessary.

74.

Denied.

75.

Denied.

76.

Denied.

## COUNT II – PROMISSORY FRAUD/FRAUDULENT INDUCMENT

**(Defendants the JCI Group, Sanda, and Winn)**

77.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 76.

78.

Denied.

79.

Denied.

80.

Denied.

81.

Denied.

## COUNT III –FRAUDULENT MISREPRESENTATION

### (Defendants the JCI Group, Sanda, and Winn)

82.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 81.

83.

Denied.

84.

Denied.

85.

Denied.

## COUNT IV –FRAUDULENT SUPPRESSION

**(Defendants the JCI Group, Sanda, and Winn)**

86.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 85.

87.

Denied.

88.

Denied.

89.

Denied.

90.

Denied.

## COUNT V – BREACH OF FIDUCIARY DUTY

**(Defendants JCI, Sanda, and Winn)**

91.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 90.

92.

The allegations contained in Paragraph 92 amount to a conclusion of law and therefore no response is necessary.

93.

The allegations contained in Paragraph 93 amount to a conclusion of law and therefore no response is necessary.

94.

Denied.

95.

Denied.

96.

Denied.

## COUNT VI – BREACH OF CONTRACT

### (Defendant JCI)

97.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 96.

98.

Admitted that JCI entered into the POS, which speaks for itself. Except as expressly admitted, the remaining allegations in Paragraph 98 are denied.

99.

Denied.

100.

Denied.

## DERIVATIVE COUNTS

## COUNT VII – PROMISSORY FRAUD/FRAUDULENT INDUCMENT

### (Defendants the JCI Group, Sanda, Winn, and Arxceo)

101.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 100.

102.

Denied.

103.

Denied.

104.

Denied.

105.

Denied.

## COUNT VIII –FRAUDULENT MISREPRESENTATION

### (Defendants the JCI Group, Sanda, Winn, and Arxceo)

106.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 105.

107.

Denied.

108.

Denied.

109.

Denied.

## COUNT IX –FRAUDULENT SUPPRESSION

### (Defendants the JCI Group, Sanda, Winn, and Arxceo)

110.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 109.

111.

Denied.

112.

Denied.

113.

Denied.

114.

Denied.

## COUNT X –BREACH OF FIDUCIARY DUTY

### (Defendants JCI, Sanda, Winn, and Arxceo)

115.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 114.

116.

The allegations contained in Paragraph 116 amount to a conclusion of law and therefore no response is necessary.

117.

The allegations contained in Paragraph 117 amount to a conclusion of law and therefore no response is necessary.

118.

Denied.

119.

Denied.

120.

Denied.

## COUNT XI –BREACH OF CONTRACT

### (Defendants JCI and Arxceo)

121.

Defendants adopt and incorporate by reference herein their responses to Paragraphs 1 through 120.

122.

Admitted that JCI entered into the POS, which speaks for itself. Except as expressly admitted, the remaining allegations in Paragraph 122 are denied.

123.

Denied.

124.

Denied.

## TWELFTH AFFIRMATIVE DEFENSE

Except as expressly admitted above, all allegations in Plaintiffs' Complaint stand denied, and Defendants further deny that Plaintiffs are entitled to any of the requested relief.

WHEREFORE, Defendants, having responded to each and every allegation contained in Plaintiff's Complaint, pray that: (a) Plaintiffs' Complaint be dismissed and that Plaintiffs recover nothing thereunder; (b) all costs of this action be assessed against Plaintiffs; (c) the Court award further relief as it deems just and proper.

## COUNTERCLAIMS OF JAPAN COMMUNICATIONS, INC. AND ARXCEO CORPORATION

JCI has asserted as an affirmative defense to Plaintiffs' claims that this Court lacks personal jurisdiction over JCI but, to the extent this Court finds that it does have personal jurisdiction over JCI, JCI and Arxceo (collectively, the "Counterclaim Plaintiffs"), by and through their counsel, hereby assert their Counterclaims against Plaintiffs/Counterclaim Defendants Donald J. Davidson ("Davidson") and J. Chandler Hall ("Hall") (collectively, the "Counterclaim Defendants"), and show this Court as follows:

## THE PARTIES

1.

