IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NIHON TSUSHIN KABUSHIKI KAISHA )
d/b/a JAPAN COMMUNICATIONS, INC., )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        C.A. No. 07-619-JJF
                                   )
DONALD DAVIDSON. et al.,           )
                                   )
            Defendants.            )

**PLAINTIFF'S ANSWERING BRIEF TO
<u>DEFENDANT DAVID IZATT'S MOTION TO DISMISS</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Thomas C. Grimm (#1098)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
tgrimm@mnat.com

*Attorneys for Nihon Tsushin Kabushiki Kaisha
d/b/a Japan Communications, Inc.*

OF COUNSEL:

Jay D. Bennett
Paul J. Kaplan
Jonathan B. Davis
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000

Dated: December 17, 2007

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ................................- 1 -

SUMMARY OF ARGUMENT .............................................................................................- 1 -

STATEMENT OF FACTS ...................................................................................................- 1 -

ARGUMENT ........................................................................................................................- 2 -

    I.     IZATT RELIES ON THE WRONG AGREEMENT. ........................................- 2 -

    II.    IZATT IS A PARTY TO THE SPA. ...................................................................- 3 -

    III.   IZATT MADE THE SPECIFIC MISREPRESENTATIONS IN
        THE SPA THAT ARE THE SUBJECT OF JCI'S COMPLAINT. ...................- 4 -

    IV.   IZATT IS BOUND BY HIS WRITTEN CONSENT TO
        PERSONAL JURISDICTION IN THIS COURT. .............................................- 5 -

    V.    BECAUSE THIS COURT HAS PERSONAL JURISDICTION
        OVER IZATT FOR HIS REPRESENTATIVE ACTS, IT HAS
        JURISDICTION OVER HIM FOR HIS RELATED PERSONAL
        ACTS AS WELL. ................................................................................................- 6 -

CONCLUSION.....................................................................................................................- 7 -

# TABLE OF AUTHORITIES

Page(s)

CASES

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*,
    709 F.2d 190 (3d Cir. 1983)........................................................................................9

*Equidyne Corp. v. John Does 1-21*,
    279 F. Supp. 2d 481 (D. Del. 2003)...................................................................3, 10

*Jumara v. State Farm Ins. Co.*,
    55 F.3d 873 (3d Cir. 1995)..........................................................................................9

*Res. Ventures Inc. v. Res. Mgmt. Int'l Inc.*,
    F. Supp. 2d 423 (D. Del. 1999)...............................................................................8-9

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

On October 9, 2007, Plaintiff Japan Communications Inc. ("JCI") filed a three-count Complaint alleging, *inter alia*, that Defendant Izatt made material misrepresentations to JCI in a written agreement by which JCI purchased the majority stake in a network security firm. (D.I. 1.)  On November 30, 2007, Izatt filed a motion to dismiss for lack of personal jurisdiction, arguing that he never signed the parties' agreement and thus is not subject to its forum selection clause consenting to jurisdiction in this Court.  (D.I. 89.)

## SUMMARY OF ARGUMENT

Izatt relies on the wrong agreement.  His affidavit and brief rely on the Arxceo Corporation Stockholders Agreement (D.I. 89-3), while JCI's Complaint is based on Izatt's misrepresentations in the parties' Securities Purchase Agreement or "SPA".  (*See* D.I. 1 at ¶¶ 1, 56-74.)  Izatt is a named party to the SPA, signed the SPA, and made the specific misrepresentations in the SPA that are the gravamen of JCI's Complaint.  Izatt thus is bound by Section 18 of the SPA, which states that all parties irrevocably consent to personal jurisdiction and venue in this Court.

## STATEMENT OF FACTS [1]

On or about February 28, 2006, JCI and Defendants entered into a Securities Purchase Agreement ("SPA") in which JCI purchased from the Defendants a 58% stake in Arxceo Corporation, an Alabama technology firm.  (*See* Complaint, D.I. 1, at ¶¶ 1 & 56.)   The SPA calls for JCI to purchase the remaining 42% of Arxceo's stock over a two-year period, with

---

[1]    "In the context of a motion to dismiss, the record must be viewed in the light most favorable to the non-moving party."  *Equidyne Corp. v. John Does 1-21*, 279 F. Supp. 2d 481, 485 (D. Del. 2003) (Farnan, J.).

the price to be determined by an "earn-out" provision.  (*Id.* at ¶ 57.)  A true and correct copy of the SPA is attached hereto as Exhibit A.

The first paragraph of the SPA expressly names Defendant Izatt as a party to the agreement for purposes of the SPA's Section 4.  (*See* Exh. A at 1.)  In Section 4 of the SPA, Izatt made certain representations and warranties to JCI on behalf of the selling shareholders.  (*Id.* at 9-20.)  These representations and warranties form the basis of JCI's claims for fraudulent inducement and breach of contract in Counts I and II of its Complaint.  (D.I. 1 at ¶¶ 60-74.)  Izatt also signed the SPA as one of two "Representatives" of the selling shareholders.  (*See* Exh. A at 58.)

Section 18 of the SPA states that it shall be governed by Delaware law.  (*Id.* at 36.)  Section 18 of the SPA further states that each of the parties consents to personal jurisdiction and venue in the United States District Court for the District of Delaware.  (*Id.*)  Each of the parties also "irrevocably waive[s] . . . any claim that any such proceeding brought in any such court has been brought in an inconvenient forum."  (*Id.*)

## ARGUMENT

### I.    IZATT RELIES ON THE WRONG AGREEMENT.

Throughout his affidavit and brief, Izatt refers to a "Purchase of Securities Agreement" or "POS."  (*See generally* D.I. 89 & 89-2.)  But there is no such agreement, and he has put none before the Court.  Instead, Izatt attaches to his brief only the "Arxceo Corporation Stockholders Agreement" (D.I. 89-3) – and it is apparently this agreement upon which his arguments are based.

Izatt argues that he is not a party to the "POS" and insists that he signed the "POS" solely "as the President and representative" of his investment company, Angus Adair Wolfgang Inc., or "AAW."  (D.I. 89 at ¶¶ 6 & 10.)  Izatt thus contends that he is not bound by

Section 18 of the "POS", in which the parties to that agreement irrevocably consent to jurisdiction in this court.  (*Id.* at ¶¶ 9-10.)

If by the "POS" Izatt means the ***Stockholders Agreement*** which he attaches to his brief, then his assertions are certainly true.  (*See* D.I. 89-3 at 1 (identifying parties to the Stockholders Agreement) *and* at 16-21 (signature blocks).)  But JCI's Complaint never mentions the Stockholders Agreement.  JCI's Complaint is based solely on the SPA.  And as to that agreement, Izatt's assertions are demonstrably false.

## II.    <u>IZATT IS A PARTY TO THE SPA.</u>

Izatt clearly is a party to the SPA.  The very first paragraph of the agreement identifies the parties thereto as (i) Arxceo, (ii) JCI, (iii) certain named shareholders listed on the signature page, and (iv) Defendants Davidson ***and Izatt*** as "Representatives" of the remaining shareholders:

**SECURITIES PURCHASE AGREEMENT**

**THIS SECURITIES PURCHASE AGREEMENT** (this "<u>Agreement</u>"), dated as of February 28, 2006, by and among Arxceo Corporation, a Delaware corporation (the "<u>Company</u>"), Japan Communications, Inc., a Japanese company (the "<u>Purchaser</u>"), for the purposes of <u>Section 3</u> only, the Stockholders set forth on the signature pages hereto and, for purposes of <u>Section 4</u> only, Donald Davidson and David Izatt (collectively, the "<u>Representatives</u>").  Capitalized words used and not defined herein have the meanings set forth in <u>Annex I</u> hereto.

(Exh. A at 1.)

Izatt signed the SPA precisely in keeping with this description:

REPRESENTATIVES:

_____
Donald Davidson

_____
David Izatt

(*Id.* at 58.)   Contrary to his assertion, Izatt did not sign the SPA as the president of AAW –
indeed, AAW didn't sign the SPA at all.  Rather, Izatt signed the SPA solely and clearly as the
express "Representative" of the selling shareholders.

### III.    IZATT MADE THE SPECIFIC MISREPRESENTATIONS IN THE SPA THAT ARE THE SUBJECT OF JCI'S COMPLAINT.

As noted above, Izatt is expressly named as one of two "Representatives" in the
SPA, "for purposes of Section 4" of that agreement.  In Section 4, "[t]he Company *and the*
*Representatives* hereby jointly and severally" made a number of representations and warranties
to JCI, including that they had personally provided JCI with reasonable, good faith projections of
Arxceo's future performance and costs.  (Exh. A at 10-11; emphasis added.)  In its Complaint,
JCI alleges that these representations and warranties were false, and that Izatt therefore breached
the SPA and fraudulently induced JCI to purchase the Defendants' Arxceo shares.  (D.I. 1 at
¶¶ 60-74.)

Izatt's status as a party to the SPA thus is not merely incidental.  Rather, his
actions as a named party and on behalf of the selling shareholders lies at the very heart of JCI's
Complaint.

## IV.    IZATT IS BOUND BY HIS WRITTEN CONSENT TO PERSONAL JURISDICTION IN THIS COURT.

As noted above – and unlike the Stockholders Agreement on which his brief relies – Izatt *is* expressly named as a party to the SPA.  Thus, he is bound by Section 18 of the SPA, in which all parties (i) agree that the SPA shall be governed by Delaware law and (ii) irrevocably consent to personal jurisdiction and venue in this Court:

**Section 18.    Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied.

**ANY PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF DELAWARE OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR, AND THE PARTIES IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH SUCH COURTS IN RESPECT OF ANY SUCH PROCEEDING. EACH OF THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDING IN THE COURTS OF THE STATE OF DELAWARE LOCATED IN NEW CASTLE COUNTY OR THE DISTRICT OF DELAWARE AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM.    ANY JUDGMENT MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.**

**EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

Such consent is clearly binding:

> *It is well settled that a party can consent to the personal jurisdiction of a court.*  Because personal jurisdiction is based on individual liberty interests protected by the due process clause, unlike subject matter jurisdiction, it can be waived by a party's express or implied consent to jurisdiction.  *The use of a forum selection clause is an example of an express consent to personal jurisdiction.*

*Res. Ventures Inc. v. Res. Mgmt. Int'l Inc.*, F. Supp. 2d 423, 431 (D. Del. 1999) (Farnan, J.)

(emphasis added).

> In federal courts, "the effect to be given a contractual forum selection clause in diversity cases is determined by federal not state law." The United States Court of Appeals for the Third Circuit has established a general rule to test the validity of a forum selection clause. Under this general rule, *a forum selection clause is presumptively valid and enforceable* by the forum *unless* the *objecting party* establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable.

*Id.* at 431-32 (emphasis added; citing *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 877 (3d Cir. 1995) and *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 202 (3d Cir. 1983)).

Izatt fails to even discuss, much less attempt to prove, a single prong of this test. He does not allege that the forum selection clause was procured by fraud. He does not allege that enforcing the clause would violate any provision of Delaware law. And he does not cite a single hardship or burden that would prevent him from litigating in this Court. As a result, his consent to jurisdiction must be enforced. *See id.* at 432 (holding forum selection clause "valid and enforceable" where defendant "has not proffered any allegations to establish" any of the factors quoted above).

## V. BECAUSE THIS COURT HAS PERSONAL JURISDICTION OVER IZATT FOR HIS REPRESENTATIVE ACTS, IT HAS JURISDICTION OVER HIM FOR HIS RELATED PERSONAL ACTS AS WELL.

As discussed above, Izatt is a party to the SPA, as the selling shareholders' Representative, for purposes of the representations and warranties that he made on their behalf in Section 4. This Court has personal jurisdiction over him for those acts by virtue of his express consent in Section 18. There is no question, then, that this Court has personal jurisdiction over Izatt for purposes of Counts I & II of JCI's Complaint, which assert claims based on Izatt's misrepresentations in Section 4.

Count III asserts a claim for fraud against Izatt and others individually, for further misrepresentations that they made after the SPA was signed.  Because this Court has personal jurisdiction over Izatt for purposes of Counts I & II, and because Count III arises  out of a common nucleus of operative fact – *i.e.,* because all three counts involve Defendants' misrepresentations in connection with the sale of their Arxceo stock – this Court has pendent personal jurisdiction over Izatt for purposes of Count III as well.  *See, e.g., Equidyne Corp.,* 279 F. Supp. 2d at 486 (finding pendent personal jurisdiction over defendant where state law claim arose "out of the same common nucleus of operative facts as the federal claims"); *see also Home Owners Funding Corp. of Am. v. Century Bank*, 695 F. Supp. 1343, 1345 (D. Mass. 1988) ("The law is well settled that, in a multi-count complaint, if a court has personal jurisdiction with respect to one count, it has personal jurisdiction over the defendant with respect to all counts.").

## CONCLUSION

For all the reasons set forth above, JCI respectfully submits that Defendant Izatt's Motion to Dismiss (D.I. 88 and 89) should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*

_____
Thomas C. Grimm (#1098)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
tgrimm@mnat.com

*Attorneys for Nihon Tsushin Kabushiki Kaisha
d/b/a Japan Communications, Inc.*

OF COUNSEL:

Jay D. Bennett
Paul J. Kaplan
Jonathan B. Davis
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
(404) 881-7000

Dated:  December 17, 2007
1337190

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing to all registered participants.

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on December 17, 2007 upon the following individuals in the manner indicated:

**BY E-MAIL & HAND DELIVERY**

Donald J. Detweiler
Dennis A. Meloro
GREENBERG TRAURIG, LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE  19801

**BY E-MAIL**

G. Bartley Loftin, III
Douglas B. Hargett
MAYNARD, COOPER & GALE, P.C.
655 Gallatin Street, S.W.
Huntsville, AL  35801

W. Percy Badham, III
Will A. Smith
MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL  35203

*/s/ Thomas C. Grimm*

_____
Thomas C. Grimm (#1098)
tgrimm@mnat.com

EXHIBIT A

**SECURITIES PURCHASE AGREEMENT**

**dated as of February 28, 2006**

**among**

**JAPAN COMMUNICATIONS, INC.**

**ARXCEO CORPORATION**

**and**

**THE STOCKHOLDERS OF ARXCEO CORPORATION PARTY HERETO**

## SECURITIES PURCHASE AGREEMENT

**THIS SECURITIES PURCHASE AGREEMENT** (this "Agreement"), dated as of February 28, 2006, by and among Arxceo Corporation, a Delaware corporation (the "Company"), Japan Communications, Inc., a Japanese company (the "Purchaser"), for the purposes of Section 3 only, the Stockholders set forth on the signature pages hereto and, for purposes of Section 4 only, Donald Davidson and David Izatt (collectively, the "Representatives"). Capitalized words used and not defined herein have the meanings set forth in Annex I hereto.