Counterclaim Defendant Davidson is a citizen of the State of Alabama..  At all times relevant hereto, Davidson has been Chief Executive Officer and a shareholder of Arxceo.

2.

Counterclaim Defendant Hall is a citizen of the State of Alabama. At all times relevant hereto, Hall has been an officer and a shareholder of Arxceo.

3.

Counterclaim Plaintiff JCI is a Japanese corporation with its principal place of business in Tokyo, Japan.

4.

Counterclaim Plaintiff Arxceo is a Delaware corporation with its principal place of business in Huntsville, Alabama.

## FACTUAL BACKGROUND

5.

All of the parties to this action are also parties to a Securities Purchase Agreement (the "SPA"), dated as of February 28, 2006.

6.

Pursuant to the terms of the SPA, JCI paid a total of $5 million to Arxceo and its stockholders, by which JCI acquired a 58% interest in Arxceo: $3 million to the stockholders for certain Common, Series A Preferred, and Series B Preferred Stock of Arxceo held by the stockholders; and $2 million to Arxceo as a cash infusion to Arxceo, and for Series C Preferred Stock.

7.

The SPA further provided for JCI to acquire the remaining 42% interest in Arxceo over a two-year period, with payments to be made by JCI to the stockholders pursuant to an "Earn Out" provision in the SPA.

8.

Despite acquiring a 58% interest in Arxceo, JCI left Arxceo's existing management intact. Thus, Davidson and Hall remained officers of Arxceo and continued to control its operations.

## COUNT I – BREACH OF CONTRACT
### (Davidson)

9.

Counterclaim Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 8, *supra*, inclusive.

10.

All conditions precedent to JCI's enforcement of the SPA have been satisfied and performed.

11.

In Section 4 of the SPA, Davidson – individually, and on behalf of Arxceo – made a number of representations and warranties to JCI. Specifically, in Section 4(h)(ii) of the SPA, Davidson, acting in his personal and representative capacities, warranted as follows:

> The business plan of the company and initial budget for calendar year 2006 as set forth on Schedule 4(h) have been prepared in good faith, using assumptions which are reasonable. Such projections set forth in reasonable detail the principal assumptions from which such projections are based and represent the company's reasonable, good faith estimate of future performance and costs.

12.

In fact, said projections were not prepared in good faith and were not prepared upon assumptions which were reasonable. Arxceo's actual sales and profits during its first year of operation after execution of the SPA were a small fraction of those projected.

13.

Davidson has breached the SPA by making the false representations and warranties stated above.

14.

As a result of the breach stated above, JCI has been damaged in an amount to be determined at trial but not less than the $5 million that JCI paid in justifiable reliance upon Davidson's representations, plus the lost income JCI would have received if the representations and warranties had been accurate.

## COUNT II – FRAUDULENT INDUCEMENT
### (Davidson & Hall)

15.

Counterclaim Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 14, *supra*, inclusive.

16.

Pursuant to Section 4(h)(ii) of the SPA, Davidson prepared and provided to JCI financial projections titled "Arxceo Corporation Projected Income Statement for Fiscal Year 2007" (the "Projections").

17.

At a meeting in approximately December 2005 at the Inverness Hotel and Conference Center in Englewood, Colorado, between Davidson,; Frank Sanda, JCI's

CEO; and Marc Winn, COO of Computer and Communications Technologies, Inc., JCI's U.S. subsidiary responsible for product development; Davidson made the following false and material statements for the purpose of inducing JCI to enter into the SPA and with knowledge that said statements were false:

(a)     that Arxceo had two products, the IP-100 and the IP-1000, which were fully developed and were ready to market;

(b)     that Arxceo had a network of 26 distributors and resellers ready, willing and able to sell the products in their current form;

(c)     that Davidson had secured commitments from BellSouth and two of BellSouth's suppliers to purchase large quantities of Arxceo's two products; and

(d)     that the working capital necessary for Arxceo to reach cash flow breakeven was $2 million or less.

18.