### PREAMBLE

**WHEREAS**, the Company provides internet security software and services;

**WHEREAS**, the Stockholders own all of the issued outstanding capital stock of the Company, consisting of: (i) 371,000 shares of Series B Preferred Stock, $0.0001 par value (the "Series B Preferred Stock"), (ii) 300,000 shares of Series A Preferred Stock, $0.0001 par value (the "Series A Preferred Stock") and 1,000,000 shares of Common Stock, $0.0001 par value (the "Common Stock", together with the Series B Preferred Stock, Series A Preferred Stock and Series C Preferred Stock collectively, the "Company Stock");

**WHEREAS**, at the First Closing, the Purchaser wishes to purchase from the Stockholders, and the Stockholders are willing to sell to Purchaser that number of shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock set forth on Annex II hereto (the "Tendered Stock");

**WHEREAS**, the Purchaser wishes to commit, subject to the terms and conditions contained herein, $3.0 million (the "Tendered Stock Purchase Price") to purchase the Tendered Stock and $2.0 million (the "Series C Amount") to purchase the Series C Preferred Stock at the First Closing;

**WHEREAS**, at the First Closing the Company desires to sell to the Purchaser and the Purchaser desires to purchase from the Company that number of shares of the Company's Series C Preferred Stock, $0.0001 par value per share (the "Series C Preferred Stock"), equal to 58% of the Fully-Diluted Capitalization of the Company as of the First Closing (the "Post-Closing 58% Number"), with the designations, preferences, and rights set forth in the Second Amended and Restated Certificate of Incorporation of the Company (the "Restated Certificate") attached hereto as Exhibit A, on the terms and subject to the conditions set forth herein; and

**WHEREAS**, the Company shall purchase such additional shares of Common Stock from the Common Holders at the respective Additional Closings at the price and subject to the additional terms and conditions set forth in Section 1.

**NOW THEREFORE**, in consideration of the foregoing and of the agreements set forth below, the parties agree as follows:

**Section 1.**    <u>**Sale and Purchase.**</u>

(a)    <u>**Authorization of Issuance and Sale; Reservation of Reserved Shares.**</u>

Subject to the terms and conditions hereof, the Company has authorized: (i) the issuance and sale of the Post-Closing 58% Number of shares of Series C Preferred Stock, and (ii) the reservation of an equal number of shares of Common Stock for issuance upon conversion of the Series C Preferred Stock (the "<u>Reserved Shares</u>").

(b)    <u>**Commitment to Purchase and Sell the Tendered Stock and the Series C Preferred Stock.**</u>

(i)    Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements contained in this Agreement, at the First Closing, each of the Series A Holders, Series B Holders and Common Holders hereby sells, assigns and conveys to the Purchaser that number of shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock, respectively, set forth on <u>Annex II</u> hereto, and the Purchaser hereby purchases, acquires and accepts from such Stockholders, all of such Series B Preferred Stock, Series A Preferred Stock and Common Stock in the amounts set forth on <u>Annex II</u> hereto. At the First Closing, each Stockholder shall deliver to the Purchaser stock certificates and, if required by Purchaser, accompanying stock powers representing the shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock purchased from such Stockholder by the Purchaser. Immediately thereafter: (i) Purchaser shall deliver such stock certificates to the Company for cancellation; (ii) the Company shall issue new stock certificates (the "<u>New Purchaser Stock Certificates</u>") to the Purchaser representing the transfer of such shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock from such Stockholder to Purchaser; (iii) the Purchaser shall deliver the New Purchaser Stock Certificates to the Company to be treated in accordance with <u>Section 7(k)</u>; and (iv) the Company shall issue new stock certificates to such Stockholder (the "<u>New Stockholder Certificates</u>") representing shares of Common Stock equal to the sum of all shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock held by such Stockholder immediately prior to the First Closing and not sold to the Purchaser at the First Closing, it being the intent of the parties that the shares of Series B Preferred Stock and Series A Preferred Stock not sold to the Purchaser at the First Closing shall, effective as of the filing of the Restated Certificate with the Delaware Secretary of State and the date of the First Closing, automatically be converted to Common Stock.

(ii)    Notwithstanding the foregoing, the Stockholders acknowledge and agree that the New Stockholder Certificates (other than the New Stockholder Certificates delivered to the Secretary of the Company pursuant to the terms of the Key Management Vesting Agreement) shall be delivered by or on behalf of the Stockholders to the Escrow Agent and held in escrow pursuant to the terms and provisions of the Escrow Agreement.

9034153.14

(iii)    Also notwithstanding the foregoing, in no event shall the Purchaser purchase, in the aggregate, more than 106,400 shares of Common Stock at the First Closing.  Each Common Holder shall have the right to sell up to its Pro Rata Amount of Common Stock at the First Closing.

(iv)    Subject to the terms and conditions of this Agreement, at the First Closing, the Purchaser shall purchase from the Company the Post-Closing 58% Number of shares of Series C Preferred Stock for an amount equal to (A) the Series C Amount ($2.0 million) plus (B) any portion of the Tendered Stock Purchase Price not used to purchase Tendered Stock (collectively, the "First Closing Company Receipts").  The Company shall issue and deliver to the Purchaser a stock certificate representing the Post-Closing 58% Number of shares of Series C Preferred Stock at the First Closing.

(c)    **Commitment to Purchase and Sell Common Stock at the Additional Closings.**

(i)    Second Closing.  Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements contained in this Agreement, on or before April 30, 2007 (the "Second Closing"):

(A)    If the Company's Gross Revenue for the period from and including the First Closing Date through and including March 31, 2007 exceeds fifty percent (50%) of the 2007 GR Target, then each Common Holder shall have the right, but not the obligation, to cause the Purchaser to, and the Purchaser shall, purchase up to (in the sole discretion of each Common Holder) twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock at the Second Closing Purchase Price; and

(B)    If the Company's Net Operating Income for the period from and including the First Closing Date through and including March 31, 2007 exceeds the 2007 NOI Target, then each Common Holder shall have the right, but not the obligation, to cause the Purchaser to, and the Purchaser shall, purchase up to (in the sole discretion of each Common Holder) twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock at the Second Closing Purchase Price; and

(C)    If the Company's Gross Revenue for the period from and including the First Closing Date through and including March 31, 2007 does not exceed fifty percent (50%) of the 2007 GR Target, then the Purchaser shall have the right, but not the obligation, to cause each Common Holder, and each Common Holder shall, sell up to (in the Purchaser's sole discretion) twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock at the Second Closing Purchase Price; and

(D)    If the Company's Net Operating Income for the period from and including the First Closing Date through and including March 31, 2007

3

does not exceed fifty percent (50%) of the 2007 NOI Target, then the Purchaser shall have the right, but not the obligation, to cause each Common Holder, and each Common Holder shall, sell up to (in the Purchaser's sole discretion) twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock at the Second Closing Purchase Price.

(ii)    <u>Third Closing</u>.    Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements contained in this Agreement, on or prior to April 30, 2008 (the "<u>Third Closing</u>"), each Common Holder (other than the Purchaser) will sell, and the Purchaser will purchase, all of the Common Stock held by such Common Holder at the Third Closing Purchase Price.

(d)    **Purchase Price at the First Closing.**

(i)    <u>Series B Preferred Stock Purchase Price</u>.    The purchase price for Series B Preferred Stock at the First Closing shall be $4.80 per share, less any and all amounts to be paid at the First Closing in accordance with <u>Section 11(b)</u>.

(ii)    <u>Series A Preferred Stock Purchase Price</u>.    The purchase price for Series A Preferred Stock at the First Closing shall be $3.00 per share, less any and all amounts to be paid at the First Closing in accordance with <u>Section 11(b)</u>.

(iii)    <u>Common Stock Purchase Price</u>.    The purchase price for Common Stock at the First Closing shall be $3.00 per share, less any and all amounts to be paid at the First Closing in accordance with <u>Section 11(b)</u>.

(iv)    <u>Series C Preferred Stock Purchase Price</u>.    The per-share purchase price for Series C Preferred Stock at the First Closing shall be an amount equal to A/B; where "A" is the First Closing Company Receipts and "B" is the Post-Closing 58% Number.

(v)    <u>Timing of Payment</u>.    The amounts to be paid to the Series B Holders, Series A Holders and Common Holders pursuant to this <u>Section 1(d)</u> shall be paid by check, sent by the Purchaser to each applicable Stockholder promptly after the satisfaction or waiver, to the extent waivable, of the conditions set forth in <u>Section 6</u>.

(e)    **Purchase Price at the Additional Closings.**

(i)    <u>Second Closing Purchase Price</u>.    The per-share purchase price for Common Stock at the Second Closing (the "<u>Second Closing Purchase Price</u>") shall be determined by calculating the Company's Gross Revenue and Net Operating Income during the relevant period, and shall be the quotient of: (A) the sum of: (1) the 2007 GR Amount <u>plus</u> (2) the 2007 NOI Amount; and (B) the number of shares of Common Stock to be sold by the Common Holders and purchased by Purchaser at the Second Closing (not to exceed twenty-five percent (25%) of each Common Holder's shares of Common Stock, in accordance with <u>Section 1(c)(i)</u>).

4

    (ii)    Third Closing Purchase Price.  The per-share purchase price for Common Stock at the Third Closing (the "Third Closing Purchase Price") shall be determined by calculating the Company's Gross Revenue and Net Operating Income during the relevant period, and shall be the quotient of: (A) the sum of: (1) the 2008 GR Amount plus (2) the 2008 NOI Amount and (B) the total number of shares of Common Stock held by all Common Holders other than the Purchaser.

**Section 2.**  **Closings.**

    (a)    **First Closing.**

    (i)    The closing of the sale of the Tendered Stock and Series C Preferred Stock shall take place at the offices of Kilpatrick Stockton LLP, 1100 Peachtree St. NE, Suite 2800, Atlanta, Georgia 30309.  Each closing of the sale and purchase of any Common Stock after the First Closing is referred to herein as an "Additional Closing"; the First Closing and each Additional Closing are referred to herein as the "Closings", and each a "Closing"; and the date of any such Closing is referred to herein as a "Closing Date".

    (ii)    The First Closing shall occur as promptly as practicable, but in no event later than the third (3rd) Business Day after the satisfaction or waiver, to the extent waivable, of the conditions set forth in Section 6, or on such other date as may be agreed upon by the Purchaser and the Stockholders' Representatives.

    (b)    **Closing Mechanics.**

    (i)    At least ten (10) Business Days prior to any proposed Additional Closing, the Company shall provide written notice (a "Purchase Price Notice") to each Common Holder and the Purchaser setting forth the Company's Gross Revenue and Net Operating Income for the applicable period, the Second Closing Purchase Price or Third Closing Purchase Price, as applicable and, to the extent: (i) JCI elects to offer its publicly traded common stock as part of the consideration in the Second Closing or Third Closing, as applicable; and (ii) the Purchaser Common Stock Valuation can be determined at such time, the Purchaser Common Stock Valuation.

    (ii)    Second Closing:

    (A)    At least five (5) Business Days prior to the Second Closing, if the Company's Gross Revenue or Net Operating Income exceeded the 2007 GR Target or NOI Target, as applicable, then the Common Holders wishing to sell Common Stock held by them shall provide written notice (the "Common Holder's Second Closing Notice") to the Purchaser setting forth the number of shares of Common Stock such Common Holder wishes to sell, and the extent to which such Common Holder desires to have the Second Closing Common Stock Purchase Price paid in cash or in Purchaser's publicly issued stock at the Purchaser Common Stock Valuation.  Notwithstanding the foregoing: (1) to the

extent the Company's Gross Revenue for the applicable period exceeded the 2007 GR Target, then each Common Holder shall be entitled to sell, and, to the extent required by each Common Holder, Purchaser shall purchase, up to twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock; and (2) to the extent the Company's Net Operating Income for the applicable period exceeded the 2007 NOI Target, then each Common Holder shall be entitled to sell, and, to the extent required by each Common Holder, Purchase shall purchase, up to twelve and one-half percent (12.5%) of such Common Holder's total shares of Common Stock. In no event shall any Common Holder be entitled to sell greater than twenty-five percent (25%) of such Common Holder's total shares of Common Stock at the Second Closing. To the extent a Common Holder fails to deliver such Common Holder's Common Holder's Second Closing Notice within the five (5) Business Day period set forth above, such Common Holder shall lose his, her or its rights to sell Common Stock pursuant to this Section 2(b)(ii).

(B)     At least five (5) Business Days prior to the Second Closing, if the Company's Gross Revenue or Net Operating Income did not exceed the 2007 GR Target or NOI Target, as applicable, then the Purchaser shall provide written notice (the "Purchaser's Second Closing Notice") to each Common Holder setting forth the number of shares of Common Stock the Purchaser wishes to purchase from such Common Holder, and the extent to which the Purchaser desires to have the Second Closing Purchase Price paid in cash or Purchaser's publicly issued stock at the Purchaser Common Stock Valuation. Notwithstanding the foregoing: (1) to the extent the Company's Gross Revenue for the applicable period did not exceed the 2007 GR Target, then the Purchaser shall be entitled to purchase, and, to the extent required by the Purchaser, the Common Holder shall sell, up to twelve and one-half percent (12.5%) of each Common Holder's total shares of Common Stock; and (2) to the extent Company's Net Operating Income for the applicable period did not exceed the 2007 NOI Target, then the Purchaser shall be entitled to purchase, and, to the extent required by the Purchaser, the Common Holder shall sell, up to twelve and one-half percent (12.5%) of each Common Holder's total shares of Common Stock. In no event shall the Purchaser be entitled to purchaser greater than twenty-five percent (25%) of any Common Holder's total shares of Common Stock at the Second Closing. To the extent the Purchaser fails to deliver its Purchaser's Second Closing Notice within the five (5) Business Day period set forth above, the Purchaser shall lose its rights to purchase Common Stock pursuant to this Section 2(b)(ii).

(iii)     At least ten (10) Business Days prior to the Third Closing, each Common Holder shall provide written notice (the "Third Closing Notice") to the Purchaser setting forth the number of shares of Common Stock held by such Common Holder and the extent to which such Common Holder desires to have the Third Closing Purchase Price paid in cash or Purchaser's publicly issued stock at the Purchaser

6

Common Stock Valuation; *provided*, that any Common Holder's failure to deliver the Third Closing Notice in such ten (10) Business Day period shall not in any manner effect the purchase and sale of such Common Holder's Common Stock in the Third Closing.