In the SPA itself, Davidson represented and warranted that the Projections were "prepared in good faith, using assumptions which are reasonable," and that the Projections constituted a "reasonable, good faith estimate of [Arxceo's] future performance and costs."

19.

In fact, Davidson and Hall were knowingly selling to JCI "vaporware" – products that had numerous bugs and defects and which had not been completed and were not ready to market.

20.

Davidson and Hall knew that these representations were false at the time they made them.

21.

Davidson and Hall made these false representations with the intent of inducing JCI into entering into the SPA.

22.

JCI reasonably relied upon the false representations made by Davidson and Hall in deciding to enter into the SPA.

23.

As a result of Davidson's and Hall's actions, JCI has suffered substantial harm including, but not limited to, loss of the $5 million paid by JCI in connection with the SPA, and lost profits JCI could have reasonably expected to earn through its investment in Arxceo had the Projections been as warranted by Counterclaim Defendants.

## COUNT III – FRAUD
### (Davidson)

24.

Counterclaim Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 23, *supra*, inclusive.

25.

Subsequent to the execution of the SPA, in approximately April 2006, at a meeting that included approximately 20 representatives from JCI, CCT, and Arxceo in Englewood, Colorado, Davidson stated to Frank Sanda and Marc Winn, JCI's designees on the Arxceo Board, that Arxceo could create a new product by easily porting its core

network security products from the Linux operating system to the Windows operating system, and represented that Arxceo could have this product ready for sale on a mass production basis within two to four weeks. This new product ultimately was to be called "Personal IPS." .

26.

All of the aforesaid statements were false when made, and were made by Davidson for the purposes of: (1) fraudulently inducing JCI over the following 18 months to increase its investment in Arxceo's business over and above the $2 million in capitalization provided in connection with the SPA, and (2) delaying JCI from bringing claims against the Counterclaim Defendants for breach of contract and fraudulent inducement.

27.

JCI reasonably relied upon the aforementioned representations by Davidson by, among other things: (1) creating a new subsidiary corporation, Arxceo Japan, to market Personal IPS and other Arxceo products in Japan; (2) securing orders for thousands of units of Personal IPS from JCI customers; and (3) providing forecasting to JCI's investors and to regulatory officials of the Hercules Exchange in Japan, where JCI stock is reviewed by industry analysts and publicly traded.

28.

As a result of Davidson's actions, JCI has suffered substantial harm including, but not limited to, lost profits and reputational harm with its existing customers, investors, regulatory officials, and industry analysts.

## COUNT IV – BREACH OF FIDUCIARY DUTY
### (Davidson & Hall)

29.

Arxceo incorporates herein by reference the allegations contained in paragraphs 1 through 28, *supra*, inclusive.

30.

At the time the Projections were prepared and the SPA was executed, Davidson was CEO of Arxceo and a member of Arxceo's Board of Directors. As such, Davidson owed fiduciary duties to Arxceo.

31.

At all times relevant hereto, Hall was an officer of Arxceo and, thus, owed fiduciary duties to Arxceo.

32.

Specifically, Davidson and Hall owed fiduciary duties to Arxceo which required them not to commit misfeasance or malfeasance, as well as other fiduciary duties and responsibilities imposed by law upon officers and directors of a corporation including, but not limited to, duties of good faith, loyalty, and care.

33.

Davidson and Hall breached their fiduciary duties to Arxceo by, among other things, falsely representing that the Projections constituted a "reasonable, good faith estimate of [Arxceo's] future performance and costs."

34.

Davidson, and Hall breached their fiduciary duties to Arxceo by, among other things, repeatedly submitting false and unsubstantiated financial forecasts in order to mislead Arxceo's investors.

35.

Davidson and Hall breached their fiduciary duties to Arxceo and its investors by, among other things, using their false and unsubstantiated forecasts to justify spending they knew would not be supported by Arxceo's actual revenues and gross profits.

36.

Davidson and Hall breached their fiduciary duties to Arxceo by, among other things, squandering the $2 million in capital JCI invested into Arxceo as a result of the SPA, and operating Arxceo so as to maximize their own personal recovery in a prospective lawsuit against Arxceo and JCI.