(iv)     Subject to the terms and conditions of this Agreement, at each Additional Closing: (a) the Purchaser shall purchase from each Common Holder the number of shares of Common Stock listed in: (1) with respect to the Second Closing: (A) the Common Holder's Second Closing Notice; and/or (B) the Purchaser's Second Closing Notice, as applicable, and (2) with respect to the Third Closing, the Third Closing Notice; and (b) each Common Holder shall deliver (either by and through the Representatives and in accordance with the Escrow Agreement or pursuant to the Key Management Vesting Agreement, as applicable) to the Purchaser stock certificates (properly endorsed for transfer) representing the shares of Common Stock purchased from such Common Holder by the Purchaser at such Additional Closing.  Immediately after the Second Closing, the Company shall issue new stock certificates (the "Second Closing New Stockholder Certificates") to each of the Purchaser and, with respect to the Second Closing only, the applicable Common Holder, representing the transfer of such shares of Common Stock from such Common Holder to Purchaser.  Notwithstanding the foregoing, the Stockholders acknowledge and agree that the Second Closing New Stockholder Certificates (other than the Second Closing New Stockholder Certificates delivered to the Secretary of the Company pursuant to the terms of the Key Management Vesting Agreement) shall be delivered to the Escrow Agent and held in escrow pursuant to the terms and provisions of the Escrow Agreement.  Immediately after the Third Closing, the Company shall issue new stock certificates to the Purchaser representing the transfer of shares of Common Stock from the Common Holders to Purchaser.

(v)     As payment for such Common Shares, at each Additional Closing, the Purchaser shall deliver to each Common Holder an amount equal to the number of shares of Common Stock purchased from such Common Holder by Purchaser at such Additional Closing multiplied by the Second Closing Purchase Price or Third Closing Purchase Price, as applicable.  All amounts payable at such Additional Closing shall be: (i) if mutually agreed upon between the applicable Common Holder and Purchaser, payable in the Purchaser's common stock, valued at the Purchaser Common Stock Valuation, or (ii) if not payable in the Purchaser's common stock, payable in cash.

(c)     **Terms of Each Closing.**

The Purchaser's agreement with each Stockholder is a separate agreement, and each Stockholder's sale to the Purchaser of: (i) Series B Preferred Stock, Series A Preferred Stock and/or Common Stock in the First Closing, and/or (ii) Common Stock in the Second Closing, and/or (iii) Common Stock in the Third Closing, as applicable, is a separate sale.  The Purchaser shall not be obligated to purchase any fractional shares of Company Stock.   No Common Holder shall be permitted to sell more than his, her or its allotted shares in the First Closing or Second Closing, as applicable, notwithstanding that one or more other Common Holders elect to sell less than their respective allotted shares in such Closing.  Each Additional

Closing shall take place at the offices of Kilpatrick Stockton LLP, 1100 Peachtree St. NE, Suite 2800, Atlanta, Georgia 30309, or at such other place as the parties to such Additional Closing shall mutually agree.

**Section 3.**    <u>**Representations and Warranties of the Stockholders.**</u>

The Stockholders, severally and not jointly and severally, hereby **represent and** warrant to the Purchaser as of each Closing Date as follows:

(a)    <u>**Organization.**</u>

Each Stockholder (if a **corporation or other entity**) is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or other formation.

(b)    <u>**Authorization; No Conflicts.**</u>

The execution, delivery and performance by each Stockholder of the Documents to which such Stockholder is a party have been duly authorized by all requisite action (corporate or otherwise) of such Stockholder, and each Document to which such Stockholder is a party constitutes a valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditor's rights and to general equitable principles. Each Stockholder's execution, delivery and performance of the Documents to which such Stockholder is a party, such Stockholder's consummation of the transactions contemplated thereby and its compliance with the provisions thereof will not (i) violate any provision of any Law applicable to such Stockholder or any of such Stockholder's properties or assets or (ii) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default or give rise to any right of termination, cancellation or acceleration under, or result in the creation of any Encumbrance upon any of the properties or assets of such Stockholder or under any formation documents (if any) or Contract applicable to such Stockholder.

(c)    <u>**Brokers.**</u>

No Stockholder **has employed or has any obligation with respect to any broker or** finder in connection with the transactions contemplated by this Agreement.

(d)    <u>**Capitalization.**</u>

Each Stockholder holds of record and owns beneficially the number and class of Company Stock set forth next to his, her, or its name in <u>Schedule 3(d)</u>, free and clear of any restrictions on transfer (other than any restrictions under the Securities Act and state securities laws). Other than this Agreement and any agreement entered into by a Stockholder related to the Company's 2004 Long Term Incentive Plan, no Stockholder is party to any option, warrant, purchase right, or other contract or commitment that could require such Stockholder to sell,

8

transfer, or otherwise dispose of any capital stock of the Company. No Stockholder is party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of the Company.

**Section 4.    Representations and Warranties of the Company.**

The Company and the Representatives hereby, jointly and severally, represent and warrant to the Purchaser as of the First Closing Date as follows:

(a)    **Organization.**

The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, is duly qualified to do business and in good standing in each other jurisdiction in which the conduct of its business requires such qualification and has all requisite corporate power and authority to own, lease and operate the assets used in its business, to carry on its business as presently conducted, to enter into the Documents to which it is a party, to perform its obligations thereunder, and to consummate the transactions contemplated thereby. Attached as Schedules 4(a)(i) and (ii), respectively, are correct and complete copies of the Certificate of Incorporation, as in effect immediately before the filing of the Restated Certificate, and the By-laws of the Company, as in effect on the date hereof (the "Certificate of Incorporation" and the "By-laws," respectively).

(b)    **Subsidiaries.**

The Company has no subsidiaries or controlled Affiliates and does not otherwise own or control, directly or indirectly, any equity or voting interest in any Person, nor has the Company made any commitment or subscribed for the purchase of any such equity or voting interest.

(c)    **Authorization of the Documents; No Conflicts.**

The Company has all requisite corporate power and authority to execute, deliver and perform the Documents to which it is a party and to consummate the transactions contemplated thereby. The execution, delivery and performance by the Company of the Documents to which it is a party has been duly authorized by all requisite corporate and stockholder action of the Company and its stockholders, and each Document to which the Company is a party constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms (to the extent the Company is a party thereto), subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditor's rights and to general equitable principles. The Company's execution, delivery and performance of the Documents to which it is a party, its consummation of the transactions contemplated thereby and its compliance with the provisions thereof will not (i) violate any provision of any Law applicable to the Company or any of its properties or assets or (ii) except as set forth in Schedule 4(c) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default or give rise to any right of termination, cancellation or

9

acceleration under, or result in the creation of any Encumbrance upon any of the properties or assets of the Company or under the Certificate of Incorporation, By-laws or any Contract.

        (d)    **Authorization of Series C Preferred Stock and Reserved Shares.**

        As of the First Closing Date, (i) the authorization, issuance, sale and delivery of the Series C Preferred Stock and the reservation of the Reserved Shares has been duly authorized by all requisite corporate and stockholder action on the part of the Company and its stockholders; (ii) the Series C Preferred Stock is validly issued and outstanding, fully paid and nonassessable and not subject to any preemptive rights, rights of first refusal or other similar rights of the stockholders of the Company (other than those rights set forth in the Stockholders Agreement).

        (e)    **No Consent or Approval Required.**

        Except as set forth on <u>Schedule 4(e)</u> hereto, no consent, approval or authorization of, or declaration to or filing with (including pursuant to any federal or state securities laws), any Person is required for the valid authorization, execution and delivery by the Company of any Document to which it is a party or for its consummation of the transactions contemplated thereby or for the valid authorization, issuance and delivery of the Series C Preferred Stock or for the valid authorization, reservation, issuance and delivery of the Reserved Shares, other than those consents, approvals, authorizations, declarations or filings which have been obtained or made, as the case may be.

        (f)    **Capitalization.**

        The capital stock of the Company immediately prior to the Closing consists solely of: (i) 5,000,000 shares of Common Stock, of which: (A) 1,000,000 shares are issued and outstanding and owned by the Persons listed on <u>Schedule 3(d)</u>, (B) 300,000 shares are reserved for issuance upon the exercise of options granted or to be granted under the Company's 2004 Long Term Incentive Plan, (C) 300,000 shares are reserved for issuance upon conversion of the Series A Preferred Stock, and (D) 371,000 shares are reserved for issuance upon conversion of the Series B Preferred Stock; and (ii) 2,000,000 shares of authorized preferred stock, $0.001 par value, of which 300,000 shares have been designated Series A Preferred Stock, all of which are issued and outstanding and owned by the Persons listed on <u>Schedule 3(d)</u> and of which 371,000 shares have been designated Series B Preferred Stock, 371,000 of which are issued and outstanding and owned by the Persons listed on <u>Schedule 3(d)</u>.

        All of the Company's issued and outstanding shares of capital stock (or other equity securities) have been duly authorized and validly issued and are fully paid and nonassessable. Except as provided in this Agreement or pursuant to the Company's 2004 Long Term Incentive Plan, (i) no subscription, warrant, option, convertible security or other right (contingent or otherwise) to purchase or acquire any shares of capital stock of the Company is authorized or outstanding, (ii) the Company has no obligation (contingent or otherwise) to issue any subscription, warrant, option, convertible security or other such right or to issue or distribute to holders of any shares of its capital stock or other equity securities any evidences of indebtedness or assets of the Company, (iii) the Company has no obligation (contingent or

10

otherwise) to purchase, redeem or otherwise acquire any shares of its capital stock (or other equity securities) or any interest therein or to pay any dividend or make any other distribution in respect thereof (other than any such obligation set forth in the Certificate of Incorporation), and (iv) there are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to the Company.  All of the issued and outstanding shares of the Company's capital stock (or other equity securities) have been offered, issued and sold by the Company in compliance with applicable federal and state securities Laws.

Immediately after the First Closing, the Series C Preferred Stock shall represent (on an as-converted basis) fifty-eight percent (58%) of the Fully-Diluted Capitalization of the Company.  Immediately after the conversion contemplated by <u>Section 7(k)</u>, the capitalization of the Company shall be as set forth on <u>Schedule 4(f)</u>.

 (g) **Defaults.**

Except as set forth on <u>Schedule 4(g)</u> hereto, the Company is not in default (i) under the Certificate of Incorporation or the By-laws, or, to the Knowledge of the Company or the Knowledge of the Representatives, any Contract to which the Company is a party or by which the Company or any of the Company's properties are bound or affected or (ii) to the Knowledge of the Company and the Knowledge of the Representatives, under any Law.  To the Knowledge of the Company and the Knowledge of the Representatives, there exists no condition, event or act which constitutes, or which, after notice, lapse of time or both, would constitute, a default under any of the foregoing.

 (h) **Financial Information; Projections.**

 (i) The Company has furnished to the Purchaser a complete and correct copy of (i) the unaudited balance sheet of the Company (the "<u>Balance Sheet</u>") as at December 31, 2005 (the "<u>Balance Sheet Date</u>") and the related statements of income and cash flows for the fiscal year then ended and (ii) the unaudited balance sheet of the Company as at January 31, 2006 and the related statements of income and cash flows for the one (1) month fiscal period then ended (collectively, the "<u>Financial Statements</u>").  The Financial Statements were prepared in accordance with the books and records of the Company and present fairly in all respects the financial condition and results of operations of the Company, at the dates and for the periods indicated.

 (ii) The business plan of the Company and the initial budget for calendar year 2006 as set forth on <u>Schedule 4(h)</u> have been prepared in good faith, using assumptions which are reasonable.  Such projections set forth in reasonable detail the principal assumptions upon which such projections are based and represent the Company's reasonable, good faith estimate of future performance and costs.

 (i) **Absence of Undisclosed Liabilities.**

Except as set forth on <u>Schedule 4(i)</u> and except for Liabilities which have not had and could not reasonably be expected to have a material adverse effect on the Company or its

11

business, the Company has no Liability that would be required to be reserved against or disclosed in a financial statement prepared in accordance with GAAP, except for (a) Liabilities disclosed on the Balance Sheet or otherwise reserved against, (b) Liabilities which have arisen since the Balance Sheet Date in the ordinary course of business and which are similar in nature and amount to the Liabilities which arose during the comparable period of time in the immediately preceding fiscal period and (c) contractual Liabilities incurred in the ordinary course of business.

(j)    **Absence of Changes.**

Except as set forth on Schedule 4(j) hereto, since the Balance Sheet Date, the Company has been operated only in the usual, regular and ordinary course and manner and there has not been (i) a Material Adverse Change, (ii) any borrowing or agreement to borrow funds or to the Knowledge of the Company and the Knowledge of the Representatives, any Liability incurred by the Company, other than current Liabilities incurred in the ordinary course of business consistent in type and amount with past practice, (iii) any asset or property of the Company made subject to any Encumbrance of any kind, (iv) any waiver of any right of the Company, or the cancellation of any debt owed to or claim held by the Company, (v) any payment of dividends on, or other distribution with respect to, or any direct or indirect redemption, purchase or acquisition of, any shares of the capital stock or other securities of the Company, (vi) any issuance of any stock, bond or other security of the Company other than as contemplated by the Company's 2004 Long Term Incentive Plan, (vii) any disposition of any tangible or intangible asset of the Company, (viii) any loan by the Company to any officer, director, employee, consultant, agent, Affiliate or Stockholder (other than advances to such persons in the ordinary course of business consistent with past practice in connection with bona fide business expenses), (ix) any material damage, destruction or loss (whether or not covered by insurance) of any asset of the Company, (x) any extraordinary increase, direct or indirect, in the compensation paid or payable to any officer, director, employee, consultant or agent of the Company, (xi) any write-down of the value of any inventory, or any write-off as uncollectible of any account or note receivable of the Company that is not consistent in type and amount with the Company's past practice, (xii) any change in the accounting methods, practices or policies followed by the Company or any change in depreciation or amortization policies or rates theretofore adopted, which has not been adequately provided for or disclosed in the Financial Statements or (xiii) any agreement or commitment with respect to any of the foregoing matters.

(k)    **Title to Assets, Properties and Rights.**

Except as is set forth on Schedule 4(k), the Company has good and marketable title to all properties, interests in properties and assets (real, personal or mixed) used by the Company in the conduct of its business, or necessary for use by the Company in the conduct of such business, free and clear of all Encumbrances.

(l)    **Intellectual Property Rights.**

(i)    Schedule 4(l)(i) includes a list of all registered Intellectual Property Rights and all pending applications for registration of Intellectual Property

12

Rights (but with respect to software excluding any readily available commercial software programs having an acquisition price of less that $5,000 ("General Commercial Software")), that are owned by or licensed to the Company (the "Company Intellectual Property").