37.

As a result of the actions of Davidson and Hall, Arxceo has suffered substantial harm including, but not limited to, lost profits and liability to JCI for breach of the SPA.


WHEREFORE, JCI and Arxceo respectfully request the following relief:

(1)     That JCI and Arxceo be awarded compensatory damages in an amount to be determined at trial;

(2)     That the Counterclaim Defendants be ordered to pay to JCI and Arxceo pre-judgment and post-judgment interest;

(3)    That the Counterclaim Defendants be ordered to pay JCI and Arxceo's costs and expenses, including attorneys' fees and costs; and

(4)    Such other relief as this Court deems just and proper.

Respectfully submitted this 8th day of October, 2007.

/s/ Robert C. Gammons
Robert C. Gammons (GAM010)
Attorney for Defendants

OF COUNSEL:
STEPHENS, MILLIRONS, HARRISON & GAMMONS, P.C.
P.O. Box 307
Huntsville, Alabama  35804
(256) 533-7711
(256) 382-3580 – fax
e-mail: bob@smhg.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Answer and Affirmative Defenses of Defendants, and Counterclaims of Defendants Japan Communications, Inc. and Arxceo Corporation has been served upon G. Bartley Loftin, III, Esq. and Douglas B. Hargett, Esq., MAYNARD, COOPER & GALE, P.C., 655 Gallatin Street, S.W., Huntsville, Alabama, 35801 and upon W. Percy Badham, III, Esq. and Will A. Smith, Esq., MAYNARD, COOPER & GALE, P.C., 2400 AmSouth/Harbert Plaza, 2901 Sixth Avenue North, Birmingham, Alabama, 35203, *Attorneys for Plaintiffs,* by placing same in the United States Mail, postage prepaid, on this the 8th day of October, 2007.

/s/ Robert C. Gammons
Of Counsel

## CHART DEPICTING IDENTICAL ALLEGATIONS AND CLAIMS IN THE DELAWARE ACTION AND THE ALABAMA ACTION

The following chart is a depiction of the virtually identical, parallel allegations made and claims asserted by JCI in its Complaint in the Delaware Action and its Counterclaim in the Alabama Action:

| Delaware Complaint | Alabama Counterclaim |
|---|---|
| Paragraph 56, pp. 10-11 | Paragraph 6, p. 21 |
| Paragraph 57, p. 11 | Paragraph 7, p. 21 |
| Paragraph 58, p. 11 | Paragraph 8, p. 22 |
| Paragraph 61, p. 11 | Paragraph 10, p. 22 |
| Paragraph 62, p. 11 | Paragraph 11, p. 22 |
| Paragraph 63, p. 12 | Paragraph 12, p. 23 |
| Paragraph 64, p. 12 | Paragraph 13, p. 23 |
| Paragraph 65, p. 12 | Paragraph 14, p. 23 |
| Paragraph 67, p. 12 | Paragraph 16, p. 23 |
| Paragraph 68, p. 12-13 (including subparts (a) through (d)) | Paragraph 17, pp. 23-24 (including subparts (a) through (d)) |
| Paragraph 69, p. 13 | Paragraph 18, p. 24 |
| Paragraph 70, p. 13 | Paragraph 19, p. 24 |
| Paragraph 71, p. 13 | Paragraph 20, p. 25 |
| Paragraph 72, p. 13 | Paragraph 21, p. 25 |
| Paragraph 73, p. 13 | Paragraph 22, p. 25 |
| Paragraph 74, p. 14 | Paragraph 23, p. 25 |
| Paragraph 76, p. 14 | Paragraph 25, p. 25-26 |
| Paragraph 77, p. 14 (including subparts (1) and (2)) | Paragraph 26, p. 26 (including subparts (1) and (2)) |
| Paragraph 78, p. 15 (including subparts (1) through (3)) | Paragraph 27, p. 26 (including subparts (1) through (3)) |
| Paragraph 79, p. 15 | Paragraph 28, p. 26 |
| Requested Relief, p. 15 | Requested Relief, pp. 28-29 |