(ii)    Other than pending applications and Intellectual Property Rights licensed to the Company, the Company Intellectual Property listed on Schedule 4(l)(i) that is registered and issued in the name of the Company is presently in full force and effect, and has not been cancelled, expired, or abandoned, and to the Knowledge of the Company and the Knowledge of the Representatives, the same are valid and enforceable. The applications listed on Schedule 4(l)(i) are pending and have not been abandoned. Except for Company Intellectual Property that is licensed to the Company or that is identified in Schedule 4(l)(ii), the Company is the exclusive owner of the registration or application for such Company Intellectual Property, free and clear of any Encumbrance (provided that this sentence shall not be interpreted to refer to validity, enforceability, right to use, freedom from infringement, or any matters addressed in the remaining provisions of this Section 4(l)). With the exception of governmental fees (for example, maintenance fees, renewal fees, issue fees, extension fees, or publication fees) and service fees to third parties related to securing, maintaining, or protecting the Company Intellectual Property, no royalties, honoraria or fees are payable by the Company to other Persons by reason of the Company's ownership of the Company Intellectual Property.

(iii)    The patents and patent applications (including any provisional patent applications) and registrations set forth in Schedule 4(l)(i) have been timely filed in accordance with the applicable rules and regulations of the United States and such other foreign patent offices and no use, disclosure, publication, sale or offer for sale, by the Company, or to the Knowledge of the Company and the Knowledge of the Representatives, by any third party, have resulted in the loss of any rights to such patents, applications and registrations.

(iv)    Except as described in Schedule 4(l)(iv), the Company has not received any threat, demand or notice of claim from any Person, whether in writing or otherwise, asserting that the Company's use, manufacture, importation, or sale of products constitutes any infringement, interference, violation, misappropriation, breach or legally actionable use of the Intellectual Property Rights of any other Person. The Company is not a party to any Proceeding (other than Proceedings filed by the Company to obtain registration, issuance, or renewal) or outstanding decree, order, Judgment, agreement or stipulation restricting in any manner that would result in a Material Adverse Change to the use, transfer, or licensing by the Company of any Intellectual Property Rights to the extent necessary to conduct its business as presently conducted, or which reasonably may be anticipated to result in a Material Adverse Change to the validity, right of the Company to use or enforceability of the Company Intellectual Property. To the Knowledge of the Company and the Knowledge of the Representatives, the Company has not been named in any suit, action or Proceeding which involves a claim of infringement, misappropriation or violation of any Intellectual Property Rights of any

13

third party. The Company believes, and neither the Company nor the Representatives have Knowledge to the contrary, that the use, manufacturing, marketing, importing to the United States, licensing and sale of the products of the Company as presently conducted do not infringe, misappropriate or violate any valid and enforceable Intellectual Property Rights of any third party.

(v)     The Company does not possess any copies it has illegally made of any General Commercial Software.

(vi)     Except as set forth on Schedule 4(l)(vi), all current and former employees of the Company, and independent contractors of the Company, in each case who were or are reasonably expected in the course of performance of their duties to the Company to create or have created Intellectual Property Rights that govern the ownership or use of the Company's products or services, have executed written agreements with the Company, substantially in the form attached hereto as Exhibit C-1. To the Knowledge of the Company and the Knowledge of the Representatives, no employee of the Company has entered into any contract in favor of a third party that restricts or limits in any way the scope or type of work in which he may be engaged for the Company or requires him to transfer, assign, or disclose information concerning work devised, developed, or designed by such employee within the scope of their employment for the Company to any Person other than the Company.

(vii)     Except as set forth on Schedule 4(l)(vii), the Company is not currently participating in any discussions, negotiations, correspondence or meetings with third parties with respect to new licensing or similar arrangements (other than licensing to customers in the ordinary course of business and renewals of existing licenses to the Company), whether involving the licensing of any of the Company-owned Company Intellectual Property or the licensing of a third party's Intellectual Property Rights.

(viii)     The Company has taken actions, measures and precautions intended to safeguard and protect the information the Company considers to be its trade secrets, with a view to being reasonable, prudent and customary in the internet security industry.

(m)     **Employment of Officers, Employees and Consultants.**

Except as set forth on Schedule 4(m), no Person has asserted, or may assert, any valid claim against the Company with respect to: (a) employment not terminable at will by, or association with, the Company, of any of the present officers or employees of or consultants to the Company (collectively, the "Designated Persons") or (b) the use, in connection with any business presently conducted or proposed to be conducted by the Company or any of the Designated Persons, of any information which the Company or any of the Designated Persons would be prohibited from using under any prior agreements or arrangements or any legal considerations applicable to unfair competition, trade secrets or proprietary information.

(n)     **ERISA Plans.**

14

(i)    Except as set forth on <u>Schedule 4(n)</u>, the Company does not maintain and is not a party to (and has never maintained or been a party to) any "employee welfare benefit plan," as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), or any other written, unwritten, formal or informal plan or agreement involving direct or indirect compensation other than workers' compensation, unemployment compensation and other government programs, under which the Company has any present or future obligation or Liability.    The Company does not maintain and is not a party to (or ever maintained or was a party to) any "employee pension benefit plan," as defined in Section 3(2) of ERISA, and the Company does not contribute to any "multiemployer plan" as defined in Section 3(37) of ERISA.

(ii)    There is no Contract, plan or arrangement covering any employee or former employee of the Company that, individually or collectively, could give rise to the payment of any amount that would not be deductible by the Company by reason of Section 280G of the Code.

(iii)    <u>Schedule 4(n)</u> hereto lists each employment, severance or other similar Contract, arrangement or policy (written or oral) providing for insurance coverage (including any self-insured arrangements), non-statutory workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock appreciation or other forms of incentive compensation or post-retirement insurance, compensation or benefits entered into, maintained or contributed to by the Company.

(o)    **Agreements.**

<u>Schedule 4(o)</u> sets forth an accurate and complete list of all material contracts, indentures, leases, agreements and instruments (each, a "<u>Contract</u>" and collectively, the "<u>Contracts</u>"), whether written or oral (including any and all amendments, modifications, supplements and side letters with respect thereto) to which the Company is a party, or by which the Company or any of the Company's assets are bound.  All of the Contracts are enforceable against the Company and, to the Knowledge of the Company and the Knowledge of the Representatives, the other parties thereto, in accordance with their terms and neither the Company nor, to the Knowledge of the Company and the Knowledge of the Representatives, any other party thereto, is in material breach or in material default under (and no event has occurred which with notice or the passage of time or both would constitute a breach or default under) any such Contract.  Except as set forth on <u>Schedule 4(o)</u> hereto, no Person has indicated that it may terminate or cancel any Contract.  Except as set forth on <u>Schedule 4(o)</u> hereto, no party to any Contract has any rights of setoff, banker's lien or similar rights with respect to any amounts due on any such Contract.  Except as set forth on <u>Schedule 4(o)</u> hereto, no Contract or to the Knowledge of the Company and the Knowledge of the Representatives, no Law restricts or inhibits in any way the Company's right or ability to conduct its business in the United States or any other jurisdiction in which it currently conducts or proposes to conduct its business or to use any Intellectual Property Rights or other rights related to the conduct of such business.

15

(p)    **Compliance; Licenses and Permits; Environmental Matters.**

(i)    The Company has complied in all respects with, and is not in violation in any respect of, any Law or Permit applicable to the business of the Company as presently or previously conducted, or as currently proposed to be conducted, except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Change.    The Company has all licenses and permits of all Governmental Authorities (collectively, "Permits") which are required for the conduct of the business presently or previously conducted by the Company, which Permits are in full force and effect, and no violations are outstanding or uncured with respect to any such Permits and no Proceeding is pending or, to the Knowledge of the Company and the Knowledge of the Representatives, threatened to revoke or limit any such Permits. Schedule 4(p) attached hereto lists all Permits of the Company which are used in or relate to such Person's business, copies of which have been previously delivered to the Purchaser. To the Knowledge of the Company and the Knowledge of the Representatives, no condition or event has occurred which, with notice or the passage of time or both, would constitute a violation of any Law or Permit.

(ii)    The Company is in compliance with all Environmental and Safety Requirements, and there are no Proceedings pending or, to the Knowledge of the Company and the Knowledge of the Representatives, threatened against the Company alleging any failure to so comply or involving any of its past operations or any real property currently used by the Company.  The Company has not received any written or oral notice or report with respect to it or its facilities regarding any (A) actual or alleged violation of Environmental and Safety Requirements or (B) actual or potential Liability arising under Environmental and Safety Requirements, including, without limitation, any investigatory, remedial or corrective obligation.   The Company has not expressly assumed or undertaken any Liability of any other Person under any Environmental and Safety Requirements.  The Company has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled or released any substance, or owned or operated any real property in a manner that has given rise to Liabilities pursuant to CERCLA, SWDA or any other Environmental and Safety Requirement, including any Liability for response costs, corrective action costs, personal injury, property damage, natural resources damage or attorney fees, or any investigative, corrective or remedial obligations.

(q)    **Labor Relations; Employees.**

The Company's employees as of the date hereof are listed on Schedule 4(q). Except as set forth on Schedule 4(q) hereto, (i) the Company is not delinquent in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed by them prior to any Closing Date or amounts required to be reimbursed to such employees, (ii) there is no labor strike, dispute, slowdown or stoppage actually pending or, to the Knowledge of the Company and the Knowledge of the Representatives, threatened against or involving the Company, and (iii) the Company is not a

16

party to or bound by any collective bargaining agreement and neither any grievance nor any arbitration proceeding arising out of or under any collective bargaining agreement is pending and no such claim has been asserted.

      (r)     **Litigation.**

Except as set forth on <u>Schedule 4(r)</u> hereto, there is no action, suit, customer claim, counterclaim, proceeding or investigation at law or in equity or by or before any Governmental Authority or other agency (collectively, "<u>Proceedings</u>") now pending or, to the Knowledge of the Company and the Knowledge of the Representatives, threatened against or by the Company, or affecting the Company or any of the Company's assets or properties, nor to the Knowledge of the Company and the Knowledge of the Representatives, does there exist any basis for any such pending or threatened Proceeding.

      (s)     **Tax Matters.**

Except as set forth on <u>Schedule 4(s)</u> hereto, (i) the Company has filed all Tax returns, declarations of estimated Tax, Tax reports, information returns and statements (collectively, the "<u>Returns</u>") required to be filed by it prior to the First Closing Date (other than those for which extensions shall have been granted prior to such Closing Date); (ii) as of the time of filing, the Returns were true, complete and correct and the Company has paid all Taxes required to be paid, whether or not shown on the Returns to be due; (iii) the Company has timely paid or made provisions on its books and records for all Taxes payable for any period that ended on or before the Initial Closing Date and for any period that began on or before such Closing Date and ends after such Closing Date, to the extent such Taxes are attributable to income earned or accrued in the portion of any such period ending on such Closing Date; (iv) the Company is not delinquent in the payment of any Taxes, nor has the Company requested any extension of time within which to file any Return, which Return has not since been filed; (v) there are no pending Tax audits of any Returns of the Company; (vi) no Encumbrance with respect to Taxes has been filed and, to the Knowledge of the Company and the Knowledge of the Representatives, no deficiency or addition to Taxes, interest or penalties for any Taxes with respect to any income, properties or operations of the Company has been proposed, asserted or assessed in writing against the Company; (vii) the Company has not been granted any extension of the statute of limitations applicable to any Return or other Tax claim; (viii) the Company has not, since its inception, been a personal holding company within the meaning of Section 542 of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"); (ix) the Company has not made any election under Section 341(f) of the Code; (x) the Company has never been a "United States real property holding corporation" as defined in Section 897(c)(2) of the Code and Section 1.897-2(b) of the Regulations promulgated thereunder; (xi) neither the Company, nor any of its stockholders, has ever filed an election pursuant to Section 1362 of the Code that the Company be taxed as an S Corporation; and (xii) the Company and each of its predecessors has complied with all applicable Laws relating to the payment and withholding of Taxes, including sales and use Taxes, and has withheld and paid over all amounts required by Law to be withheld and paid from the wages or salaries of employees, and to the Knowledge of the Company and the

17

Knowledge of the Representatives, the Company is not liable for any Taxes for failure to comply with such Laws.

(t)     **Customers and Suppliers.**

Schedule 4(t) sets forth a correct and complete list of each of the top five (5) customers and top five (5) suppliers of the Company who made purchases from or sales to the Company since January 1, 2005 and indicates with respect to each the nature of the relationship (including the principal categories of products or services bought or sold and the annual dollar value of products or services bought or sold). Except as set forth in Schedule 4(t), the Company is not required to provide any bonding or other financial security arrangements in connection with any of its transactions with any such customer or supplier. Since the Balance Sheet Date, no such customer or supplier has terminated its relationship with, or materially reduced its purchases from or sales to, the Company, and the Company does not have any knowledge that any such customer or supplier intends to terminate its relationship with, or materially reduce its purchases from or sales to, the Company.

(u)     **Accounts Receivable; Deferred Revenue:**

All of the accounts receivable of the business conducted by the Company are owned by and in the name of the Company, and Schedule 4(u) discloses all accounts receivable of the Company outstanding as of the First Closing Date, presented on an aged basis, and separately identifies the name of each account debtor and the total amount of each related accounts receivable. All of the Company's accounts receivable represent bona fide amounts owed for products previously delivered or services previously rendered, and none of the Company's accounts receivable is subject to any counterclaim, defense or set off or is otherwise in dispute. The Company has not accepted any prepayment or other payment for products to be delivered or services to be performed on or after the Closing Date. The Company does not have any Deferred Revenue.

(v)     **Insurance.**

Schedule 4(v) sets forth a list of all insurance policies carried by the Company, and also sets forth an accurate list of all insurance loss runs and worker's compensation claims received for the most recently ended two (2) policy years to the extent reasonably available. True, complete and correct copies of all insurance policies carried by the Company that are presently in effect have been provided to the Purchaser, and all such insurance policies have been issued by insurers of recognized responsibility and currently are in full force and effect. No insurance carried by the Company has been cancelled by the insurer and the Company has never been denied insurance coverage in any regard or to any degree.

(w)     **Related Party Transactions; Competing Business Interests.**

Except as set forth on Schedule 4(w) hereto, no current or former stockholder, director, officer or employee of the Company, nor any "associate" (as defined in the rules and regulations promulgated under the Securities Act), of the Company is presently, or since the

18

inception of the Company has been, directly or indirectly through his, her or its affiliation with any other Person, a party to any transaction with the Company, providing for the furnishing of services by or to, or rental of real or personal property from or to, or otherwise requiring cash payments to or by any such Person (other than the payment of salaries and benefits to employees in the ordinary course of business). To the Knowledge of the Company and the Knowledge of the Representatives, none of the Stockholders nor any of their Affiliates engages in any business activity relating to or competitive with the Company.

(x)     **Offering Exemption.**

To the Knowledge of the Company and the Knowledge of the Representatives and assuming the accuracy of the representations of the Purchaser in Section 5(a), the offering, sale, and issuance of the Series C Preferred Stock and the Reserved Shares by the Company are, or will be, exempt from registration under the Securities Act and the Exchange Act, and such offerings, sales and issuances are also exempt from registration under applicable state securities and "blue sky" laws. The Company has made or will make all requisite filings and has taken or will take all action necessary to be taken to comply with such state securities or "blue sky" laws in connection with the offering, sale and issuance of the Series C Preferred Stock and the Reserved Shares by the Company.

(y)     **Brokers and Finders.**

Neither the Company nor any of the officers, directors, employees or stockholders of the Company, has employed or has any obligation with respect to any broker or finder in connection with the transactions contemplated by this Agreement.

(z)     **Registration Rights.**

No Person has any right to cause the Company to effect the registration under the Securities Act of any shares of Common Stock or any other securities (including debt securities) of the Company.

(aa)    **Disclosure.**

None of the Documents or any other document provided to the Purchaser pursuant to the Documents, in any case to which the Company is a party, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading as of the date thereof or the First Closing Date. To the Knowledge of the Company and the Knowledge of the Representatives, there is no fact which adversely affects, or in the future may adversely affect, the business, operations, affairs, prospects, condition, properties or assets of the Company. No investigation or due diligence conducted by, or knowledge obtained by, the Purchaser shall limit, modify or negate any of the foregoing representations and warranties.

19

9034153.14

(bb)    **Use of Proceeds.**

The First Closing Company Receipts received by the Company from the sale of the Series C Preferred Stock shall be used by the Company as follows:

(i)    For the payment in full, on the First Closing Date, of the Company's indebtedness to First Commercial Bank;

(ii)    In accordance with <u>Section 11</u> related to certain fees and expense of Company and Purchaser; and

(iii)    for general corporate and working capital purposes.

**Section 5.**    **Representations of the Purchaser.**

The Purchaser represents to the Company as follows:

(a)    **Investment Representations.**

(i)    The Purchaser is acquiring the Series C Preferred Stock for its own account, for investment and not with a view to the distribution thereof, nor with any present intention of distributing the same.

(ii)    The Purchaser understands that the Series C Preferred Stock has not been, and any shares of capital stock issuable upon conversion of the Series C Preferred Stock will not be, registered under the Securities Act, by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act, and that they must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from registration.

(iii)    The Purchaser understands that the exemption from registration afforded by Rule 144 (the provisions of which are known to the Purchaser) promulgated under the Securities Act depends on the satisfaction of various conditions and that, if applicable, Rule 144 may only afford the basis for sales under certain circumstances and only in limited amounts.

(iv)    The Purchaser has had a reasonable time prior to the date hereof to ask questions and receive answers concerning the terms and conditions of the offering of the Series C Preferred Stock, and to obtain any additional information which the Company possesses or could acquire without unreasonable effort or expense, and has generally such knowledge and experience in business and financial matters and with respect to investments in securities of privately held companies as to enable the Purchaser to understand and evaluate the risks of such investment and form an investment decision with respect thereto.

(v)    The Purchaser is an "accredited investor," as such term is defined in Rule 501 (the provisions of which are known to such the Purchaser) promulgated under the Securities Act.

(b)    **Organization**.    The Purchaser is a company duly organized, validly existing and in good standing under the laws of Japan, is duly qualified to do business and in good standing in each other jurisdiction in which the conduct of its business requires such qualification and has all requisite corporate power and authority to own, lease and operate the assets used in its business, to carry on its business as presently conducted, to enter into the Documents to which it is a party, to perform its obligations thereunder, and to consummate the transactions contemplated thereby.

(c)    **Authorization of the Documents; No Conflicts**.

The Purchaser has all requisite corporate power and authority to execute, deliver and perform the Documents to which it is a party and to consummate the transactions contemplated thereby.    The execution, delivery and performance by the Purchaser of the Documents to which it is a party has been duly authorized by all requisite corporate action, and each Document to which the Purchaser is a party constitutes a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms (to the extent the Company is a party thereto), subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditor's rights and to general equitable principles.    The Purchaser's execution, delivery and performance of the Documents to which it is a party, its consummation of the transactions contemplated thereby and its compliance with the provisions thereof will not: (i) violate any provision of any Law applicable to the Purchaser or any of its properties or assets; or (ii) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default or give rise to any right of termination, cancellation or acceleration under, or result in the creation of any Encumbrance upon any of the properties or assets of the Purchaser or under the Purchaser's formation and organizational documents.

(d)    **No Consents or Approvals Required**.

No consent, approval or authorization of, or declaration to or filing with (including pursuant to any federal or state securities laws), any Person is required for the valid authorization, execution and delivery by the Purchaser of any Document to which it is a party or for its consummation of the transactions contemplated thereby, other than those consents, approvals, authorizations, declarations or filings which have been obtained or made, as the case may be.

(e)    **Brokers and Finders**.

No Person acting on behalf or under the authority of the Purchaser is or will be entitled to any broker's, finder's, or similar fee or commission in connection with the transactions contemplated thereby.

**Section 6.**    **Prior or Simultaneous Actions.**

(a)    **First Closing.**

(i)    The obligation of the Purchaser to purchase the Series A Preferred, the Series B Preferred Stock, the Series C Preferred Stock and the Common Stock at the First Closing is subject to the fulfillment, or the waiver by the Purchaser, of each of the following conditions:

(A)    Accuracy of Representations and Warranties.    The representations and warranties of the Stockholders, the Company and the Representatives contained in the Documents shall be true and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as of the date of this Agreement and the First Closing Date as if made on and as of the First Closing, and the Purchaser shall have received a certificate of an officer of the Company to such effect with regard to the representations and warranties of the Company and the Representatives on the First Closing Date.

(B)    Compliance with Covenants.    The Company shall have performed and complied in all material respects with all agreements and covenants contained in the Documents to which it is a party as of the date of the First Closing, and the Purchaser shall have received a certificate of an officer of the Company attesting as to such compliance.

(C)    Due Diligence.    Prior to the First Closing Date, the Purchaser shall have been satisfied in all respects with the results of its and its advisors' business, intellectual property, legal, tax and accounting due diligence investigation of the Company.

(D)    Restated Certificate.    On the First Closing Date, the Restated Certificate shall have been filed with and accepted by the Secretary of State of the State of Delaware and shall have become effective. The By-Laws of the Company shall be amended in a manner satisfactory to the Purchaser prior to the First Closing Date.

(E)    Stockholders' Agreement.    The Stockholders' Agreement substantially in the form attached hereto as Exhibit B shall have been executed and delivered by all parties thereto and shall be in full force and effect.

(F)    Required Consents.    All consents, approvals and other actions of, and notices and filings with, all Persons as may be necessary or required to be obtained by the Company with respect to the execution and delivery by the Company of the Documents to which it is a party, and the consummation by the Company of the transactions contemplated thereby, have been obtained or made including all filings, consents and approvals required

22

Competition and Employment Agreement substantially in the form attached hereto as <u>Exhibit C</u>, and such agreements shall be in full force and effect.

(M)    <u>Option Exercise</u>.  On or prior to the First Closing Date, the Company will grant the balance of its option pool existing as of the date hereof (such amount set forth on <u>Schedule 6(a)(i)(M)</u>) to existing employees (at the sole discretion of the Board of Directors of the Company immediately prior to the First Closing Date).    Such options shall be granted with an exercise price of $3.00/share, and shall vest in accordance with the following schedule: (a) 50% of each grantee's options shall vest on March 31, 2007; and (b) 50% of each grantee's options shall vest on March 31, 2008.

(N)    <u>Option Sale Agreements</u>.  On or prior to the First Closing Date, each holder of options to purchase Common Stock (each, an "<u>Optionholder</u>") shall have executed and delivered an Option Sale Agreement substantially in the form attached hereto as <u>Exhibit D</u>, and such agreements shall be in full force and effect.

(O)    <u>Key Management Vesting Agreements</u>.  On or prior to the First Closing Date, each of Donald Davidson, David Izatt and Chandler Hall shall have executed and delivered a Key Management Vesting Agreement substantially in the form attached hereto as <u>Exhibit E</u>, such agreements shall be in full force and effect.

(P)    <u>Patent Search</u>.  On or prior to the First Closing Date, the Purchaser shall have completed a "freedom to operate" search for third-party United States patent rights.

(Q)    <u>Escrow Agreement; Escrowed Shares</u>.  On or prior to the First Closing Date: (a) the Purchaser shall have received a duly executed copy of the Escrow Agreement, substantially in the form attached hereto as <u>Exhibit F</u>; and (b) the Stockholders or on behalf of the Stockholders, the Representatives shall have deposited the New Stockholder Certificates with the Escrow Agent under the Escrow Agreement (other than those New Stockholder Certificates to be deposited with the Secretary of the Company pursuant to the Key Management Vesting Agreement).

(ii)    The obligation of the Company to sell the Series C Preferred Stock at the First Closing is subject to the fulfillment, or waiver by the Stockholders' Representatives, of each of the following conditions on or before the First Closing:

(A)    <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of the Purchaser contained in the Documents shall be true and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as of the date of this Agreement and the First Closing Date as if made

on and as of the First Closing, and the Company shall have received a certificate of an officer of the Purchaser to such effect.

(B)    Compliance with Covenants.    The Purchaser shall have performed and complied in all material respects with all agreements and covenants contained in the Documents to which it is a party as of the date of the First Closing, and the Company shall have received a certificate of an officer of the Purchaser attesting as to such compliance.

(C)    Required Consents.    All consents, approvals and other actions of, and notices and filings with, all Persons as may be necessary or required to be obtained by the Purchaser with respect to the execution and delivery by the Purchaser of the Documents to which it is a party, and the consummation by the Company of the transactions contemplated thereby, have been obtained or made, and an authorized officer of the Purchaser shall deliver a certificate to the Company to such effect on the First Closing Date.

(D)    Payment of Fees.    On the First Closing Date, Bradley Arant Rose & White LLP shall have been reimbursed in accordance with Section 11(b), by wire directly to Bradley Arant Rose &White LLP, the amounts set forth on Schedule 6(a)(i)(H).

(E)    Termination of Line of Credit.    On the First Closing Date, the Company shall have received evidence that the Company's indebtedness to First Commercial Bank is paid in full and the personal guaranty of Donald J. Davidson in connection therewith is released.

(F)    Payment of Stockholders.    The Purchaser shall have delivered to the Company the New Purchaser Stock Certificates to be treated in accordance with Section 7(k), and shall have sent (in accordance with Section 1(d)(v)) to the Stockholders the amounts required pursuant to Section 1(d), for the purchase by Purchaser of the number of shares of Series B Preferred Stock, Series A Preferred Stock and Common Stock set forth on Annex II.

(G)    Execution of Documents.    The Purchaser shall have executed and delivered to the Company the Escrow Agreement and any other agreement the Purchaser is required to execute pursuant to this Agreement.

(b)    **Obligation of the Purchaser at Additional Closings.**

The obligation of the Purchaser to purchase the Common Stock at each Additional Closing is subject to the fulfillment, or the waiver by the Purchaser, of each of the following conditions on or before such Closing:

(i)    Accuracy of Representations and Warranties.    (A) The representations and warranties of the Company contained in the Documents shall be true

25

and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as if made on and as of such Closing, and the Purchaser shall have received a certificate of an officer of the Company to such effect on such Closing Date; and (B) the representations and warranties of each Stockholder contained in the Documents to which such Stockholder is a party shall be true and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as if made on and as of such Closing.

(ii)    <u>Compliance with Covenants</u>.  **The Company shall have performed and complied in all material respects with all agreements and covenants contained in the Documents to which it is a party as of the date of such Closing, and the Purchaser shall have received a certificate of an officer of the Company attesting as to such compliance.**

(iii)    <u>Stock Certificates</u>.  On the date of each Additional Closing, the Purchaser shall have received stock certificates evidencing its purchase of Common Stock hereunder and the Company, or the Escrow Agent (or escrow agent under the Key Management Vesting Agreement), as applicable, shall have delivered to the Purchaser the stock certificates in the manner set forth in <u>Section 2(b)(iv)</u>.

(iv)    <u>Option Sale Agreements</u>.    Each Optionholder that had not previously entered into an Option Sale Agreement shall have executed and delivered an Option Sale Agreement in substantially the form attached as <u>Exhibit D</u>, and such agreements shall be in full force and effect.

(c)    **<u>Obligation of the Stockholders at Additional Closings</u>.**  The obligation of the Stockholders to sell the Common Shares at each Additional Closing is subject to fulfillment, or the waiver by the Stockholders' Representatives, of each of the following conditions on or before such Closing:

(i)    <u>Accuracy of Representations and Warranties</u>.    The representations and warranties of the Purchaser contained in the Documents shall be true and correct in all material respects (other than those representations and warranties which are qualified by "materiality", which shall be true and correct in all respects) as of the date of this Agreement and each Closing Date as if made on and as of such Closing Date, and the Company shall have received a certificate of an officer of the Purchaser to such effect.

(ii)    <u>Compliance with Covenants</u>.  The Purchaser shall have performed and complied in all material respects with all agreements and covenants contained in the Documents to which it is a party as of the date each Closing, and the Company shall have received a certificate of an officer of the Purchaser to such effect.

(iii)    <u>Required Consents</u>.  All consents, approvals and other actions of, and notices and filings with, all Persons as may be necessary or required with respect the execution and delivery by the Purchaser of the Documents, and the consummation by the

26

Purchaser of the transactions contemplated thereby have been obtained or made and the Company shall have received a certificate of an officer of the Purchaser to such effect.

**Section 7.    Covenants of the Company.**

Until the earliest to occur of: (i) the date of the QIPO (as defined in the Restated Certificate), (ii) the Third Closing, or (iii) the termination of this Agreement, the Company (and, where applicable, the Purchaser) shall comply with the following agreements:

(a)    **Access to Records.**

The Company shall afford to the Purchaser and its authorized employees, counsel, accountants and other representatives, (i) full access at the Company's offices and to true and correct copies of (A) all of its and their books of account, records and properties (including the opportunity to inspect its and their properties at such times as the Purchaser may reasonably request) and (B) all documents, reports financial data and other information as the Purchaser may reasonably request (including any information necessary to comply with 22 U.S.C. 3102, 3103 and 3104), and (ii) the opportunity to interview, consult with and advise any officer or director, representative, accountant, and other advisor of the Company regarding the Company's affairs.

(b)    **Budget.**

At least fifteen (15) days prior to the beginning of each fiscal quarter and thirty (30) days prior to the beginning of each fiscal year of the Company, respectively, the Company shall deliver to the Purchaser quarterly and annual management projections and budgets for the Company for such fiscal period, in form, methodology, and level of detail consistent with the Initial Budget delivered to the Purchaser and otherwise reasonably satisfactory to the Purchaser. Such budgets shall be deemed satisfactory if they shall have received the approval of the director designated by the Purchaser. Each of the Initial Budget and the other budgets to be delivered hereunder (including any revisions thereof) is referred to herein as a "Budget".

(c)    **Financial Reporting.**

The Company shall deliver to the Purchaser the following:

(i)    within twenty (20) Business Days after the end of each month and within forty-five (45) days of the end of each quarter, commencing with the month ended February 2006 (A) the unaudited balance sheet of the Company at the end of such period, (B) the unaudited statements of income and cash flows of the Company for such period, (C) the unaudited comparative statements of income of the Company for the year-to-date and the current Budget for the year-to-date, each as of the last day of such period and (D) an unaudited schedule of total expenses by account for such period;

(ii)    within ninety (90) Business Days after the end of each fiscal year of the Company, (A) the balance sheet of the Company at the end of such fiscal year, together with comparisons to the balance sheet of the Company at the end of the prior

fiscal year and to the current Budget, (B) the statements of income and cash flows of the Company for such fiscal year, together with comparisons to the statements of income and cash flows of the Company for the prior fiscal year and to the current Budget, and (C) an audit report of a nationally-recognized firm of independent certified public accountants (or such other accounting firm as is mutually acceptable to the Company and the Purchaser) on such financial statements; and

        (iii)    to the extent the Company is required by law or pursuant to the terms of any outstanding indebtedness of the Company to prepare such reports, any annual reports, quarterly reports and other periodic reports pursuant to Sections 13 or 15(d) of the Exchange Act of 1934, as amended, actually prepared by the Company, as soon as available.

        All financial statements to be delivered under this Section shall be presented in a format satisfactory to the Purchaser and in accordance with the books and records of the Company.  At any time at which the Company has any subsidiaries or controlled Affiliates, all such financial statements shall be the consolidated financial statements of the Company and such subsidiaries.

        The Purchaser shall have the right to consult with and advise the management of the Company, upon reasonable notice at any time or from time to time, on all matters relating to the operation of the Company.

        (d)    **Payment of Obligations.**

        The Company shall pay or discharge or cause to be paid or discharged all material claims or demands, and all Taxes levied or imposed upon such Person or upon the income, profits or property of such Person; provided, however, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such claim, demand, or Tax the amount, applicability or validity of which is being contested in good faith by appropriate Proceedings and for which adequate reserves have been made.

        (e)    **Noncompetition Agreements and Related Matters.**

        The Company shall use all reasonable efforts to cause all future employees of the Company or any of its subsidiaries to enter into an agreement with respect to non-competition, non-solicitation of customers and employees of the Company or any of its subsidiaries, non-disclosure proprietary information and patent and invention assignment substantially similar in effect to the form currently used by the Company, or in such other form as approved from time to time by the Board of Directors of the Company.

        (f)    **Notice of Disputes; Defaults.**

        The Company shall promptly notify the Purchaser of (i) the commencement of any Proceeding against or affecting the Company or any of its subsidiaries which, if adversely

28

determined, might reasonably be expected to result in a Material Adverse Change and (ii) any default under any indebtedness of the Company or any of its subsidiaries.

(g)    **Conduct of Business.**

The Company shall (i) take all actions required to assure that the Company and each of its subsidiaries (if any) remains duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, (ii) take all actions required to assure that the Company and each of its subsidiaries (if any) maintains all requisite Permits to conduct its business, and (iii) conducts its business, and causes each of its subsidiaries (if any) to conduct its business in material compliance with all Laws.

(h)    **Other Businesses.**

Neither the Company nor any of its subsidiaries (if any) shall engage in any material business or activity, other than those currently conducted or those from time to time included within the then current business plan of the Company as approved by the Board of Directors of the Company.

(i)    **Employee Compensation.**

Except for salary increases, incentive compensation or bonuses determined and granted or paid in accordance with salary or compensation plans approved by the Board of Directors of the Company, the Company shall not, and shall not permit any subsidiary or controlled Affiliate to, directly or indirectly grant any salary increase or pay any bonuses or pay any compensation to any of its directors, officers, or management employees outside the ordinary course of business consistent with the Company's past practices.

(j)    **Significant Events.**

The Company shall promptly provide the Purchaser with written notice of any proposed public offering of its shares of its Common Stock or any transaction that would constitute a Liquidation (as defined in the Restated Certificate) (a "Significant Event"). In connection with a Significant Event, the Purchaser shall be entitled to retain separate legal counsel (whose fees and expenses shall be paid by the Company) to review the proposed definitive documentation implementing such Significant Event and such counsel shall be afforded sufficient time and opportunity to review and comment on such proposed definitive documentation.

(k)    **Conversion of Tendered Stock.**

Immediately after the First Closing, the Purchaser and the Company shall take all actions necessary to cancel any and all shares of Series A Preferred Stock and Series B Preferred Stock and to contribute any and all shares of Common Stock purchased by the Purchaser to the Company (at no cost to the Company). The Common Stock so contributed shall be treated as treasury shares and shall be cancelled by the Company.

29

(l)    **Declaration of Dividends**.

The Purchaser shall not cause the Company to declare any dividends or other distributions on its Stock.

(m)    **Additional Issuances**.

The Purchaser shall not cause the Company to issue any securities other than Excluded Stock (as defined in the Restated Certificate), without the prior written approval of the holders of a majority of all outstanding Common Stock.

**Section 8.    Survival.**

Irrespective of any investigation, inquiry or examination made by, for or on behalf of the Purchaser, or the acceptance by the Purchaser of any certificate or opinion, the representations, warranties and covenants contained herein with respect to each Closing shall terminate upon the second anniversary of each Closing.

**Section 9.    Indemnification.**

(a)    **General.**

(i)    The Company and each Stockholder (jointly and severally with the Company) shall indemnify, defend and hold the Purchaser and their respective officers, directors, members, partners, affiliates, employees, agents and representatives (collectively, the "Purchaser Indemnitees") harmless against all Liability, loss and damage together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from the untruth, inaccuracy or breach of any of the representations by such Stockholder set forth in Section 3.

(ii)    The Company and each Representative, jointly and severally with the Company and each other Representative, shall indemnify, defend and hold the Purchaser Indemnitees harmless against all Liability, loss and damage (including taxes thereon) together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from: (a) the untruth, inaccuracy or breach of any of the representations, warranties, covenants or agreements made by the Company or the Representatives contained in the Documents to which either the Company or the Representatives is a party; (b) the execution or delivery by the Company or any Representative of any Document or any other agreement or instrument contemplated hereby or thereby or the performance by the Company or any Representative of their respective obligations under the Documents or the consummation of the transactions contemplated hereby or thereby, in all events only to the extent the Company and/or the Representatives are a party to the Documents; and (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the events in Section 10(a)(ii)(a) or Section 10(a)(ii)(b) (including as may be commenced by third

30

(l)     **Declaration of Dividends.**

The Purchaser shall not cause the Company to declare any dividends or other distributions on its Stock.

(m)     **Additional Issuances.**

The Purchaser shall not cause the Company to issue any securities other than **Excluded Stock** (as defined in the Restated Certificate), without the prior written approval of the holders of a majority of all outstanding Common Stock.

**Section 8.     Survival.**

Irrespective of any investigation, inquiry or examination made by, for or on behalf of the Purchaser, or the acceptance by the Purchaser of any certificate or opinion, the representations, warranties and covenants contained herein with respect to each Closing shall terminate upon the second anniversary of each Closing.

**Section 9.     Indemnification.**

(a)     **General.**

(i)     The Company and each Stockholder (jointly and severally with the Company) shall indemnify, defend and hold the Purchaser and their respective officers, directors, members, partners, affiliates, employees, agents and representatives (collectively, the "Purchaser Indemnitees") harmless against all Liability, loss and damage together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from the untruth, inaccuracy or breach of any of the representations by such Stockholder set forth in Section 3.

(ii)     The Company and each Representative, jointly and severally with the Company and each other Representative, shall indemnify, defend and hold the Purchaser Indemnitees harmless against all Liability, loss and damage (including taxes thereon) together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from: (a) the untruth, inaccuracy or breach of any of the representations, warranties, covenants or agreements made by the Company or the Representatives contained in the Documents to which either the Company or the Representatives is a party; (b) the execution or delivery by the Company or any Representative of any Document or any other agreement or instrument contemplated hereby or thereby or the performance by the Company or any Representative of their respective obligations under the Documents or the consummation of the transactions contemplated hereby or thereby, in all events only to the extent Company and/or the Representatives are a party to the Documents; and (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the events in Section 10(a)(ii)(a) or Section 10(a)(ii)(b) (including as may be commenced by third

30

parties), whether based in contract, tort or any other theory and regardless of whether any Purchaser Indemnitee is a party thereto.

(iii)    The Purchaser shall indemnify, defend and hold the Company and its respective officers, directors, members, partners, affiliates, employees, agents and representatives (the "Company Indemnitees") harmless against all Liability, loss and damage (including taxes thereon) together with all reasonable costs and expenses related thereto (including reasonable legal fees and expenses), relating to or arising from: (a) the untruth, inaccuracy or breach of any of the representations, warranties, covenants or agreements of the Purchaser contained in the Documents to which the Purchaser is a party; (b) the execution or delivery by the Purchaser of any Document or any other agreement or instrument contemplated hereby or thereby or the performance by the Purchaser of its respective obligations under the Documents or the consummation of the transactions contemplated hereby or thereby, in all events only to the extent the Purchaser is a party to the Documents; (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the events in <u>Section 10(a)(iii)(a)</u> or <u>Section 10(a)(iii)(b)</u> (including as may be commenced by third parties), whether based in contract, tort or any other theory and regardless of whether any Company Indemnitee is a party thereto.

(b)    <u>Notice and Resolution of Third-Party Claims.</u>

An indemnified party under this Agreement shall promptly give written notice to the indemnifying party of any third-party claim against the indemnified party as to which recovery may be sought against the indemnifying party pursuant to this <u>Section 9</u>, specifying in reasonable detail the claim and the basis for indemnification. The indemnified party shall permit the indemnifying party to assume the defense of any such third-party claim on the indemnified party's behalf; provided, however, the indemnifying party shall permit the indemnified party to participate in such defense through counsel chosen by the indemnified party, with the fees and expenses of such counsel borne by the indemnified party. Failure by the indemnifying party to notify the indemnified party of its election to assume the defense of any such claim by a third party within thirty (30) days after notice thereof has been given to the indemnifying party shall be deemed a waiver by the indemnifying party of its right to assume the defense of such claim, in which the case the indemnified party may defend such claim at the expense of the indemnifying party.

(c)    <u>Limitation of Liability.</u>

Notwithstanding the foregoing <u>Section 9(a)</u>, in no event shall any Stockholder or Representative have any indemnification obligation to the Purchaser Indemnitees, in the aggregate, in excess of the gross proceeds received by such Stockholder or Representative through the sale of his, her or its Company Stock.

**Section 10.    Termination.**

Certain of the parties to this Agreement may terminate this Agreement as provided below:

31

(a)    **By the Purchaser.**

The Purchaser may terminate this Agreement by giving written notice to the Company and the Representative at any time prior to the Closing: (i) in the event the Company has committed a material breach of any representation, warranty, or covenant contained in this Agreement, the Purchaser has notified the Company and the Representative of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach; or (ii) if the Second Closing shall not have occurred on or prior to April 30, 2007 (unless the Purchaser itself is in material breach of any representation, warranty, or covenant contained in this Agreement at such time) and the breach has continued without cure for a period of 5 days after the notice of breach; or (iii) if the Third Closing shall not have occurred on or prior to April 30, 2008 (unless the Purchaser itself is in material breach of any representation, warranty, or covenant contained in this Agreement at such time) and the breach has continued without cure for a period of 5 days after the notice of breach; and

(b)    **By the Company.**

The Company may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing: (i) in the event the Purchaser has committed a material breach of any representation, warranty, or covenant contained in this Agreement, the Company has notified the Purchaser of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach; or (ii) if the Second Closing shall not have occurred on or prior to April 30, 2007 (unless the Company itself is in material breach of any representation, warranty, or covenant contained in this Agreement at such time) and the breach has continued without cure for a period of 5 days after the notice of breach; or (iii) if the Third Closing shall not have occurred on or prior to April 30, 2008 (unless the Company itself is in material breach of any representation, warranty, or covenant contained in this Agreement at such time) and the breach has continued without cure for a period of 5 days after the notice of breach.

(c)    **Effect of Termination.**

(i)    If any party terminates this Agreement pursuant to this <u>Section 10</u>, all rights and obligations of the parties hereunder shall terminate without any Liability of any party to any other party (except as set forth in <u>Section 9</u>).

(ii)    The terms and provisions of <u>Sections 9</u>, <u>10</u>, and <u>11</u> shall survive the termination of this Agreement.

**Section 11.    Fees and Expenses.**

(a)    **Fees and Expenses of Purchaser.**

The Company shall pay all of its expenses incurred in connection with the preparation, execution and delivery of the Documents and the consummation of the transactions contemplated thereby. In addition, the Company shall pay, and hold the Purchaser and its

32

representatives harmless against all liability for the payment of: (i) the fees and expenses incurred by the Purchaser and the fees and charges of Kilpatrick Stockton LLP, counsel to the Purchaser, actually incurred in connection with the preparation, execution and delivery of the Documents and the consummation of the transactions contemplated thereby, in an amount not to exceed $40,000.00, (ii) the reasonable costs and expenses (including fees and expenses of counsel, accountants and other advisors) incurred by the Purchaser in connection with any amendment or waiver of any Document, (iii) the reasonable out-of-pocket costs incurred by the Purchaser in sending their representatives to participate in meetings of the Board of Directors (or any committee thereof) of the Company or any of its subsidiaries, (iv) any costs reasonably incurred by the Purchaser in rendering assistance to the Company or any of their subsidiaries, (v) any stamp or similar taxes which may be determined to be payable in connection with the execution and delivery and performance of any Document to which the Company is a party or any modification, amendment or alteration of any Document to which the Company is a party, and all issue taxes in respect of the issuance of any Series C Preferred Stock or the Reserved Shares (or any other securities issued in respect thereof) and (vi) the reasonable fees and expenses incurred by the Purchaser in any filing with any Governmental Authority with respect to the Company or any of its subsidiaries that mentions the Purchaser or its Affiliates. The provisions of this Section are automatically assignable to any Person who acquires any Series C Preferred Stock from the Purchaser. The Company and the Purchaser hereby acknowledge and agree that the Company's obligation to reimburse the Purchaser for the fees and charges of Kilpatrick Stockton LLP pursuant to this <u>Section 11(a)</u> shall be fulfilled at the First Closing by permitting the Purchaser to deduct such fees and charges from the First Closing Company Receipts and to wire such amounts directly to Kilpatrick Stockton LLP at the Closing.

      **(b)**      <u>**Fees and Expenses of Bradley Arant Rose & White LLP.**</u>

      In addition, the Company and the Purchaser hereby acknowledge **and agree that** the payment of the fees and expenses of Bradley Arant Rose & White LLP, counsel to the Company, actually incurred by the Company, in an amount not to exceed $20,000.00, shall be paid out of the First Closing Company Receipts on the First Closing Date; *provided*, that any fees and expenses of Bradley Arant Rose & White LLP actually incurred by the Company in excess of $20,000.00, whether in connection with the preparation, execution and delivery of the Documents and the consummation of the transactions contemplated thereby and set forth on <u>Schedule 6(a)(i)(H)</u>, or otherwise, shall be deducted *pro rata* (based on the dollar amount of proceeds to be received by the Stockholders in the First Closing) from each Stockholder by the Purchaser and wired directly to Bradley Arant Rose & White LLP.

**Section 12.**      <u>**Assignment; Parties in Interest.**</u>

      This Agreement shall bind and inure to the benefit of the parties and each of their respective successors and permitted assigns. The Company may not assign either this Agreement or any of its rights, interests, or obligations hereunder. The Purchaser may assign any of its rights hereunder; provided, however, that the transferee agrees to be bound by, and entitled to the benefits of, this Agreement as an original party hereto.

33

Shinagawa-ku
Tokyo 140-0013 **JAPAN**
Telephone: 011-81-3-5767-9101
Fax: 011-81-3-5767-9123
Attention: Frank Seiji Sanda

**with a copy (which shall not constitute notice) to:**

Kilpatrick Stockton LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Fax: 404-815-6555
Telephone: 404-815-6500
Attention: Steven L. Berson

or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith. Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery if a business day or, if not a business day, the next succeeding business day, (ii) in the case of internationally-recognized overnight courier, on the second business day after the date when sent, (iii) in the case of fax transmission, when received if a business day or, if not a business day, the next succeeding business day, and (iii) in the case of mailing, on the seventh business day following that on which the piece of mail containing such communication is posted.

**Section 15.    Amendments; Waivers.**

The terms and provisions of this Agreement may only be modified or amended pursuant to an instrument signed by the Company, the holders of at least a majority of the outstanding shares of Common Stock and the holders of at least a majority of the outstanding shares of Series C Preferred Stock. Any waiver of any term or provision of this Agreement requested by any party hereto must be granted in advance, in writing: (i) by the holders of at least a majority of all then outstanding shares of Series C Preferred Stock (if the Company or the holders of a majority of all the then outstanding shares of Common Stock is requesting such waiver); or (ii) by the holders of a majority of all the then outstanding shares of Common Stock (if the Company or the holders of at least a majority of all then outstanding shares of Series C Preferred Stock is requesting such waiver), as the case may be.

**Section 16.    Counterparts.**

This Agreement may be executed in any number of original or facsimile counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

**Section 17.    Headings.**

35

The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 18.    <u>Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial</u>.**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied.

**ANY PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF DELAWARE OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR, AND THE PARTIES IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH SUCH COURTS IN RESPECT OF ANY SUCH PROCEEDING. EACH OF THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDING IN THE COURTS OF THE STATE OF DELAWARE LOCATED IN NEW CASTLE COUNTY OR THE DISTRICT OF DELAWARE AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM.    ANY JUDGMENT MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.**

**EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

**Section 19.    <u>Specific Performance</u>.**  The Company Stock and the Series C Preferred Stock (collectively, the "<u>Stock</u>") cannot be readily purchased or sold in the open market, and for that reason, among others, the parties will be irreparably damaged in the event that this Agreement is not specifically enforced.    Should any dispute arise concerning the sale or disposition of the Stock in any Closing, an injunction may be issued restraining any sale or disposition pending the determination of such controversy.    In the event of any controversy concerning the right or obligation to purchase or sell any of the Stock in any Closing, such right or obligation shall be enforceable in a court of equity by a decree of specific performance. Such remedy shall, however, be cumulative and not exclusive, and shall be in addition to any other remedy which the parties may have.

**\* \* \* \***

36

## INDEX OF SCHEDULES & EXHIBITS

Annex I:                    Definitions
Annex II:                   Securities Purchased by Purchaser

Exhibit A:                  Restated Certificate of Incorporation
Exhibit B:                  Form of Stockholders Agreement
Exhibit C:                  Form of Non-Competition and Employment
                            Agreement
Exhibit C-1                 Form of Intellectual Property Agreements
Exhibit D:                  Form of Option Sale Agreement
Exhibit E:                  Form of Key Management Vesting Agreement
Exhibit F:                  Form of Escrow Agreement

Schedule 3(d)               Ownership of Company Stock
Schedule 4(a)(i):           Certificate of Incorporation
Schedule 4(a)(ii):          By-laws
Schedule 4(c):              Conflicts
Schedule 4(e):              Consents and Approvals
Schedule 4(f)               Capitalization Before and After First Closing
Schedule 4(g):              Defaults
Schedule 4(h):              Initial Budget
Schedule 4(i):              Undisclosed Liabilities
Schedule 4(j):              Absence of Changes
Schedule 4(k):              Encumbrances
Schedule 4(l)(i):           Company Intellectual Property
Schedule 4(l)(ii):          Exceptions to Intellectual Property Rights
Schedule 4(l)(iv):          Intellectual Property Infringement
Schedule 4(l)(vi):          Employee Intellectual Property Matters
Schedule 4(l)(vii):         Licensing Arrangements
Schedule 4(m):              Employment Matters
Schedule 4(n):              Benefit Plans
Schedule 4(o):              Material Contracts
Schedule 4(p):              Permits
Schedule 4(q):              Employees
Schedule 4(r):              Litigation
Schedule 4(s):              Tax Matters
Schedule 4(t):              Customers and Suppliers
Schedule 4(u):              Accounts Receivable
Schedule 4(v):              Insurance
Schedule 4(w):              Related Party Transactions
Schedule 6(a)(i)(H):        Fees and Expenses of Bradley Arant Rose &
                            White LLP
Schedule 6(a)(i)(M):        Option Pool

9034153.14

ANNEX I

## **DEFINITIONS**

"**2007 GR Amount**" means a specified percentage of $625,000 based upon the Company's Gross Revenue relative to the 2007 GR Target for the period from and including the First Closing Date through and including March 31, 2007, based upon the following formula:

| PERCENTAGE OF 2007 GR TARGET | 2007 GR AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | 32.5% |
| Greater than or equal to 60% but less than 65% | 40% |
| Greater than or equal to 65% but less than 70% | 47.5% |
| Greater than or equal to 70% but less than 75% | 55% |
| Greater than or equal to 75% but less than 80% | 62.5% |
| Greater than or equal to 80% but less than 85% | 70% |
| Greater than or equal to 85% but less than 90% | 77.5% |

2

| | |
|---|---|
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | 92.5% |
| Greater than or equal to 100% but less than 105% | 100% |
| Greater than or equal to 105% but less than 110% | 108.5% |
| Greater than or equal to 110% but less than 115% | 117% |
| Greater than or equal to 115% but less than 120% | 125.5% |
| Greater than or equal to 120% but less than 125% | 134% |
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"**2007 GR Target**" means $3,300,000.

"**2007 NOI Amount**" means a specified percentage of $625,000 based upon the Company's Net Operating Income relative to the 2007 NOI Target for the period from and including the First Closing Date through and including March 31, 2007, based upon the following formula:

3

| PERCENTAGE OF 2007 NOI TARGET | 2007 NOI AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | 32.5% |
| Greater than or equal to 60% but less than 65% | 40% |
| Greater than or equal to 65% but less than 70% | 47.5% |
| Greater than or equal to 70% but less than 75% | 55% |
| Greater than or equal to 75% but less than 80% | 62.5% |
| Greater than or equal to 80% but less than 85% | 70% |
| Greater than or equal to 85% but less than 90% | 77.5% |
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | 92.5% |
| Greater than or equal to 100% but less than 105% | 100% |

4

| | |
|---|---|
| Greater than or equal to 105% but less than 110% | 108.5% |
| Greater than or equal to 110% but less than 115% | 117% |
| Greater than or equal to 115% but less than 120% | 125.5% |
| Greater than or equal to 120% but less than 125% | 134% |
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"**2007 NOI Target**" means $600,000.

"**2008 GR Amount**" means a specified percentage of $1,875,000 based upon the Company's Gross Revenue relative to the 2008 GR Target for the twelve month period from and including April 1, 2007 through and including March 31, 2008, based upon the following formula:

| PERCENTAGE OF 2008 GR TARGET | 2008 GR AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |

5

| | |
|---|---|
| **Greater than or equal to** 30% but less than 35% | **10%** |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | **17.5%** |
| Greater than or equal to 50% but less than 55% | 25% |
| Greater than or equal to 55% but less than 60% | **32.5%** |
| Greater than or equal to 60% but less than 65% | 40% |
| Greater than or equal to 65% but less than 70% | **47.5%** |
| Greater than or equal to 70% but less than 75% | 55% |
| Greater than or equal to 75% but less than 80% | **62.5%** |
| Greater than or equal to 80% but less than 85% | 70% |
| Greater than or equal to 85% but less than 90% | 77.5% |
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | 92.5% |
| Greater than or equal to 100% but less than 105% | 100% |
| Greater than or equal to 105% but less than 110% | **108.5%** |
| Greater than or equal to 110% but less than 115% | 117% |
| Greater than or equal to 115% but less than 120% | **125.5%** |
| **Greater than or equal to** 120% but less than 125% | **134%** |

6

| | |
|---|---|
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"**2008 GR Target**" means $7,000,000.

"**2008 NOI Amount**" means a specified percentage of $1,875,000 based upon the Company's Net Operating Income relative to the 2008 NOI Target for the twelve month period from and including April 1, 2007 through and including March 31, 2008, based upon the following formula:

| PERCENTAGE OF 2008 NOI TARGET | 2008 NOI AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |

7

| | |
|---|---|
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| Greater than or equal to 140% but less than 145% | 168% |
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"**2008 GR Target**" means $7,000,000.

"**2008 NOI Amount**" means a specified percentage of $1,875,000 based upon the Company's Net Operating Income relative to the 2008 NOI Target for the twelve month period from and including April 1, 2007 through and including March 31, 2008, based upon the following formula:

| PERCENTAGE OF 2008 NOI TARGET | 2008 NOI AMOUNT |
|---|---|
| Less than 25% | 0% |
| Greater than or equal to 25% but less than 30% | 10% |
| Greater than or equal to 30% but less than 35% | 10% |
| Greater than or equal to 35% but less than 40% | 10% |
| Greater than or equal to 40% but less than 45% | 10% |
| Greater than or equal to 45% but less than 50% | 17.5% |

7

| | |
|---|---|
| **Greater than or equal to** 50% but less than 55% | **25%** |
| Greater than or equal to 55% but less than 60% | 32.5% |
| **Greater than or equal to** 60% but less than 65% | **40%** |
| Greater than or equal to 65% but less than 70% | 47.5% |
| **Greater than or equal to** 70% but less than 75% | **55%** |
| Greater than or equal to 75% but less than 80% | 62.5% |
| **Greater than or equal to** 80% but less than 85% | **70%** |
| Greater than or equal to 85% but less than 90% | 77.5% |
| Greater than or equal to 90% but less than 95% | 85% |
| Greater than or equal to 95% but less than 100% | **92.5%** |
| Greater than or equal to 100% but less than 105% | 100% |
| Greater than or equal to 105% but less than 110% | 108.5% |
| Greater than or equal to 110% but less than 115% | 117% |
| Greater than or equal to 115% but less than 120% | 125.5% |
| Greater than or equal to 120% but less than 125% | 134% |
| Greater than or equal to 125% but less than 130% | 142.5% |
| Greater than or equal to 130% but less than 135% | 151% |
| Greater than or equal to 135% but less than 140% | 159.5% |
| **Greater than or equal to** 140% but less than 145% | 168% |

8

| | |
|---|---|
| Greater than or equal to 145% but less than 150% | 176.5% |
| Greater than or equal to 150% but less than 155% | 185% |
| Greater than or equal to 155% but less than 160% | 193.5% |
| Greater than or equal to 160% | 200% |

"**2008 NOI Target**" means $1,400,000.

"**Additional Closing**" shall have the meaning set forth in <u>Section 1(c)</u>.

"**Affiliate**" means, with respect to any Person, any (a) director, officer, limited or general partner, member or stockholder holding 5% or more of the outstanding capital stock or other equity interests of such Person, (b) any spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of a Person specified in clause (i) above relating to such Person) and (c) other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. References herein to the Company's "subsidiaries" or a "subsidiary" include both direct and indirect subsidiaries of the Company.

"**Agreement**" shall have the meaning set forth in the preamble hereto.

"**Balance Sheet**" shall have the meaning set forth in <u>Section 4(g)</u>.

"**Balance Sheet Date**" shall have the meaning set forth in <u>Section 4(g)</u>.

"**Budget**" shall have the meaning set forth in <u>Section 7(b)</u>.

"**Business Days**" means days other than Saturdays, Sundays and other legal holidays or days on which banks in the State of Delaware are authorized or required by law to close.

"**Bylaws**" shall have the meaning set forth in <u>Section 4(a)</u>.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, and the rules and regulations promulgated thereunder.

"**Certificate of Incorporation**" shall have the meaning set forth in <u>Section 4(a)</u>.

9

**"Closing"** shall have the meaning set forth in <u>Section 2(a)</u>.

**"Closing Date"** shall have the meaning set forth in <u>Section 1(c)</u>.

**"Code"** shall have the meaning set forth in <u>Section 4(r)</u>.

**"Common Holders"** means those Persons owning shares of Common Stock.

**"Common Holders Second Closing Notice"** shall have the meaning in <u>Section 2(b)(ii)(A)</u>.

**"Common Stock"** shall have the meaning set forth in the recitals hereto.

**"Company"** shall have the meaning set forth in the preamble hereto.

**"Company Indemnitee"** shall have the meaning set forth in <u>Section 9(a)(i)</u>.

**"Company Intellectual Property"** shall have the meaning set forth in <u>Section 4(k)(i)</u>.

**"Company Stock"** shall have the meaning set forth in the recitals hereto.

**"Contract"** shall have the meaning set forth in <u>Section 4(n)</u>.

**"Deferred Revenue"** means the amount of all payments due under invoices issued by the Company as of the Closing Date for services not yet rendered or goods not yet delivered as of the Closing Date.

**"Designated Persons"** shall have the meaning set forth in <u>Section 4(l)</u>.

**"Documents"** means (i) this Agreement, (ii) the Restated Certificate, (iii) the Stockholders' Agreement, and (iv) all other documents, agreements and instruments executed and delivered in connection herewith, in each case, as amended, modified or supplemented from time to time.

**"Encumbrances"** means all mortgages, Judgments, claims, liens, security interests, pledges, escrows, charges, pre-emptive rights, rights of first offer or first refusal or other encumbrances of any kind or character whatsoever.

**"Environmental and Safety Requirements"** means all Laws, orders, contractual obligations and all common law concerning public health and safety, worker health and safety, and pollution or protection of the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts,

asbestos, polychlorinated biphenyls, noise or radiation, including, but not limited to, the SWDA, the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq., the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251 et seq., the Emergency Planning and Community Right-to-Know Act, as amended, 42 U.S.C. §§ 11001 et seq., CERCLA, the Hazardous Materials Transportation Uniform Safety Act, as amended, 49 U.S.C. §§ 5101 et seq., the Occupational Safety and Health Act of 1970, as amended, and the rules and regulations promulgated thereunder.

"**ERISA**" shall have the meaning set forth in <u>Section 4(m)</u>.

"**Escrow Agent**" means the escrow agent under the Escrow Agreement.

"**Escrow Agreement**" means that certain Escrow Agreement, dated as of the date hereof, substantially in the form set forth as <u>Exhibit F</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and any successor statute, together with the rules and regulations promulgated thereunder.

"**Financial Statements**" shall have the meaning set forth in <u>Section 4(h)</u>.

"**Fully-Diluted Capitalization of the Company**" means, as of any given date, the sum of (i) all shares of Common Stock then outstanding assuming (A) the conversion into Common Stock of all of the then outstanding shares of Preferred Stock and (B) the conversion, exercise or exchange of any other securities into Common Stock (in each case in accordance with the terms of such Preferred Stock and other securities convertible, exercisable or exchangeable into Common Stock) plus (ii) all shares of Common Stock authorized or reserved for issuance under the Company's 2004 Long Term Incentive Plan, whether or not options for all of such shares have been granted or are vested.

"**GAAP**" means the generally accepted accounting principles in the United States in effect as of the date hereof.

"**General Commercial Software**" shall have the meaning set forth in <u>Section 4(l)</u>.

"**Governmental Authority**" means any federal, state, municipal, foreign or other government, governmental department, commission, board, bureau, agency or instrumentality, or any public court or tribunal.

"**Gross Revenue**" shall be defined in accordance with GAAP.

"**First Closing**" means the date hereof.

"**First Closing Company Receipts**" shall have the meaning set forth in <u>Section 1(b)(iv)</u>.

11

"**Intellectual Property Rights**" means all industrial and intellectual property rights to the extent recognized and protected under any Laws of any country or jurisdiction in which the Company presently sells its products and services, including, without limitation, to the extent protected under such applicable Laws, rights in patents, patent applications, and patent rights, trademarks, trademark applications and registrations, service marks, service mark applications and registrations, trade dress, logos and designs, trade names, brands, product configurations, and the goodwill connected with the foregoing, copyrights and copyright rights (including, without limitation, those in source code), copyright applications and registrations, mask works, proprietary business methods, trade secrets, confidential information, proprietary processes and technology, proprietary data bases, inventions, discoveries, technical advances, and any manual, formulae and/or documentation constituting, describing or related to the foregoing.

"**Judgments**" means all judgments, injunctions, citations, orders and decrees of all courts and arbitrators in proceedings or actions in which the Person in question is a party or by which any of its assets or properties is bound.

"**Key Management Vesting Agreement**" means the Key Management Vesting Agreement dated as of the date hereof, in the form of Exhibit E hereto, as amended.

"**Knowledge**" or "**Knowledge of the Company**" or "**Knowledge of the Representatives**" means (i) with respect to the Company, the actual knowledge of any officer of the Company, or the knowledge reasonably ascribed to such person through such person's performance of his/her duties in the ordinary course of business and (ii) with respect to the Representatives, the actual knowledge of such person or the knowledge reasonably ascribed to such person through such person's performance of his duties in the ordinary course of business.

"**Law**" means, as to any Person, all provisions of laws, statutes, ordinances, rules, regulations, permits, certificates or orders of any Governmental Authority applicable to such Person or any of its properties or assets, and all Judgments applicable to such Person.

"**Liability**" means any liability or obligation of any nature (whether known or unknown, matured or unmatured, secured or unsecured, fixed or contingent, accrued or unaccrued).

"**Material Adverse Change**" means any material adverse change in the business, affairs, operations, assets, properties, Liabilities, results of operations or condition (financial or otherwise) of the Company or any of its subsidiaries (taken as a whole).

"**Net Operating Income**" means the gross income of the Company, net of: (i) selling, general and administrative expenses; and (ii) costs of good s sold (in each case, defined in accordance with GAAP).

"**New Purchaser Stock Certificates**" shall have the meaning set forth in Section 1(b)(i).

"**New Stockholder Certificates**" shall have the meaning set forth in Section 1(b)(i).

12

"**Optionholder**" shall have the meaning set forth in <u>Section 6(a)(iv)</u>.

"**Permits**" shall have the meaning set forth in <u>Section 4(o)(i)</u>.

"**Person**" shall be construed in the broadest sense and means any individual, corporation, partnership, limited liability company, association, trust, Governmental Authority or other entity or organization.

"**Post-Closing 58% Number**" means that number of shares of the Series C Preferred Stock equal to 58% of the Fully-Diluted Capitalization of the Company immediately following the First Closing.

"**Pro Rata Amount**" means a percentage equal to the number of shares of Common Stock held by such Common Holder divided by the total number of shares held by all Common Holders.

"**Proceeding**" shall have the meaning set forth in <u>Section 4(q)</u>.

"**Purchaser**" shall have the meaning set forth in the preamble hereto.

"**Purchaser Common Stock Valuation**" means a value equal to the average of the closing prices of the Purchaser's common stock on the Osaka Exchange during the last ten (10) trading days prior to the date of the filing of a registration statement for fixing the price of the common stock of the Purchaser to be issued in connection with the relevant Additional Closing.

"**Purchaser Indemnitee**" shall have the meaning set forth in <u>Section 9(a)(i)</u>.

"**Purchaser's Second Closing Notice**" shall have the meaning set forth in <u>Section 2(b)(ii)(B)</u>.

"**Representatives**" shall have the meaning set forth in the preamble hereto.

"**Reserved Shares**" shall have the meaning set forth in <u>Section 1(a)</u>.

"**Restated Certificate**" shall have the meaning set forth in the recitals hereto.

"**Returns**" shall have the meaning set forth in <u>Section 4(r)</u>.

"**Second Closing**" shall have the meaning set forth in <u>Section 1(c)(i)</u>.

"**Second Closing New Stockholder Certificates**" shall have the meaning set forth in <u>Section 2(b)(iv)</u>.

"**Second Closing Purchase Price**" shall have the meaning set forth in <u>Section 1(e)(i)</u>.

13

"**Securities Act**" means the Securities Act of 1933, as amended, and any successor statute, together with the rules and regulations promulgated thereunder.

"**Series A Holders**" means those Persons owning shares of Series A Preferred Stock.

"**Series B Holders**" means those Persons owning shares of Series B Preferred Stock.

"**Series A Preferred Stock**" shall have the meaning set forth in the recitals hereto.

"**Series B Preferred Stock**" shall have the meaning set forth in the recitals hereto.

"**Series C Amount**" shall have the meaning set forth in the recitals hereto.

"**Series C Preferred Stock**" shall have the meaning set forth in the recitals hereto.

"**Significant Event**" shall have the meaning set forth in Section 7(j).

"**Stock**" shall have the meaning set forth in Section 19.

"**Stockholders**" means, collectively, the Common Holders, Series A Holders and Series B Holders.

"**Stockholders Agreement**" means the Stockholders Agreement dated as of the date hereof, in the form of Exhibit B hereto, as amended.

"**SWDA**" means the Solid Waste Disposal Act, as amended, and the rules and regulations promulgated thereunder.

"**Tax**" means any of the Taxes and "**Taxes**" means, with respect to any Person: (A) all income Taxes (including any tax on or based upon net income, or gross income, or income as specially defined, or earnings, or profits, or selected items of income, earnings or profits) and all gross receipts, sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property or windfall profits taxes, alternative or add-on minimum taxes, customs duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any taxing authority (domestic or foreign) on such Person; and (B) any Liability for the payment of any amount of the type described in the immediately preceding clause (A) as a result of: (1) being a "transferee" (within the meaning of Section 6901 of the Code or any other applicable law) of another Person; (2) being a member of an affiliated, combined, consolidated or unitary group; or (3) any Contractual Liability.

"**Tendered Stock**" shall have the meaning set forth in the preamble hereto.

"**Tendered Stock Purchase Price**" shall have the meaning set forth in the recitals hereto.

14

**"Third Closing"** shall have the meaning set forth in <u>Section 1(c)(ii)</u>.

**"Third Closing Notice"** shall have the meaning set forth in <u>Section 2(b)(iii)</u>.

**"Third Closing Purchase Price"** shall have the meaning set forth in <u>Section 1(e)(ii)</u>.

**"Work for Hire"** shall have the meaning set forth in <u>Section 4(k)(iv)</u>.

15

ANNEX II

## SECURITIES PURCHASED BY PURCHASER

| Stockholder | (1)<br>Number of Series<br>A Preferred Stock<br>Purchased at First<br>Closing | (2)<br>Number of Series<br>B Preferred Stock<br>Purchased at First<br>Closing | (3)<br>Number of<br>Common Stock<br>Purchased at First<br>Closing |
|---|---|---|---|
| Angus Adair Wolfgang, Inc. | | | 47,880 |
| Donald J. Davidson | | | 20,000 |
| RNR Ventures, L.L.C. | | | 17,500 |
| J. Chandler Hall | | | 6,384 |
| David S. Butler | 10,000 | — | |
| John Jurenko | 37,037 | | |
| William and Billie Joe McCary | 18,519 | | |
| William Scott McCary | 18,518 | | |
| Lioce Investments, L.L.C. | 37,037 | | |
| Jean T. and Margaret T. Moore | 37,037 | | |
| HRC, L.L.C. | 37,037 | | |
| National Investor Services Corp.,<br>FBO: Dawn Darnell Shelton<br>Account No. 385-97378-13 | 10,186 | | |
| Bryan W. and Jacalyn A. Butler | 8,518 | | |
| Shatas Partners, Ltd. | 10,000 | 1,000 | |
| David J. Slyman | | 1,000 | |
| Todd J. Slyman | 9,000 | 4,812 | |

16

| | |
|---|---|
| DB Securities, Inc. (Tax I.D. No. 502208880) as Custodian F/B/O IRA FBO David J. Slyman, Jr. | 10,000 |
| Heide Williams | 9,375 |
| David and Mark Nicolas | 5,208 |
| James V. Balch | 15,625 |
| Alan L. Nordlinger | 31,250 |
| Forrest R. Hairston | 4000 |
| Dixie D. Wolf | 10,000 |
| Michael W. Solley | 15,625 |
| Samuel P. McManus | 8,000 |
| Steven D. Marz | 8,000 |
| Anthony A. Gann | 30,000 |
| Gregory J. Clayton | 9,375 |
| J. Jeffrey and Vicki C. Irons | 1,600 |
| City Light Capital, LLC | 78,125 |
| Louis K. Sisco | 7,850 |
| Gregory K. Gum | 10,000 |
| E. Wayne Bonner | 10,000 |
| Thomas M. and Dale B. Griggs | 10,625 |
| Brindlee Capital, LLC | 31,250 |
| Webber Investments, LLC | 8,000 |
| Franklin Street Investments, LLC | 18,750 |
| John R. and Donna C. Coleman | 1,600 |

17

| | | | |
|---|---|---|---|
| Charles T. Houser | 7,850 | | |
| Prasada R. Bhavani K.D. Kakani | 3,850 | | |
| Robert E. and Eleanor B. Thurber | 15,625 | | |
| Lioce Investments, L.L.C. | 1,000 | | |
| **TOTAL** | **242,889** | **359,395** | **91,764** |

9034153.14

**IN WITNESS WHEREOF**, the parties have executed and delivered this Securities Purchase Agreement on the date first above written.

COMPANY:

ARXCEO CORPORATION

By: _____
     Name:  Donald J. Davidson
     Title:  President and Chief Executive Officer

PURCHASER:

JAPAN COMMUNICATIONS, INC.

By: _____
     Name:  Frank Seiji Sanda
     Title:  President and Chief Executive Officer

**IN WITNESS WHEREOF**, the parties have executed and delivered this Securities Purchase Agreement on the date first above written.

**COMPANY:**

**ARXCEO CORPORATION**

By:_____
    Name: Donald J. Davidson
    Title: President and Chief Executive Officer

**PURCHASER:**

**JAPAN COMMUNICATIONS, INC.**

By:_____
    Name: Frank Seiji Sanda
    Title: President and Chief Executive Officer

**SERIES A STOCKHOLDERS:**

**HRC, LLC**

By:_____
Name:
Title:

**LIOCE INVESTMENTS, LLC**

By:_____
Name:
Title:

**SHATAS PARTNERS, LTD.**

By:_____
Name:
Title:

3/183437.1

**REPRESENTATIVES:**

_____
Donald Davidson

_____
David Izatt

[Signature Page to Securities Purchase Agreement]

**IN WITNESS WHEREOF**, the parties have executed and delivered this Securities Purchase Agreement on the date first above written.

**COMPANY:**

**ARXCEO CORPORATION**

By:_____
    Name:  Donald J. Davidson
    Title:  President and Chief Executive Officer

**PURCHASER:**

**JAPAN COMMUNICATIONS, INC.**

By:_____
    Name:  Frank Seiji Sanda
    Title:  President and Chief Executive Officer

**SERIES A STOCKHOLDERS:**

HRC, LLC

By:_____
Name:  ROLAND WARREN
Title:  MANAGING MEMBER

**LIOCE INVESTMENTS, LLC**

By:_____
Name:
Title:

**SHATAS PARTNERS, LTD.**

By:_____
Name:
Title: